Jason Paul Voelker
Folsom State Prison
P.O. Box 950
Folsom, CA 95671 (USA)
Prisoner Id. #: V-62496

In propria persona

E-filing

**FILED**

MAR - 5 2008

**RICHARD W. WIEKING**
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT

## IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

CV 08        1285CW

| | |
|---|---|
| JASON PAUL VOELKER, | ) CASE No.: _____ |
| Petitioner, | ) |
| vs. | ) **PETITION FOR A FEDERAL (PR)** |
| | ) **WRIT OF HABEAS CORPUS** |
| M. C. KRAMER, Warden, et al., | ) **(28 U.S.C. Section 2254.)** |
| Respondent. | ) |

## PETITION FOR WRIT OF HABEAS CORPUS

# TABLE OF CONTENTS

|  | Page No. |
|---|---|
| **TABLE OF AUTHORITIES** | v |
| **PREFACE** | x |
| **PETITION** | 1 |
| **STATEMENT OF THE CASE** | 2 |
| **STATEMENT OF THE FACTS** | 4 |
| **GROUNDS FOR RELIEF** | 10 |
| **PRAYER FOR RELIEF** | 12 |
| **MEMORANDUM OF POINTS AND AUTHORITIES** | 13 |

**GROUND ONE:   PETITIONER'S   CONSTITUTIONALLY   PROTECTED RIGHT TO PRESENT A DEFENSE AND TESTIFY IN HIS OWN BEHALF WAS VIOLATED BY TRIAL COUNSEL WHEN COUNSEL PREJUDICIALLY FAILED TO CALL PETITIONER AS A WITNESS IN HIS OWN BEHALF.**

| | | Page No. |
|---|---|---|
| 1. | Introduction. | 13 |
| 2. | Standard of review. | 13 |
| 3. | Prejudice. | 22 |
| 4. | Conclusion. | 25 |

**GROUND TWO:   TRIAL   COUNSEL'S   *ADMITTED*   FAILURE   TO INTRODUCE EXCULPATORY EVIDENCE CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL; THUS, DENYING PETITIONER A FAIR TRIAL AND A RELIABLE JURY VERDICT IN VIOLATION OF HIS FOURTEENTH AMENDMENT RIGHTS.**

| | | Page No. |
|---|---|---|
| 1. | Introduction. | 25 |
| 2. | Standard of review. | 26 |
| 3. | Counsel's Admitted Failure to Introduce Material Phone Records into Evidence Resulted in Prejudice to Petitioner's Defense. | 27 |
| 4. | The Wrongful Impeachment of Defense Witness Raven Oliver. | 32 |
| 5. | Conclusion. | 36 |

**GROUND THREE:** CALIFORNIA HAS VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS TO DUE PROCESS AND FUNDAMENTAL FAIRNESS BECAUSE IT HAS ARBITRARILY REFUSED TO CONSIDER NEWLY DISCOVERED WITNESSES WHO IMPEACH THE PROSECUTION'S SOLE PERCIPIENT WITNESS AND PROVIDE EXCULPATORY EVIDENCE FOR PETITIONER.

| | | |
|---|---|---:|
| 1. | Introduction. | 37 |
| 2. | Karlan Brooks. | 40 |
| 3. | Zeph Carter. | 41 |
| 4. | The state courts' denied petitioner an evidentiary hearing in which petitioner would have presented the new witnesses. | 42 |
| 5. | Trial Counsel's failure to investigate denied petitioner's right to present readily available witnesses. | 45 |
| 6. | Conclusion. | 46 |

**GROUND FOUR:** THE TRIAL COURT COMMITTED PREJUDICIAL CONSTITUTIONAL ERROR WHEN IT FAILED TO INSTRUCT ON THE SPECIFIC INTENT ELEMENT REQUIRED FOR PETITIONER TO BE FOUND GUILTY OF AIDING AND ABETTING.

| | | |
|---|---|---:|
| 1. | Introduction. | 46 |
| 2. | Standards of review. | 47 |
| 3. | The trial court committed prejudicial error by failing to instruct the jury on the specific intent element required for petitioner to be found guilty of aiding and abetting. | 47 |
| 4. | The error was prejudicial under the *Brecht* Standard. | 51 |
| 5. | Conclusion. | 54 |

**GROUND FIVE:** CUMULATIVELY, THE ERRORS IN THIS CASE PREJUDICED PETITIONER'S RIGHTS TO DUE PROCESS, A FAIR TRIAL AND EFFECTIVE ASSISTANCE OF COUNSEL SUCH THAT REVERSAL OF THE CONVICTION IS COMPELLED.

| | | |
|---|---|---:|
| 1. | Introduction. | 54 |
| 2. | Conclusion. | 57 |

**GROUND SIX:      AS A MATTER OF LAW, THERE IS INSUFFICIENT EVIDENCE TO SUPPORT THE JURY'S FINDING OF *PERSONAL* INFLICTION OF GREAT BODILY INJURY.**

1.    Introduction.                                                                57

2.    There is insufficient evidence to support the determination
      that petitioner *personally* inflicted DiPrima's injuries.          57

3.    Conclusion.                                                                 62

**GROUND SEVEN:      IT WAS REVERSIBLE ERROR TO INSTRUCT THE JURY PURSUANT TO CALJIC No. 17.20 BECAUSE IT ALLOWED THE JURY TO FIND PETITIONER GUILTY WITHOUT MEETING THE STATUTORILY REQUIRED ELEMENTS OF PENAL CODE § 12022.7 IN VIOLATION OF PETITIONER'S RIGHTS TO DUE PROCESS OF LAW UNDER THE FEDERAL CONSTITUTION.**

1.    Introduction.                                                               62

2.    CALJIC No. 17.20 is unconstitutional.                               63

3.    The erroneous giving of CALJIC No. 17.20 allowed
      petitioner's jury to find liability in the absence of proof
      that he *personally* inflicted the great bodily injury.          65

4.    The instruction's omission of a material element of the
      enhancement lowered the prosecution's burden of proof and
      deprived petitioner of his federal rights to due process of law.     67

5.    The erroneous giving of CALJIC No. 17.20 expanded liability
      and, thus, violated the Rule of Lenity.                          68

6.    The error was prejudicial because it is not possible to determine
      whether the jury relied on the erroneous legal theory.          68

7.    The aiding and abetting instructions complicated the erroneous
      giving of CALJIC No. 17.20.                                      69

8.    As the error went to an enhancement that increases the penalty for a
      crime beyond the statutory maximum, it must be judged under the
      standard of *Brecht v. Abrahamson*.                              70

9.    Because *People v. Corona* misstates and misinterprets the statute and
      legislative intent, it deprived petitioner of his right to due process of law
      and to proof beyond a reasonable doubt under the Federal Constitution.    71

10. *Corona* impermissibly lowers the prosecution's burden of proof by allowing liability for personal infliction of great bodily injury on the speculative basis of what "could have" caused the injury.    71

11. As the error affected the reasonable doubt standard, it is reversible *per se*.    73

12. The second basis allows the jury to substitute a knowledge finding for a finding that petitioner personally performed the act causing the victim's injuries.    74

13. The error was prejudicial under the *Brecht* Standard.    75

14. Conclusion.    75

**GROUND EIGHT: THE PERSONAL INFLICTION OF GREAT BODILY INJURY ENHANCEMENT WAS WRONGLY REINSTATED.**

1. Introduction.    76

**CONCLUSION**    79

**VERIFICATION**    80

**PROOF OF SERVICE**    *attached*

# TABLE OF AUTHORITIES

**FEDERAL CASES**

Page No.

Alcala v. Woodford, (9th Cir. 2003) 334 F.3d 862 — 34

Apprendi v. New Jersey, (2000) 530 U.S. 466 — 67

Bifulco v. United States, (1980) 447 U.S. 381 — 68

Boyde v. California, (1990) 494 U.S. 370 — 50, 51

Brecht v. Abrahamson, (1993) 507 U.S. 619 — 51, 55, 57, 70

Brown v Myers, (9th Cir. 1998) 137 F.3d 1154 — 16, 56

Burks v. United States, (1978) 47 U.S. 1 — 50, 68

Cabana v. Bullock, (1986) 474 U.S. 376 — 64

California v. Roy, (1996) 519 U.S. 2 — 49, 51, 54

Carella v. California, (1989) 491 U.S. 263 — 52, 53

Chambers v. State of Florida, (1940) 309 U.S. 227 — 42

Chambers v. Mississippi, (1973) 410 US 284 — 44, 54

Cooper v. Fitzharris, (9th Cir. 1978) 586 F.2d 1325 — 56-57

Delgado v. Lewis, (9th Cir. 2000) 223 F.3d 976 — 46

Duncan v. Louisiana, (1968) 391 U.S. 145 — 52

Earp v. Ornoski, (9th Cir. 2005) 431 F.3d 1158 — 39, 43, 45

Estelle v. McGuire, (1991) 502 U.S. 62 — 47

Fong Foo v. United States, (1962) 369 U.S. 141 — 77

Gerlaugh v. Stewart, (9th Cir.) 129 F.3d 1043 — 54

Gui v. INS, (9th Cir. 2002) 280 F.3d 1217 — 20

Hardnett v. Marshall, (9th Cir. 1994) 25 F.3d 875 — 57

Hart v. Gomez, (9th Cir. 1999) 174 F.3d 1067 — 26, 31, 33, 34, 36

|  | Page No. |
|---|---|
| Herrera v. Collins, (1993) 506 U.S. 390 | 37, 38 |
| Hicks v. Oklahoma, (1980) 447 U.S. 343 | 68 |
| In re Winship, (1970) 97 U.S. 358 | 62, 70 |
| Jackson v. Virginia, (1979) 443 U.S. 307 | 38, 62 |
| Keating v. Hood, (2001) 191 F.3d 1053 | 50, 69 |
| Keeney v. Tamayo-Reyes, (1992) 504 U.S. 1 | 37 |
| Kimmelman v. Morrison, (1986) 477 U.S. 385 | 26 |
| Lewis v. Mayle, (9th Cir. 2004) 391 F.3d 989 | 46 |
| Lord v. Wood, (9th Cir. 1999) 184 F.3d 1083 | 26 |
| Martinez v. Borg, (9th Cir. 1991) 937 F.2d 422 | 49 |
| Miller-El v. Cockrell, (2003) 537 U.S. 322 | 21 |
| Miranda v. Arizona, (1966) 384 U.S. 436 | 17, 18 |
| McQuown v. McCartney, (9th Cir. 1986) 795 F.2d 807 | 4 |
| Morrissey v. Brewer, (1972) 408 U.S. 471 | 42 |
| O'Neal v. McAninch, (1995) 513 U.S. 432 | 55, 70 |
| Rock v. Arkansas, (1987) 483 U.S. 44 | 13 |
| Roy v. Gomez, (9th Cir. 1996) 81 F.3d 863 | 49 |
| Sanabria v. United States, (1978) 437 U.S. 54 | 77 |
| Sandstrom v. Montana, (1979) 442 U.S. 510 | 50, 53 |
| Smith v. Stewart, (9th Cir. 1998) 140 F.3d 1263 | 31 |
| Strickland v. Washington, (1984) 466 U.S. 668 | 13, 14, 16, 21, 22, 26, 31, 36 |
| Sullivan v. Louisiana, (1993) 508 U.S. 275 | 52, 73, 75 |

|  | Page No. |
|---|---|
| Taylor v. Duncan, (9th Cir. 1998) 158 F.3d 449 | 56 |
| Taylor v. Maddox, (9th Cir, 2004) 366 F.3d 992 | 4, 16, 19, 20, 26 |
| Tome v. United States, (1995) 513 U.S. 150 | 67, 72 |
| Townsend v. Sain, (1963) 372 U.S. 293 | 37 |
| Tucker v. Prelesnik, (2000) 181 F.3d 747 | 35 |
| Turner v. Duncan, (9th Cir. 1998) 158 F.3d 449 | 26 |
| United States v. Bass, (1971) 404 U.S. 336 | 71 |
| United States v. Dahlstrum, (9th Cir. 1981) 655 F.2d 971 | 77 |
| United States v. Dunlap, (8th Cir. 1994) 28 F.3d 823 | 61, 66 |
| United States v. Gaudin, (1995) 515 U.S. 506 | 48, 51, 52 |
| United States v. Giampa, (3rd Cir. 1985) 758 F.2d 928 | 77 |
| United States v. Joelson, (9th Cir. 1993) 7 F.3d 174 | 13, 14 |
| United States v. Martin Linen Supply Co., (1977) 430 U.S. 564 | 77 |
| United States v. Rahseparian, (10th Cir. 2000) 231 F.3d 1257 | 61, 6 |
| United States v. Salerno, (1992) 505 U.S. 317 | 67 |
| United States v. Scott, (1978) 437 U.S. 82 | 77 |
| United States v. Teague, (11th Cir. 1992) 953 F.2d 1525 | 13 |
| United States v. Tucker, (9th Cir. 1983) 716 F.2d 576 | 26, 34 |
| United States v. Valenzuela-Bernal, (1982) 458 U.S. 858 | 45 |
| Williams v. Taylor, (2000) 529 U.S. 362 | 15 |
| Winans v. Bowen, (9th Cir. 1988) 853 F.2d 643 | 20 |
| Woodford v. Visciotti, (2002) 537 U.S. 19 | 14 |

**STATE CASES**                                                    Page No.

People v. Beeman, (1984) 35 Cal.3d 547                            48, 49, 51

People v. Bland, (2002) 28 Cal.4th 313                                  59

People v. Cole (1982) 31 Cal.3d 568                                 58, 63

People v. Corona, (1989) 213 Cal.App.3d 589                    64, 66, 71, 72

People v. Gutierrez, (1996) 46 Cal.App.4th 804                          59

People v. Hairgrove, (1976) 18 Cal.App.3d 606                           43

Romadka v. Hodge, (1991) 232 Cal.App.3d 1231                            78

People v. Marshall, (1997) 15 Cal.4th 1                                 43

People v. Martinez, (1984) 36 Cal.3d 816                            39, 45

People v. Rodriguez, (1999) 69 Cal. App. 4th 341                        62

People v. Voelker, (2005) WL 299581 (Nov. 9, 2005, A108798 [nonpub. opn.])    3

**CONSTITUTION**

5th Amendment                                                       *Passim*

6th Amendment                                                       *Passim*

8th Amendment                                                       *Passim*

14th Amendment                                                      *Passim*

**FEDERAL STATUTES**

28 U.S.C. § 2254                                                         1

28 U.S.C. § 2254 (b)                                                     4

28 U.S.C. § 2254 (d)(1)                                          15, 26, 58

28 U.S.C. § 2254 (d)(2)                                       4, 15, 26, 58

28 U.S.C. § 2254 (e)(1)                                              4, 26

**STATE STATUTES**

California Penal Code § 1181(8)                                              38, 39

California Penal Code §31                                                         47

California Penal Code § 211/213 (a)(1)(A)                                          1

California Penal Code § 236                                                        1

California Penal Code § 245 (a)(1)                                                 1

California Penal Code § 12022.1                                                   76

California Penal Code § 12022.7 (a)          1, 58, 62, 63, 65, 69, 70, 73, 74, 75, 76, 78

**CALIFORNIA JURY INSTRUCTIONS ("CALJIC")**

CALJIC No. 2.13.1                                                                 18

CALJIC No. 3.00                                                               48, 69

CALJIC No. 3.01                                                               47, 50

CALJIC No. 3.03                                                               48, 69

CALJIC No. 4.51                                                               48, 69

CALJIC No. 17.20                                        11, 62, 63, 65, 68, 69, 75, 76

**PREFACE**

Commenting on the overwhelming flow of habeas corpus petitions that are filed within America's judicial system, a wise man once said: "[i]t must prejudice the occasional meritorious application to be buried in a flood of worthless ones. He who must search a haystack for a needle is likely to end up with the attitude that the needle is not worth the search." (*Brown v. Allen*, 344 U.S. 44, 537 (1953) opn. Justice Jackson.) Indeed, Justice Jackson made a significant point——prophetic, if I may say so. Today, many habeas petitions simply contain a route of many roads leading from nowhere to nothing. Some Petitioners have forgotten that habeas is a remedy to right a wrong. It is not a lottery ticket or a device for investigating possible claims, but a means of vindicating actual claims. Inevitably, the sheer volumes of frivolous petitions have, in my humble opinion, necessarily precipitated a chilling effect on the ones that are potentially legitimate.

As a young child, I remember being told an old tale about a little boy who would often cry that he had seen a wolf. Each time this boy cried the local townsmen would run to his aid, only to find that the little boy was being deceitful——there was indeed no wolf to be found. Most of us remember how this story ended. Unfortunately, many prisoners must have forgotten this old fable. Their forgetfulness, however, not only dooms their claims, but it condemns the rest of us as well——leading to inconsistent rulings, needless re-litigation of the same issues, wasted court time, and most tragically, every now and again, meritorious claims are lost without ever being adjudicated at all.

So how, then, does a sincere petitioner, without the aid of an attorney, convince an already skeptical court that his "needle is worth the search?" I do not begin to know the answer to this question, but what I do know is that the few sincere should not be discouraged by the many who make this burden that much harder. I must not give up. I must lift my pen and passionately wield it. And then, God willing, I might catch the eye of a diligent jurist.

Old Folsom, California
February 27th, 2008

J.P.V.

Jason Paul Voelker
Folsom State Prison
P.O. Box 950
Folsom, CA 95671 (USA)
Prisoner Id. #: V-62496

In propria persona

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASON PAUL VOELKER,<br><br>             Petitioner,<br><br>    vs.<br><br>M. C. KRAMER, Warden, et al.,<br><br>             Respondent. | CASE No.: _____<br><br>**28 U.S.C. § 2254 PETITION**<br><br>**(Evidentiary Hearing and Appointment<br>of Counsel Requested.)** |

TO:    THE HONORABLE PRESIDING JUDGE OF THE UNITED STATES
DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA.

I, Jason Paul Voelker, petitioner in the above-entitled cause (hereinafter "petitioner"), appeal to this Honorable Court for a Writ of Habeas Corpus by a person in state custody pursuant to the United States Constitution, 28 United States Code section 2254, and all other applicable federal law. The reasons for why this petition should be granted are set forth within.

I.

Petitioner Jason Paul Voelker is confined in violation of the Constitution by the Director of the California Department of Corrections & Rehabilitation and Mathew Kramer, Warden of Folsom State Prison (hereinafter "respondent").    This Petition arises from the judgment of conviction rendered December 22, 2004, in San Rafael, California, in <u>People v. Jason Voelker</u>, Marin County Superior Court Case No.: SC132406A.

II.

On February 26, 2004, petitioner was convicted in a jury trial of Penal Code § 211/213, subdivision (a)(1)(A), robbery in concert (count 1)[1], § 245, subdivision (a)(1), assault by means likely to cause great bodily injury (count 2) and § 236 false imprisonment (count 3).  As to counts 1 and 2, pursuant to § 12022.7, subdivision (a), it was alleged that petitioner personally inflicted great bodily injury upon Damian DiPrima.

III.

On July 30, 2004, the section 12022.7 great bodily injury enhancements were dismissed pursuant to the prosecution's motion.  (RT 1374.)  However, finding that a mistake had been made, the trial court reinstated these enhancements and instead, struck the "on bail enhancement."  (CT 482, 548; RT 1384-1389.) (Discussed <u>post</u> VIII.)

IV.

On December 22, 2004, probation was denied and petitioner was sentenced to the mid-term of 6 years on count 1.  The sentences on counts 2 and 3 were stayed.  A consecutive term of 3 years was imposed for the great bodily injury enhancement.  Thus, petitioner's total sentence in the instant case was 9 years.  A 2 year 8-month sentence in another case (case no. SC124701A) was ordered to run

---

1 All further statutory references are to the California Penal Code unless otherwise indicated.

Voelker's Petition for Writ of Habeas Corpus                    -2-

consecutive to the sentence in the instant case. (CT 550-552; RT 1408-1410.)  The First District Court of Appeal affirmed the judgment in a non-published opinion.  (People v. Voelker 2005 WL 299581 (Nov. 9, 2005, A108798 [nonpub. opn].))    On January 18, 2006 the California Supreme Court declined discretionary review.

V.

On April 4, 2006, petitioner filed a petition for a writ of habeas corpus in the Marin County Superior Court.  On August 4, 2006, the original trial judge without any in-court proceedings summarily denied the petition.

VI.

On September 19, 2006, petitioner challenged the lower court's ruling in a petition for habeas corpus relief to the California First District Court of Appeal.  The appellate court denied the petition on October 12, 2006.  The California Supreme Court subsequently granted petitioner's petition for review.  On Review, the California Supreme Court denied all of petitioner's habeas claims except for ground II (trial counsel's prejudicial deficiency in failing to call petitioner as a witness in his own behalf), and remanded this single ground to the Appellate Court with instructions to issue an order to show cause, returnable upon the Marin County Superior Court.  (In re Voelker, (2007) DJDAR 201.)  Ground II was briefed, an evidentiary hearing was conducted, and the same judge who had previously denied the past petition again denied it.

VII.

Meanwhile, petitioner filed a supplemental pleading in the Marin County Court, in which he claimed, inter alia, that it was error for his jury to be guided by aiding and abetting instructions in determining whether or not he had personally inflicted great bodily injury.  In response to that pleading the Marin County Superior Court issued an order stating that, "Petitioner has made a *prima*

1   *facie* showing" on the issues. (2/20/07 Marin County Super. Court Order at p. 1; Case No.

2   SC152013A.) The court then summarily denied the petition (4/4/07 Marin County Super. Ct. Order.)

3                                                                VIII.

4        Petitioner then filed a new consolidated habeas petition in the First District Court of Appeal;

5   the petition was summarily denied on the merits.  The California Supreme Court declined to grant

6   discretionary review. However, Kennard, J., was of the opinion the petition should have been granted.

7                                                                 IX.

8        This current petition is a timely federal petition for writ of habeas corpus. The current issues

9   are being presented to this Honorable Court pursuant to this Court's jurisdiction under 28 U.S.C. §

10  2254.  Petitioner *has exhausted all state remedies*, has met the AEDPA's timeliness provisions, and

11  has filed no previous pleadings in Federal Court. (McQuown v. McCartney (9th Cir. 1986) 795 F.2d

12  807, 809; 28 U.S.C. § 2254(b).)

13                                                                 X.

14                                         **STATEMENT OF THE FACTS**[2]

15       Late on the night of November 7, 2003, petitioner met Damian DiPrima in a bar in San

16  Anselmo——Matteucci's.  At about 2:30 a.m., DiPrima drove petitioner to petitioner's third-floor

17  apartment in San Rafael.  DiPrima may have gone there to buy and/or smoke marijuana.  Soon after

18  arriving, DiPrima was attacked, severely beaten, and robbed.   He lost his driver's license, keys,

19

20

21  _____

22  [2] This statement of facts is a summary taken from the Reporter's ("RT") Transcript of the trial and
    sentencing proceedings. Petitioner asserts that, based on extrinsic evidence——evidence that was
23  brought forth in subsequent state collateral proceedings——the instant federal proceeding will
    demonstrate that the determination of facts in the unpublished opinion of the California Court of
24  Appeal, First Appellate District, is unreasonable.  (28 U.S.C. § 2254 (d)(2).)  Petitioner further
    asserts that the petition, in *passim*, presents clear and convincing evidence that demonstrates that
25  the state-court findings are in error.  (28 U.S.C § 2254(e)(1); Taylor v. Maddox (9th Cir, 2004) 366
    F.3d 992, 1000.)

1  cellphone, money clip, watch, necklace, shoes, and all his clothes except his pants and underpants (in

2  which he had defecated during the attack).  A stomping to the top of the head opened a wound that

3  required five staples.  He escaped the assault by running onto the balcony and jumping some thirty

4  feet to the ground below.

5      Two of the assailants were black males.  One was referred to at trial as "Bob Marley" because

6  he was wearing a hat with a Bob Marley patch on it.  The other black male was referred to as the

7  "mulatto guy."[3]   Petitioner was arrested the next day.    The two black assailants were not

8  apprehended.

9

10      According to the prosecution, petitioner acted in coordination with the two black men. (RT

11  1258, 1262, 1263; see RT 1324 [petitioner "orchestrated this robbery and violent attack with his

12  friends."].)  The prosecution argued that petitioner lured DiPrima into the apartment and participated

13  in the subsequent attack by, at a minimum, keeping DiPrima in a chokehold from behind while the

14  two black males beat and robbed him.  (RT 1268, 1324.)

15      The defense acknowledged that petitioner came to the apartment with DiPrima just before the

16  attack but argued that petitioner played no role in it.  Defense counsel readily acknowledged that

17  DiPrima had been beaten but reminded the jury that the doctor testified that there was no medical

18  indication or evidence that DiPrima had been choked by petitioner.  (RT 367-368.)  Under the

19  defense theory, DiPrima, the two black males, and petitioner left the bar for petitioner's apartment

20  (RT 1291, 1293-1294, 1296, 1303) to "party."  (RT 1309 ["They went up there to party."].)  While

21  petitioner was on the phone with his ex-girlfriend, the two blacks attacked DiPrima over DiPrima's

22  use of the word "nigga."  (See RT 220 [defense counsel's opening statement: "... Jason Voelker

23

24

25  3 For simplicity, and because the matter is not in dispute, petitioner will also refer to the two
   assailants as Bob Marley and the mulatto guy, as the parties did at trial.

shouldn't have to pay for what two other people did. That's not Jason Voelker's responsibility."]; RT 1314 [defense counsel's closing argument: DiPrima was beaten, but petitioner did not do it].) When the attack began, petitioner was in the back room on the phone with his ex-girlfriend, Raven Oliver, when the black males attacked DiPrima when DiPrima used racial slander with the two black males.[4] (RT 223; RT 1310, 1316-1317.)

Defense counsel asserted that DiPrima was falsely accusing petitioner because petitioner was the only one being charged and was "the easiest person to get...." (RT 1315.)

Videotape from a 7-Eleven convenience store near petitioner's apartment established that petitioner and DiPrima were in the store together at 2:15 a.m. (People's Exh. 34: RT 609.) At 2:39 and 2:40 a.m., the police received two 911 calls about the crime from neighbors. The second call referred to DiPrima's jump from the balcony. The caller stated that someone had fallen off of a deck and it appeared that one person was attempting to assist the other. The police arrived at the building at about 2:45 a.m. No one was in the apartment. From a cursory check, the police concluded that there were no definitive signs of a crime, although they did see an overturned table and chairs in the living room and dried blood on one wall. After arresting petitioner the next day, the police searched the apartment and found DiPrima's ripped necklace laying on the floor but non of his other belongings were located. At this time, the police also recovered the "Bob Marley" hat outside the apartment building.

In his opening statement and closing argument, defense counsel stressed that petitioner was on the telephone with his ex-girlfriend during the attack. (RT 223, 1304, 1306, 1310, 1315.) Asserting that the attack on DiPrima was occurring while petitioner was on the phone, defense counsel argued

---

[4] DiPrima testified that he uses the "N" word loosely, as a "term of endearment." (CT 19——Clerk's Transcript.)

that petitioner could not have been assaulting DiPrima while petitioner was in the other room talking on the phone with his ex-girlfriend.    (RT 1307-1308, 1316-1317.)    The defense produced a documentary indication of the calls in the form of Oliver's cellphone bill (CT 431-432), which was marked as defense Exhibit C. (RT 1060-1064.) The bill shows calls from the same number (415-459-7063, which Oliver said was petitioner's——RT 1065) at 2:24 and 2:36 (CT 431-432.) However, Defense Exhibit C (Raven Oliver's phone bill) was not admitted into evidence because defense counsel admittedly failed to submit the phone records into evidence. (RT 1163; CT 304.)

On Monday, February 23, 2004, as the defense was nearing an end, the court sua sponte asked if petitioner would be the last defense witness and how long direct examination would be.    Trial counsel informed the court that "yes," petitioner would be testifying and that petitioner's testimony would take about an hour. (RT 1198.) The court then recessed for the day.   The very next morning trial counsel filed the defense's requested CALJIC instructions.   The requested instructions were explicitly constructed for the purpose of placing petitioner on the witness stand. (CT 310.) However, the next morning trial counsel summarily rested the case without calling petitioner as a witness in his own behalf. (Discussed post I.)

In her closing argument, the prosecutor discredited the defense by telling the jury that there were no phone records establishing that petitioner was actually on the phone.  (See RT 1319 [prosecutor's closing argument: "there is absolutely no certified record or attested to phone bill that will tell you that the phone call was actually made."]; RT 1325 ["DiPrima told you that when he jumped off that balcony, the defendant was still present in that apartment. It makes no sense to believe that he was supposedly on the phone with his girlfriend ... it makes no sense to believe that he was actually on the phone...."]

During the first half-hour of deliberations, the jury sent a note to the court requesting to see the phone records that would prove whether or not petitioner was in fact on the phone. After conferring with counsel, the trial judge sent a note informing the jury that there were, in fact, no phone records for them to view. The jury's request to see the phone records was ultimately denied because defense counsel failed to subpoena the certified phone records in time for the trial. (Discussed post II.)

Another much-discussed issue in the trial was DiPrima's use of the word "nigga." According to the prosecution, DiPrima used the racial term affectionately with petitioner (who is white) while asking him to move over so that DiPrima could buy a drink at the bar. "Bob Marley" was also at the bar, and became offended. DiPrima apologized. (RT 1260-1261.) According to the defense, DiPrima used the racially charged word not in the bar but back at the apartment. The defense further asserted that the racial slander is what precipitated the two black males attacking DiPrima in petitioner's apartment while petitioner was in the other room talking on the phone with his ex-girlfriend, Raven Oliver. (RT 1309, 1314-15.)

## PROSECUTION'S CLOSING STATEMENTS

The prosecution argued that the petitioner and other suspects hatched and calculated a plan to attack and rob DiPrima after the 'N' word incident. (RT 1260-1263.) She argued that the suspects ambushed DiPrima within seconds of entering the apartment and that petitioner was present during the entire time. (RT 1267.) She characterized petitioner's role by saying, "everything goes back to [Petitioner] Voelker——his idea, his plan, his friends, his apartment." (RT 1282.) She emphasized that the defense presented no certified phone records to show that a phone call actually occurred from petitioner's apartment to Oliver. (RT 1319.) The prosecutor repeatedly argued that it made no sense that petitioner would be on the phone with Oliver during the assault and attacked Oliver's credibility.

(RT 1325, 1319.)  The prosecutor also informed the jury that they could, in any event, find petitioner guilty as an aider and abettor.  (Discussed <u>post</u> IV.)

### DEFENDANT'S CLOSING STATEMENT

The defense attorney argued that the facts showed no plan.  It made no sense to plan out an attack that wouldn't work unless DiPrima came to the apartment——a complete uncertainty.  (RT 1292.)  It made no sense for the petitioner to use DiPrima's phone if he was going to rob DiPrima a short time later.  (RT 1304.)  The defense argued that DiPrima went to the apartment with everyone and that the 'N' word incident occurred at the apartment at which time the argument began that led to the fight.  (RT 1307, 1309.)  The defense attorney reminded the jury that there was no medical evidence of a choke and argued that if the jury believed DiPrima that they would have to disbelieve the police, the investigators, Darko and DiPrima's girlfriend, Melinda Swanson.  (RT 1306.)  The defense proffered that petitioner was the one that said, "he's cool," referring to DiPrima and that petitioner could not be choking DiPrima if petitioner was on the phone with Raven Oliver during the assault.  (RT 1310, 1316-1317.)

### JURY'S DELIBERATION

During the first half-hour of deliberations, the jury sent a note to the court requesting to see the phone records that would prove whether or not petitioner was in fact on the phone at the time of the assault.  After conferring with counsel, the trial judge sent a note informing the jury that there were, in fact, no phone records for them to see.  The jury's request to see the phone records was ultimately denied because defense counsel negligently failed to subpoena the certified phone records in time for the trial.  (Discussed <u>post</u> II.)  Shortly thereafter the jury reached a guilty verdict on all counts.

## XI.

Petitioner has no other plain, speedy or adequate remedy at law in that the present issues are only fully reviewable by a consideration of the facts presented in this federal petition for writ of habeas corpus.

## XII.

In support of this petition, petitioner relies upon the petition, the supporting memorandum of law, the record on appeal and the Exhibit portion attached, which are incorporated herein by reference.

## XIII.

Petitioner is currently unlawfully incarcerated in violation of the United States Constitution and confined at Folsom State Prison in Represa, California, pursuant to a judgment pronounced by the Marin County Superior Court.

## XIV.

### **CONTENTIONS**

This Petition is based upon the following grounds:

**GROUND ONE:**    Petitioner's constitutionally protected right to present a defense and testify in his own behalf was violated by trial counsel when counsel prejudicially failed to call petitioner as a witness in his own defense;

**GROUND TWO:**    Trial counsel's admitted failure to introduce into evidence phone records that would have corroborated petitioner's defense denied petitioner the right to the effective assistance of counsel, in violation of clearly established Federal law, as determined by the Supreme Court of the United States;

**GROUND THREE:** California's denial of petitioner's right to present newly discovered evidence that establishes his innocence violated petitioner's constitutional right to equal protection, due process and fundamental fairness under the United States Constitution;

**GROUND FOUR:**    The trial court committed prejudicial constitutional error when it failed to instruct on the specific intent element required for petitioner to be found guilty of aiding and abetting.

**GROUND FIVE:**    Cumulatively, the errors in this case prejudiced petitioner's rights to due process, a fair trial and effective assistance of counsel such that reversal of his conviction is compelled; furthermore, trial counsel has conceded to rendering ineffective assistance of counsel;

**GROUND SIX:**    There is insufficient evidence to support the jury's finding of *personal* infliction of great bodily injury;

**GROUND SEVEN:** The trial court committed prejudicial constitutional error when it instructed the Jury with aiding & abetting instructions and CALJIC No. 17.20 regarding personal infliction of great bodily injury as a result of a group beating; thus, lowering the prosecutions burden by omitting an element of the crime;

**GROUND EIGHT:** The infliction of great bodily injury enhancement was wrongly reinstated.

Due to the above, petitioner's imprisonment is in violation of his Federal Constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

**WHEREFORE**, petitioner prays that the Court grant the following relief:

1. Order that the Warden of Folsom State Prison, at Folsom, California, and the California Department of Corrections **show cause** why this Court should not vacate the judgment and sentence in Marin County Superior Court No.: SC132406A;

2. Order Respondent to lodge with this Court all state proceedings, and the record on appeal in People v. Jason Voelker, A108798;

3. Order an evidentiary hearing so that the Court may corroborate petitioner's claims and resolve any possible conflicts in evidence;

4. Appoint counsel to represent petitioner in this matter, and if appropriate, afford counsel the opportunity to invoke the Court's processes to supplement/amend the current petition in a way that protects petitioner's constitutional rights;

5. Issue a Writ of Habeas Corpus, vacating petitioner's unconstitutional conviction;

6. Order any and all relief that this Court deems just and proper.

Your petitioner,

Dated: 3-1-08

Jason Paul Voelker
California State Prison, Folsom
P.O. Box 950
Folsom, CA 95763
Prison I.D. V-62496

In propria persona

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION

**GROUND ONE:    PETITIONER'S CONSTITUTIONALLY PROTECTED RIGHT TO PRESENT A DEFENSE AND TESTIFY IN HIS OWN BEHALF WAS VIOLATED BY TRIAL COUNSEL WHEN COUNSEL PREJUDICIALLY FAILED TO CALL PETITIONER AS A WITNESS IN HIS OWN BEHALF.**

### (1).    Introduction

Defense Attorney James Wall denied petitioner's constitutional right to *present a defense* and testify in his own behalf.  As a result, petitioner's rights to the effective assistance of counsel, due process, a fair and reliable trial, and his Fifth, Sixth, and Fourteenth Amendments to the United States Constitution were violated.

### (2).    Standard of review

A defendant's right to testify is a personal right of fundamental dimension.   (Rock v. Arkansas, (1987) 483 U.S. 44, 51-53.)  While defense counsel has power to control proceedings on behalf of a defendant, that power may not be exercised to deprive the defendant of the right to testify in ones own defense.   However, if a defendant is denied his right to testify by defense counsel he must seek relief, if any is due, by showing ineffective assistance of counsel.  (United States v. Joelson, (9th Cir. 1993) 7 F.3d 174, 179 [When the record before the court is insufficient to evaluate a claim of ineffective assistance of counsel regarding counsel's refusal to allow his client to testify, a petitioner may raise these claims in a collateral proceeding in order to develop a record regarding his attorney's failure].)

In United States v. Teague, (11th Cir. 1992) 953 F.2d 1525, the court held that "a criminal defendant has a fundamental constitutional right to testify in his or her own behalf at trial.  This right is personal to the defendant and cannot be waived either by the trial court or by defense counsel."  Id. at 1532.  It was also held that ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, is a proper framework in which to address a claim in which petitioner's right to testify was

1    violated, not by the government, or the trial court, but by his own attorney. Teague, at 1534; accord

2    Joelson, supra, at p. 179

3        In Strickland v. Washington 466 U.S. 668, the United States Supreme Court outlined the

4    requirements for a claim of ineffective assistance of counsel. This requires showing that counsel's

5    performance was deficient and requires a showing that counsel was not functioning as the "counsel"

6    guaranteed by the Sixth Amendment.    Second, the defendant must show that the deficient

7    performance prejudiced the defense. This requires showing that counsel's errors were so serious as to

8    deprive the defendant of a fair trial whose result is reliable, Id. at p. 687.

9        In the California state courts, petitioner argued that he was denied the right to effective

10   assistance of counsel because his attorney prejudicially failed to call petitioner as a witness in his own

11   defense. The California Supreme Court granted review and remanded to the Marin County Superior

12   Court for factual findings on this particular issue. (In re Voelker (2007) DJDAR 201.) The Marin

13   County Superior Court denied habeas relief after finding that petitioner had failed to prove by a

14   "preponderance of the evidence" that he had been denied his constitutional right to the effective

15   assistance of counsel. (See Exhibit D [6/27/07 Marin County Superior Court order].) The California

16   Supreme Court declined to review. (Kennard, J., dissenting.) This federal petition follows.

17       Petitioner understands that this Court may not grant a petition for writ of habeas corpus by a

18   person in state custody with respect to any claim that was properly adjudicated on the merits in state

19   court unless it (1) "resulted in a decision that was contrary to, or involved an unreasonable application

20   of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2)

21   "resulted in a decision that was based on an unreasonable determination of the facts in light of the

22   evidence presented in the State court proceeding."   28 U.S.C. § 2254(d); Woodford v. Visciotti

23   (2002) 537 U.S. 19, 21.

1      "[U]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court

2   arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the

3   state court decides a case differently than [the Supreme] Court has on a set of materially

4   indistinguishable facts." <u>Williams v. Taylor</u> (2000) 529 U.S. 362, 412-413.  And "[a] state court

5   decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state

6   court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." <u>Id</u>. at 405.

7   For example, a habeas petition could be granted if, in spite of the rule in <u>Strickland v. Washington</u>

8   466 U.S. 688, 694 (1984)——that a petitioner urging ineffective assistance of counsel need only

9   show a "reasonable probability" of prejudice——a state court required the petitioner to show

10  prejudice by a preponderance of the evidence. <u>Williams</u>, 529 U.S. at 405-406.  When a state court

11  commits such an error, "a federal court [is] unconstrained by § 2254 (d)(1)," <u>Id</u>. at 406, and *de novo*

12  review is appropriate.

13      In the instant case, the state courts required petitioner to prove his ineffective assistance of

14  counsel claim by a *preponderance of the evidence*; therefore, the state courts' determination on this

15  issue resulted in a decision that was contrary to clearly established Federal law, as determined by the

16  Supreme Court of the United States. (<u>Williams</u>, <u>supra</u>, 529 U.S. at 405-406.)  Moreover, because the

17  state courts plainly misstated and omitted key aspects of the record, and those misapprehensions went

18  to material factual issues that were central to petitioner's claims, those misapprehensions fatally

19  undermined the fact-finding process, rendering the resulting factual determination unreasonable. (28

20  U.S.C. 2254(d)(1)&(2).)

21      Here, petitioner is presenting a constitutional challenge to the lower court's findings based on

22  its decision that was contrary to, and involved an unreasonable application of, clearly established

23  federal law, as determined by the Supreme Court of the United States.  Petitioner's claim presents

several interesting sets of considerations. No doubt the simplest is the situation where the state courts used the incorrect legal standard——preponderance of the evidence——in adjudicating petitioner's ineffective assistance of counsel claim. (See e.g., <u>Brown v Myers</u>, (9th Cir. 1998) 137 F.3d 1154, 1156 [emphasizing that a habeas petitioner "does not have to show by a preponderance of the evidence that the result in the case would have been different but for counsel's errors," but rather that "counsel's errors undermine confidence in the outcome." <u>Citing</u> <u>Strickland v. Washington</u>, 466 U.S. 668].)

Here, the state courts' determination that petitioner did not prove by a preponderance of the evidence that petitioner was denied the effective assistance of counsel was contrary to the rule set forth in <u>Strickland</u>, and thus contrary to Supreme Court precedent.

Aside from being contrary, the state courts' determinations are unreasonable because they should have made certain findings of fact but neglected to do so. In this situation, the California courts' factual determinations are unreasonable and there is nothing to which the presumption of correctness can attach. (<u>See</u>, e.g., <u>Taylor v. Maddox</u> (9th Cir. 2004) 336 F.3d 992, 1001, [where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the factual determination unreasonable].) As petitioner will show, the state court outright misconstrued the record in making its findings, and that misunderstanding went to several material facts that were central to petitioner's claim.

In sum, the constitutional defects in the state courts' fact-finding process——failure to use the correct legal standard and failure to consider and weigh relevant evidence that was properly presented

1   to the lower court and made part of the record——requires that this Court invoke a *de novo* standard

2   of review in adjudicating the instant claim.

3          In presenting the instant ineffective assistance of counsel claim, petitioner is mindful that the

4   lower court was not required to address and jot down every title of proof presented to it. To fatally

5   undermine the fact finding process, and render the resulting finding unreliable, the overlooked

6   evidence must be highly probative and central to petitioner's claim. In other words, the evidence in

7   question must be sufficient to support petitioner's claim when considered in context of the full record

8   bearing on the issue presented in the habeas petition. With these principals in mind, petitioner next

9   proceeds to the merits of his claim that he was prejudicially denied his fundamental right to testify

10  due to Trial Counsel Wall's failure to call petitioner as a witness in his own behalf.

11         During the trial, the defense presented evidence on February 20 and 23, 2004. (CT 302-303,

12  307-308.) After the last of the subpoenaed defense witnesses had testified on February 23, the trial

13  court announced that "we've broken for the day because [the] defense hasn't decided whether to call

14  Mr. Voelker, and I'm sure that decision will be made in the fullness of time, however we have some

15  Castro and Wheeler issues that we have to deal with if Mr. Voelker testifies." (RT 1195.)[5] The court

16  ruled that the prosecution could impeach petitioner with a conviction from January 22, 2004, and with

17  conduct leading to that conviction on March 22, 2002, for drug possession. (RT 1196-1197.)

18         The prosecutor then argued that if petitioner were to testify he also should be impeached by

19  statements the police took from him in violation of Miranda v. Arizona (1966) 384 U.S. 436. (RT

20  1197-1198, 1204.) The defense did not contest any of these rulings or arguments.

21

22

23  _____

24  5   In its Order, the state court relied on this comment to show that the decision whether to call
    petitioner to testify had not been made. (6/27/07 Order at p. 5.) However, the state court's
25  reasoning is flawed because it fails to mention an exchange that occurred moments later between
    the court, defense counsel (James Wall), and the prosecutor (Ashley Worsham) in which Mr. Wall
    informed the court that petitioner was indeed going to be testifying. (RT 1198.)

As the prosecutor was looking through her notes for authority to support her position that petitioner could be impeached with his statements to the police, the following exchange occurred:

> THE COURT: All right. Well, will Mr. Voelker be your last witness probably?
>
> Mr. WALL: Yes, ma'am.
>
> THE COURT: And do you have any idea how long your direct examination will be?
>
> Mr. WALL: Probably an hour.
> (RT 1198.)

The court then recessed for the day in preparation for the testimony petitioner would be presenting in the morning. The following morning (Tuesday, February 24, 2004), Mr. Wall lodged the defense's requested jury instructions——specifically, Mr. Wall requested CALJIC 2.13.1, statement obtained in violation of <u>Miranda v. Arizona</u>. (CT 310.)[6] However, when the proceedings resumed, Mr. Wall summarily rested the case without calling petitioner as a witness.

On December 22, 2004, Mr. Wall told the court that a conflict had arisen between him and petitioner and that counsel did not think his continuing as defense counsel was in petitioner's best interests. (RT 1379.) The court held an in-camera hearing (RT 1380), a transcript of which is attached as Exhibit F. At the in-camera hearing petitioner informed the court of, inter alia, his desire to testify: "I also wanted to testify. I wasn't given that chance either." (In-camera hearing transcript at p. 4.) When given the opportunity to explain the alleged improprieties, Mr. Wall did not indicate that he had not denied petitioner's right to testify, rather, he indicated that he had made a "huge mistake" in petitioner's trial. Counsel went on to confess that he had "inadequately" performed part of his job in the trial as well. (In-camera hearing transcript at pp. 4-6.) Based on the facts of this

---

[6] It would make no sense for counsel to have requested this instruction on the exact day petitioner was intending to testify unless, of course, counsel intended to call petitioner as a witness.

case——in particular, that petitioner's right to testify had been invoked on the record——the California Supreme Court remanded this issue for an evidentiary hearing in the Marin County Superior Court.

Remarkably, in rendering its decision, the Marin County Superior Court did not acknowledge any of the above exchanges between the court, petitioner and defense counsel. As detailed below, these omitted facts strongly corroborate petitioner's account of the events and stand entirely unrefuted. The Marin County Superior Court did not discredit Wall or petitioner's statements; it simply chose to ignore them. For the reasons explained below, the state courts' failure to consider, or even acknowledge Wall's highly probative statements casts serious doubt on the state courts' fact-finding process and compels the conclusion that the state courts' decision was based on an unreasonable determination of the facts. (See Taylor v. Maddox, supra, at p. 1005 [the state courts' failure to acknowledge probative testimony demonstrates that the state-courts' decision was based on an unreasonable determination of the facts].)

While Wall's testimony is perhaps not conclusive, it is certainly highly probative. A rational fact-finder might discount it or, conceivably, find it incredible, but no rational judge would simply ignore it. Yet this is precisely what the state court did in petitioner's case. At the end of the evidentiary hearing, the lower court found that petitioner had: 1) failed to prove by a "preponderance of the evidence" that he had been denied the right to the effective assistance of counsel; and 2) that "...petitioner acquiesced, perhaps reluctantly..." in the loss of his right to testify. (See Order at p 1-6)

In making its ruling, the court said nothing at all about Wall's statements, nor even so much as to acknowledge that Wall had invoked petitioner's right to testify in the trial and admitted his ineffectiveness several months later, even though the importance of these statements were vigorously argued in petitioner's briefs.

The lower court was supposed to consider the entire record, not individual pieces of evidence standing alone. This reflects the philosophy of the American fact-finding process——specifically, that various pieces of evidence and testimony in the record must be considered in light of the others. (See Taylor v. Maddox at p. 1007-1008.) For example, petitioner's assertion that he wanted to testify may have seemed implausible standing alone, yet gain considerable force when confirmed in a material respect by Mr. Wall informing the court that petitioner's direct testimony would last "about an hour." By contrast, the state courts' failure to take into account and reconcile key parts of the record, such as Wall admitting his ineffectiveness, casts serious doubt on the process by which the court's finding was reached, and hence the correctness of the court's finding. See, e.g., Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1988) [the court's failure to give specific reasons for ignoring treating physician's opinion constitutes grounds for reversal]; Gui v. INS, 280 F.3d 1217, 1228 (9th Cir. 2002) [the court's failure to support adverse credibility finding with specific, cogent reasons constitutes grounds for reversal]; Taylor v. Maddox (9th Cir. 2004) 336 F.3d 992, 1001 [the state court's failure to give particular reasons for omitting attorney's statements constitutes grounds for reversal].

As noted, the state courts did not so much as mention Jim Wall's statements in ruling on the habeas corpus petition, much less discuss what light this testimony would cast on petitioner's assertion that he was denied his constitutional right to testify. This was a major omission. Wall was not a random person making statements to a collateral detail. Rather, he was the very lawyer that petitioner claims denied him of his right to testify. As discussed below, the very fact that Wall admitted his ineffectiveness moments after petitioner informed the court that he was denied the right to testify, makes Wall's statements highly probative. The state court might have disbelieved Wall, or perhaps discounted his statements, but it was not entitled to act as if his statements didn't exist.

1    The United States Supreme Court has held that a court's failure to consider key aspects of the

2   record is a defect of the fact-finding process. (Miller-El v. Cockrell (2003) 537 U.S. 322, 346.) How

3   serious the defect, of course, depends on what bearing the omitted evidence has on the record as a

4   whole.  Here, Wall's statements are significant.   In trial, as the defense had completed calling all of

5   its subpoenaed witnesses, the court asked Wall if petitioner would be the last witness for the defense

6   and how long petitioner's direct examination would be.  Wall informed the court that "yes," petitioner

7   would be testifying and that petitioner's testimony would take about an hour.  Such an unequivocal

8   statement constitutes an adequate and timely assertion of petitioner's right to testify.  (RT 1198.)  The

9   court then recessed for the day in preparation for the last defense witness: petitioner.  However, the

10  next morning trial counsel summarily rested the case without calling petitioner as a witness in his

11  own behalf, in direct violation of petitioner's desire to testify.

12

13    Later, on December 22, 2004, the court conducted a conflict in-camera hearing.  In that

14  hearing, petitioner informed the court that he had wanted to testify and that he "wasn't given that

15  chance."  When given a fair opportunity to respond to petitioner's contentions, Wall informed the

16  court that he had made a "huge mistake" and he confessed that he had "inadequately" performed part

17  of his job in the trial.

18    The superior court judge, having been informed of all of the above inadequacies, never

19  concluded whether counsel's performance was within the range of reasonable professional assistance.

20  By failing to consider Wall's factual statements——that petitioner would be testifying, that his direct

21  testimony would last about an hour and that he had made a huge mistake——the state court ruled that

22  "… Petitioner acquiesced, perhaps reluctantly…." in the loss of petitioner's right to testify.  (Order at

23  p. 5.)  This conclusion by the lower court essentially obviated the court's duty to analyze petitioner's

24  ineffective assistance of counsel claim under the framework of Strickland v. Washington; a

25

conclusion which is *contrary* to United States Supreme Court precedent. Moreover, the record does not support such a conclusion. The record shows that the court was indeed alerted that petitioner was going to testify. (See RT 1198; CT 310.)

By making its findings without taking any of the above factual statements into account, the state courts not only came to a conclusion that was contrary to U.S. Supreme Court precedent, but they made an unreasonable determination of the facts and failed to reach the question of prejudice.

### (3).    **Prejudice**

In considering the second prong of <u>Strickland</u>, petitioner respectfully requests that this Court take a *de novo* review of the record in order to evaluate the prejudicial effect of defense counsel's failure to call petitioner as a witness in his own behalf.

The key controversies in this trial focused on how the robbery and attack transpired and what petitioner did or didn't do. Did he participate? Did he stand by? Was he really on the phone when this was happening? Did he come to the aid of the victim? Was he in the room for all or part of the incident? Was the fight and robbery contrived ahead of time or did the fight/attack erupt in the apartment——a spark from the argument over the "N" word at the location? The jury had to answer these questions with just one witness, the victim, whose testimony about these events wasn't all that clear. When questioned about any details or inconsistencies, or why he couldn't remember facts, he told the jury the following: "cause I got my head beat to a pulp" (RT 484); "you know, I don't recall a lot of stuff cause my head's been beat up so bad that it's like, how am I supposed to remember everything"? (RT 450); "you know, I——I got——my head beat in, like, how am I supposed to remember at what time, like that goes on? I mean, it's just like——come on"? (RT 481); "I don't remember too much about it——it was real emotional." (RT 453) When questioned about specifics he simply had to answer I have no idea. I have no clue. I don't know. I can't tell you. I'm not sure

how all that happened. I don't recall a lot of stuff. At one point in the trial he testified that petitioner had hit and kicked him, but later he admitted that, in reality, he did not know if petitioner had ever struck him. (RT 492-494, 583.) He even identified with certainty one of his attackers, i.e., Vijay Kelly——and it turned out to be the wrong person. He did not remember the incident with any clarity or certainty. He also testified:

> "Mr. Wall [Trial Counsel]: Q. Do you -- do you know where Mr. Voelker's phone was in his apartment that day--
>
> A. [DiPrima] I do not.
>
> Q. -- if at all? Okay. Do you know if he used the phone that day?
>
> A. I do not.
>
> Q. So it's possible that when you were in his apartment, he used the phone?
>
> A. Maybe he did.
>
> Q. Well -- but you said he was virtually around you the whole time. How could he use the phone when -- he was right there with you?
>
> A. I wouldn't know if he used the phone 'cause I was beat up the whole time and ... I couldn't see anything.

Clearly, DiPrima was not sure if petitioner was on the phone or not; and he ultimately testified that he didn't know if petitioner had ever hit him. (RT 583.) Petitioner's defense was that he had brought several people back from the bar to hang out and smoke some marijuana. While petitioner was in the other room talking on the phone with his ex-girlfriend the fight broke out between DiPrima and the two black males. Petitioner's testimony would have been enormously important, and corroborated by phone records and other circumstantial evidence. (See Exhibit A, the Evidentiary hearing transcripts, attached hereto and incorporated herein by reference as though set forth in full.)

In this case, petitioner was present at the scene of the crime while talking on the phone, but when he realized what was happening he tried to come to the assistance of the victim. In no way did petitioner aid or abet the actual assault and robbery. Having never heard petitioner's testimony, the jury could not have fully assessed petitioner's version of the above events, his credibility and demeanor, or any other aspect of his involvement that would have reinforced the above defense. Here, defense counsel failed to present petitioner's side of the facts and shore up the holes in the testimony of the prosecution's only percipient witness. Counsel's failure to call petitioner to the stand was *not* a tactical maneuver. On the contrary, it was a deviation from the defense's original game plan; thus, violating petitioner's express desire to testify while highly prejudicing petitioner's defense.

Before reaching the conclusion of this issue it should be summarized with the following facts: 1) Petitioner's decision to testify was in the affirmative and tactically recommended by trial counsel; 2) Prior to the trial, petitioner was admonished, by trial counsel, that he was never to speak to the court except through trial counsel; 3) the court sua sponte asked if petitioner would be testifying; 4) trial counsel voiced petitioner's desire to testify by informing the court that petitioner would be testifying——such an unequivocal statement constitutes an adequate and timely assertion of petitioner's right to testify; 5) counsel never called petitioner to the stand; 6) later, on December 22, 2004, the court conducted a conflict in-camera hearing. In that hearing petitioner informed the court that he "wanted to testify" and "I wasn't given that chance." Trial counsel's subsequent rebuttal consisted of him admitting that he had made a "huge mistake" and he confessed that he had "inadequately" performed part of his job in the trial. Petitioner asserts that counsel's above remarks equate a solemn declaration which, as him being an officer of the court, carry a strong presumption of verity.

### (4).  Conclusion

As the court noted on record, conflicting evidence was presented to the jury (RT 1217.)  The verdicts could have gone either way——no one would have been surprised if the verdicts came back "not guilty."  All things being equal——it was a close call on the issue of petitioner's roles in the crimes.  Thus, testimony that would have set him apart from the two black perpetrators was critical.  In not calling petitioner to the stand, counsel "dropped the ball," violated petitioner's right to present a defense, and denied him his constitutional right to the effective assistance of counsel.  But for counsel's errors, there is a reasonable probability of a different outcome.

**GROUND TWO:**   TRIAL   COUNSEL'S *ADMITTED*  FAILURE  TO  INTRODUCE  EXCULPATORY    EVIDENCE    CONSTITUTED    INEFFECTIVE    ASSISTANCE    OF  COUNSEL; THUS, DENYING PETITIONER A FAIR TRIAL AND A RELIABLE JURY  VERDICT IN VIOLATION OF HIS FOURTEENTH AMENDMENT RIGHTS.

> "[T]here's an ineffective assistance claim, which I think is valid here, on
> an appeal, I -- I firmly do believe that's a valid claim ... I believe that I
> made a huge mistake ... I don't want him to be the person who loses
> because of that. I'm the one who should lose because of that, that's on
> me, as an attorney. Jason shouldn't lose ... I can also say that I feel very
> guilty, and I felt like I did inadequately do part of my job in this trial."
> (Exhibit F [Post trial quote from James A. Wall, trial counsel], Page 5-6
> of in-camera hearing transcript re attorney conflict Dec. 22, 2004.)

### (1).  Introduction

In this case, trial counsel was very much aware that there were phone records that existed and established exculpatory evidence.  Indeed, he stressed their existence by explaining to the jury that these exculpatory phone records placed petitioner on the phone in the other room when the assault exploded in petitioner's living room.   The prosecutor, on the other hand, told the jury that no such phone records existed and that petitioner was never actually on the phone.  During the first 30 minutes of deliberations the jury *requested to see the phone* records in order determine if petitioner was in fact on the phone at the time of the assault. After conferring with counsel, the trial judge sent

the jury a note informing them that there were in fact no phone records for them to see. Consequently, petitioner's defense was easily discredited.  The absence of these material phone records hampered petitioner's defense, allowed a key defense witness to be falsely impeached, and completely undermines the jury's verdict.

(2).    **Standard of Review**

A defendant's criminal lawyer has a "duty to make reasonable investigations or to make reasonable decisions that makes particular investigations unnecessary." Strickland, supra, 466 U.S. at 691; Turner v. Duncan, 158 F.3d 449, 456 (9th Cir. 1998).  This includes a duty to investigate the prosecution's case and to follow up on exculpatory evidence.  Kimmelman v. Morrison, 477 U.S. at 385; U.S. v. Tucker, 716 F.2d 576, 583 fn. 16 (9th Cir. 1983).  Thus, a lawyer's performance is deficient if evidence exists that might show a defendant's innocence or raises sufficient doubt to undermine confidence in a guilty verdict, and the lawyer did not present the evidence. Lord v. Wood, 184 F.3d 1083, 1093 (9th Cir. 1999); Hart v. Gomez, 174 F.3d 1067, 1070 (9th Cir.) ["A lawyer who fails adequately to investigate, and introduce into evidence, records that demonstrate his client's factual innocence, or that raises sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance."]

The state courts never allowed petitioner an opportunity to fully develop this claim.  In the state, petitioner requested an order to show cause and an evidentiary hearing on this issue, but the issue was summarily denied without ever giving petitioner an opportunity to present readily available evidence, law or arguments in an evidentiary hearing. (28 U.S.C. § 2254(e)(1); Taylor v. Maddox (9th Cir, 2004) 366 F.3d 992, 1000.) (28 U.S.C. § 2254(d)(1) & (d)(2).)

### (3).    Counsel's Admitted Failure to Introduce Material Phone Records into Evidence Resulted in Great Prejudice to Petitioner's Defense.

After petitioner's arrest he informed his trial attorney that on the night of the incident he had invited several people back from the bar to hang out and smoke some marijuana at his apartment. Upon entering his apartment, petitioner passed out some marijuana and a little alcohol was consumed. Petitioner then got on the telephone with his ex-girlfriend. While talking on the phone, petitioner heard a lot of noise coming from his living room. Upon further investigation he saw that two of his guests were assaulting one of his other guests.    Petitioner subsequently jumped in between the altercation and tried to break it up. While he was trying to help, he saw the victim, DiPrima, get hit over the head with a fire-log.    Petitioner then saw DiPrima jump off of petitioner's third story balcony to getaway from the assault. Petitioner subsequently ran outside to help DiPrima. (See Exhibit E, [Declaration of Jason Voelker] ¶ 3-6; and Exhibit A [Evidentiary Hearing Transcripts]. See also Exhibit I [Karlan Brooks' interview] ¶ 1-10, attached hereto and incorporated herein by reference [Brooks saw petitioner "come out from under the garage area and run up to the guy who had flown off the balcony." Brooks heard petitioner ask the man lying on the ground "Are you alright? Do you need an ambulance?"].)

Here, Attorney Wall knew that petitioner's home phone records constituted exculpatory evidence——corroborating petitioner's side of the facts and placing petitioner on the phone at the time of the assault. In fact, prior to the trial, attorney Wall told petitioner that petitioner's successful defense was contingent upon petitioner's testimony in conjunction with his home phone records. (See Exhibit E, Declaration of Jason Voelker; see also Exhibit A, the Evidentiary Hearing Transcripts.) Yet Wall never subpoenaed petitioner's home phone records for the trial.

Before the trial, Wall sent a defense investigator to interview petitioner's ex-girlfriend, Raven Oliver. Raven Oliver confirmed what petitioner had told attorney Wall——that she had been on the

phone with petitioner when she heard a fight breakout in the background of petitioner's apartment. The record discloses that Oliver then gave her telephone records to the investigator. (RT 1161-1162.) The investigator then "used that phone bill to prepare a written report...." (RT 1164.)

During trial, Attorney Wall told the jury that the facts showed no plan. It made no sense for petitioner to plan out an attack at his own apartment. Wall argued that while in the apartment DiPrima used a racially charged word which provoked the black males into attacking DiPrima while petitioner was in the other room talking on the phone with his ex-girlfriend, Oliver. (RT 1307, 1309, 1314-1315.)   Wall stated that if everyone arrived at petitioner's apartment around 2:24 and the 911 call didn't occur until 2:40——then there must have been some normal socializing going on for a while and no one immediately attacked DiPrima. (RT 1306.)   The police found four beer bottles inside the apartment (there were four people in the apartment).   Then there would be the verbal arguing and then the assault. (RT 1309.)   Wall argued that if petitioner was on the phone at 2:36 a.m.——that is several minutes before DiPrima jumped from the balcony (the 911 calls came in at 2:39 & 2:40)——then it doesn't make sense that petitioner would be choking DiPrima at that time. Wall argued that the phone records proved that the incident didn't occur in the manner in which DiPrima testified and the fighting/argument didn't immediately occur, but rather developed over DiPrima's use of the "N" word.

While on the witness stand DiPrima testified that he was yelling, "please stop ... I'm sorry, please stop" because he believed the men were beating him "... over the "N" word." (RT 294-297, 492-493, 580-583, 811, 834.)   DiPrima also testified that he had no idea if petitioner was on the phone or not; and he ultimately testified that he didn't know if petitioner had ever hit him. (RT 583.)

The documentary phone records would have been extremely exonerating evidence for petitioner's defense. Attorney Wall articulated so——he argued, to the jury, that petitioner couldn't

be attacking DiPrima if petitioner was in the other room talking on the phone with his ex-girlfriend. (RT 1307.) See RT 1306, where attorney Wall argues:

> So its 2:36 and [petitioner's] on the phone. He's telling Raven, uncontroverted, that "I'm coming over." He -- Raven hears voices arguing in the background. Wait a minute. Wait a minute. There was no argument, until after the beating had started according to Mr. Diprima. [¶] So, if Raven's on the phone with [petitioner] at 2:36 and there's an argument going on in the background, then they're either already fighting or they have a fight, but that dispels Mr. Diprima's story that he walked in and, bam, he was hit by Bob Marley, bam, a mulatto guy hit him, bam, he was covered up, he was down on the ground, he was banging.
>
> * * *
>
> Remember, Mr. Diprima says he goes in and immediately it happens. Well, then how -- how do you get the fact that she's on the phone at 2:36, talks for however long, and the report goes in at 2:40? so he jumps over the balcony right around 2:40. It doesn't make sense that he's on the phone -- well, maybe -- maybe their theory is he's on the phone, and he's choking him at the same time. (RT 1307-1308.)

Wall told the jury that DiPrima, the two black males, and petitioner left the bar for petitioner's apartment to "party." (RT 1309 ["They went up there to party."].) Wall argued that, while petitioner was on the phone with his ex-girlfriend, the two blacks attacked DiPrima over DiPrima's unfortunate use of the word "nigga." (RT 1310, 1316-1317.) However Wall never subpoenaed the phone records that would have validated this defense.

Preparing a defense should be based on reasonable and rational foundations, both factually and legally, in order to be valid and invulnerable. Any competently reasonable attorney would have secured petitioner's phone records for the trial. Wall's failure to obtain these material records was not reasonable or professionally acceptable, especially in light of the fact that petitioner's entire defense necessitated these records.

Recognizing that Wall had failed to obtain his client's phone records, the prosecutor immediately highlighted counsel's failure; indeed, she devoted more of her closing argument to the phone records than trial counsel did. She emphasized that the defense presented no certified evidence to show that petitioner was on the phone during this time. The prosecutor repeatedly told the jury that it made no sense that petitioner would be on the phone during the assault. Furthermore, she began her rebuttal argument by arguing about the lack of any certified phone records.[7] **In other words**, the prosecutor exploited defense counsel's failure to obtain the certified phone records and was particularly successful in placing skepticism in the jury's mind. We know that the jury was uncertain as to petitioner's defense because during the first half-hour of deliberations the *jury sought to verify the phone call by requesting the records,* but the trial judge denied their request, telling the jury that there were, in fact, *no phone records* for them to see. This presented a serious blow to petitioner's entire defense. The lack of the phone records conveyed to the jury that petitioner's defense was nothing more then a sham, and that the other evidence and testimony must be equally incredible just like the prosecutor had previously suggested. The prosecutor's argument had a pernicious effect, in

---

7    The prosecutor told the jury that the phone records did not exist, notwithstanding that the trial record shows that the prosecutor subpoenaed the phone records (RT-176) and had her very own photocopy of the records right in front of her during the trial. (CT 431-432; RT 1060-1064.) This was highly improper because through these implications she intended to do, and did in fact destroy petitioner's entire defense through fallacious tactics. Indeed, it is easy to see that the jury in this case was in fact misled; during deliberations *the jury's first request was to see the phone records,* but the trial judge denied their request.

Nevertheless, although a claim of prosecutorial misconduct may appear to have merit, petitioner believes it is not preserved for federal review and consequently can not be resolved on its merits. To preserve this issue, misconduct must be assigned as error at trial with a request that the jury is instructed to disregard its effect. Here, defense counsel failed to make any objection whatsoever to any of the instances where the prosecutor declared that the phone records did not exist. Thus, petitioner believes, precluding a later claim of prosecutorial misconduct.

In any event, had trial counsel properly subpoenaed the exculpatory phone records and submitted them into evidence——like a reasonable competent attorney would have done——the prosecutor would have been deterred from engaging in conduct of this sort.

1    that it sought to cut petitioner's defense by a tainted sword that made it appear that petitioner was

2    never on the phone and implied that his lawyer was attempting to mislead the jury and corrupt the

3    fact finding process. However, without the phone records, the defense was unable to prove that, in

4    fact, the Marin County Prosecutor was the one misleading the jury, not the defense.

5        There is no conceivable strategic or tactical reason not to use these records at trial. Having

6    chosen this line of defense, it is simply inconceivable that defense counsel's decision not to introduce

7    documentary phone records corroborating the defense was a strategic one. When faced with similar

8    examples of a defense counsel's failure to introduce exculpatory evidence, the courts have concluded

9    that the failure constitutes deficient performance under Strickland.  See e.g., Hart v. Gomez, supra,

10   174 F.3d 1067, [holding that counsel provided constitutionally ineffective assistance where, inter alia,

11   "[h]aving chosen to pursue [a particular] line of defense," counsel did not introduce readily-available

12   records that would have corroborated that line of defense, and there was no plausible strategic reason

13   for his not introducing the evidence].  See also Smith v. Stewart, 140 F.3d 1263, 1269 (9th Cir. 1998)

14   [when the failure to present evidence is not based upon tactical considerations, "we have not hesitated

15   to find deficient performance"].

16       In this case, Wall argued that petitioner could not have been partaking in the assault and

17   robbery because he was on the phone. Given the substance of this defense, Wall had an affirmative

18   duty to present these material phone records to the jury, especially inasmuch as the prosecutor

19   vigorously denied that these phone records even existed; and the jury asked to see the phone records.

20       Even if trial counsel were to somehow offer a basis for his failure to obtain these phone

21   records for petitioner's defense, he would still need to provide a basis for why he allowed a material

22   defense witness, Raven Oliver, to be wrongfully impeached by the prosecution.

#### (4).    The Wrongful Impeachment of Defense Witness Raven Oliver.

In trial, Oliver testified that she had been on the phone with petitioner when she "heard some yelling and some kind of confrontation..." erupting in the background of petitioner's apartment. (RT 1067.) Oliver's testimony was important because it demonstrated that she had been on the phone with petitioner when things got out of hand and got physical. The prosecutor, however, threw Oliver's credibility into doubt by insinuating that the phone records did not exist——suggesting that Oliver and petitioner merely created the timing of the phone calls after conspiring with each other.  The prosecutor argued:

> And if you recall from Raven Oliver's testimony, I never questioned her about the alleged phone call at 2:36 in the morning supposedly from this defendant.  There is absolutely no certified phone record or attested to phone bill that will tell you that that phone call was actually made. [¶]  What I asked Raven Oliver on cross-exam was, "Isn't it a fact that when you wrote out your statement about this incident for [the D.A. Investigator], you wrote that the defendant had called you between 11:30 and 12:00 o'clock in the morning, and that about 10 to 15 minutes later, he showed up. [¶]  I then said, "Isn't it a fact that you later changed your story after having talked to the defendant about the particulars of this case?"  And under oath, she said that she had changed her story after talking to [petitioner] Voelker."
> (RT 1319.)

The prosecutor essentially argued that Raven Oliver was suddenly lying and that there was no phone records corroborating Oliver's "new" version of events.  The prosecutor's argument distorted the factual landscape by making it appear that petitioner had unduly influenced Raven Oliver into changing her story, thereby diverting the fact finder from assessing Oliver's testimony to alternatively deciding that petitioner was guilty because he had manipulated Oliver into lying to the jury.  A

1    reasonably competent attorney would have restored Oliver's credibility by simply validating her

2    testimony with the certified phone records.[8]

3         Trial counsel's failure to obtain the phone records that would have counteracted the false

4    impeachment of Oliver was ineffective and highly prejudicial. The 9th Circuit has found similar

5    omissions of corroborative evidence to constitute deficient, and prejudicial, performance by counsel.

6         In Hart v. Gomez, supra, 174 F.3d 1067, James Thomas Hart was convicted of molesting his

7    daughter during visits to a camping resort. His daughter had testified that "Hart *never* molested her

8    during visits on which he was accompanied by another adult." Id. at 1067. Hart's girlfriend testified

9    at trial that she had been with him during all of the trips alleged in the information, and had witnessed

10   no molestation. See Id. Hart's trial counsel, however, did not introduce grocery receipts and the

11   girlfriend's personal calendars, which would have corroborated her testimony that she was present

12   during all of the trips and, thereby, "demonstrate[d] [Hart's] factual innocence[.]" Id. at 1070. The 9th

13   Circuit concluded that "[the girlfriend's] evidence, if believed by the jury, would have demonstrated

14   the truthfulness of her testimony and established that ... no molestation occurred during the time

15   period set forth in the information——or at least that the molestation as charged in the information

16   had not been proved beyond a reasonable doubt." Id.

17        As in Hart, petitioner's trial attorney had at his fingertips evidence that would have

18   corroborated a key defense witness whom the jury might otherwise not believe, yet failed to secure

19   this evidence and use it at trial. By failing to introduce into evidence the material phone records,

20

21

22

23   _____

     8     Oliver previously had reported to a D.A. Investigator that the phone calls occurred around
24   11:30–12:00 in the morning. However, Oliver later explained that, after talking with petitioner,
     and *reviewing her phonebill*, she realized that the calls had in fact occurred much later. (See RT
25   1072-1074; see also Exhibit G [Oliver's phone records].) However, the D.A. told the jury that the
     phone records didn't exist, and insinuated that Oliver only changed her story after speaking with
     petitioner.

Wall allowed the prosecution to falsely impeach Raven Oliver, a witness who was factually telling the truth. Wall's prejudicial actions undermine confidence in the outcome of this trial, particularly in light of the prosecutor's inaccurate arguments. [9]

In the end, this case paints a picture of prejudice beyond the example announced in Hart because the jury took the additional step——the additional step of requesting to see the telephone records that would prove whether or not petitioner was in fact on the phone with Oliver. Apparently the jury wanted to resolve their lack of conviction. Unfortunately, though, the jury's request to see the records was denied by the trial judge who gave the false impression that no such records existed.

Given the defense in this case, trial counsel should have, at the least, obtained the phone records for his client's defense——certainly when a lawyer makes a sound strategic choice to present a defense, he must provide his client's jury with factual support for that defense. (See U.S. v. Tucker, supra, 716 F.2d 576, 594 (9th Cir.) ["a reasonably competent lawyer must ... provide factual support for [the] defense where such corroboration is available"]; accord, Alcala v. Woodford, (9th Cir. 2003) 334 F.3d 862, 870-873.)

Wall's sworn declaration concedes that the telephone records dovetailed with his strategy and would be "necessary for my client's defense." (See Exhibit H, trial counsel, Jim Wall declaration, ¶ 1-4. ["I concluded that a telephone call by my client to Raven Oliver on the night in question would be

---

9 See e.g., RT 1268, where the prosecutor argues to the jury that "the defendant ... was never using the phone in that house" and that the defendant "was always present during the entire time that this beating was going on." See also RT 1319, where the prosecutor tells the jury that "there is absolutely no certified record or attested to phone bill that will tell you that the phone call was actually made." See also RT 1325, where the prosecutor wrongly discredits Oliver and tells the jury that "DiPrima told you that when he jumped off that balcony, the defendant was still present in that apartment. It makes no sense to believe that he was supposedly on the phone with his girlfriend ... it makes no sense to believe that he was actually on the phone...."

exculpatory evidence for my client ... [and] necessary for my client's defense.... Several times during trial, I looked for the subpoenaed records, but they did not arrive. I did not seek a continuance or check on their status"]. Cf., Tucker v. Prelesnik, 181 F.3d 747, [holding that trial counsel's "failure to request a continuance, combined with his failure to obtain ... records casting serious doubt on the reliability of the testimony of the prosecution's sole witness ... was an error so serious as to have deprived [petitioner] of a fair trial as guaranteed by the Sixth Amendment].

The certified records would have further shown that petitioner was on the phone at 2:24 a.m.——That is, during the first few minutes of entering the apartment. This is a fact that would have proven it incredible for petitioner to ambush DiPrima within the first few minutes of entering the apartment. Videotape from a 7-11 convenience store near the apartment established that DiPrima and petitioner were in the store together at 2:15 a.m. (People's Exh. 34: RT 609.) Also, referring to another of the video clips that were introduced into evidence, defense counsel in closing argument said DiPrima and petitioner left the store at 2:17 a.m. (RT 1303.) DiPrima estimated that the trip from 7-Eleven to the apartment took about 3-4 minutes. (RT 277.) This timeline illustrates that DiPrima and petitioner made it to petitioner's apartment complex at about 2:22 a.m., give or take a minute or so. **Simply stated**, If petitioner were on the phone with Oliver at 2:24 a.m. it proves that he couldn't be attacking DiPrima at this time. Defense counsel Wall knew this fact was absolutely crucial to the defense, indeed, *he told the jury in his opening statement that this proof would be forthcoming.* (RT 223.) However, defense counsel prejudicially abandoned this part of his opening statement due to his negligent failure to properly obtain the phone records for trial.[10]

---

[10]    Numerous courts have held that when defense counsel tells the jury in the opening statement that certain proof will be forthcoming and then fails to deliver it, ineffectiveness has been shown. See e.g., Hart v. Davenport, 478 F.2d 20 (3rd Cir. 1973); People v. Corona, 80 Cal.App.3d 684 (1st Dist. 1978).

### (5).    Conclusion

Trial counsel made a sound strategic choice to present a viable defense, but nonetheless failed in his duty to present that defense reasonably and competently. Consequently, counsel's admitted omissions and failures prejudiced petitioner's defense. Counsel *never* subpoenaed petitioner's home phone records and he *failed to lay a proper foundation* for the introduction of the phone records that would have corroborated a key defense witness whom the jury would otherwise not believe, i.e., ex-girlfriend, Raven Oliver. In that such steps, if taken, could have, at the least, created reasonable doubt in the minds of the jury. This ineptitude was exacerbated when the prosecutor told the jury that the phone records did not exist——defense counsel's argument appeared to be in fact false——the jury asked for, but were denied the phone records. Consequently, defense counsel's "bark with no bite" and "faith with no proof" tactics severely undercut petitioner's whole case. Counsel's admitted failures were prejudicial and they resulted in the violation of petitioner's right to present a defense and his constitutional right to the effective assistance of counsel. But for attorney Wall's errors, there is a reasonable probability of a different outcome.    For these reasons, and respectfully directing this Honorable Court specifically to the principles utilized in <u>Hart v. Gomez</u>, <u>supra</u>, 174 F.3d 1067, and <u>Strickland v. Washington</u>, <u>supra</u>, 466 U.S. 668, petitioner prays that this Honorable Court order an evidentiary hearing and issue the Writ.

////

///

//

/

1    **GROUND THREE**:    CALIFORNIA    HAS    VIOLATED    PETITIONER'S
2    CONSTITUTIONAL RIGHTS TO DUE PROCESS AND FUNDAMENTAL FAIRNESS
     BECAUSE IT HAS ARBITRARILY REFUSED TO CONSIDER NEWLY DISCOVERED
3    WITNESSES WHO IMPEACH THE PROSECUTION'S SOLE PERCIPIENT WITNESS
     AND PROVIDE EXCULPATORY EVIDENCE FOR PETITIONER.

4                    (1).    **Introduction**

5
6          The Supreme Court has explained that "newly discovered evidence relevant to the guilt of a

7    state prisoner is not a ground for relief on federal habeas corpus." Townsend v. Sain (1963) 372 U.S.

8    293 ["where newly discovered evidence is alleged in a habeas application, evidence which could not

9    reasonably be presented to the state trier of facts, the federal court must grant an evidentiary hearing.

10   Of course, such evidence must bear upon the constitutionality of the applicant's detention; the

11   existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground

12   for relief on federal habeas corpus.  Also, the district judge is under no obligation to grant a hearing

13   upon a frivolous or incredible allegation of newly discovered evidence."], overruled on other grounds

14   by Keeney v. Tamayo-Reyes (1992) 504 U.S. 1; accord, Herrera v. Collins (1993) 506 U.S. 390, 400.

15   "This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not

16   imprisoned in violation of the Constitution——not to correct errors of fact."  Herrera at p. 400 [citing

17   cases]; see also Id. at 404-405 [noting that the fundamental miscarriage of justice exception has never

18   been extended to "freestanding claims of actual innocence."]

19
20         Based on petitioner's review of the case law, it does not appear that the Supreme Court has

21   ever held that newly discovered evidence in and of itself implicates the constitution.  In Herrera, the

22   petitioner presented what he believed to be newly discovered evidence of his actual innocence——an

23   affidavit by another individual stating that he, not Herrera, had committed the murder for which

24   Herrera had been convicted and sentenced to death.  In rejecting the petitioner's claim, the Supreme

25   Court noted that "[c]laims of actual innocence based on newly discovered evidence have never been

1  held to state a ground for federal habeas relief absent an *independent constitutional violation*

2  occurring in the course of the underlying state criminal proceeding." Id. (emphasis added). The

3  Supreme Court determined that Herrera had not established that any constitutional violations had

4  occurred at his trial.

5      At the core of the Supreme Court's discussion in Herrera was the principle that habeas relief is

6  available only to remedy violations of federal constitutional law; the due process clause guarantees

7  only a procedurally fair trial and not that the verdict will be factually "correct." See Id. at 401-402.

8  The Supreme Court pointed to constitutional sufficiency-of-the-evidence review and noted that the

9  requirement was only that the record contained sufficient evidence, viewed in the light most

10  favorably to the prosecution, to justify a rational juror in finding the defendant guilty beyond a

11  reasonable doubt. Id. (Citing Jackson v. Virginia (1979) 443 U.S. 307.)

12

13      Herrera v. Collins dealt with a claim of actual innocence; the new evidence was an affidavit

14  submitted by another individual taking responsibility for the petitioner's crime.  The present case

15  involves a claim that a newly discovered eyewitness observed petitioner coming to the aid of the

16  victim, and a separate witness (also newly discovered) was personally informed by the victim that

17  petitioner had no role in the crimes.  Notwithstanding those differences, Herrera appears to be the

18  Supreme Court precedent most apposite to the present case.  With Herrera in mind, petitioner next

19  proceeds to the merits of his newly discovered evidence claim.

20      In California a defendant is entitled to a new trial when new evidence is discovered that would

21  probably result in a different result on a retrial.  (Penal Code 1181(8).)  California courts have

22  analyzed this language as creating a five-part requirement——that is:

23

24          "[A] new trial will be granted if: (1) the evidence is newly
            discovered; (2) the evidence is not cumulative; (3) the evidence is
25          'such as to render a different result probable on a retrial of the
            cause;' (4) 'the party could not with reasonable diligence have

discovered and produced it at the trial;' and (5) that the 'facts be shown by the best evidence of which the case admits.'" (Earp v. Ornoski (9th Cir. 2005) 431 F.3d 1158, 1171 fn. 10; citing People v. Martinez (1984) 36 Cal.3d 816.

In cases where a counsel's lack of diligence in securing the attendance of a necessary witness at the trial is the only requirement not met, and the prosecution's case is not strong, California courts make an exception and grant a new trial.    Martinez, supra, citing to People v. Williams (1962) 57 Cal.2d 263, 272-275.    Certainly a defendant should not remain convicted only because of his attorney's lack of diligence if new evidence would exonerate him.  The lack of diligence could also constitute ineffective assistance of counsel in any case. Martinez, supra, at 825-826.

Briefly, as stated in the previous sections of this petition, the prosecution's case was based upon the premise that Petitioner Voelker was involved and participated in the robbery and beating of DiPrima. The defense, on the other hand, attempted to show that petitioner was initially unaware that the two black males attacked DiPrima over his use of the "n" word.  The defense asserted that petitioner was in the other room talking on the phone and not involved when the physical confrontation erupted.  The evidence in the trial centered on the roles of the two black men and that of petitioner.

After the jury came back with its guilty verdict, the trial court appointed petitioner a new attorney who discovered two new witnesses who possessed exonerating evidence.[11]

---

11 The Marin County Superior Court appointed Attorney Mary Stearns to represent petitioner on a motion for new trial (§ 1181) because the original trial attorney, James Wall, had a legitimate conflict in arguing that his failure to secure material phone records prejudiced petitioner's defense. (See infra II.) Ms. Stearns immediately subpoenaed the phone records, hired an investigator, found witnesses, and expanded the motion beyond the claim of ineffective assistance.

### (2).    **Karlan Brooks**

The first witness was an eyewitness, Mr. Karlan Brooks, who lived below petitioner. This person was not on any witness list for the prosecution or the defense. His statements are newly discovered.

His testimony would not be cumulative. (See Exhibit I [Karlan Brooks interview].) In essence, Mr. Brooks stated that he lived in apartment 106 of the apartment complex where the incident occurred. On the night of the incident he heard "a lot of noise coming from right above us. It went on for about 20 minutes. We could hear voices and it sounded like some fighting." After listening to the noise Brooks and his girlfriend got up to look out their balcony, they saw a body go flying by and land in the yard next door. The person who flew by lay there for a minute and then called out "call an ambulance, I'm hurt." Then Brooks saw petitioner jump over a wall and run up to the person who had fallen/jumped from above. Petitioner said, "Are you okay? Do you need an ambulance?" The person lying on the ground got up and ran away. No one testified to these events at the trial.

This testimony contradicts the victim's trial testimony and contradicts the prosecution's theme and character assassination of Petitioner Voelker. First, Brooks' statement suggests that there was an argument/fighting for some 20 minutes. It is a reasonable inference that everyone went to petitioner's apartment to party, that the victim said the "n" word there, that the arguments broke out and that then, the fighting started. The new witness' testimony more importantly demonstrates that petitioner was concerned about the victim——he asked if the victim was hurt and asked if he should call an ambulance. A reasonable interpretation of these facts would be that petitioner had been on the phone with his ex-girlfriend when things got out of hand and got physical, and that he came into the living room right before the victim jumped from the balcony. When the victim jumped, petitioner ran out to

see if he needed help. Certainly, petitioner's question, "are you hurt? Do you need an ambulance?" is not something that a robber or attacker would ask to his victim. The testimony at the very least provides reasonable doubt as to petitioner's role. And with the sketchy testimony of the victim, it is likely that this type of evidence would affect the verdict rendered.

It should be noted that Michael Kollin (the independent party that called 911) corroborates Brooks' testimony. Kollin, a resident in the apartment building, reported to officers that on the night/morning of the incident he looked outside and saw that "one subject [was] helping the other." (RT 954-959; CT 221.) The victim told the jury that he didn't know who this person was that had helped him and he did not think that it was the petitioner. (RT 562-563.) However, DiPrima previously told detectives that the petitioner was the person that he encountered after jumping off of the deck. (RT 1111-1112.) Noticeably, there was conflicting evidence on this issue. That is why the discovery of Brooks was tremendously significant——he added the missing piece to this part of the puzzle by not only impeaching the prosecution's only percipient witness, but also confirming that petitioner was indeed trying to help the victim. That Brooks' testimony would contradict the victim's sketchy testimony and the prosecution's theory demonstrates its great relevance.

### (3).  Zeph Carter

The second witness that the defense found was Zeph Carter, who would have testified that the victim told him that the two black males were the ones that did the beating and attack and that petitioner did not participate or assist. Neither the defense nor the prosecution had this evidence at the time of the trial. The evidence is newly discovered. Carter's testimony will impeach the victim and will provide exculpatory evidence for petitioner. In trial, the victim testified that he could not remember much of what happened during his brutal beating. The black men are the ones that got upset about the "n" word——they hit him in the face, whipped him with a belt, took his personal

property, hit him in the head with a Dura Flame log and yelled at him to give up his credit cards, etc. The victim said he only saw petitioner *once* during the assault and robbery when he looked up at someone holding him in the midst of this chaotic and frightening scene. As noted in the "statement of the facts" portion of this petition, petitioner is one of the people that the victim spent the most time with that night and petitioner's face would stick out in the victim's memory for that reason alone. If the victim spoke to Zeph Carter near the time of the incident and specifically said that petitioner did not do anything, there is a reasonable probability that that testimony would affect the verdict. The evidence would be admissible at trial as an inconsistent statement. Other then the victim telling the police that he did not remember petitioner doing anything, and telling the jury that he did not know if the petitioner had hit him, the victim's statements as to such a friend would be the next best evidence.

### (4).   The state courts' denied petitioner an evidentiary hearing in which petitioner would have presented the new witnesses.

The state courts did not give petitioner an opportunity to present these two witnesses' statements, even though petitioner timely presented his motion.

The United States Constitution, pursuant to the Fifth and Fourteenth Amendments, guarantees a criminal defendant due process of law. Regarding due process in general, the Court in Chambers v. State of Florida (1940) 309 U.S. 227, 236-237 stated:

> "[A]s assurance against ancient evils, our country, in order to preserve 'the blessings of liberty,' wrote into its basic law the requirement... that the forfeiture of the lives, liberties or property of people accused of crime can only follow if procedural safeguards of due process have been obeyed."

Due process is not rigid and unbending but "... is a flexible concept that varies with the particular situation." (Zinermon v. Burch (1990) 494 U.S. 113, 127; accord, Morrissey v. Brewer (1972) 408 U.S. 471, 481 ["... due process is flexible and calls for such procedural protections as the particular situation demands... Whether any procedural protections are due depends on the extent to

1  which an individual will be condemned to suffer grievous loss.'"]) Here, petitioner has been

2  condemned to suffer grievous loss of liberty, i.e., many years in prison for a crime that he did not

3  commit.  Under the facts of this case, the demands of due process mandated the state courts to

4  consider the new witnesses' testimony.

5        In People v. Hairgrove, (1976) 18 Cal.App.3d 606, 610, the defendant's motion was based

6  upon a third parties affidavit but was denied without the trial court taking the affiant's testimony at the

7  hearing.  Because the affiant did not testify at the trial, the court of appeal held that the trial judge

8  abused his discretion in not taking all relevant evidence on the motion prior to denying it.  However,

9  in reversing, the court expressed no opinion as to the merits of the defendant's motion.  (Id. at p. 610.)

10 In Earp v. Ornoski, supra, 431 F.3d 1158, the Ninth Circuit held that an evidentiary hearing was

11 required in order to determine whether, due to government interference, the petitioner in that case was

12 precluded "from presenting a witness in support of his motion for new trial."

13

14       Hairgrove and Earp both addressed the issue of due process——the defendant's ability to fully

15 present his new evidence.  In both cases it was not the merits of the trial court's decision that was at

16 issue, but rather the procedures used to reach that decision.  In the present case the trial court never

17 even sought to allow petitioner to have an evidentiary hearing in which petitioner would be permitted

18 to produce these witnesses' testimony.  Indeed, at the motion for new trial, Brooks was present in the

19 courthouse (in the custody of the Sheriff), and prepared to testify, but the court declined to hear from

20 him.

21

22       In the case of Zeph Carter, the defense knew his whereabouts, but we were unable to elicit his

23 exculpatory testimony at the hearing due to the fact that he was in a court mandated drug treatment

24 program.  Even with a subpoena, the defense's efforts to secure Carter proved useless.  The defense

25 asked the court for a reasonable continuance and/or to bifurcate the hearing.  (RT 1350-1356; See

1    also RT 1350 [defense counsel: Mr. Carter isn't here, so I would ask the court at least to bifurcate this

2    hearing so that I can try and get him here..."].  The court, however, refused to grant a continuance.

3    (See RT 1356 [Trial Judge: "I am not going to continue the hearing on a motion for new trial so that

4    Mr. Carter, who still hasn't been served, and who has been elusive at best, can come in and testify"].[12]

5
     California law does provide that a reasonable continuance may be granted to procure the
6
     affidavits of the witness by whom the evidence is to be given, and, if the showing is sufficient, it is
7
     error to refuse it.  (People v. Gaines, (1961) 192 Cal.2d 128, 135.)  Here, Carter was confined in a
8
     court mandated drug treatment program by the government.  Petitioner cannot imagine a showing on
9
     a request for continuance more sufficient.
10

11    If the court would have allowed petitioner to present Carter and Brooks' testimony it would

12    have established that there was substantial merit to petitioner's motion or that their testimony would

13    have not affected the outcome of the trial.  Either outcome would have contributed positively to the

14    administration of justice.  Even if their testimony had turned out to be inclusive, at least the court

15    would have all available information before it in ruling on the motion for new trial.  Surely few rights

16    are more fundamental than "that of an accused to present witnesses in his own defense." (Chambers

17    v. Mississippi, 410 US 284, 302 (1973).)  Indeed, defendants have a due process right to compel

18    attendance of relevant witnesses so that they may be treated with "that fundamental fairness essential

19

20    _____

21    12 What's intriguing is that Carter later testified before the same court in a subsequent trial that
        incriminated one of the black males.  (See the case of People v. Harvey, Marin County Case
22      No. SC13284A.)  Carter's appearance at the Harvey trial produces a perceivable violation of
        petitioner's constitutional rights.  Surely if the court allows the Marin County District
23      Attorney's office to use Carter's testimony to incriminate one of the black males, but disallows
        petitioner's defense the opportunity to utilize the same witness' testimony to vindicate him,
24      that's a violation of the equal protection clause of the Fourteenth Amendment and the due
        process clause of that Amendment.  Furthermore, it adds to the weight of petitioner's
25      argument that the court failed to fulfill petitioner's right to present relevant exculpatory
        witnesses in an evidentiary hearing.  (See Exhibit J, [Declaration of Harvey], ¶ 1-4.)

1   to the very concept of justice." (<u>United States v. Valenzuela-Bernal</u>, 458 U.S. 858, 872 (1982).)

2   Here, the state courts were unable to make credibility determinations because petitioner was unable to

3   compel attendance of relevant witnesses.

4       By shrouding Carter in a treatment facility, the interference element required to establish a

5   violation of compulsory process has been met. (<u>See</u> <u>United States v. Valenzuela-Bernal</u>, <u>supra</u>, 458

6   U.S. 858.) Indeed, the government's holding of Carter caused an inability to present him as a defense

7   witness; thus, petitioner's defense was unable to subpoena him for the hearing or conduct a proper

8   interview. Yet, the Marin County District Attorney's Office, who held the keys to Carter, had no

9   difficulty in securing him as a prosecution witness before the same court in a subsequent trial that

10  incriminated petitioner's alleged "cohort." (<u>See</u> <u>People v. Harvey</u>, Marin County Superior Court No.

11  SC132841A; <u>see</u> also Exhibit K [Tristan Harvey declaration] ¶ 1-3 attached hereto and incorporated

12  herein by reference as though set forth in full.)

13

14      **(5).     Trial Counsel's failure to investigate denied petitioner's right**
        <u>**to present readily available exculpatory witnesses.**</u>

15      As noted, the California standard for granting a new trial is what guides a federal court's

16  prejudice analysis. <u>Earp v. Ornoski</u>, <u>supra</u>, (9th Cir. 2005) 431 F.3d 1158, 1171, fn. 10 ["Because this

17  is a state conviction the California standard for granting a new trial must guide our prejudice

18  analysis"]. Pursuant to <u>People v. Martinez</u>, <u>supra</u>, (1984) 36 Cal.3d 816, 825, if the newly discovered

19  evidence would make a different result probable on retrial, a defendant's attorney's lack of diligence is

20  not enough to deny a motion for new trial.

21      If this Court were to find that trial counsel's lack of diligence waived petitioner's argument

22  that he was precluded from presenting newly discovered witnesses, then petitioner would ask that this

23  Court reach the merits of the issue based on a finding that counsel's failure to investigate denied

24  petitioner his Sixth Amendment right to the assistance of competent counsel. Had counsel been

25

1    armed with this additional evidence, it is more than reasonably probable a better result would have

2    occurred absent counsel's omissions.    See also Exhibit J, [Declaration of Mike Williams] ¶ 1-5,

3    attached hereto and incorporated herein by reference, [Trial counsel *never* asked defense investigator

4    to discover possible witnesses at the location of the incident!].[13]

5                    (6).    **Conclusion**

6
         This Court should hear the testimony from Zeph Carter and Karlan Brooks before making a

7    final decision in this case.    Both witnesses possess exonerating evidence that contradicts the

8    prosecution's theme and their main witness' story.  In such a close case with such dire consequences,

9    this Court should grant an evidentiary hearing on this issue.

10

11   **GROUND FOUR:           THE    TRIAL    COURT    COMMITTED    PREJUDICIAL**

12   **CONSTITUTIONAL ERROR WHEN IT FAILED TO INSTRUCT ON THE SPECIFIC**
     **INTENT ELEMENT REQUIRED FOR PETITIONER TO BE FOUND GUILTY OF AIDING**

13   **AND ABETTING.**

14                    (1).    **Introduction**

15        As a preliminary matter, it should be noted that the state courts "rubber stamped" this federal

16   constitutional claim without providing a basis for their decision, therefore, the state court decision

17   does "not warrant the deference [this Court] might usually apply."  (Delgado v. Lewis (9th Cir. 2000)

18   223 F.3d 976, 982.)  Lacking a reasoned decision from the state court, this Court should consider the

19   claim under an independent standard of review rather than the more deferential standard.  See also

20   Lewis v. Mayle (9th Cir. 2004) 391 F.3d 989, 996 [standard of review applicable to claim state court

21   did not reach on the merits].

22

23

24   _____

25   13 Counsel's lack of diligence in investigating witnesses was not isolated to this incident alone.
        Counsel also exhibited a lack of diligence when he failed to investigate several witnesses on
        his own witness list. See e.g., RT 442-443, where counsel admits that he was "relying on the
        information from the District Attorney's investigator to do [his] cross-examination and direct."

In this case, the jury was instructed on two theories for finding petitioner guilty of the charged offenses: that he was liable as a direct perpetrator or, in the alternative, that he was liable as an aider and abettor.  However, no instructions defining aiding and abetting (such as CALJIC No. 3.01) were given.  Thus, the jury never properly considered whether petitioner had the specific intent necessary to be convicted as an aider and abettor.  As a result of the court's failure to properly instruct the jury on the theory of aiding and abetting, petitioner's rights to due process, a fair trial, and fundamental fairness under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution were prejudicially violated. Reversal of the conviction is necessary.

### (2).    **Standard of Review**

The standard of review for instructional error was stated in <u>Estelle v. McGuire</u> (1991) 502 U.S. 62, 67:

> "The only question for us is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process' ... It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record. [Citation.]"

Applying the above standard, reversal is required.

### (3).    **The trial court committed prejudicial error by failing to instruct the jury on the specific intent element required for petitioner to be found guilty of aiding and abetting.**

California Penal Code section 31 (the aider and abettor or co-conspirator statute) states, in pertinent part, that:

> All persons concerned in the commission of a crime, ... whether they directly commit the act constituting the offense, or aid and abet in its commission, ... are principals in any crime so committed.

In the case of <u>People v. Beeman</u> (1984) 35 Cal.3d 547, the California Supreme Court held that a "person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advise aids, promotes, encourages or instigates, the commission of the crime." <u>Id</u>. at 561. <u>See</u> also <u>People v. Marshall</u> (1997) 15 Cal.4th 1, 40.

Regarding the aiding and abetting instructions, petitioner's jury was instructed pursuant to CALJIC numbers 3.00, 3.03 and 4.51, that:

> Persons who are involved in committing a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation is equally guilty. Principals include: 1. Those who directly and actively commit the act constituting the crime, or 2. Those who aid and abet the commission of the crime. (CALJIC No. 3.00; CT 342.)

> Before the commission of the crimes charged in count 1, 2 + 3, an aider and abettor may withdraw from participation in those crimes, and thus avoid responsibility for those crimes by doing two things: First, he must notify the other principles known to him of his intention to withdraw from the commission of those crimes; second, he must do everything in his power to prevent its commission. (CALJIC No. 3.03; CT 343.)

> If the evidence establishes beyond a reasonable doubt that the defendant aided and abetted the commission of the crime charged in this case, the fact, if it is a fact that he was not present at the time and place of the commission of the alleged crime for which he is being tried does not matter and does not, in and of itself, entitle the defendant to an acquittal. (CALJIC No. 4.51; CT 344.)

It is well established that trial courts are required to accurately and completely instruct jurors as to the elements of charged offenses. <u>United States v. Gaudin</u> (1995) 515 U.S. 506, 522-523 [the Sixth Amendment to the federal constitution "gives a criminal defendant the right to have a jury

determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged"].

Under section 31, a jury must find that the defendant had the specific intent required of aiding and abetting. None of the above instructions comply with this requirement; they do not define aiding and abetting. This was error pursuant to People v. Beeman, supra, (1984) 35 Cal.3d 547 [an instruction that did not correctly inform the jury about the specific intent required to be guilty of aiding and abetting was reversible error. Id. at 561]; accord, Roy v. Gomez (9th Cir. 1996) 81 F.3d 863, 866, revd. on other grounds sub. nom. California v. Roy (1996) 519 U.S. 2; see also Martinez v. Borg (9th Cir. 1991) 937 F.2d 422, 223.

In this case, the alternative aiding and abetting instructions were given with regards to all of the charged offenses. The prosecutor's argument further demonstrates that the jury had two theories in which they could choose from:

> "[T]he Judge has already instructed you on what the elements and charges are, and this is a violation of Penal Code section 211, and we've charged this as a first degree robbery, and one of the reasons we've charged it as a first degree robbery is because this robbery took place -- and the term, "acting in concert," meaning two or more persons acting together in a group, and *that includes not only those who personally engaged in the act or acts constituting the crime, but also those who aided and abetted a person accomplishing it.* (RT 1280; italics added.)

As instructed, the jury could have found petitioner guilty of each of the charges on either an aiding and abetting theory, or for directly committing the offenses. However, because the verdict forms did not specify whether petitioner was guilty as a principal or as an aider and abettor, it is impossible to know from the verdicts themselves upon which theory the jury relied.

By eliminating the need for a jury finding on the required elements of the aiding and abetting allegation, the instructions given by the trial court misstated the law and were therefore erroneous.

When a jury is instructed on alternate theories, one of which is legally inadequate, reversal is required unless the record reflects that the jury's finding was not based on the legally invalid theory. (Boyde v. California (1990) 494 U.S. 370, 379-380.) Under this rule, the convictions must be reversed unless the prosecution can establish that no juror relied upon the improper theory. (Sandstrom v. Montana (1979) 442 U.S. 510; Burks v. United States, 47 U.S. 1 (1978).) No such finding is possible here because the prosecutor relied heavily on the erroneous instructions during her closing argument——she argued the actions of "Bob Marley" and the other assailant (not petitioner), "We have a stomp to the head, we have a ... whack against the victims head with a Duracell log (sic), we have him being whipped repetitively with a belt" (RT 1325), and urged the jury to base its finding of guilt on the erroneous instructions.

There is nothing in the record before this Court that indicates that the jury's true finding was not based on the erroneous aiding and abetting instructions. The record shows that the black men are the ones that hit DiPrima in the face, whipped him with the belt, took his personal property, hit him in the head with the fire log and yelled at him to give up his credit cards, etc. Nowhere in the record does it show that petitioner took anything from the victim. As it can not be demonstrated that the jury surely did not rely on the erroneous instructions, the conviction must be reversed. See Keating v. Hood 191 F.3d 1053, 1062, ["We have consistently interpreted Supreme Court precedent to require reversal in any case in which a verdict may have rested on a legally invalid ground."][14]

///

///

//

_____

14 In this case the state appropriately requested that an instruction defining aiding and abetting be given to the jury. (CT 299; CALJIC No. 3.01.) However, for whatever reason, the proposed instruction was never given to the jury.

### (4). The Error was Prejudicial Under the Brecht Standard.

As the jury may have relied on the legally incorrect aiding and abetting theory, this issue falls squarely under <u>Boyde v. California</u> (1990) 494 U.S. 370, 379-380, and should be reversed per se. However, should this Honorable Court disagree, the error was prejudicial under the <u>Brecht</u> federal standard, and requires reversal. (See <u>California v. Roy</u> (1996) 519 U.S. 2 [holding that California's <u>Beeman</u> error is subject to <u>Brecht v. Abrahamson</u> 507 U.S. 619, 637, standard of review]; <u>also see</u> Scalia, J., concurring opinion [a federal habeas court should grant relief for this sort of claim when a petitioner has had "no opportunity to litigate it before, or when there is substantial doubt, on the facts, whether the defendant was guilty"].)[15]

The aiding and abetting instructions, as given here, allowed petitioner's jury to find him guilty of the crimes (1) without finding that he had knowledge of the unlawful purpose of the perpetrators and (2) without determining, even if he did, that he had the specific intent or purpose of committing, encouraging, or facilitating the commission of the crime. Indeed, there are no findings by the jury that demonstrate that the jury found that petitioner had the intent to facilitate the robbery on the victim. The jury could have found that petitioner did not know what the two black males were doing, or that petitioner merely had the intent to allow the blacks to scare the victim, or that petitioner changed his mind in the middle of the incident, or for any reason lacked the requisite intent. Perhaps the jury simply ignored petitioner's intent altogether, which is precisely the danger of <u>Beeman</u> error.

The Sixth Amendment to the federal constitution "gives a criminal defendant the right to have a jury determine, beyond a reasonable doubt, his guilt of every element of the crime with which he is charged." (<u>United States v. Gaudin</u>, <u>supra</u>, (1995) 515 U.S. 506, 522-523.) The jury's "constitutional

---

[15] Petitioner asserts that this case presents a novel situation in which both prongs of the <u>California v. Roy</u> concurring opinion are satisfied in this case——Petitioner has never previously been afforded the opportunity to litigate this issue; and petitioner is actually innocent of the crimes in this case.

responsibility," the high court said in <u>Gaudin</u>, includes the existence of each element of the crime—
—"that is [the] 'ultimate' or 'elemental' fact[s]" needed to convict. (<u>Id</u>. at pp. 514-515.)  No matter how inescapable a defendant's guilt of an element may seem in light of the evidence presented, the judge must have the jury make the ultimate finding on each element of the crime charged.  Here, however, the trial court's aiding and abetting instructions precluded the jury from independently determining one element of the charged offense: *Intent*.

As the United States Supreme Court has pointed out in the past, to determine whether an error "contributed to" a verdict, a reviewing court does not ask whether a hypothetical jury in a hypothetical trial in which the error did not occur would surely have reached the same verdict. (<u>Sullivan v. Louisiana</u> (1993) 508 U.S. 275, 277-279.)  Rather, the reviewing court must ask whether the guilty verdict actually rendered in this trial was "surely unattributable to the error." (<u>Ibid</u>.)  This is because the Sixth Amendment right to a jury trial means that the jury, and not a reviewing court, must find beyond a reasonable doubt every fact needed to convict.  This is the test that United States Supreme Court Justice Antonin Scalia articulated in his concurring opinion in <u>Carella v. California</u> (1989) 491 U.S. 263, 267, which the entire nine-member court later adopted in <u>Sullivan v. Louisiana</u> (1993) 508 U.S. 275.

"The constitutional right to a jury trial embodies 'a profound judgment about the way in which law should be enforced and justice administered.' <u>Duncan v. Louisiana</u> 391 U.S. 145, 155 (1968). It is a structural guarantee that 'reflect[s] a fundamental decision about the exercise of official power——a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges.' <u>Id</u>., at 156. A defendant may assuredly insist upon observance of this guarantee even when the evidence against him is so overwhelming as to establish guilt beyond a reasonable doubt. That is why the Court has found it constitutionally impermissible for a judge to direct a verdict for the state."

(Carella v. California, supra, 491 U.S. 263, 268 (conc. opn. of Scalia, J.).)    No matter how overwhelming the evidence may be in any given case, the defendant has the right to have a jury and not the judge determine every element of the charged offense.

Here, the trial court improperly removed from the jury's consideration the element of criminal intent.  The instant Beeman error is subject to the test of Brecht, which requires reversal for federal constitutional error that has a "substantial and injurious effect."    (Ibid.)    Here, the error was substantial and injurious because, without the proper definition of aiding and abetting, CALJIC No. 4.51 (one of the several aiding and abetting instructions given) prejudicially extracted petitioner's entire defense.  As noted, petitioner's defense was that he was present in the other room at the time of the assault, however, when he discovered what was happening he attempted to come to the aid of the victim.  The instruction (CALJIC No. 4.51) informed the jury that petitioner's "presen[ce] at the time and place of the commission of the crime for which he is being tried does not matter and does not, in and of itself, entitle the defendant to an acquittal. (CT 344.)  Consequently, even if the jury believed petitioner's defense (that he was talking on the phone in the other room at the time of the assault) they may have mistakenly believed that petitioner had not met his burden of proving that he was not an aider and abettor.  **Simply stated**, without the proper definition of aiding and abetting, CALJIC No. 4.51 had the effect of shifting the burden of proof to petitioner.  This is not acceptable.  The Supreme Court has held that the prosecution cannot shift the burden of proof or persuasion as to any element of a crime to the defendants. (Sandstrom v. Montana (1979) 442 U.S. 510.)  By instructing the jury that petitioner's presence at the time and place of the crime "...does not matter and does not, in and of itself, entitle the defendant to an acquittal," the trial court in effect shifted the burden to petitioner to prove that he was not an aider and abettor in order for petitioner to retain any right to his defense.

### (5).   Conclusion

As a matter of law, the trial court committed prejudicial error of constitutional magnitude when it instructed the jury on an aiding and abetting theory without informing the jury that they had to find that petitioner shared the intent to commit, encourage, or facilitate the crimes that took place in petitioner's apartment.   Unlike any other case that petitioner has found, this case presents an unusual situation in which petitioner has had "no opportunity to litigate [this claim] before" (California v. Roy 519 U.S. 2, 8, Scalia, J.); therefore, the federal writ should issue.

**GROUND FIVE:    CUMULATIVELY, THE ERRORS IN THIS CASE PREJUDICED PETITIONER'S RIGHTS TO DUE PROCESS, A FAIR TRIAL AND EFFECTIVE ASSISTANCE OF COUNSEL SUCH THAT REVERSAL OF THE CONVICTION IS COMPELLED.**

### (1).   Introduction

Similar to the claim in the previous section, the state courts never considered whether the cumulative effect of all the trial errors denied petitioner of a fair trial.  Therefore, there is no reasoned state court decision on the *gestalt* effect of the fundamental errors that marred petitioner's legal proceedings.  Accordingly, this Court is unconstrained by AEDPA and should consider, *de novo*, all of the incidents of constitutional impropriety in the aggregate.

It is well established that a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.  See, e.g., Chambers v. Mississippi, supra, (1973) 410 U.S. 284, 302.  Thus, even in cases with strong government evidence, reversal may be compelled when legal errors raise the strong possibility that aggregate prejudicial effect of such was greater than the sum of the prejudice of each error standing alone.  (Gerlaugh v. Stewart, (9th Cir.) 129 F.3d at 1043.)  In close cases, the cumulative effect of multiple errors can lead to the miscarriage of justice even though impact of any one error may be relatively slight.  While not

conceding that any of the errors mentioned in this petition were separately harmless, petitioner asserts that their combined effect contributed to the adverse result. Consequently, a breach of the Constitution has occurred, requiring issuance of the federal writ.

Petitioner believes that several of the errors mentioned in this petition are so fundamental that reversal is required per se.   Should this Court find that one or more of these errors is subject to a less strict standard, the rule would apply that when a number of trial errors occur, the standard is whether or not their cumulative effect had a substantial and injurious effect.  (Brecht v. Abrahamson supra 507 U.S. 619, 637.)  Furthermore, the prosecution bears the burden of demonstrating that the error was not substantial and injurious and any doubt on this question should be resolved in favor of granting relief. (O'Neal v. McAninch, (1995) 513 U.S. 432.)

In this case, petitioner's defense counsel failed to subpoena material exculpatory phone records and he failed to lay proper grounds for admission into evidence a certified copy of an exhibit that corroborated a defense witness' testimony; thus, allowing the witness to be falsely impeached by the prosecution.   Moreover, defense counsel told the jury that certain time proof would be forthcoming, and then failed to deliver it.   When the jury requested to see that evidence defense counsel failed to get it, and the jury's request was denied.  Not only was this deficient presentation of the defense less helpful than a competent presentation would have been, it was actually harmful to petitioner's defense.  Trial counsel consistently told the jurors that he would prove that petitioner was on the phone during the assault, and utterly failed to do so, harming the credibility of petitioner's entire defense.  The prosecutor's rebuttal highlighted counsel's failure; indeed, the prosecutor devoted more of her closing argument to the phone records than petitioner's attorney did.

What's more, defense counsel did not interview or investigate anyone that wasn't already listed in the reports in discovery.  In doing this, he failed to find easily locatable eyewitnesses who

1  would have testified that petitioner had no role in the crimes. Carter and Brooks' testimony would

2  have further weakened the prosecution's theory of the case. The combined testimony of these

3  witnesses would have challenged DiPrima's version of the events and effectively corroborated

4  petitioner's defense. (Infra III).

5       The trial attorney also denied petitioner's express desire to testify. If this right had not been

6  denied, petitioner would have testified to his presence at the scene of the crime, without aiding and

7  abetting it, which is corroborated by petitioner's phone records that defense counsel failed to

8  subpoena and petitioner's ex-girlfriend's records that he failed to admit into evidence. Petitioner's

9  jury was also erroneously instructed on the theory of aiding and abetting, which substantially lowered

10  the prosecution's burden of proof——extricating petitioner's defense and placing the burden directly

11  on petitioner.

12       If defense counsel had taken the opportunity to set forth for the jury petitioner's theory of the

13  case, and had he introduced the contradictory evidence that was promised, reasonable doubt would

14  have been created in the minds of the jury. Trial counsel's mistakes completely undermine

15  confidence in the outcome. (Brown v Myers, (9th Cir. 1998) 137 F.3d 1154, 1156 [emphasizing that a

16  habeas petitioner "does not have to show by a preponderance of the evidence that the result in the

17  case would have been different but for counsel's errors," but rather that "counsel's errors undermine

18  confidence in the outcome."]

19       Defense counsel could have had no satisfactory tactic for excluding petitioner's testimony, the

20  phone records and exculpatory witnesses. Trial counsel's errors clearly prohibited petitioner from

21  presenting his defense to the jury. "When an attorney has made a series of errors that prevents the

22  proper presentation of a defense, it is appropriate to consider the cumulative impact of the errors in

23  assessing prejudice." (Taylor v. Duncan, (9th Cir. 1998) 158 F.3d 449, 457; Cooper v. Fitzharris, (9th

Cir. 1978) 586 F.2d 1325, 1333, ["[A]bsence of prejudice is not established by demonstrating that no single error considered alone significantly impaired the defense[;] prejudice may result from the cumulative impact of multiple deficiencies."]

When this Honorable Court considers the cumulative impact of defense counsel's errors it will see that petitioner's jury could not be reasonably expected to fulfill their duty to determine whether the state had met its burden. When all was said and done, the jury did not have the benefit of readily available defense evidence before them, allowing them to be easily misled by the prosecution's factual misrepresentations. Although the prejudice of all these errors would, in isolation, be assessed as to "whether [they] had a substantial and injurious effect or influence in determining the jury's verdict" under Brecht, in this case the errors occurred where the prosecutor had already misrepresented material facts. As such, the prosecutor's factual misrepresentations (erroneously arguing that there were no phone records showing that petitioner was on the phone even though the record shows that she had a copy of the phone records in front of her) further aggravated the prejudice stemming from the cumulative errors. Under Brecht, trial errors that are combined with a pattern of prosecutorial misconduct may require reversal even if they do not substantially affect the verdict. (Brecht at p. 638 fn. 9 [error must affect integrity of entire proceeding]. Accord Hardnett v. Marshall (9th Cir. 1994) 25 F.3d 875, 879, 893 [footnote 9 error requires automatic reversal].

### (2).    Conclusion

The accumulation of errors in this case impacted petitioner's ability to present a viable defense and denied him the opportunity to present material evidence. The errors also impacted the way in which the jury considered the other evidence in this case. The cumulative effect of these errors were per se prejudicial and, in any event, were substantial and injurious. When given the opportunity to explain the alleged improprieties, trial counsel conceded to rendering ineffective assistance of

counsel.  See Exhibit F, [in-camera hearing transcript]; and Exhibit H [trial counsel Jim Wall declaration] ¶ 1-4.

Due to the above, petitioner's imprisonment is in violation of his Federal Constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  For these reasons, a new trial should be granted pursuant to 28 U.S.C. 2254 (d)(1)&(2).)

THE *PERSONAL* INFLICTION
OF GREAT BODILY INJURY ENHANCEMENT

**GROUND SIX:**     **AS A MATTER OF LAW, THERE IS INSUFFICIENT EVIDENCE TO SUPPORT THE JURY'S FINDING OF PERSONAL INFLICTION OF GREAT BODILY INJURY.**

>          **(1).     Introduction**

Penal Code section 12022.7, subdivision (a) provides that "[a]ny person who *personally inflicts* great bodily injury..." (italics added) shall be punished.  In the instant case, the evidence established that the two black males, not petitioner, were the ones who personally inflicted the injuries on DiPrima; thus, as a matter of law, the evidence is insufficient to support the great bodily injury enhancement.  This unproven and unsupported finding violated petitioner's rights to due process, a fair trial, a reliable determination of penalty, and fundamental fairness under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

>          **(2).     There is insufficient evidence to support the determination that petitioner personally inflicted DiPrima's injuries.**

As noted, Penal Code section 12022.7, subdivision (a) states that "[a]ny person who personally inflicts great bodily injury..." is subject to punishment.  In the case of People v. Cole (1982) 31 Cal.3d 568, 571-572, the California Supreme Court held that this enhancement applies only

to those persons who themselves *actually and personally inflict the injury*, not to those who merely aid and abet:

> "... We have concluded that the Legislature intended to impose an additional penalty for causing great bodily injury *only on those principles who perform the act that directly inflicts the injury,* and that one who merely aids, abets, or directs another to inflict the physical injury is not subject to the enhanced penalty of section 12022.7.
>
> ***
>
> In our opinion, the meaning of the statutory language is clear: the enhancement applies only to a person who himself inflicts the injury. ... It is doubtful that the Legislature could have enacted the statute in question more tersely to express the intended limitation on the class of individuals who may be exposed to an enhanced sentence for inflicting great bodily injury. Among the several dictionary definitions of 'personally,' we find the relevant meaning clearly reflecting what the legislature intended: 'done in person without the intervention of another; direct from one person to another.' (Webster's New Internat. Dict. (3d ed. 1961).) No other expression could have more clearly and concisely expressed what we interpret to be the plain meaning of the Legislature: that the individual accused of inflicting great bodily injury must be the person who directly acted to cause the injury. The choice of the word 'personally' necessarily excludes those who may have aided or abetted the actor directly inflicting the injury." (Emphasis added)

(Accord, People v. Bland (2002) 28 Cal.4th 313, 337; People v. Gutierrez (1996) 46 Cal.App.4th 804, 813, ["... section 12022.7... is limited in its applicability to the defendant who performs the act directly inflicting the injury."])

In petitioner's trial it was established that "Bob Marley" and the other black male (not petitioner) were the ones who inflicted great bodily injury——they punched DiPrima, hit him repeatedly with the belt, stomped on his head, and hit him with a Duraflame log. It was alleged that petitioner held DiPrima. Although the supposed hold was alleged to have choked DiPrima, there is no evidence that he suffered any injury as a result.

DiPrima did not know whether petitioner had ever struck him. He told Detective Pata that petitioner "'... **didn't hit**,'" which Pata understood as petitioner "[n]ever struck him with his hands..." (RT 746.) When asked, "Do you know if the defendant ever hit you with a closed fist or kicked you?" DiPrima answered, "**I do not**." (RT 583; emphasis.) He also testified:

> "MR. WALL [Defense counsel]: Q. Do you recall
> telling her that all of them traded off holding you down,
> Kicking you and punching you?
>
> A. I do.
>
> Q. How many times did Mr. Voelker punch you?
>
> A. The only time that I could see people actually
> hitting me is when Mr. Voelker had me in a restrained hold.
>
> Q. How many times did you see him punch you, if any?
>
> A. How -- again, that's the only time I could see
> people attacking me. So *maybe he attacked me* while I was
> like this the whole time on the ground, like I'm sure he kicked me
> or punched me, like, five, ten times. *I don't see why he wouldn't have*.
>
> Q. So he kicked you or punched you five to ten times?
>
> A. That's just a rough estimate. ...
>
> MR. Wall: Q. You said that he was holding you,
> with which arm?
>
> A. He -- I'm not sure which arm it was, one of his arms,
> he was choking me.
>
> Q. And the other arm he was hitting you, right?
>
> A. *I don't know*.
>
> Q. You just said just a few seconds ago that he was hitting
> you five to ten times. Do you recall specifically any of the
> times where he hit you?
>
> A. Again, I said the only time that I could see who was
> hitting me was when he was holding me. That's the only time I

could see this mulatto guy above me beating me with my belt and -- and this other guy taking off my watch and breaking my chain off. That's the only time that I could see *those two guys beating me*, and he was behind me holding me. And other than that, like I said, *he could have -- he could have beat me* any time I was on the ground--

Q. Okay.

A. -- like *how was I supposed to know*?

Q. You said that he -- five to ten times. Is there any time that you remember after you were on the ground and you got up that he hit you?

A. Again, like, *I couldn't see*, I was protecting my head.

Q. You said that -- after you'd gotten up, that you were standing over by the computer desk --

A. M-hm.

Q. -- correct?

A. Yeah.

Q. And your hands were over your head then?

A. No, I was standing up.

Q. Did he hit you then?

A. At that point, no...." (RT 492-494; emphasis added.)

Clearly, DiPrima had no idea whether petitioner had done anything other than allegedly hold him. He was merely guessing that petitioner had personally hit him. However facts must be proved by evidence not by conjecture, guess work or wishful thinking. (U.S. v. Dunlap (8th Cir. 1994) 28 F.3d 823; U.S. v. Rahseparian (10th Cir. 2000) 231 F.3d 1257. [A jury may make inferences only where those inferences can be made beyond a reasonable doubt: it may not speculate.])

While DiPrima's testimony indicated that the two black males personally inflicted great bodily injury, it did not show that petitioner had *personally* done so, nor did the prosecutor argue that petitioner directly performed or personally inflicted *any* of the injuries that formed the basis of the great bodily injury allegation. As a matter of law, DiPrima's speculative testimony is not sufficient to support the jury's finding on the *personal* infliction of great bodily injury enhancement.

A personal infliction finding which is not supported by substantial evidence violates a defendant's rights to due process, a fair trial, a reliable determination of penalty, and fundamental fairness under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. (Accord, Jackson v. Virginia (1979) 433 U.S. 307, 315-316; In re Winship (1970) 97 U.S. 358.)

### (3).    Conclusion

The true finding on the personal infliction of great bodily injury enhancement is not supported by substantial evidence; thus, the finding is unconstitutional.

**GROUND SEVEN:** **IT WAS REVERSIBLE ERROR TO INSTRUCT THE JURY PURSUANT TO CALJIC No. 17.20 BECAUSE IT ALLOWED THE JURY TO FIND PETITIONER GUILTY WITHOUT MEETING THE STATUTORILY REQUIRED ELEMENTS OF PENAL CODE § 12022.7 IN VIOLATION OF PETITIONER'S RIGHTS TO DUE PROCESS OF LAW UNDER THE FEDERAL CONSTITUTION.**

### (1).    Introduction.

As noted in the previous section, it has long been established that the enhancement for infliction of great bodily injury, within the meaning of Penal Code section 12022.7, applies only to those who have been found to have *personally* and directly caused the victim to suffer great bodily injury. "[A] defendant cannot receive an enhanced sentence under section 12022.7 on a theory of vicarious liability." (People v. Rodriguez, (1999) 69 Cal. App. 4th 341, 348.) "To 'personally inflict' injury, the actor must do more than take some direct action which proximately causes injury. *The defendant must directly, personally, himself inflict the injury.*" (Rodriguez, supra, at p. 349; italics

1  added.) Therefore, one who "aids, abets, or directs another to inflict the physical injury is not subject

2  to the enhanced penalty of section 12022.7." (People v. Cole, (1982) 31 Cal.3d at 571.)

3       In the instant case, the trial court instructed the jury that they were to be guided by aiding and

4  abetting instructions and CALJIC No. 17.20 in determining whether petitioner had *personally*

5  inflicted great bodily injury pursuant to Penal Code §12022.7 (CT 364; RT 1240.) However,

6  CALJIC No. 17.20 is unconstitutional because it lowers the prosecution's burden of proof by omitting

7  a material element of the enhancement. As petitioner will show, the result of this misinstruction

8  violated his rights to due process, a fair trial, a jury trial, and fundamental fairness under the Fifth,

9  Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

10

11       **(2).   CALJIC No. 17.20 is unconstitutional**

12  Penal Code section 12022.7, subdivision (a) states in pertinent part, that:

13       Any person who *personally* inflicts great bodily injury on any
     person other than an accomplice in the commission of a felony or
14       attempted felony shall be punished by an additional and
     consecutive term of imprisonment in the state prison for three
15       years. (Italics added.)

16       Regarding the great bodily injury enhancement, the jury was instructed, pursuant to CALJIC

17  17.20, that:

18       When a person participates in a group beating and *it is not possible to*
     *determine which assailant inflicted a particular injury,* he may be found to
19       have personally inflicted great bodily injury upon the victim, if 1) the
     application of force upon the victim was of such nature that, by itself, it
20       *could have caused* the great bodily injury suffered by the victim; or 2) that
     at the time the defendant personally applied unlawful physical force to the
21       victim, the defendant knew that other persons, as a part of the same
     incident, had applied, were applying, or would apply unlawful physical
22       force upon the victim and the defendant then knew or reasonably should
     have known that the cumulative effect of all the unlawful physical force
23       would result in great bodily injury to the victim. (CT 364; RT 1240;
     italics added.)

24

25

1   It is well settled that trial courts are required to accurately and completely instruct jurors as to

2   the elements of charged offenses.   (Cabana v. Bullock (1986) 474 U.S. 376, 385 ["A defendant

3   charged with a serious crime has the right to have a jury determine his guilt or innocence, ... and a

4   jury's verdict cannot stand if the instructions provided to the jury do not require it to find each

5   element of the crime..."])

6       Under section 12022.7, the only proper basis for a jury to have found petitioner guilty of

7   infliction of great bodily injury is that he must have *personally* delivered the injurious blow.  Neither

8   basis stated in CALJIC No. 17.20 comply with this requirement.  The first basis encourages the jury

9   to speculate as to whether the defendant performed the act causing the victim's injuries. This is

10  directly in conflict with the plain and unambiguous language of the statute.   Thus, the jury was

11  instructed that even if they could not find that petitioner *personally* inflicted the great bodily injury

12  they would still be required to find the allegation to be true as long as they felt that petitioner "*could

13  have caused* the great bodily injury suffered by the victim."   (CALJIC No. 17.20; CT 364; RT 1240;

14  italics added.) Petitioner's trial established that "Bob Marley" and the other black male (not

15  petitioner) were the ones who inflicted the great bodily injury——they punched DiPrima, hit him

16  repeatedly with the belt, stomped on his head, and hit him with a Duraflame log.[16]

---

16      Unlike other group beating cases, this case presents a situation in which it is clear to see who
        inflicted the great bodily injury: It was alleged, albeit incorrectly, that petitioner held DiPrima
        while the two black males inflicted great bodily injury. Thus, assuming arguendo that CALJIC No.
        17.20 is not unconstitutional, it was error to give this instruction because CALJIC No. 17.20
        should not be given when it is possible to determine who inflicted the injurious blows. (People v.
        Corona (1989) 213 Cal.App.3d 589.) Furthermore, "[t]he prosecution does bear the burden of
        showing that it cannot be determined which assailant inflicted a particular injury in the context of a
        group beating." (People v. Banuelos, 106 Cal.App.4th 1332.)

Ultimately, DiPrima did not know whether petitioner had ever hit him.  He told Detective Pata that petitioner "'... didn't hit,'" which Pata understood as petitioner "[n]ever struck him with his hands..." (RT 746.)  When asked, "Do you know if the defendant ever hit

you with a closed fist or kicked you?," DiPrima answered, "*I do not.*" (RT 583; italics added.)

DiPrima's testimony did not show that petitioner had *personally* hit him, nor did the prosecutor argue that petitioner directly performed or personally inflicted **any** of the injuries that formed the basis of the great bodily injury allegation.  Thus, the only possible basis for the jury's finding that the great bodily injury enhancement was true came by application of the improper instruction which told the jury if "when a defendant participates in a group beating and when its not possible to determine which assailant inflicted which injuries, the defendant may be punished with a great bodily injury enhancement if his conduct was of nature that it *could have caused* the great bodily injury suffered." (CALJIC No. 17.20; italics added.)

> (3).    **The erroneous giving of CALJIC No. 17.20 allowed petitioner's jury to find liability in the absence of proof that he *personally* inflicted the great bodily injury.**

Despite Penal Code Section 12022.7's unambiguous language that liability for personal infliction of great bodily injury may only be based on direct, personal action by a defendant, CALJIC No. 17.20 allowed petitioner's jury to find the great bodily injury enhancement true even if it did not find that he, himself, had *personally* inflicted the great bodily injury.  This misinstruction allowed the jury to find personal infliction of great bodily injury if it felt that petitioner had participated in a group beating, it was not possible to determine which assailant inflicted a particular injury, and he "could have caused the great bodily injury suffered." **In other words,** it allowed a finding of personal infliction of great bodily injury in the absence of a finding that petitioner personally inflicted

the great bodily injury, so long as the jury felt that petitioner was involved——in any way——in the group beating, and "could have" applied force resulting in great bodily injury.

The Use Note to CALJIC No. 17.20 states that the instruction is derived from People v. Corona (1989) 213 Cal.App.3d 589. Corona carved out a narrow "group beating" exception to the statutory requirement that personal infliction of great bodily injury be inflicted personally.  It held that "when a defendant participates in a group beating and *when it is not possible to determine which assailant inflicted which injuries*, the defendant may be punished with a great bodily injury enhancement if his conduct was of nature that it could have caused the great bodily injury suffered." (Ibid.; italics added.)

Here, petitioner's trial established that "Bob Marley" and the other black male (not petitioner) were the ones who inflicted the great bodily injury; thus, CALJIC No. 17.20 should not have been given. As given here, CALJIC No. 17.20 clashed with the statutory language of section 12022.7, as the clear and unambiguous statutory language limits the category of persons subject to the enhancement to those who directly perform the act that causes the physical injury to the victim.  In other words, the giving of CALJIC No. 17.20 in this case was erroneous because 1.) The analytic touchstone for the Corona exception is impossibility of determining who inflicted the great bodily injury (an issue that was not implicated in the instant case); and 2.) the instruction permitted the jury to draw an inference on the basis of inconclusive evidence: that petitioner "**could have caused**" the great bodily injury suffered.  In American jurisprudence, however, convictions must be proved by evidence, not speculation. U.S. v. Dunlap (8th Cir. 1994) 28 F.3d 823; U.S. v. Rahseparian (10th Cir. 2000) 231 F.3d 1257.

**(4).    The instruction's omission of a material element of the enhancement lowered the prosecution's burden of proof and deprived petitioner of his federal rights to due process of law.**

The United States Constitution requires that the trial court give instructions regarding——and the jury determine——all material elements of an enhancement that increases a defendant's punishment beyond the statutory maximum. (<u>Apprendi v. New Jersey</u> (2000) 530 U.S. 466.) That standard is applicable here because the great bodily injury enhancement transformed petitioner's convictions into serious felonies under the Three Strikes statute (§ 1192.7 subd. (c)(8)) so it constituted a sentencing enhancement of 25 years to life in prison for **any** future felony. It can not be argued that petitioner's federal rights will not be at issue until a future felony may be charged, for it is the jury's finding of great bodily injury here that mandates enhancement of any future felony sentence. The status of a felony as "serious" is determined upon the date of conviction. (§§ 667, subd. (d)(1), 1170.12, subd. (b)(1).)

This is the moment——the only moment——petitioner can litigate the great bodily injury finding, for once established in this case, it will be binding forever. Accordingly, the instruction's omission of the material element that petitioner himself *personally* inflicted the great bodily injury violated his Constitutional right to proof beyond a reasonable doubt.

While it could be argued that it is difficult to prove who inflicted what injury in a "group attack," difficulty of proof does not justify lessening the prosecution's burden. Even though "[c]ourts must be sensitive to the difficulties attendant upon the prosecution of [certain kinds of cases] ... 'this court cannot alter evidentiary rules because litigants might prefer different rules in a particular class of cases.'" (<u>Tome v. U.S.</u> (1995) 513 U.S. 150, 165-67, quoting <u>U.S. v. Salerno</u> (1992) 505 U.S. 317, 332.)

### (5).    The Erroneous giving of CALJIC No. 17.20 Expanded liability and, thus, violated the Rule of Lenity.

Ambiguities in penal statutes must be resolved in favor of the defendant. The rule, called the rule of lenity, controls in both the U.S. Supreme Court and this court. (See, e.g., Bifulco v. United States (1980) 447 U.S. 381, 387.) Under the separation of powers doctrine, the rule serves to protect the legislature's exclusive authority to define crimes from judicial encroachment. As a matter of fundamental due process, the rule helps to ensure that citizens are given fair warning of conduct punishable as crime.

CALJIC No. 17.20 expands liability for personal infliction of great bodily injury beyond the offense defined by the clear and unambiguous language of the statute, and, thus, violates the rule of lenity. Failure to honor that rule violated petitioner's Fourteenth Amendment right to due process of law. (Hicks v. Oklahoma (1980) 447 U.S. 343, 346-347 [state's arbitrary denial of its own domestic rules may implicate due process].)

### (6).    The error was prejudicial because it is not possible to determine whether the jury relied on the erroneous legal theory.

When a jury is instructed on alternate theories, one of which is legally improper, reversal is required unless the record reflects that the jury's finding was not based on the legally invalid theory. Under this rule, the conviction (or finding in this case) must be reversed unless the prosecution can establish that no juror relied upon the improper theory. (Burks v. United States, 47 U.S. 1 (1978).) No such finding is possible here because the prosecutor relied heavily on the erroneous instruction during her closing argument – she argued the actions of "Bob Marley" and the other assailant (not me), "We have a stomp to the head, we have a ... whack against the victims head with a Duracell log (sic), we have him being whipped repetitively with a belt" (RT 1325), and urged the jury to base its finding of guilt on the erroneous instruction.

There is nothing in the record before this court which indicates that the jury's true finding was not based on the misapplied instruction. As it can not be demonstrated that the jury surely did not rely on the erroneous instruction, the enhancement must be reversed. See Keating v. Hood 191 F.3d 1053, 1062, ["We have consistently interpreted Supreme Court precedent to require reversal in any case in which a verdict may have rested on a legally invalid ground."]

> (7).   **The aiding and abetting instructions complicated the erroneous giving of CALJIC No. 17.20.**

As noted in the previous sections, Penal Code section 12022.7, subdivision (a) states that "[a]ny person who personally inflicts great bodily injury..." is subject to punishment. In the case of People v. Cole, supra, (1982) 31 Cal.3d 568, 571-572, the California Supreme Court held that this enhancement applies only *to those persons who themselves actually and personally inflict the injury*, and that one who merely *aids, abets*, or directs another to inflict the physical injury is not subject to the enhanced penalty of section 12022.7. (Ibid.)

In the instant case, petitioner's jury was instructed with aiding and abetting instructions. (CT pp. 342, 343, 344; CALJIC numbers 3.00, 3.03, and 4.51) Because CALJIC Numbers 3.00, 3.03, and 4.51 apply when a defendant is an aider and abettor, they should not have been given in combination with CALJIC No. 17.20. As given here, these aiding and abetting instructions simply provided an additional basis upon which the jury could find petitioner guilty of personal infliction of great bodily injury without finding that petitioner had *personally* inflicted such injury.

CALJIC Number 3.00 instructed the jury that "[e]ach principal, regardless of the extent or manner of participation is equally guilty. Principals include ...[t]hose who aid and abet the commission of the crime." (CT 342.)

CALJIC 4.51, the Alibi – Aider and Abettor or Co-Conspirator instruction, informed the jury that:

1    If the evidence establishes beyond a reasonable doubt that the
     defendant aided and abetted the commission of the crime charged
2    in this case, the fact, if it is a fact that he was not present at the time
     and place of the commission of the alleged crime for which he is
3    being tried does not matter and does not, in and of itself, entitle the
     defendant to an acquittal. (CT 344)
4

5    An aider and abettor can not be punished with the enhanced punishment of 12022.7. As it

6    cannot be demonstrated that the jury surely did not rely on the aiding and abetting instructions, the

7    enhancement must be reversed.

8    **(8).    As the error went to an enhancement that increases the penalty for a
             crime beyond the statutory maximum, it must be judged under the
9            standard of _Brecht v. Abrahamson_.**

10   As discussed above, a trial court's failure to instruct the jury on an element of a sentence

11   enhancement provision that increases the penalty for an underlying crime beyond the statutory

12   maximum is federal constitutional error. (In re Winship (1970) 97 U.S. 358.) The Brecht standard is

13   just as applicable to a "misinstruction" on an element as it is to a failure to instruct on an element and

14   the prosecution bears the burden of demonstrating that the error was "harmless beyond a reasonable

15   doubt." (O'Neal v. McAninch, (1995) 513 U.S. 432.)

16

17   Here, the challenged instruction went to the heart of the jury's true finding of great bodily

18   injury: as previously shown, DiPrima was merely guessing that petitioner had hit or kicked him.

19   DiPrima later testified that, in reality, he did not know whether petitioner had ever struck him. (RT

20   492-494, 583.) He told Detective Pata that petitioner "'... didn't hit'" him. (RT 746.) Although it was

21   alleged that petitioner choked DiPrima, there is no medical evidence that he suffered an injury as a

22   result. Indeed, there is no medical evidence that he was choked at all. (Please see the testimony of

23   the Medical Doctor. (RT 367-368.).) Furthermore, there was no evidence whatsoever to show that

24   petitioner had personally inflicted great bodily injury.

25

1

2

      **(9).    Because *People v. Corona* misstates and misinterprets the statute and legislative intent, it deprived petitioner of his right to due process of law <u>and to proof beyond a reasonable doubt under the Federal Constitution</u>.**

3

4

<u>Corona</u> purported to create a "group beating exception" to the statutory requirement that personal infliction of great bodily injury be inflicted personally.  The court held that "when a

5

defendant participates in a group beating and *when its not possible to determine which assailant*

6

*inflicted which injuries,* the defendant may be punished with a great bodily injury enhancement if his

7

conduct was of nature that it *could have caused* the great bodily injury suffered."  (<u>Ibid</u>.; italics

8

added)

9

10

      The Corona holding and, thus, CALJIC No. 17.20, is not the law, but a "narrowly carved

11

exception" to the law.   It removes the element of *personal* infliction of great bodily injury from the

12

offense in certain circumstances.  As <u>Corona</u>'s expansion of liability to persons who have not been

13

proved to have *personally* and directly inflicted great bodily injury stands in clear contradiction to the

14

language of the statute it constitutes impermissible judicial legislation and invasion of the

15

Legislatures designated sphere, in violation of the doctrine of separation of powers that is enshrined

16

in the Constitution and fundamental to the preservation of our civil liberties.  (<u>U.S. v. Bass</u> (1971)

17

404 U.S. 336, 348 [violation of doctrine of separation of powers violates Fourteenth Amendment].)

18

      **(10).   *Corona* impermissibly lowers the prosecutions burden of proof by allowing**

19

**liability for personal infliction of great bodily injury on the speculative <u>basis of what "could have" caused the injury</u>.**

20

21

      In addition to allowing the jury to find personal infliction of great bodily injury without

22

finding that petitioner had *personally* and directly inflicted such injury, <u>Corona</u>, and hence, the

23

challenged instruction, further lowers the prosecution's burden of proof by allowing liability if "the

24

application of unlawful physical force upon the victim was of such a nature that, by itself, it **could**

25

**have caused** the great bodily injury." (CT 364; RT 1240, emphasis added.)  This formulation blinds

the prudence of distinguished centuries of Anglo-American jurisprudence.  What **"could have** caused injury" is a fancy that belongs in the airy realms of the subjunctive, it sails on wisps of abstract reasoning and speculation; it slides on possibility and chance.  Criminal liability and punishment, in contrast, must be embedded in indisputable fact, securely fastened in the absolute "beyond a reasonable doubt."

The Corona holding hinders the Legislature's intent.  Its imposition of liability on a person who may have participated in a group beating without, himself, directly inflicting great bodily injury removes all reason for individual restraint, for under Corona, once someone is involved in a group beating situation, he is fully liable for great bodily injury regardless of his own level of involvement in the creation of the injury.

Corona sought to justify its expansion of liability by citing the difficulty of proving which defendant in a group beating was responsible for a victim's injuries.  (Id. at p. 594.)  Difficulty of proof, however, does not excuse the judicial removal of a material element of the statute, an excision that violates a defendant's due process right to jury determination of every material element of the offense. (Tome v. U.S., supra, 513 U.S. at p. 165-67.)

Group assaults (Corona) present problems of proof of individual liability, and problems of punishment where that proof is lacking.  Resolving those problems necessarily involves a choice: shall the law allow persons who may have been guilty, but could not be proved to be so, evade liability, or shall it inflict enhanced punishment and liability for a serious felony on persons who did not, in fact, personally inflict great bodily injury?[17]

---

17 While paraphrasing Sir William Blackstone, Thomas Jefferson was once conveyed the opinion that it would be far better to allow ten guilty persons to go free then it would be to strip the liberty away from one innocent. Is such sentiment simply pretentious rhetoric, or rather a cardinal principle of Anglo-American jurisprudence?

The California Legislature, however, has assisted us with the answer to the aforementioned question. Its amendment of section 12022.7 to add the word "personally" shows an unambiguous decision to define the enhancement to ensure that only those who have been proven to *personally* inflict great bodily injury are subjected to an immediate three year enhancement to their sentences and the consequences of having a serious, "strike" felony on their record for life.

### (11). As the error affected the reasonable doubt standard, it is reversible per se.

The U.S. Supreme Court has made clear that a constitutionally deficient reasonable doubt instruction is a structural defect in the trial mechanism that requires reversal regardless of the strength of the evidence of the defendant's guilt. (Sullivan v. Louisiana (1993) 508 U.S. 275, 277-278.)

> "Since a constitutionally defective reasonable doubt instruction renders it impossible for the jury to return a verdict of guilty beyond a reasonable doubt, there is no object, so to speak, upon which a harmless-error scrutiny can operate. The most an appellate court can conclude is that the jury would surely have found petitioner guilty beyond a reasonable doubt – not that the jury's actual finding of guilty beyond a reasonable doubt would surely not have been different absent the constitutional error. That is not enough. [Citation.] The Sixth Amendment requires more than appellate speculation about a hypothetical jury's action, or else directed verdicts for the State would be sustainable on appeal; it requires an actual jury finding of guilty." (Sullivan, supra, at 280.)

The jury here was advised that it could find liability on the basis of what *"could have"* happened, as opposed to the constitutionally required standard of certainty beyond a reasonable doubt. As a constitutionally deficient reasonable doubt instruction cannot be harmless error, the reduction of the prosecution's burden of proof on an element of the offense was structural error, requiring reversal per se on the finding of personal infliction of great bodily injury, for the finding of personal infliction was inextricably tainted by the erroneous instruction on group beatings.

**(12).    The second basis allows the jury to substitute a knowledge finding for a finding that petitioner personally performed the act causing the victim's injuries.**

The second basis of the instruction is also unconstitutional because it allows the jury to substitute a knowledge finding for a finding that petitioner directly performed the act causing the victim's injuries.   Section 12022.7 does not, however, permit a knowledge finding to obviate the need for a finding that the defendant himself inflicted the injury.

The second alternate basis allows the jury to substitute a knowledge finding for a finding that petitioner directly performed the act causing the victim's injuries.  This is directly in conflict with the plain and unambiguous language of the statute.  Thus, the jury was instructed that even if they found that petitioner did not *directly* and *personally* inflict the great bodily injury they would still be required to find the allegation to be true as long as they felt that petitioner **"knew"** that others had applied, were applying, or would apply physical force and that petitioner "knew **or should have known"** that the cumulative effect of all the unlawful physical force would result in great bodily injury.

As previously illustrated, petitioner's trial established that "Bob Marley" and the other black male (not petitioner) were the ones who punched DiPrima, hit him repeatedly with the belt, stomped on his head, and hit him with a Duraflame log.  Ultimately, DiPrima did not know whether petitioner had ever hit him. He told Detective Pata that petitioner "'... **didn't hit,**'" which Pata understood as petitioner "[n]ever struck him with his hands..." (RT 746.) When asked, "Do you know if the defendant ever hit you with a closed fist or kicked you?" DiPrima answered, "*I do not*." (RT 583; emphasis.)

DiPrima's testimony did not show that petitioner had personally hit him, nor did the prosecutor argue that petitioner directly performed or personally inflicted *any* of the injuries that

formed the basis of the great bodily injury allegation. Thus, the basis for the jury's finding that the great bodily injury enhancement was true came by application of CALJIC 17.20 which told the jury that if petitioner "... knew that other persons, as part of the same incident, had applied, were applying, or would apply unlawful physical force upon the victim and the defendant then knew, or reasonably should have known, that the cumulative effect of all the unlawful physical force would result in great bodily injury to the victim" then petitioner had *personally* inflicted great bodily injury within the meaning of § 12022.7.

### (13).    The error was prejudicial under the *Brecht* Standard.

As the instruction at issue here lessened the prosecution's burden of proof, it falls squarely under Sullivan, supra, and should be reversed per se. However, should this Honorable Court disagree, the error was prejudicial under the federal standards for the reasons discussed above.

### (14).    Conclusion.

CALJIC No. 17.20 was prejudicial under the circumstances of the instant case. As shown in the previous sections of this Petition, DiPrima was merely guessing that I hit or kicked him. DiPrima later testified that, in reality, he did not know whether I had ever struck him. (RT 583.) He told Detective Pata that petitioner "'didn't hit'" him. (RT 746.) In regards to the conviction, though, the prosecutor argued the actions of the two black youth, "We have a stomp to the head, we have a ... whack against the victim's head with a Duracell log (sic), we have him being whipped repeatedly with a belt" (RT 1325), and urged the jury to find the infliction of great bodily injury enhancement to be true based upon this conduct. Thus, the prosecutor directed the jury to base its finding of guilt on the erroneous instruction——CALJIC No. 17.20, which told the jury that "the defendant may be punished with a great bodily injury enhancement if his conduct was of nature that it *could have caused* the great bodily injury suffered." (Ibid.; emphasis added.)

1   Based on CALJIC No. 17.20, the prosecutor's argument, the <u>aiding and abetting instructions</u>

2   and DiPrima's own testimony: "***he could have -- he could have*** beat me any time I was on the ground

3   -- like how was I supposed to know?" (RT 494; emphasis added), the jury was not required to find

4   that petitioner personally inflicted great bodily injury.   A reasonable juror would have readily

5   understood that it was not necessary to a true finding that petitioner *personally* inflicted the injury if

6   the jury utilized the court's instructions. The writ should issue

7   **GROUND EIGHT:  THE PERSONAL INFLICTION OF GREAT BODILY INJURY**

8   **ENHANCEMENT WAS WRONGLY REINSTATED.**

9   On July 30, 2004, pursuant to the prosecution's express motion "... with regards to the

10   12022.7...," the trial court dismissed the infliction of great bodily injury enhancement. (RT 1374.) At

11   sentencing (five months later), the prosecutor argued that she had made a mistake, and that the Penal

12   Code section 12022.1 out on bail enhancement was the one she wanted to dismiss.  The trial court

13   found that the dismissal of the great bodily injury enhancement was an error, reinstated it, and

14   dismissed the on bail enhancement.  Trial counsel objected. (RT 1384-1389; and <u>see</u> RT 1344 where

15   the parties discuss "... the enhancement attached to Count Three...," i.e., the on bail enhancement.)

16   Petitioner was subsequently sentenced to three years in prison on the great bodily injury

17   enhancement.  However, the reinstatement of the enhancement was error as a matter of law and

18   violated petitioner's rights to due process and against double jeopardy under the Fifth, Sixth, and

19   Fourteenth Amendments.

20   Here, the prosecution moved that the Penal Code section 12022.7 enhancement be dismissed

21   and the trial court granted the motion and dismissed the enhancement.  A dismissal "... cuts off an

22   action or part of an action against the defendant." (<u>People v. Carillo</u> (2001) 87 Cal.App.4th 1416,

23   1421.)  And, like a striking, a dismissal, "... is an unconditional deletion of the legal efficacy of the

24   stricken allegation or fact for the purposes of a specific proceeding."  (Id.)  "The fact that the

1    [dismissal] order was made inadvertently does not derogate from constitutional jeopardy preventing

2    further prosecution from attaching." (In re Krieger (1969) 272 Cal.App.2d 866, 891.)

3         In Fong Foo v. United States (1962) 369 U.S. 141, the trial court mistakenly directed a verdict

4    of acquittal.  The Court of Appeals vacated the judgment and reassigned the case for trial.  The

5    Supreme Court reversed, holding that even if "... the acquittal was based upon an egregiously

6    erroneous foundation ...[t]he verdict of acquittal was final, and could not be reviewed ... without

7    putting (the petitioners) twice in jeopardy, and thereby violating the constitution." (369 U.S. at 143,

8    82 S.Ct. 672.)

9

10        The fundamental principle stated in Fong Foo has been reiterated numerous times. (See, e.g.,

11   Sanabria v. United States (1978) 437 U.S. 54, 64 ["... when a defendant has been acquitted at trial he

12   may not be retried on the same offense, even if the legal rulings underlying the acquittal were

13   erroneous."]; United States v. Martin Linen Supply Co. (1977) 430 U.S. 564, 568-571; United States

14   v. Giampa (3rd Cir. 1985) 758 F.2d 928, 932.)

15        Petitioner acknowledges that the trial court's dismissal of the section 12022.7 enhancement

16   was not an acquittal.  However, in United States v. Scott (1978) 437 U.S. 82, the Court recognized

17   that the double jeopardy protections may apply in situations "... in which the trial judge terminates the

18   proceedings favorably to the defendant on a basis not related to factual guilt or innocence." (437 U.S.

19   at 92.)  Such situations occur *only* where the defendant chooses to seek termination of the action.

20   (Scott, supra, 437 U.S. at 98-101; accord, United States v. Dahlstrum (9th Cir. 1981) 655 F.2d 971,

21   975-976.) Here, the dismissal of the enhancement was pursuant to the prosecutor's motion. Thus, the

22   principles of Fong Foo preclude reinstatement.

23

24        The California Courts held that the trial court's dismissal was a clerical error and that it was

25   properly corrected. (Exhibit C, 16-17.) But, a clerical "'... error is one "which cannot reasonably be

1   attributed to exercise of judicial consideration...'"" (<u>Wetson v. Wilson</u> (1952) 109 Cal.App.2d 673,

2   674.) "'Clerical' errors are, generally speaking, those errors, mistakes, or omissions which are not a

3   result of the judicial function." (<u>Smith v. Smith</u> (1952) 115 Cal.App.2d 92, 99.)  Unless the order was

4   made inadvertently, it cannot be changed under the guise of clerical error.  (<u>Tokio Marine v. Western</u>

5   <u>Pac. Roofing Corp.</u> (1999) 75 Cal.App.4th 110, 117.)

6          Here, the prosecutor expressly moved to dismiss the Penal Code section 12022.7

7   enhancement.  The trial court advertently granted the motion made by the prosecutor.  The prosecutor

8   then notified the probation department that the court had had dismissed the 12022.7 enhancement and

9   that it was no longer applicable for sentencing.  There was nothing inadvertent in this judicial action.

10  "'If the court misconstrued the evidence before it, or misapplied the law applicable to the facts

11  disclosed by the evidence, or was even misled by counsel, such an error was in no sense a clerical

12  error...'"  (<u>Tokio Marine</u>, <u>supra</u>, 75 Cal.App.4th at 118.)  Clearly, the trial court's granting of the

13  prosecution motion was not a clerical error.  If anything it was a judicial error, which cannot be so

14  corrected. (<u>Bulkey v. Klein</u> (1962) 206 Cal.App.2d 742, 750 ["although the inherent power to amend

15  is records so as to make them speak the truth extends to all courts..., judicial error may not be so

16  corrected."])  Here, by reinstating the enhancement, the trial court made of record an order that was

17  never in fact given.  As a matter of law, the granting of the prosecution's motion was attributable to

18  "judicial consideration;" thus, it could not be changed under the guise of "clerical error."

19         Furthermore, in California "... *an error in a request for dismissal does not constitute a*

20  *'clerical error' in the court's records and thus cannot be corrected as such.*" (<u>Romadka v. Hodge</u>

21  (1991) 232 Cal.App.3d 1231, 1235, fn.2, [emphasis added]; accord, <u>Roybal v. University Ford</u> (1989)

22  207 Cal.App.3d 1080, 1084-1085.)

1     As a matter of law, once the trial court dismissed the enhancement pursuant to the

2  prosecution's motion, it had no power or authority to reinstate it.  Reinstatement of the enhancement

3  under the clerical error doctrine was unconstitutional and contrary to United States Supreme Court

4  precedent.

5

6                                          **CONCLUSION**

7     For the foregoing reasons the writ should issue.[18]

8

9

10                                          Respectfully submitted.

11

12

13

Dated: 3-2-08

14

15                                          Jason Paul Voelker
                                            California State Prison, Folsom
16                                          P.O. Box 950
                                            Folsom, CA 95763
17                                          Prison I.D. # V-62496

18                                          In propria persona

19

20

21

22

23
_____

24  [18] Petitioner believes that all of the above issues should be resolved directly on the merits.  However,
     should respondent attempt to invoke some unforeseeable procedural defense, petitioner reserves the
25   right to fully litigate the adequacy and independence of any such claim.  Moreover, petitioner has
     reserved an exhausted ineffective assistance of counsel claim in the event this Court subsequently
     requires a cause and prejudice analysis.

1

2

## VERIFICATION & DECLARATION

3

I, Jason Paul Voelker, acting in pro se, declare:

4

I am the Petitioner in this action. I have authored, read and know the contents of the foregoing

5

Petition for a Federal Writ of Habeas Corpus and the facts stated therein are true of my own

6

knowledge.

7

I declare under penalty of perjury that the foregoing is true and correct and

8

that this declaration was executed on ___3-2-08___,

9

at Folsom, California.

10

11

12

Respectfully submitted,

13

14

15

Jason Paul Voelker
California State Prison, Folsom

16

P.O. Box 950
Folsom, CA 95763

17

Prison ID.# V-62496

18

In propria persona

19

20

21

22

23

24

25

## DECLARATION OF SERVICE BY UNITED STATES MAIL

I, Jason Paul Voelker, do hereby declare:

I am a citizen owing loyalty to and entitled to the protections of the United States of America. I am 26 years old; I am a party to the within action; my legal address is California State Prison, Folsom, P.O. Box 950, Represa, California 95673.

On _____ 3-2-08 _____ , I served the within:

### PETITION FOR A FEDERAL WRIT OF HABEAS CORPUS
### BY A PERSON IN STATE CUSTODY
### (28 U.S.C. section 2254)

on the following interested persons in said action by delivering a true copy thereof enclosed in an envelope to prison staff addressed as follows:

**CALIFORNIA ATTORNEY GENERAL'S OFFICE**
ATTN: Jeremy Friedlander (State Bar No. 125138), Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004

I am readily familiar with the prison's practice of collection and processing correspondence for legal mailing. It is normally deposited with the U.S. Postal Service within a "reasonable amount of time" in the ordinary course of business.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: 3-2-08

_____
Jason Paul Voelker

VOELKER V62496
FOLSOM STATE PRISON
PO Box 950    5 A62-38
FOLSOM CA 95671



U S DISTRICT COURT
NORTHERN DISTRICT
450 GOLDEN GATE AVE
SAN FRANCISCO CA 94102

RECEIVED
MAR - 4 2008
RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA