1  Jason Paul Voelker
2  Folsom State Prison
   P.O. Box 950
3  Folsom, CA 95763 (USA)
   Prisoner Id.# V-62496
4

5  In propria persona

*E-filing*

**FILED**

MAR – 5 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

6

7

8              UNITED STATES DISTRICT COURT

9        IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

**CW
(PR)**

10

11                                    CV 08      1285

12  JASON PAUL VOELKER,          )    CASE No.: _____
                                 )
13              Petitioner,      )    **PETITIONER'S LODGED EXHIBITS**
                                 )
14          vs.                  )
                                 )
15                               )
    M. C. KRAMER, Warden, et al.,)
16                               )
                                 )
17          Respondent.          )
    _____)

18

19

20              **PETITIONER'S EXHIBITS A-K**

21

22

23

24

25

Voelker's 28 U.S.C. § 2254 EXHIBITS

# TABLE OF EXHIBITS

**EXHIBIT A:**
     [Marin County Superior Court Evidentiary Hearing Transcripts].

**EXHIBIT B:**
     [California Supreme Court Orders: Collateral & Direct Appeal].

**EXHIBIT C:**
     [California Court of Appeal Denials: Collateral & Direct Appeal].

**EXHIBIT D:**
     [Superior Court Orders: Denial of Habeas Corpus Petitions].

**EXHIBIT E:**
     [Declaration of Jason Voelker].

**EXHIBIT F:**
     [Transcript of in-camera Hearing re attorney conflict].

**EXHIBIT G:**
     [Post-trial procurement of Raven Oliver's phone records].

**EXHIBIT H:**
     [Jim Wall Declaration].

**EXHIBIT I:**
     [Karlan Brooks Interview].

**EXHIBIT J:**
     [Michael Williams Declaration].

**EXHIBIT K:**
     [Tristan Harvey Declaration].

Voelker's 28 U.S.C. § 2254 EXHIBITS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT A:

[Marin County Superior Court Evidentiary Hearing Transcripts].

1

1    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2    IN AND FOR THE COUNTY OF MARIN

3    ---oOo---

4    HON. VERNA A. ADAMS, JUDGE                    DEPARTMENT H

5                                                  COPY

6    In the Matter of the Application of  )
                                          )
7     JASON P. VOELKER (V-62496),         )
                                          )      No. SC146932
8                            Petitioner,  )
                                          )
9    for a Writ of Habeas Corpus.         )
                                          )
    _____  )

10

11

12

13              REPORTER'S TRANSCRIPT OF PROCEEDINGS

14                         JUNE 21, 2007                FILED

15
                                                   AUG 7 - 2007
16
                                                KIM TURNER
                                           Court Executive Officer
17                                    MARIN COUNTY SUPERIOR COURT
                                           By: S. Lautsch, Deputy

18   APPEARANCES:

19   For the Petitioner:          CARL GONSER
                                  Attorney at Law
20                                P.O. Box 151317
                                  San Rafael, California
21

22

23   For the Respondent          HON. EDWARD S. BERBERIAN
     People of the State         District Attorney
24   of California:              By:  DORI AHANA
                                  Deputy District Attorney
25

26

27   Reported by:
     SUSAN L. FITZSIMMONS
28   CSR No. 4369

I N D E X

WITNESSES

| FOR THE PETITIONER | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DAVID BROWN | | | | |
| By Mr. Gonser | 5 | | | |
| By Ms. Ahana | | 8 | | |
| MARY STEARNS | | | | |
| By Mr. Gonser | 14 | | | |
| By Ms. Ahana | | 18 | | |
| By Mr. Gonser | | | 27 | |
| ROBERT VOELKER | | | | |
| By Mr. Gonser | 28 | | | |
| JASON PAUL VOELKER | | | | |
| By Mr. Gonser | 31 | | | |
| By Ms. Ahana | | 54 | | |
| By Mr. Gonser | | | 75 | |

FOR THE RESPONDENT

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ASHLEY WORSHAM | | | | |
| By Ms. Ahana | 80 | | | |
| By Mr. Gonser | | 85 | | |

EXHIBITS

| FOR THE PETITIONER | IDENTIFICATION | EVIDENCE |
|---|---|---|
| 1   Request for investigator | 16 | 28 |

1    THURSDAY, JUNE 21, 2007                    9:12 O'CLOCK A.M.

2                           ---oOo---

3               (Whereupon, the following proceedings were held in

4                open court outside the presence of the Petitioner:)

5               THE COURT:  All right.  In Re Voelker.

6               Miss Worsham, welcome back to Marin.

7               MS. WORSHAM:  How are you, Judge Adams?

8               THE COURT:  Fine, and you?

9               MS. WORSHAM:  Very well, thank you.  It's good to

10   see you again.

11              THE COURT:  Welcome back.

12              Mr. Gonser, welcome back to Department H.

13              MR. GONSER:  Thank you, Judge.  It's good to see

14   you.

15              THE COURT:  Miss Ahana, you too.

16              Mr. Brown, you too.

17              MR. BROWN:  Thank you.

18              MS. AHANA:  Thank you.

19              THE COURT:  It's nice to have the old crowd back,

20   although albeit for an unfortunate situation.

21              Good morning, Miss Stearns.

22              MS. STEARNS:  Morning.

23              THE COURT:  Any other criminal lawyers going to be

24   joining us?  I seem to have the whole criminal bar back in

25   here.

26              MR. GONSER:  No, this is it, your Honor.

27              THE COURT:  This is it?  Okay.

28   - - -                   - - -                   - - -

1      (Whereupon, the Petitioner was escorted into the

2      courtroom.)

3      THE COURT:  Okay.  In the case of People versus --

4  or excuse me, in the case of In Re Voelker.

5      Good morning, Mr. Voelker.

6      THE PETITIONER:  Good morning, Miss Adams.

7      THE COURT:  Mr. Voelker is here with his attorney,

8  Mr. Gonser; Miss Worsham and Miss Ahana are appearing for the

9  People.  And this is on in connection with an evidentiary

10  hearing on this Court's order to show cause issued -- or order

11  re evidentiary hearing issued February 15th, 2007.

12      The issue on this hearing is whether Mr. Voelker's

13  trial counsel deprived him of his right to testify in his

14  own defense at the trial in SC132406A.

15      According to my understanding of the law, the

16  Petitioner, Mr. Voelker, has the burden of proving that by a

17  preponderance of the evidence.

18      Given that Mr. Voelker has the burden of proof, I

19  think he should go first.  Do you want to make an opening

20  statement, Mr. Gonser?

21      MR. GONSER:  No, your Honor.

22      THE COURT:  How about the People, Miss Ahana?

23      MS. AHANA:  No, your Honor.

24      THE COURT:  Okay.  Call your first witness,

25  Mr. Gonser.

26      MR. GONSER:  Mr. Brown, David Brown, please.

27      THE COURT:  All right.

28  - - -           - - -              - - -

1           DAVID BROWN,

2  called as a witness on behalf of the Petitioner, having been

3  first duly sworn, testified as follows:

4           THE CLERK:  Thank you.  Please be seated.

5           Please state your name, and spell it for the record.

6           THE WITNESS:  David Brown, from the Public

7  Defender's Office.

8           THE COURT:  Go ahead, Mr. Gonser.

9                    DIRECT EXAMINATION

10 BY MR. GONSER:

11     Q.   Good morning, Mr. Brown.  This will be brief.

12     A.   Do you mind if I move this?

13          THE COURT:  Not at all.  As long as we can hear you.

14          THE WITNESS:  All right.  You can -- you'll be able

15 to, I think, your Honor.

16          THE COURT:  Go ahead.

17          MR. GONSER:  Q.  Good morning, Mr. Brown.

18     A.   Good morning.

19     Q.   Do you know Jason Voelker?

20     A.   Yes.

21     Q.   And how do you know Mr. Voelker?

22     A.   Mr. Voelker was in trial -- was appearing regularly

23 when he was facing the charges in this -- in the case that

24 we're talking about right now in Judge Adams' previous

25 assignment, Courtroom J.  I was the Public Defender in charge

26 of our portion of that Department, and so I would see Mr.

27 Voelker, you know, on many -- on a number of occasions while

28 he had various calendar appearances leading up to the trial

1    in -- in this case.  And that's how I know him.

2         Q.   And -- and you're acquainted with his trial counsel,

3    Mr. Wall; is that correct?

4         A.   Yes, I am.

5         Q.   And prior to Mr. Voelker's trial in this case, did

6    you have an opportunity to discuss with Mr. Wall the defense

7    of this case?

8         A.   Yes.  I had been representing somebody named Vijay

9    Kelly, who, while he was not a co-defendant named in the

10   complaint charging Mr. Voelker, he was charged with this --

11   with being another participant in the same crime.  I

12   believe -- he was exonerated because I believe we proved at

13   the preliminary hearing that he was factually innocent, and so

14   that was the end of Mr. Kelly's involvement in the case, and

15   the reason that I was -- that I was talking to -- that I had

16   conversations with Mr. Wall about Mr. Voelker's case is

17   because I was familiar with the facts of the crime with which

18   Mr. Voelker was charged.

19        Q.   And what did you discuss with Mr. Wall specifically?

20        A.   I can't say exactly what the specific conversations

21   were at this point.  This was, you know, a couple of years

22   ago.

23        Q.   I understand.

24        A.   I know -- you know, we talked about the -- you know,

25   various testimony that was presented in the -- in the case,

26   and, you know, the testimony of the victim, and, you know,

27   basically I guess comparing my experience with Mr. Wall's

28   experience, things like that.

1    Q.   Did you offer any assistance to Mr. Wall in the

2    preparation of the case?

3    A.   Well, Mr. Wall indicated -- I guess the -- there was

4    ongoing discussion between -- my impression was, based on our

5    conversations, that there was ongoing discussion between

6    Mr. Wall and Mr. Voelker regarding the strategy of the case,

7    how to present the case, and I think one -- and one of the

8    issues was whether Mr. Voelker was going to testify.

9    Q.   And were you going to do anything with regards to

10   his testimony?

11   A.   Well, you know, I -- at -- in the course of these

12   discussions, at some point I -- and I can't remember whether

13   it was me or Mr. Wall who brought this up, but that I agreed

14   that -- that if they needed me, meaning Wall and Voelker, that

15   I would be willing to cross-examine Mr. Voelker if -- since I

16   was familiar with the case.

17              THE COURT:  You mean like -- for trial preparation?

18              THE WITNESS:  M-hm, that's right, your Honor.

19              THE COURT:  To pretend you were in trial --

20              THE WITNESS:  That's right, your Honor.

21              THE COURT:  -- and do a scathing cross-examination?

22              THE WITNESS:  I often do that for lawyers in my

23   office, and my -- and after thinking about it, my thought was

24   that given the fact that, although I had represented somebody

25   else charged with the same crime, given the fact that I

26   believe, and I believe the Court believed that he had nothing

27   to do with it, that, you know, my assisting Mr. Wall and Mr.

28   Voelker, if asked in that regard, would not create any

1   problems with regard to Mr. Kelly's interests since I didn't

2   believe he had any liability.

3          THE COURT:  Go ahead.

4          MR. GONSER:  Thank you.

5          Thank you, Mr. Brown.  That's all I have.

6          THE COURT:  All right.  Miss Ahana, are you doing

7   the cross-examination here?

8          MS. AHANA:  I am, your Honor.

9          THE COURT:  Okay.  Go ahead.

10          MS. AHANA:  Thank you.

                    CROSS-EXAMINATION

12  BY MS. AHANA:

13      Q.   Mr. Brown, how many years have you been an attorney?

14      A.   Twenty-five.

15      Q.   You've been practicing criminal law for how long?

16      A.   About the same.

17      Q.   And how many criminal cases have you -- have you

18  been the attorney on?

19      A.   Thousands.

20      Q.   You're the Chief Deputy Public Defender in Marin --

21  Marin County?

22      A.   One of two, yes.

23      Q.   How long have you known Mr. Wall, the attorney for

24  Mr. Voelker in this case?

25      A.   Hmmm.  You know, since he started appearing in court

26  in Marin County.  I don't really know.  I mean, it sounds --

27  seems like it must be, you know, five -- five or six years

28  ago, but I don't know for -- I -- that's just a guess.  I

1    really can't remember exactly how long I've known him.

2         Q.   In addition to knowing him in a professional

3    capacity as an attorney, would you also consider yourselves

4    friends?

5         A.   Yes, I -- I would.

6         Q.   And are you also aware that he considered you to be

7    a mentor of his?

8         A.   You'd have to ask him.

9         Q.   As the trial in Mr. Voelker's case was proceeding,

10   you said you continued to have ongoing discussions with

11   Mr. Wall regarding the case --

12        A.   I --

13        Q.   -- is that right?

14        A.   I didn't say that.

15        Q.   Okay.  Did you talk to Mr. Wall during the course of

16   the trial?

17        A.   Occasionally, but not much.  I mean, he was kinda

18   busy.

19        Q.   "Occasionally," that would mean how many times you

20   discussed the case with him while the trial was ongoing?

21        A.   I can't give you -- I can't say.  I don't know.  I

22   mean, you know, I was -- my recollection is that I was

23   still -- that while the trial was going on in front of Judge

24   Adams, I believe in Courtroom J, that I was still regularly

25   appearing in there, so, you know, I would run into him, I'm

26   sure, while he was doing the case in the morning and, you

27   know, "How's it going?" things like that.  But, you know, I

28   can't tell you how many substantive discussions I had with

1  Mr. Wall about how the trial was going. I would say that, you

2  know, I probably had more discussions with him about the case

3  before the trial started than after the trial started.

4      Q.   And when he asked you to -- or discussed with you

5  the possibility of you assisting in doing sort of a mock

6  cross-examination --

7      A.   M-hm.

8      Q.   -- was that before the trial started or during the

9  course of the trial?

10     A.   I believe it was before the trial started.

11     Q.   Did you ever assist him in that regard?

12     A.   No.

13     Q.   How many times did he approach -- or strike that.

14 How many times did you -- did you discuss with him your being

15 available to do this for Mr. Voelker?

16     A.   Several.  I can't -- you know, I mean -- several.

17     Q.   What, if you can recall, were the details of the

18 conversations that you had with Mr. Wall relating to Mr.

19 Voelker and his wish to testify at this trial, if any?

20          MR. GONSER:  Objection, hearsay.

21          MS. AHANA:  I think we've -- this has all been

22 hearsay, really, about his conversations with Mr. Wall, it's

23 been elicited on direct.

24          THE COURT:  I think -- I don't think it's offered to

25 prove the truth of the facts asserted, but rather to test the

26 witness's memory of the detail.  And you -- you opened this

27 door, asking about if there was discussion about mock

28 cross-examination for trial preparation.  I think that

1  Ms. Ahana's entitled to explore that further.  So I'm going to

2  overrule the objection for those reasons.

3          You can answer the question, Mr. Brown.

4          THE WITNESS:  Did you -- was the question what were

5  the nature of the discussions?  I'm sorry.

6          THE COURT:  The question is, what, if you recall,

7  were the details of the conversation that you had with

8  Mr. Wall relating to Mr. Voelker and his wish to testify at

9  this trial, if any?

10          MR. GONSER:  It's also vague and ambiguous and

11  overbroad as to time and --

12          THE COURT:  Overruled.  You can do redirect and

13  sharpen it up all you want.

14          You can answer the question, Mr. Brown.

15          THE WITNESS:  Well, you know, I -- I don't

16  specifically recall talking to Mr. Wall about the details of

17  whether Mr. Voelker wanted to testify, it was more in the

18  context of whether or not Mr. -- you know, Mr. Wall, trying to

19  figure out with Mr. Voelker, whether or not, you know, it was

20  a good idea or something like that.

21          MS. AHANA:  Q.  Did Mr. Wall ever tell you that he

22  was expressly prohibiting his client from testifying at this

23  trial?

24      A.   That he was expressly prohibiting him?  No, he -- he

25  didn't tell me that.

26      Q.   Would you consider Mr. Wall to be a zealous advocate

27  for his clients?

28      A.   Yes.

1    Q.   Specific to Mr. Voelker, did he seek to zealously

2   advocate for him during the course of this trial?

3    A.   I --

4        MR. GONSER:   Objection, beyond his -- it assumes

5   facts not in evidence, that he was present during the trial.

6        THE COURT:   He testified that he was regularly

7   appearing in Department J, my courtroom, during the trial,

8   which I know to be true.  I think the objection goes more to

9   the weight I'll give to this testimony than to its

10  admissibility.

11        You can answer the question.

12        THE WITNESS:   The question was do -- did I think

13  that --

14        THE COURT:   Was he a zealous advocate for Mr.

15  Voelker during this particular trial?

16        THE WITNESS:   Well, I think he did a lot of work on

17  the case, and he was very concerned about the case.  I can't

18  really speak to, you know, what happened in the trial 'cause I

19  really wasn't there watching, so, you know, I -- I don't know

20  about what happened in court.

21        MS. AHANA:   Nothing further, your Honor.

22        THE COURT:   Anything further, Mr. Gonser?

23        MR. GONSER:   No.  Thank you, your Honor.

24        THE COURT:   Okay.  Can this witness be excused then?

25        (Whereupon, there was a discussion between

26        Mr. Gonser and the Petitioner off the record.)

27        THE COURT:   Can this witness be excused, folks?

28        MR. GONSER:   Mr. Voelker's expressing some concern

1   about the fact -- he can be excused, I'm sorry.

2          THE COURT:  All right.

3          MR. GONSER:  I apologize.

4          THE WITNESS:  Okay.

5          THE COURT:  You may go.

6          THE WITNESS:  Thank you.

7          THE COURT:  Thank you, Mr. Brown.

8          THE PETITIONER:  Thank you, sir.

9                                    (Witness excused.)

10         MR. GONSER:  Mr. Voelker's expressing some concern

11  about the fact that he is shackled and can't access his legal

12  materials and --

13         THE PETITIONER:  Notes.

14         MR. GONSER:  -- and I don't believe there's been

15  necessarily a showing that would -- the required showing for

16  having him shackled.

17         THE COURT:  I'll hear from the Deputy about it, then

18  I'll make a ruling.

19         THE BAILIFF:  Would we -- would it be adequate if I

20  release his right hand?

21         THE COURT:  Is that an acceptable compromise?

22         THE PETITIONER:  Yeah.

23         MR. GONSER:  Yes.

24         THE PETITIONER:  I would like to be able to take

25  notes and access my material, that's all.

26         THE COURT:  Sure.

27         THE PETITIONER:  Thank you.

28  - - -              - - -                  - - -

1          (Whereupon, the Petitioner's right hand was

2          unshackled.)

3          THE COURT:  Do you want to call your next witness,

4   Mr. Gonser?

5          MR. GONSER:  That would be Miss Stearns.

6          THE COURT:  All right.

7          MR. GONSER:  She'll be right in, your Honor.

8          THE COURT:  Very well.

9                          MARY STEARNS,

10  called as a witness on behalf of the Petitioner, having been

11  first duly sworn, testified as follows:

12          THE CLERK:  Thank you.  Please be seated.

13          Please state your name, and spell it for the record.

14          THE WITNESS:  Mary Stearns, S-t-e-a-r-n-s.

15                       DIRECT EXAMINATION

16  BY MR. GONSER:

17      Q.   Good morning, Miss Stearns.

18      A.   Good morning.

19      Q.   Do you know Mr. Voelker?

20      A.   I do.

21      Q.   And how do you know him?

22      A.   I was appointed to represent him on a motion for a

23  new trial several years ago.

24      Q.   And in representing him, did you discuss with him

25  the issues that he wanted to raise in his new trial motion?

26      A.   I did.

27      Q.   And what did you discuss with him?

28      A.   Well, my memory was that there was two issues that I

1  thought were the strongest, that was the failure of his

2  attorney to get phone records that I thought would be

3  independent evidence to give him a complete -- or a

4  affirmative defense to the crime, that is, that he would have

5  been on the phone at the time that the crime occurred, and

6  those documents were not obtained by his defense counsel, and

7  the jury asked for those documents during jury deliberations.

8  So me and Mr. Voelker discussed that issue at length, and I

9  thought that was the main issue to raise.

10        We discussed an issue regarding a witness that was

11  not findable at the time of trial, that we felt we knew where

12  he was, and that that witness might have some information, and

13  I do recall Mr. Voelker raising the issue of him testifying.

14     Q.   And with regards to him -- his testimony, wanting to

15  testify, what did he tell you?

16     A.   I don't have a clear memory because I didn't pursue

17  that in the motion for new trial, but I believe he stated to

18  me that he had wanted to testify and that -- that had been the

19  plan all along, and that his attorney had repeatedly assured

20  him that that would happen, and that the night before his

21  testimony, he didn't sleep very well, and then his attorney

22  told him that that wasn't gonna happen, something to that

23  effect, but I -- I didn't take notes to that specific -- I

24  mean, I don't still have those notes.

25     Q.   But do you have any record of him raising that issue

26  with you?

27     A.   I do.  I looked into my computer yesterday, in fact,

28  to see if there was any documents, and I looked at a request

1    for an investigator, which one needs to do for conflict cases,

2    and you write a summary of the issues that are potentially

3    going to be explored in your request for an investigator, and

4    I printed that out yesterday.

5            MR. GONSER:  May I have this document marked, your

6    Honor?

7            THE COURT:  You may.

8            Do you have a copy of that, Miss Ahana?

9            MS. AHANA:  I don't.

10           MR. GONSER:  No, I just got it this morning, your

11   Honor --

12           THE COURT:  Okay.

13           MR. GONSER:  -- I'm going to show it to her now.

14           THE COURT:  All right.

15           MR. GONSER:  I apologize.

16           THE CLERK:  Defendant's 1 marked for identification.

17           THE COURT:  It's Petitioner's.

18           THE CLERK:  Oh, Petitioner's.

19           (Request for investigator marked as Petitioner's

20            Exhibit No. 1 for identification.)

21           (Whereupon, there was a discussion between

22            Ms. Ahana and Ms. Worsham off the record.)

23           MR. GONSER:  May I approach, your Honor?

24           THE COURT:  You may.

25           MR. GONSER:  Q.   I'm handing you what's been marked

26   as the Petitioner's No. 1 and ask if you recognize that?

27       A.   I do.

28       Q.   And what is that?

1    A.    This is my request for an investigator that is

2  needed to be filed -- or given to A.D.I. in order to get

3  County funds for an investigator.

4    Q.    And in reviewing that document, what does that

5  document specifically say with regards to Mr. Voelker's issue

6  regarding his denial of his right to testify?

7    A.    Well, the document indicates that the two main

8  issues that I first discussed just a minute ago, and then at

9  the bottom of the paragraph it says, "There are a few more

10  issues, like Mr. Voelker wanting to testify and that the

11  attorney said he would on many occasions, but on the day he

12  was to testify, the attorney told him not to because he hadn't

13  received any sleep."

14    Q.    Did you -- did you prepare that document?

15    A.    I did.

16    Q.    And when did you prepare that document?

17    A.    It looks like around April of 2004, which would have

18  been shortly after being appointed by the Court to pursue --

19  pursue the motion for a new trial.

20    Q.    And can you tell us the procedure used to prepare

21  the document?

22    A.    Well, I --

23    Q.    How did you prepare that document?

24    A.    I spoke with my client, Mr. Voelker --

25    Q.    M-hm.

26    A.    -- I spoke with Mr. Wall, and then I write a factual

27  summary and I detail the areas that need to be explored and

28  ask for funds, and then this is turned into the Director of

1    A.D.I., who then approves or disproves what I'm requesting.

2        Q.    And was that document prepared in the regular course

3    of business?

4        A.    Yes.

5        Q.    Did you raise that issue about the denial of his

6    right to testify in the new trial motion?

7        A.    No, I did not.

8        Q.    And why was that?

9        A.    It -- in my opinion, the issue of the phone records

10   was such a good issue, because it was documentary evidence

11   that would have supplied a defense to Mr. Voelker.  A.D.I.

12   normally doesn't do motions for a new trial, and this isn't a

13   death penalty case where you raise every single issue possible

14   in a motion for a new trial, and I felt that, strategically,

15   the best way to go would be to pick the one or two best

16   arguments, especially the phone records, because I really felt

17   that was a problem since the jury even asked for them, that

18   that would be -- provide Mr. Voelker with a defense, that, in

19   fact, he was on the phone at the time that these terrible

20   things happened to the victim in the case.  So I just didn't

21   feel it was as strong, and that's why.

22              MR. GONSER:  Okay.  Thank you.

23              That's all I have, your Honor.

24              THE COURT:  Cross-examine, Miss Ahana.

25              MS. AHANA:  Thank you, your Honor.

26                        CROSS-EXAMINATION

27   BY MS. AHANA:

28        Q.    Miss Stearns, how many years have you been an

1   attorney?

2       A.   I passed the bar in 1988.

3       Q.   How long have you been practicing criminal law?

4       A.   Since then.

5       Q.   How many criminal cases have you been appointed on?

6       A.   Hundreds.

7       Q.   And you are a member of the A.D.I. panel --

8       A.   I am.

9       Q.   -- here in Marin County?

10      A.   Yes.

11      Q.   Elsewhere as well?

12      A.   Not at this time.

13      Q.   How many criminal cases have you tried?

14      A.   Over 30.

15      Q.   How many new -- new trial motions have you written

16  and litigated?

17      A.   Probably under five.

18      Q.   Under five?

19      A.   Motions for new trial?

20      Q.   Yes.

21      A.   Yes.

22      Q.   Over the course of your legal career, have you

23  discussed with other attorneys subjects of new trial motions

24  in general?

25      A.   Yes.

26      Q.   And you have, yourself, researched grounds for new

27  trial motions that you've prepared or have spoken to other

28  attorneys about; is that right?

1    A.    Yes.

2    Q.    You said that in preparing for your new trial

3    motion, you spoke with Mr. Voelker?

4    A.    Yes, I did.

5    Q.    How many times?

6    A.    I could not tell you.  Multiple -- multiple times.

7    Q.    During the scope of your contact with Mr. Voelker,

8    would you characterize him as an intelligent and articulate

9    young man?

10    A.    Yes.

11    Q.    Not a shrinking violet by any means; is that right?

12    A.    Well -- I don't know what you mean by that.

13    Q.    He is rather outspoken and will tell you what his

14    concerns are?

15    A.    In my interactions with him, he told me his

16    concerns, but that was in a limited context.

17    Q.    He certainly was not shy?

18    A.    I -- I couldn't answer that.

19    Q.    Would you describe his demeanor to you during your

20    conversations with him as being shy and withdrawn?

21    A.    In the jail regarding these issues, no.

22    Q.    How many times have these -- did you speak with

23    Mr. Wall in order to prepare your new trial motion?

24    A.    Many times.

25    Q.    Could you quantify that for me?

26    A.    More than five.

27    Q.    Did you discuss with him the issues that are set

28    forth there in your factual summary in the document that's

1    marked as Petitioner's Exhibit 1?

2         A.   Yes.

3         Q.   What, if any, was Mr. Wall's response to the

4    testifying issue?

5              MR. GONSER:  Objection, hearsay.

6              THE COURT:  Let's see.  Hmmm.

7              MS. AHANA:  Again, it's just for the words uttered

8    by Mr. Wall.

9              MR. GONSER:  Irrelevant, hearsay, confrontation

10   clause.

11             THE COURT:  We've -- we've heard an awful lot of

12   words uttered by Mr. Wall in connection with Petitioner's

13   application.  Indeed, it seems that the gravamen of the

14   application is Mr. Wall's alleged statement that, "You had a

15   bad night's sleep the night before, I'm not going to call you

16   to testify."

17             If you want Mr. Wall's statements out, they're all

18   going to go out, and that is going to undercut your

19   application seriously.  So I think what Mr. Wall said really

20   goes to the heart of this, and it certainly goes -- too bad we

21   aren't hearing from Mr. Wall, but apparently we aren't, but

22   that is a hearsay objection, and it is hearsay, it is offered

23   for the truth of the facts asserted, I have to sustain the

24   objection.

25             MS. AHANA:  Q.  When were you asked to testify in

26   Mr. Voelker's behalf for this writ of habeas corpus hearing?

27        A.   I was subpoenaed a couple of weeks ago.

28        Q.   Were you approached before that?

1      A.    I had informal discussions with Mr. Gonser, but I

2  could not tell you when.

3      Q.    Were you aware of what the central issue to this

4  writ of habeas corpus hearing was when you were subpoenaed two

5  weeks ago?

6      A.    Yes, I was.

7      Q.    And knowing that, did you seek to provide the

8  document provided to Mr. Gonser this morning to the People, or

9  Mr. Gonser, or Mr. Voelker?

10     A.    Could you repeat the question?

11     Q.    Did you seek to provide the document that you --

12  well, strike that.  The document that we just marked as

13  Petitioners Exhibit 1, did you provide that to Mr. Gonser this

14  morning?

15     A.    Yes.

16     Q.    Is there a reason why, prior to this date, knowing

17  what the issue was, that you did not seek to provide that to

18  Mr. Gonser beforehand, or to the People?

19     A.    No, it's -- no.

20     Q.    Did you not think that it was important to this

21  issue?

22     A.    I'm not Mr. Voelker's attorney.  You knew who I was

23  and I didn't receive any call from you.  I mean, I don't know

24  what you're asking.  This is -- I didn't make this up --

25     Q.    Did --

26     A.    -- it's in the computer.

27     Q.    Did Mr. Gonser ask you for any documentation of a

28  conversation that you had with Mr. Voelker relating to his

1    desire to testify?

2         A.    No.

3         Q.    So it was on your own initiative that you provided

4    that to Mr. Gonser this morning?

5         A.    As I stated earlier, yesterday afternoon I thought,

6    "I wonder if there's something in my computer relevant to

7    this," and I saw that I had some requests for an investigator,

8    and I printed this out.

9         Q.    There are a number of investigative requests listed

10   on that document that was proffered to the Court this morning;

11   is that right?

12        A.    Excuse me?

13        Q.    There are a number of investigative requests listed

14   on that document that was proffered to the Court this morning?

15        A.    This is one investigator request in which I have

16   certain tasks listed.

17        Q.    Okay.  As to those tasks, are there any tasks

18   mentioned there relative to following up on this allegation

19   that he was not allowed to testify, that is, Mr. Voelker was

20   not allowed to testify?

21        A.    Number 2 indicates that the investigator would

22   interview the defendant in a few other areas, other than the

23   newly discovered witness.  And the other tasks are dealing

24   with the other two issues, the missing witness and the

25   subpoenaed -- trying to subpoena the phone records.

26        Q.    You stated that -- well, strike that.  How long have

27   you known Mr. Wall?

28        A.    Since he started accepting cases here in this

1    County.

2         Q.    Which was about -- ?

3         A.    I don't know.

4         Q.    Can you approximate?  Was it 10 years ago, five

5    years ago?

6         A.    Between four and seven.

7         Q.    In addition to having a professional relationship

8    with him, do you know him on a personal level as well?

9         A.    I do.

10        Q.    Would you consider yourself friends?

11        A.    Yes.

12        Q.    Would you consider him to be a good attorney?

13        A.    Yes.

14        Q.    Would you consider him to be a zealous advocate?

15        A.    Yes.

16        Q.    Do you believe he cares about his clients?

17        A.    Yes.

18        Q.    Do you believe he cared about Mr. Voelker?

19        A.    Yes.

20        Q.    You stated earlier that you highlighted the strong

21   arguments in your new trial motion that you submitted to the

22   Court in this case; is that right?

23        A.    No, I did not say that.

24        Q.    Okay.  Why don't you clarify for me why you

25   highlighted two issues, as you said, in this new trial motion.

26        A.    I'm misunderstanding the use of "highlighted".  I

27   chose two issues to file on, I didn't have other ones and

28   highlight those too, I chose two issues.

1    Q.   Okay.   Now, you understand that a defendant has a

2    fundamental right to testify in a criminal proceeding -- in

3    his criminal proceeding; is that right?

4    A.   Yes.

5    Q.   Okay.  Do you believe Mr. Wall had this same

6    understanding?

7         MR. GONSER:  Objection, calls --

8         THE WITNESS:  I couldn't answer that.

9         MR. GONSER:  -- for speculation.

10        THE COURT:  Overruled.  It's already been answered

11   anyway.

12        THE WITNESS:  I don't know.

13        MS. AHANA:  Q.  And your understanding, from being a

14   defense attorney, is, a defense attorney's job is to counsel

15   and advise your client as to, you know, what you believe to be

16   in his or her best interests; is that right?

17   A.   Yes.

18   Q.   And in determining whether or not to put a client, a

19   defendant, on the stand, isn't it true that you consider

20   whether or not that person's credibility would be impeached by

21   things, such as felony convictions or prior inconsistent

22   statements?

23   A.   Of course.

24   Q.   And, of course, a defense attorney, in his or her

25   capacity, cannot expressly prohibit a client or a defendant

26   from testifying if the defendant so chooses to?

27   A.   That's my understanding of the law.

28   Q.   And to prohibit a client from testifying who chooses

1  to, would be not only an ethical violation, but also one that

2  would subject you to discipline before the State Bar; is that

3  not -- that not also true?

4      A.   I would assume so.  I would think of it more in

5  constitutional terms of the defendant but --

6      Q.   And --

7      A.   -- I hadn't thought of that issue.

8      Q.   And as -- as you mentioned, it is of a -- of

9  constitutional consequence if a defendant is deprived of his

10  right to testify by an attorney --

11      A.   Yes.

12      Q.   -- is that right?

13          Did Mr. Wall ever tell you that he expressly

14  prohibited the defendant from testifying?

15          MR. GONSER:  Objection, hearsay.

16          THE COURT:  Why isn't it hearsay?

17          MS. AHANA:  I'm asking for a simple yes or no

18  answer.

19          THE COURT:  It doesn't matter.

20          MS. AHANA:  And again, it's going not for the truth,

21  but whether or not he said yes or no when -- or if he uttered

22  those words, excuse me, to Miss Stearns.

23          MR. GONSER:  That still calls for hearsay, and if

24  it's not for the truth, then it's irrelevant.

25          THE COURT:  The objection's sustained.

26          MS. AHANA:  I have nothing further.

27          THE COURT:  All right.  Redirect?

28  - - -                    - - -                    - - -

1                           REDIRECT EXAMINATION

2    BY MR. GONSER:

3        Q.    Obviously, you weren't present during any

4    conversations between Mr. Wall and Mr. Voelker regarding

5    whether or not he was -- wanted to testify, correct?

6        A.    Correct.

7              MR. GONSER:  Okay.  Thank you.

8              That's all I have, your Honor.

9              THE COURT:  Can this witness be excused?

10             MR. GONSER:  Yes, your Honor.

11             MS. AHANA:  Yes.

12             THE WITNESS:  Thank you.

13                                        (Witness excused.)

14             THE COURT:  Call your next witness, Mr. Gonser.

15             (Whereupon, there was a discussion between

16             Mr. Gonser and the Petitioner off the record.)

17             MR. GONSER:  I'm going to call his uncle, Robert

18   Voelker, your Honor.

19             THE COURT:  Very well.

20             Mr. Voelker, if you'd remain standing, raise your

21   right hand, you'll be given the oath.

22                           ROBERT VOELKER,

23   called as a witness on behalf of the Petitioner, having been

24   first duly sworn, testified as follows:

25             THE CLERK:  Thank you.  Please be seated.

26             Please state your name, and spell it for the record.

27             THE WITNESS:  Yes.  My name is Robert Voelker,

28   V-o-e-l-k-e-r.

1          THE COURT:  And Mr. Voelker, before we get started,

2   could you hand me that paper that's sitting right in front of

3   you on the table?  Thank you very much.

4          THE WITNESS:  M-hm.

5          THE COURT:  Go ahead, Mr. Gonser.

6          MR. GONSER:  I would move to introduce that into

7   evidence at this point in time.

8          THE COURT:  Is there any objection?

9          MS. AHANA:  No.

10          THE COURT:  It will be received.

11          (Petitioner's Exhibit No. 1, previously marked

12           for identification, was received in evidence.)

13                      DIRECT EXAMINATION

14   BY MR. GONSER:

15      Q.   Mr. Voelker, do you know the gentleman to my right?

16      A.   Yes, indeed I do.

17      Q.   And who is he?

18      A.   That's Jason Paul Voelker, my nephew.

19      Q.   And that was going to be my next question, how do

20   you know him?

21      A.   Well, I am his uncle, and the closest thing that

22   Jason has to a father, who has been missing in action for most

23   of his life.  As far -- yeah.

24      Q.   And taking you back to -- taking you back to the

25   time prior to his trial in this case, do you remember that

26   period of time?

27      A.   Yeah.

28      Q.   And did you have occasion to talk to Mr. Voelker

1   about his issues in his trial?

2        A.   Oh, absolutely, yes, indeed.

3        Q.   And tell us whether or not you ever had occasion to

4   discuss with Mr. Voelker his desire to testify on his own

5   behalf in that case?

6        A.   Yeah, absolutely.  It was assumed all along that

7   Jason --

8             MS. AHANA:   Your Honor --

9             THE WITNESS:   -- would testify --

10            THE COURT:   Wait, wait.

11            MS. AHANA:   Excuse me.  Beyond his first utterance,

12  I am going to object as it calls for hearsay.

13            THE COURT:   It does, and the objection's sustained.

14            MR. GONSER:   Judge, it's -- it's going to state of

15  mind, his intent, and -- Mr. Voelker's --

16            THE COURT:   That's not the issue.  The issue is the

17  communications between Mr. Voelker and Mr. Wall.  Unless this

18  witness was present during those communications, anything he

19  says about them is hearsay, and it's inadmissible.

20            You can't make hearsay objections to some questions

21  about the Mr. Wall, Mr. Voelker discussions and admit other

22  hearsay.  That's not going to work here, we're going to be

23  consistent.  So the objection's sustained for the reasons

24  stated.

25            MR. GONSER:   My proffer would be under Evidence Code

26  1250, state of mind, intent, and that it's also non-hearsay in

27  that it's conduct showing his intent and his state of mind,

28  and it's also going to be a consistent statement --

1           THE COURT:  The issue isn't his intent or his state

2   of mind, the issue is his discussions with Mr. Wall.  If he

3   had a secret, undisclosed intent that wasn't disclosed to

4   Mr. Wall, it's really not relevant.

5           MR. GONSER:  Then that's the substance of

6   Mr. Voelker's testimony.  His is going to be the discussions

7   he had with Mr. Voelker.  So that's what I'm proffering him

8   for.  So then --

9           THE COURT:  Well --

10           MR. GONSER:  -- if he can't testify to that, then I

11  don't have any more questions for him.

12           THE COURT:  Cross-examine.

13           MS. AHANA:  No, your Honor.

14           THE COURT:  Thank you, Mr. Voelker.  You're excused.

15                                    (Witness excused.)

16           THE COURT:  Call your next witness.

17           MR. GONSER:  Jason Voelker.

18           THE COURT:  Very well.

19           Mr. Voelker?

20           THE BAILIFF:  Sue, could you move over for me?

21           THE REPORTER:  (Nods head.)

22           MR. GONSER:  Judge, he was wondering if he'd be

23  able --

24           THE COURT:  Just a minute, we're off the record

25  right now.

26           MR. GONSER:  Sorry, Judge.

27           THE COURT:  Now -- we're off the record, it will be

28  just another moment here.

1    Go ahead.

2        MR. GONSER:  He wanted to know if he could take his

3    notes up with him?

4        THE COURT:  Certainly.

5        MR. GONSER:  Thank you, Judge.

6        THE PETITIONER:  Sorry, I can't raise my hand, I'm

7    shackled.  Sorry.

8        THE COURT:  It's okay.

9                    JASON PAUL VOELKER,

10   the Petitioner herein, called as a witness on his own behalf,

11   having been first duly sworn, testified as follows:

12       THE CLERK:  Thank you.

13       State your name, and spell it for the record.

14       THE WITNESS:  It's Jason Paul Voelker.  The last

15   name is V, as in Victor, o-e-l-k-e-r.

16       THE COURT:  Go ahead, Mr. Gonser.

17       MR. GONSER:  Thank you, Judge.

18                    DIRECT EXAMINATION

19   BY MR. GONSER:

20       Q.  I'd like to take you back to a time prior to your

21   trial, which I believe commenced on February 5th, 2004.  Could

22   you tell us, please, whether or not you had any discussions

23   with your attorney, Mr. Wall -- Jim Wall, about testifying in

24   this case?

25       A.  Yes, I did.

26       Q.  And what were those discussions?

27       A.  Those base -- discussions basically consisted of me

28   and Mr. Wall discussing the trial strategy, and after

1    discussing it, it was confirmed that the only way that I'd be

2    able to present an affirmative defense is if I presented my

3    phone records in corroboration with my testimony.  That was

4    the defense, and that's what we discussed.

5         Q.   Did you discuss with him your desire to testify?

6         A.   Yes, I did.

7         Q.   What did you say to him?

8         A.   Well, initially he told me that it was something

9    that I would have to do, that I had to testify.

10        Q.   When did this discussion take place?

11        A.   This was prior to trial.

12        Q.   Okay.  And what did you say to him?

13        A.   Well, at first, you know, we went over the strategy

14   and everything, and I didn't know, I'd never been to a trial

15   before, so he kind of explained to me about the voir dire,

16   picking the jury and everything, and -- and then about trial

17   strategy as well.  He explained that, you know, there's a

18   difference between presenting an affirmative defense and then

19   just trying to deal with reasonable doubt, and he kind of

20   explained those to me, and he said that this was a case where

21   we were definitely presenting an affirmative defense, and

22   because we were doing that, we were going to have to have me

23   testify along with my phone records to corroborate my

24   testimony.

25        Q.   M-hm.  And when was the first conversation you had

26   with Mr. Wall about your desire to testify?

27        A.   I would say that the first discussion was within --

28   I don't have a date, but I would say some time after

1    November 7th and prior to New Years of 2004.

2        Q.    Okay.  And did you have later discussions about your

3    desire to testify in this case?

4        A.    Yes.  Yes, we did.

5        Q.    Okay.  And do you remember the next occasion you

6    talked to Mr. Wall about that?

7        A.    I don't know the date, but we -- we had a lot of

8    discussions, Mr. Wall would come up and see me frequently.

9        Q.    How many times did you talk about your desire to

10   testify in this case with Mr. Wall?

11       A.    I would say about 80 percent of the time from when

12   he'd come and discuss the case with me.  He probably came to

13   see me upwards of 25 times.

14       Q.    Did you ever tell Mr. Wall that you did not want to

15   testify in this case?

16       A.    No, I did not.

17       Q.    And on each occasion when you discussed testifying,

18   did you tell Mr. Wall that you wanted to testify in this case?

19       A.    Yes, I did.  I agreed with him, the whole

20   affirmative defense thing, I agreed with that --

21       Q.    M-hm.

22       A.    -- and that was part of that, so, yes, I agreed and

23   wanted to testify.

24       Q.    And I'd like to cast your mind back to the night --

25   or the day before you were scheduled to testify.  Do you

26   recall that?

27       A.    The -- yeah, the night before I was scheduled to

28   testify?

1  Q.   On the day before you were scheduled to testify.

2  A.   Yes, I recall.  The day or the night --

3  Q.   The day.

4  A.   -- or both?

5  Q.   Let's start with the day.

6  A.   All right.

7  Q.   Okay.  And do you recall that it was announced

8  that -- that you had -- that you intended to testify --

9  A.   Oh, yeah.

10 Q.   -- on the next day?

11 A.   Yeah.

12 Q.   And that was your intent, to come in --

13 A.   Yes, it was.

14 Q.   -- and testify the next day?

15 A.   It was, to come in.

16 Q.   Okay.  And do you recall the next day when you were

17 scheduled to testify?

18 A.   Yes, I do.

19 Q.   Why don't you tell me what happened that morning?

20 A.   Well, that morning I came in and I was a little -- a

21 little upset, because Mr. Wall had promised to come meet me

22 the night before in the County jail, all right.

23 Q.   But let me interrupt you for a second because you

24 pointed something out to me.  After court the day before you

25 were going to testify --

26 A.   Uh-huh.

27 Q.   -- did you have any plans with regards to preparing

28 your testimony?

1     A.   Yes, I did.

2     Q.   What were those plans?

3     A.   Mr. Wall had promised to come up to the -- the jail

4 to go over my testimony with me --

5     Q.   M-hm.

6     A.   -- because at that point we hadn't done that.  We

7 were planning on doing it, we were -- there was certain

8 individuals that were going to come in and do these -- these

9 mock cross-examinations, I guess is what they're called.

10    Q.   And who were -- who were those individuals?

11    A.   Well, one was David Brown.

12    Q.   Yes.

13    A.   And that never took part -- I mean, that never

14 happened.  And another one was an attorney from San Francisco,

15 I do recall that, but I don't know the attorney's name.

16    Q.   Was it Gary Preneta?

17    A.   I -- I don't recall the name.

18    Q.   And so -- so you had always intended to prepare your

19 testimony --

20    A.   Yes, I did.

21    Q.   -- your cross-examination --

22    A.   I did.

23    Q.   -- is that --

24    A.   I did.

25    Q.   -- correct?  And did -- Mr. Brown was one of the

26 attorneys that -- that was going to help you --

27    A.   That's true.

28    Q.   -- prepare also?

1    A.    That's true.  Yeah, Mr. Wall wasn't too concerned

2  about my direct, but he said he wanted to work on the

3  cross-exam, so he was going to have somebody do that.

4    Q.    And the night before you were planning to testify,

5  did Mr. Wall come and -- and visit you to --

6    A.    No, he did not.

7    Q.    -- prepare your testimony?

8    A.    He actually did not.  He had planned on coming, and

9  I was scheduled for him to show up, and I was prepared, had my

10  notes and everything.

11    Q.    M-hm.

12    A.    And -- but that visit never took place.  So I kind

13  of stayed up late preparing myself.

14    Q.    Okay.  And did that change your intent to testify?

15    A.    No, it didn't.

16    Q.    Okay.  So what did you intend to do the following

17  day, as far as testimony?

18    A.    I intended to testify in the morning.

19    Q.    Okay.  Why don't you tell us what happened that

20  morning?

21    A.    Well, that morning I came into the courtroom, it was

22  in Department J, I believe, I walked in, and my attorney was

23  already sitting there at the bench.

24    Q.    M-hm.

25    A.    And I came in, and the first thing he did is he

26  apologized for not showing up --

27    Q.    M-hm.

28    A.    -- the previous evening, and he said he was ready to

1    proceed. So I sat down next to him and -- and then court

2    started and --

3        Q.   Was the jury --

4        A.   What's that?

5        Q.   Was the jury in the box at this point in time?

6        A.   Initially, no, no, not -- not at first, but then

7    they came in.

8        Q.   Okay.

9        A.   And then they were seated.

10       Q.   Then what happened?

11       A.   And then I believe -- I believe the Judge asked --

12   Miss Adams asked if -- if we were ready to proceed at that

13   time, and my attorney said yes. And I'm not sure if it was

14   asked to call the next witness, or asked what we had further

15   to produce, but Mr. Wall said that the defense rested at that

16   time.

17       Q.   What was your -- how did you feel about that?

18       A.   Well, I was upset about that. I -- I looked over at

19   him, I said, basically, "Hey, what -- what are you doing?

20   What's going on? I wanted to testify."

21       Q.   Did you say anything to the Court?

22       A.   No, I did not. I didn't tell the Court anything.

23       Q.   Why not?

24       A.   Well, up to that time, I had been told never to

25   speak directly to the Court. The only time I was supposed to

26   say anything to the Court, ever, is if the Court said

27   something to me. And -- and I followed that. That's exactly

28   what I did.

1      Q.   And after -- after your -- after the conclusion of

2  your trial, did you discuss this issue -- strike that.

3  After -- after the conclusion of your trial, were you

4  appointed another attorney?

5      A.   I was.  I was.  That -- that happened -- it took a

6  while, a little longer than I would have liked, but, yes, I

7  was eventually appointed an attorney.

8      Q.   And did you have discussions with regards to your

9  denial of your right to testify?

10      A.   Oh, yes, I did.  Yes, I did.

11      Q.   And that was Miss Stearns?

12      A.   That was with Miss Stearns.

13      Q.   And what did you discuss with her?

14      A.   Well, I basically told Miss Stearns that I was upset

15  about the fact of not getting to testify.

16      Q.   M-hm.

17      A.   And I was also upset about the fact that, you know,

18  we had planned this affirmative defense, and then we never

19  presented it.  I mean, there was phone records that we were

20  supposed to present that would have corroborated my testimony.

21  Those phone records never showed up.  Yet Mr. Wall continued

22  to argue to the jury that they proved exculpatory, and the

23  D.A., on the other hand, argued that such records really

24  didn't exist, and -- and that it was kind of a sham.  And it

25  kind of went back and forth, you know, he's saying they do

26  exist, she's saying they don't.

27          Well, then, lo and behold, the jury says, "Well,

28  where are the phone records?"  And -- and they're informed

1    that there are none.  So that was one of my major concerns.

2            Also the fact that I didn't get to testify.  There

3    were some other concerns, too, having to do with the great

4    bodily injury that -- you know, I was under the impression

5    that you had to personally inflict great bodily injury in this

6    state.

7            MS. AHANA:  Objection, your Honor, as to this

8    portion of the narrative, it's non-responsive.

9            THE COURT:  Well --

10            THE WITNESS:  It isn't.

11            THE COURT:  -- the question was -- the question

12    was -- I don't know how pertinent it is to this application,

13    but what did you discuss with Miss Stearns, and he's telling

14    us what he discussed with Miss Stearns.  I'll allow it.

15            So great bodily injury was a concern, the issue of

16    personal infliction.

17            THE WITNESS:  And -- and also there was another

18    issue with some witnesses that weren't located that I would

19    have liked to come into trial as well.  They weren't found

20    until the conclusion of the trial, and -- so that kind -- I

21    had a concern with that as well.  But those are some of the

22    things that -- that were discussed with Mary Stearns.

23            MR. GONSER:  Q.  But you specifically recall raising

24    the issue of your denial of the right to testify with Miss

25    Stearns --

26        A.    Yes.

27        Q.    -- isn't that correct?

28        A.    Yes.

1    Q.   And you were present during the -- the trial, and

2    you heard the testimony of Damian Diprima; is that correct?

3    A.   Yes, I -- I was.

4    Q.   And do you agree or disagree with his testimony?

5    A.   I disagree with a lot of it.

6    Q.   Okay.  And why don't you tell us what really

7    happened on the evening of November 6th, 2003?

8    A.   Well --

9          MS. AHANA:  Objection, relevance.

10         MR. GONSER:  Goes to prejudice.

11         THE COURT:  Goes to what?

12         MR. GONSER:  Prejudice.  The issue of prejudice,

13   what he -- what he actually would have testified to at --

14         THE COURT:  I'll hear what -- bearing in mind, and

15   I -- it hasn't really come up in this hearing --

16         MR. GONSER:  M-hm.

17         THE COURT:  -- but I think it's appropriate to say,

18   for the record, that in connection with Mr. Tristan Harvey's

19   trial, I sat and watched a videotape of an interview Miss

20   Bousquet took of Mr. Voelker, where he talked at length about

21   the incident.

22         I'll let you testify to that.  Go ahead, sir.

23         THE WITNESS:  All right.  Where would you like me to

24   start?

25         MR. GONSER:  Q.  Why don't you start when -- at --

26   at the point in time that you were at Matteucci's bar in San

27   Anselmo?

28   A.   Okay.  Well, I had gone to Matteucci's bar with my

1  friend, Luke Mann, and his girlfriend, Sarah Shelly.  We got

2  to the bar, drank for a while.

3      Q.   M-hm.  And then what happened?

4      A.   We drank -- I ran into an old neighbor of mine, Zeph

5  Carter, who was at the bar, I hadn't seen him in a while.

6      Q.   Okay.  And what happened next?

7      A.   Well, he introduced me to Damian Diprima, that's

8  when I met Damian for the first time.

9      Q.   Okay.  And then what happened?

10     A.   Basically we were just socializing a little bit,

11 hanging out, playing a little bit of pool, and I remember Zeph

12 had asked me if I had any marijuana, 'cause he wanted to smoke

13 some, and I believe Damian wanted to smoke some as well.

14     Q.   Okay.  And what did you do?

15     A.   I said I had some.

16     Q.   M-hm.

17     A.   And Damian wanted to purchase some.  I said I -- it

18 wasn't for sale, but that if he bought me a drink, I'd smoke

19 with him, I was certainly obliged to that.

20     Q.   And then what happened?

21     A.   He bought me a drink at the bar.

22     Q.   And what'd you do next?

23     A.   I drank, hang out for a while.  I told him that when

24 I -- you know, when I rolled up a joint or something, that I

25 would allow him -- you know, I mean we would smoke it.  But

26 basically after I drank some alcohol, I realized that I no

27 longer had the marijuana with me, I left it back at -- at

28 Marin Street, at the apartment that I was going to move out of

1   at that time.

2       Q.    So at some point in time, did you make an

3   arrangement to go back to your apartment?

4       A.    Yes, we did.  Well, he -- he offered me the keys to

5   his vehicle, and he said, you know, "You can go back and go

6   pick it up."  And at that point, I'd already been drinking and

7   I didn't want to drive, so I -- you know, I said, "No, thank

8   you, but if you want, you can come over to my house later,

9   I'll smoke with you then."

10      Q.    Did you have occasion to leave the bar that evening?

11      A.    Say that again, I'm sorry?

12      Q.    When did you leave the bar that evening?

13      A.    We left the bar, I would guess about sometime after

14  1:45, prior to 2:00.

15      Q.    And where did you go?

16      A.    From the bar we went straight to 7-11.

17      Q.    How did you get there?

18      A.    I drove with Damian Diprima.

19      Q.    Were you driving or was he?

20      A.    No, I wasn't, I was sitting in the passenger seat.

21      Q.    And what did you do when you got to the 7-11 store?

22      A.    We got to 7-11.  When we went in there, we were

23  trying to get some alcohol, it was after 2:00 a.m., but I was

24  able to get alcohol.

25      Q.    M-hm.

26      A.    And we tried, but there was some security guards

27  that were in there, and basically the store owner didn't want

28  to sell any alcohol with the security guards in there, so we

43

1   ended up settling for some chimichongas and burritos in the

2   microwave.  I think he bought a pack of cigarettes or

3   something.  But I also -- you know, when I was in the 7-11, I

4   asked to use the cell phone, because earlier in the evening I

5   had made plans with my ex-girlfriend to try to meet up later

6   and I -- since I was in the 7-11, I figured if she wanted

7   something, I'd ask her.

8        Q.   And Raven Oliver, that -- that's your ex-girlfriend?

9        A.   Yeah, that was my ex-girlfriend at the time.

10       Q.   And -- and so you called her sometime after

11   2:00 o'clock; is that -- is that correct?

12       A.   Yeah, sometime after 2:00 I called her and asked her

13   if she -- if she wanted anything from 7-11.

14       Q.   Okay.  And what time did you leave the 7-11?

15       A.   I believe sometime after -- about 2:17, 2:18.

16       Q.   Okay.  And where did you go from there?

17       A.   From there we went straight back to my apartment.

18       Q.   When did you get there?

19       A.   When did we get to the apartment?

20       Q.   Yes.

21       A.   Oh, it's about a three, four minute drive.

22       Q.   Okay.  And then what did you do?

23       A.   Well, when we got there, the other guys from the bar

24   that we had met up with earlier --

25       Q.   Who were the other guys?

26       A.   That was Trey Harvey (phonetic) and the other guy,

27   I'm not sure of his name.

28       Q.   M-hm.

1     A.   His name was Jay, I think, but -- .

2     Q.   Okay.  And what did you do next?

3     A.   At that point, we -- we were downstairs, and we were

4 ready to go ahead up.  There were some girls that were

5 supposed to be coming with us as well, but I guess they had

6 gone somewhere else.

7     Q.   M-hm.

8     A.   So me, Trey, and Damian, we ended up going upstairs

9 because Jay -- I guess he was -- I'm not sure exactly what he

10 was doing, but he was doing something down there, either

11 talking on his cell phone or -- I'm not sure what.  But I told

12 him to "Buzz up," you know, I lived in apartment 306, I just

13 said, "Hit the buzzer and we'll buzz you up."

14     Q.   Okay.  So who came up with you to your apartment?

15     A.   It was me, Tristan, and Damian Diprima.

16     Q.   What did you do when you got inside the apartment?

17     A.   Well, when we first walked in the apartment -- I

18 think the first thing I did was I went over to my desk where I

19 had my -- where I had left my marijuana and I went and grabbed

20 it, and -- 'cause he was expecting to smoke, you know, he had

21 bought me a drink at the bar --

22     Q.   M-hm.

23     A.   -- so I believe I picked it up -- he was commenting

24 on the -- on it, and I remember I -- I had taken him into the

25 back and I was showing him some plants that I had growing in

26 the apartment.  And I was showing him those, and then we went

27 back out, I think I turned on some music or something, and we

28 rolled up some -- or actually, at that point, I had not rolled

1  it up yet, but I put the marijuana on the table, and I told

2  them to help themselves because, when I was previously at

3  7-11, Raven asked me to call her once I got home.

4      Q.  Did you do that?

5      A.  Yes, I did.

6      Q.  And what time did you call her?

7      A.  Can I check my notes for that?

8      Q.  Yes, could you, please?

9      A.  I'm -- the first call, I called her -- no, this is

10  the second time.  I had previously called her at 7-11.  The

11  second time, I called her at 2:24 right after getting in the

12  apartment.

13      Q.  Okay.  And -- and you're referring to Exhibit E

14  that's attached to your petition that was filed in the First

15  District Court of Appeal; is that --

16      A.  No, I'm actually not, I don't have those exhibits up

17  here with me, I'm referring to something else where I had

18  noted it down in a -- in a declaration on page 8, and that's

19  Exhibit A to the traverse.

20      Q.  Oh, in -- in my traverse --

21      A.  Yeah --

22      Q.  -- is that correct?

23      A.  -- in your traverse that you had filed, that's all I

24  have up here.

25      Q.  Okay.  So that's -- that's attached to my traverse,

26  correct?

27      A.  Yeah.

28      Q.  Okay.  So that's the conversation you had with Raven

46

1    Oliver at 2:24?

2         A.    At 2:24, yeah.

3         Q.    Okay.  And then what happened?

4         A.    Well, I talked to her for a while, I was on the

5    phone, and we were planning on meeting up later in the

6    evening.  We had already discussed meeting up earlier, I think

7    like 10:00 o'clock I called her from the apartment, and she

8    was asking who I had over at my house and stuff like that, and

9    actually I was kind of trying to get into a -- back into a

10   relationship with her at that time, so I was --

11        Q.    So you were planning to meet up later; is that

12   correct?

13        A.    Yeah, well, I wanted to meet up with her, yeah, and

14   she kind of -- I mean, earlier she kind of hinted at, yeah, we

15   would meet up, it wasn't like a for sure thing, but it was

16   kind of a tentative thing.  So I called her, and we were

17   talking for a while.

18        Q.    And did anything unusual happen during that phone

19   conversation?

20        A.    Well, while I was talking with her, I remember

21   she -- she said, "What is that noise in the background?"  And

22   I didn't notice at first, I guess I had a few too many drinks

23   or something, but I stopped and I listened and I heard noise

24   in the background, I heard some yelling.

25        Q.    What did you do in response to hearing that noise?

26        A.    I told her that I would call her back, and she asked

27   me, she said, "Well, call me back."

28        Q.    Okay.  And so what'd you do next?

1    A.    I hung up the phone and I went out to the living

2  room.

3    Q.    What did you see when you got in the living room?

4    A.    When I got into the living room, it was -- it was

5  Damian and Tristan, they were arguing, and that other guy,

6  Jay, he was also in the apartment, I guess somebody had buzzed

7  him up when he hit the --

8    Q.    M-hm.

9    A.    -- intercom system when I was in the back or

10 something.

11   Q.    What were they doing?

12   A.    They were arguing.

13   Q.    M-hm.

14   A.    They were arguing.

15   Q.    What did you do?

16   A.    Well, they were arguing over -- over a -- I guess

17 Jay was calling him a racist, and -- and Damian was kind of

18 defending himself, he was saying, "I'm not a racist, I didn't

19 mean it like that," when I had come out.

20   Q.    M-hm.

21   A.    And I guess they were arguing over -- I didn't

22 actually hear Damian say the N word, but I guess Damian had

23 called them -- excuse my language, but, niggers, and -- and

24 basically I had come out and I was like ,"Whoa, whoa, what's

25 going on here?"  And Damian explained that he didn't mean it

26 like that.

27   Q.    What happened next?

28   A.    I tried to just diffuse the situation.  I stepped

1  in, I said, "Hey, I don't -- I don't think this guy's a

2  racist, he didn't mean it like that."  And Damian was kind of

3  saying, "Yeah, yeah, I didn't mean it like that, I'm into the

4  hip-hop culture and everything, and I'm from Minnesota and

5  that's just how I talk."

6      Q.   M-hm.  So what'd you do next?

7      A.   Well, at that point I said, "Hey, everybody's got to

8  get out of my house if you're going to be loud in -- in here,

9  you know, you guys can't be in my house arguing like this,

10  you're being loud."

11     Q.   What did they do?

12     A.   They -- they said they'd be quieter.

13     Q.   Then what did you do?

14     A.   At that point I -- the marijuana that I had over on

15  the desk, I went and grabbed it --

16     Q.   M-hm.

17     A.   -- and I rolled it up, and we were all talking and

18  everything seemed to be settled, you know, everybody was

19  getting along.

20     Q.   Did the marijuana seem to have a calming effect

21  on --

22     A.   Well, I would think so.  I mean, for me it did,

23  but -- yeah, everybody was getting along, everybody seemed to

24  be getting along.

25     Q.   Okay.  And then what did you do next?

26     A.   Well, we -- we talked for a few minutes, and then at

27  that point everything seemed to be fine, they said they

28  weren't going to be loud any more, and I went to go call Raven

1    again 'cause I told her I would call her right back.

2        Q.   Did you call her back?

3        A.   Yeah, I did, I went into the back room and called

4    her again.

5        Q.   What time was that?

6        A.   I'd have to refer to my notes.

7        Q.   Would you, please?  When you say "notes," you're

8    actually referring to the phone records?

9        A.   To the -- well, I don't have the phone records up

10   here, I'm referring to the declaration in which -- when I

11   wrote it --

12       Q.   Okay.

13       A.   -- I had the time I think.  Actually, I don't think

14   I -- let's see.

15       Q.   2:36, does that refresh your recollection?

16       A.   Yeah, 2:36 sounds good.  I -- I don't have it in

17   front of me, I don't think it's actually in the declaration.

18       Q.   Okay.  And did anything unusual happen during the

19   conversation, the second conversation in the apartment --

20       A.   Well, yes, she --

21       Q.   -- with Miss Oliver?

22       A.   -- she said, "Well, what had happened?"  And I -- I

23   said, "It was just a misunderstanding."  And I was talking

24   with her, not very long, when all of a sudden I heard like

25   a -- a thumping noise and some -- and some sound in the

26   background.  And --

27       Q.   What did you do in response to hearing that noise?

28       A.   Well, I realized they were acting up again, so I --

1    I hung up the phone and I ran out into the living room.

2         Q.   And what did you see when you got in the living

3    room?

4         A.   At that point when I ran into the living room, I saw

5    that Damian Diprima was being kicked in his head by that one

6    guy, Jay.

7         Q.   M-hm.

8         A.   And Tristan was also punching on him, so I -- I ran

9    in, the first thing I did was I grabbed Tristan, and when I

10   grabbed him, I tried to yank him off him, but I guess he

11   instinctively grabbed me back or something, so we both went

12   down to the floor.

13        Q.   M-hm.

14        A.   And when we were down on the floor, he was asking me

15   what I was doing, and I was asking him what he was doing, and

16   basically when I looked up, I saw -- I saw Jay kicking him and

17   I was just -- I was trying to diffuse it, trying to get him

18   off of him.

19        Q.   What happened next?

20        A.   Well, next I -- I got up, I was a little nervous, I

21   thought I'd seen a knife, but in -- in hindsight, I guess I

22   didn't.   But there was blood everywhere, and I guess maybe I

23   just assumed there was a knife or something.

24        Q.   What did you do next?

25        A.   Next thing I did was I hopped up, and I was trying

26   to diffuse the situation because -- 'cause Jay was still

27   hitting him --

28        Q.   M-hm.

1    A.    -- and when I hopped up, he kind of backed up, and I

2    asked Damian if he was all right, and he really wasn't saying

3    anything, he was kind of, like, up against the wall trying to

4    get up, he was struggling to get up.

5    Q.    Did he get up?

6    A.    Yeah, he got up.  He got up and --

7    Q.    Then what did he do?

8    A.    Well, right when he got up, Jay took a fire log from

9    my fireplace, which is pretty close, right to the kitchen --

10    Q.    Okay.

11    A.    -- and hit him right over the head with it.  And it

12    kinda -- it kinda cracked his head open a little bit, 'cause I

13    remember blood came right out when he had done that, and --

14    and then Damian just kinda did like a 180 and ran straight

15    through my living room out to my deck, and once he got to the

16    deck, he just jumped right over.

17    Q.    What was your reaction when you saw him jump off the

18    deck?

19    A.    I was horrified.  I mean, I -- I lived on the

20    third -- third floor, and plus there's a parking garage, so

21    it's like four -- it's like four stories.

22    Q.    What did you do in response to him jumping off your

23    deck?

24    A.    Well, the response to that was I froze, I didn't

25    know what to do, I -- it was -- it was pretty shocking.  I

26    really didn't do nothing at first.  A few seconds, I don't

27    know, I kind of froze up.

28    Q.    After you had -- had those few seconds of shock,

1    what did you do?

2         A.    At that point then I had ran downstairs, 'cause I

3    knew I had to get down there, I ran downstairs to go and try

4    and help him.

5         Q.    M-hm.

6         A.    And I got down there, and I got to admit it was

7    really awkward.  I didn't go up to him at first because I -- I

8    thought he might have been dead, and I didn't know how to

9    handle it, it -- it was really weird, it was kinda awkward.

10   He was laying there, and I was just kinda looking at him, and

11   he looked as though he was dead.

12        Q.    What happened next?

13        A.    Then I saw he kind of moved, and then he -- so he

14   had some breath come out of him, like he had had the wind

15   knocked out of him, and when that happened, that's when I -- I

16   flung myself over the retaining wall and jumped up and went

17   to --

18        Q.    Were you trying -- were you trying to attack him?

19        A.    No, I was not trying to attack him.

20        Q.    What were you -- what were you trying to do?

21        A.    I was trying to help him.

22        Q.    Okay.

23        A.    And he was there, and I ran up and I -- and I told

24   him, I said, "You probably shouldn't move, your neck might be

25   broken or something."  And at that point a neighbor had

26   flashed their flashlight down, and I -- and I remember I

27   looked up, and this neighbor was flashing his flashlight down,

28   and at that point Damian said, "Don't hit me."  And the

 1   neighbor was yelling, "Don't hit him." And I remember

 2   thinking, "Man, this looks like I'm down here beating on this

 3   guy down here."

 4        Q.   Were you?

 5        A.   No, I was not beating on him down there, and --

 6        Q.   What were you doing?

 7        A.   I was trying to help him, that's what I yelled to

 8   the neighbor, I said, "Hey, I'm trying to get him an

 9   ambulance, he's hurt."

10        Q.   And then what happened?

11        A.   At that point he hopped up, and I would say it was

12   kind of miraculous, I was surprised he hopped up like that, he

13   hopped up and he said, "Get me out of here."  And I was like

14   shocked that he would be even walking around, I mean, that's a

15   heck of a fall.  And he just said, "Help, help me get out of

16   here."  So I did, I helped him -- I helped him get over the

17   fence.

18        Q.   On -- on the evening of November 6th, 2003, did you

19   rob Mr. Diprima?

20        A.   No, I did not.

21        Q.   And on -- on the evening of November 6th, 2003, did

22   you assault Mr. Diprima?

23        A.   No, I did not.

24        Q.   And on the evening of November 6th, 2003, did you

25   falsely imprison Mr. Diprima?

26        A.   No, I did not.

27        Q.   And did you conspire to do any of those things?

28        A.   No, no.  I do realize that I unknowingly facilitated

1    something in my house, but I -- I didn't participate in it.

2        Q.   Okay.  And did you have any knowledge that the

3    people that came into your house were going to do any of --

4        A.   No, I had no idea.

5        Q.   -- these things?

6        A.   I had no idea.

7            MR. GONSER:  That's all I have, your Honor.  Thank

8    you.

9            THE COURT:  Okay.  We'll take a recess for 15

10   minutes, we'll resume at 10:35.  Thank you.

11               (Whereupon, at the hour of 10:20 o'clock a.m.,

12                a recess was taken until 10:37 o'clock a.m.)

13           THE BAILIFF:  Remain seated and come to order, Court

14   is back in session.

15           THE COURT:  In the case of In Re Voelker, the record

16   will reflect that we are in the presence of the Petitioner,

17   with his attorney, Mr. Gonser; Miss Ahana and Miss Worsham are

18   here for the People.

19           And Mr. Voelker, you've been direct examined, you're

20   now about to be cross-examined, you're still under oath.

21           Miss Ahana, will you be doing that?

22           MS. AHANA:  Yes, your Honor.

23           THE COURT:  Okay.  Go ahead.

24           MS. AHANA:  Thank you, your Honor.

25                        CROSS-EXAMINATION

26   BY MS. AHANA:

27       Q.   Mr. Voelker, did you review the new trial motion

28   written by Miss Stearns?

1    A.    Yes, I did.

2    Q.    Okay.  And as a result of the conviction that

3 occurred in this particular case and your sentence, you filed

4 an appeal, did you not, with the Court of Appeal?

5    A.    Yes, I did.

6    Q.    Okay.  And you, yourself, wrote and filed with this

7 Superior Court a writ of habeas corpus; is that right?

8    A.    A petition for writ of -- yeah.

9    Q.    A petition for writ of habeas corpus, exactly.  And

10 you also filed a petition for writ of habeas corpus with the

11 Court of Appeal?

12    A.    That's correct, First District.

13    Q.    And you wrote that yourself; is that right?

14    A.    That's correct.

15    Q.    You also filed a petition for review with the

16 California Supreme Court; is that also correct?

17    A.    That's correct.

18    Q.    Okay.  And these are all documents that you wrote

19 yourself?

20    A.    Yes, they are.

21    Q.    Okay.  In none of these documents that you authored

22 or spoke with your attorney about, or in the new trial motion,

23 did you complain of Mr. Wall's examination of Damian Diprima

24 during the course of the trial; is that right?

25    A.    That's correct.

26    Q.    In fact, Mr. Wall did a rather exhaustive and good

27 job in cross-examining and examining Damian Diprima; is that

28 right?

1      A.   Yeah, he's repeatedly impeached.   Yeah, he did a

2    good job.

3      Q.   And a number of inconsistencies in Damian Diprima's

4    story was elicited or brought out by --

5      A.   Yeah, a lot.

6      Q.   -- by the cross-examination and examination done by

7    Mr. Wall --

8      A.   Yeah.

9      Q.   -- of Mr. Diprima?

10     A.   That's correct, numerous inconsistencies.

11     Q.   And you know this better than I do, is it true that

12   he -- Mr. Wall cross-examined Mr. Diprima, and also examined

13   him as his own witness during the course of the trial?

14     A.   I believe that to be so.

15     Q.   Okay.   Over what portion of the trial, how many

16   days, do you believe Mr. Wall examined, in total, Mr. Diprima?

17     A.   I would say three days, maybe, four perhaps.   I'm

18   sorry, that's just a estimate, I don't know.

19     Q.   Okay.   And at the -- you recited to us your version

20   of what occurred on that evening of the offense here in court

21   today; did you not?

22     A.   Yes, I did.

23     Q.   Okay.

24     A.   I just did.

25     Q.   And that is what you maintained when you spoke with

26   Mr. Wall about what occurred in this case; is that right?

27     A.   That is.   We discussed some other things as well, it

28   was -- it was more in depth, but, yeah.

1   Q. I'm sorry, your discussions with Mr. Wall were a

2 little bit more in depth than what you testified --

3   A. Yes, they were.

4   Q. -- to here in court today?

5   A. Yes, they were.

6   Q. Okay.  Yet when Mr. Wall cross-examined and examined

7 Mr. Diprima, he never brought out a lot of the details that

8 you've now testified to here in this hearing which contradict

9 Damian Diprima's testimony; isn't that right?

10   A. That's true.

11   Q. In fact, the other individual that you now refer to

12 as Jay was never referred to as Jay during this

13 cross-examination and examination by Mr. Wall of Mr. Diprima;

14 is that right?

15   A. I believe -- that is correct, yes.

16   Q. This statement that you've given to us today here in

17 court was never provided pre-trial or during the course of the

18 trial to Detective Pata or Detective Spaletta of the San

19 Rafael Police Department; is that right?

20   A. That's correct, or the D.A.'s Office as well.

21   Q. Okay.  And you've testified that at a moment in time

22 after this attack, that you thought Damian Diprima was dead?

23   A. That's true.

24   Q. Yet you never called 9-1-1?

25   A. I was in the process of running downstairs at that

26 time.

27   Q. How old are you, Mr. Voelker?

28   A. I'm 25.

1    Q.    What is your education?

2    A.    I'm a graduate of high school and a little bit of

3    college.

4    Q.    During your trial, I take it you paid particular

5    attention to the proceedings as they occurred?

6    A.    Yeah, I tried to.  It was all foreign to me, but,

7    yeah, I did.

8    Q.    You listened to the witnesses testify; did you not?

9    A.    Yes, I did.

10   Q.    And during the course of the trial, you took copious

11   notes?

12   A.    I don't know how copious they were, but I took

13   notes.

14   Q.    Okay.  And part of the note writing was in order to

15   communicate with Mr. Wall during the course of the trial; is

16   that right?

17   A.    Mostly they were for notes for myself, but

18   occasionally I would write something down for Mr. Wall.

19   Q.    During the course of the trial as well, you spoke or

20   whispered to Mr. Wall, is that right --

21   A.    That's true.

22   Q.    -- as well?

23   A.    That's correct.

24   Q.    Okay.  Clearly you had no problem communicating with

25   Mr. Wall during the course of the trial; is that right?

26   A.    That's not necessarily true.  It started -- the

27   communication kind of started to break down after the District

28   Attorney's case in chief.  Mr. Wall was going through some

1  family problems at that time and --

2      Q.    Thank you.

3      A.    I don't know.

4      Q.    You stated that pre-trial, and also -- and correct

5  me -- correct me if I'm wrong, during the course of the trial,

6  you had some conversations with Mr. Wall about testifying?

7      A.    That's true.

8      Q.    Okay.  And you said that during the course of these

9  discussions with Mr. Wall, he counseled you about the

10 benefits, and presumably the detriment to you testifying at

11 your trial?

12     A.    Mr. Wall never really discussed any detriment at

13 all.  He told me that -- initially he told me that it was

14 something I had to do if I wanted to go to trial.  If I

15 planned on going to trial, that was a necessity.

16     Q.    And did he maintain that this was a good thing to do

17 throughout the trial as well?

18     A.    He told me that my successful defense was contingent

19 on my testimony.

20     Q.    Okay.  And you went along with that?

21     A.    Yes, of course.

22     Q.    Okay.  You thought it was a good idea as well?

23     A.    Yes.

24     Q.    Okay.  So while you were -- while these discussions

25 regarding testifying were ongoing, you believed and you

26 trusted in the advice and counsel of Mr. Wall in that regard?

27     A.    Yes, I did.

28     Q.    And as a result of that trust and belief, you

1    followed his advice in that regard as well?

2         A.    Yes, I did.  I -- I listened to everything he said.

3         Q.    Okay.  At some point towards the end of your case,

4    as you testified, the Court inquired of Mr. Wall as to whether

5    or not you were going to testify, and he indicated that you

6    would at one point?

7         A.    Yes, he did.

8         Q.    Is that your recollection of what happened?

9         A.    Yeah, he informed the Court that I would be

10   testifying.

11        Q.    And --

12        A.    And that -- from my understanding, there was

13   informal discussions as well as -- where he informed the

14   District Attorney's Office that I would be discussing -- or

15   testifying as well.

16        Q.    Now, did that happen in court?

17        A.    No, they were informal, like I said.

18        Q.    Okay.  And were these discussions between Mr. Wall

19   and Ms. -- Ms. Worsham?

20        A.    I would assume so, but --

21        Q.    But you don't know this yourself --

22        A.    No, I don't.

23        Q.    -- based on personal knowledge?

24        A.    I'm sorry.  No, I do not.

25        Q.    Okay.

26        A.    I wasn't privy to the informal communication.

27        Q.    All right.  Now, after your counsel announced on the

28   record that you were going to testify, do you recall there

1    being a discussion between the parties and the Court relative

2    to your felony convictions being able to be used to impeach

3    you --

4         A.   Yes.

5         Q.   -- at trial?

6         A.   That's correct.

7         Q.   And do you understand what I mean when I say

8    "impeach"?  In other words, they can be used to attack your

9    credibility --

10        A.   My credibility, yeah.

11        Q.   -- in front of the jury?

12        A.   Yeah.

13        Q.   Okay.  In addition to that, it was also raised by

14   the prosecutor, on that same day, that your statement, your

15   previous statements, that were previously suppressed --

16        A.   M-hm.

17        Q.   -- the prosecutor intended on re-raising the issue

18   of bringing those prior inconsistent statements up, should you

19   choose to testify --

20        A.   That's correct.

21        Q.   -- do you remember that discussion?

22        A.   That's correct.

23        Q.   Okay.

24        A.   Well, I -- I remember a motion in limine where the

25   District Attorney's Office requested to do so, and I read

26   that.

27        Q.   Do you recall as well that once your counsel

28   announced that you were going to testify, that that issue was

1   also --

2       A.    Yes.

3       Q.    -- re-raised?

4       A.    Yes, I do.

5       Q.    Okay.  And basically at that point in time, the

6   Court left it to you and your attorney to discuss whether or

7   not you'd be testifying, and would rule definitively as to

8   whether or not those prior inconsistent statements could come

9   in to impeach your testimony?

10      A.    At that time my attorney said, "Don't worry, we have

11  a California jury instruction for that."

12      Q.    What did you take that to mean?

13      A.    I didn't really know at the time.  He told me that

14  there was some type of instruction that would tell the jury

15  that -- that my -- my statement was not necessarily something

16  that they had to listen to because it was taken in violation

17  of my rights.

18      Q.    However, you knew that statements that you had

19  previously made to law enforcement would come in, and that

20  those statements were inconsistent with the story that you

21  were going to testify to?

22      A.    I didn't really think they were inconsistent at all.

23  I didn't really have a problem with those statements coming

24  in.

25      Q.    Do you recall talking to Detective Pata about this

26  incident?

27      A.    Yes, I do.

28      Q.    Okay.  And in your declaration as well, you -- and

1    this is the declaration attached to the traverse, you do admit

2    that you made inconsistent statements to law enforcement?

3        A.   No, they weren't inconsistent.  What I said to law

4    enforcement, I was consistent, although it wasn't necessarily

5    the whole truth.  I told Detective Pata, and I believe it was

6    Rick Martin as well, that I did not want to discuss anything

7    with them and I wanted an attorney.  And they told me, "Oh,

8    that will be arranged."  And then they continued to question

9    me.  And basically, I didn't want to talk, so I would tell 'em

10   a certain amount of it, what happened up to a point, and I

11   never went beyond that point.

12        Now, whether that's a lie or not -- I mean, yeah, it

13   is, it is a lie 'cause I didn't tell the whole truth, but I

14   didn't lie, I just specifically stated, "I'm not going on

15   beyond that, I left, I don't know."

16       Q.   Do you recall telling Detective Pata that during the

17   course of your interaction with Mr. Diprima, that you had five

18   people over at your home and invited Diprima to also come over

19   to your home, which Diprima agreed to?

20        MR. GONSER:  Judge, I'm going to object to the use

21   of this statement as being involuntary and violative of his

22   right to an attorney under the Sixth Amendment.

23        THE COURT:  If this were a jury trial, I might

24   sustain that objection, but I allowed, over the People's

25   objection, Mr. Voelker to testify to his -- what he believes

26   he would have said had he been called to testify at the trial.

27   I think it's appropriate cross-examination for the People to

28   inquire about some of the possible downsides, including prior

64

1  inconsistent statements.  So I'm overruling the objection for

2  that reason.

3          Do you remember the question?

4          THE WITNESS:  Would you please repeat it?

5          THE COURT:  Yes.  Do you -- do you recall telling

6  Detective Pata that during the course of your interaction with

7  Mr. Diprima, that you had five people over at your home and

8  invited Mr. -- and invited Diprima to also come over to your

9  home, which Diprima agreed to?

10         THE WITNESS:  I don't recall saying five people, but

11 the rest of it sounds about pretty straightforward, yeah, that

12 I had had people over at my house earlier in the evening.

13         MS. AHANA:  Q.  Do you recall during that same

14 conversation with Detective Pata, that you could not remember

15 the names of those five people who were at your apartment?

16     A.   Yes, and I was adamant about that, and that's when I

17 was asking for an attorney.  He would ask me, "What were the

18 names?"  And I would say, "I want an attorney."  And -- and he

19 would continue to question me, and I said I wanted to leave,

20 and he wouldn't let me leave either.  So I said, "I don't know

21 anything.  I don't know the names of these people, I don't

22 know anything you want to know."  And at that point, I shut

23 down.

24     Q.   During that conversation as well, you said that

25 these five people that you had invited over to your house were

26 already there when you and Diprima arrived?

27     A.   I don't recall saying that they were already there

28 or that there was five.

1        MS. AHANA:  Your Honor, may I approach after showing

2   this to counsel?

3        THE COURT:  Sure.

4        MS. AHANA:  Q.  Mr. Voelker, I'm showing you a

5   document, I'm going to point to it right here and ask you to

6   review it and see if it refreshes your recollection in that

7   regard.

8        Now, do you recall saying that five people that you

9   invited to your apartment were already there when you and Mr.

10  Diprima arrived?

11       A.   No, I do not recall that.  I do recall reading that

12  document you have, though, but I don't recall saying that.  I

13  said that there was people at my house when I had left earlier

14  for the bar and that I had brought people back to the house.

15       Q.   As you -- as this conversation with Detective Pata

16  progressed, you then told Detective Pata that you actually

17  remembered that Rob Voelker, your cousin, and a girl named

18  Violetta --

19       A.   Violet.

20       Q.   -- were at --

21       A.   Violet.

22       Q.   -- your home when you returned from the bar.  Do you

23  recall saying that to him?

24       A.   No, I didn't.  I told Ralph Pata that they were at

25  my house previously in the evening, prior to that.  I didn't

26  tell him they were there when we returned.

27       Q.   Do you recall also following up with Detective Pata,

28  telling him that there were two black males at his home who

1  were Diprima's friends?

2      A.   I don't think I said they were Diprima's friends,

3  but I said they were acquaintances with Diprima, yes, I did

4  tell him that.

5      Q.   Later, however, we discovered that the two people

6  you were referring to are actually friends of yours, one being

7  Tristan Harvey; is that right?

8      A.   One being a friend of mine, the other one I don't

9  know too well.

10      Q.   Okay.  Now, that -- I'm sorry.

11             (Whereupon, there was a discussion between

12              Ms. Ahana and Ms. Worsham off the record.)

13             MS. AHANA:  Q.  Now, you said that following the

14  discussion about you testifying, there was a recess of the

15  case and then you all returned the following morning; is that

16  right?

17      A.   That's true.

18      Q.   And there was no discussion between you and Mr. Wall

19  the intervening evening?

20      A.   No, there was no discussion.  He was supposed to

21  meet with me that night at the County jail, and he never

22  showed up for that visit.

23      Q.   In the morning, when Mr. Wall advised all the

24  parties and the Court that he was going to rest on his

25  evidence --

26      A.   Yeah.

27      Q.   -- and on the case submitted by the People, meaning

28  you were not going to testify --

1    A.    M-hm.

2    Q.    -- what was your reaction?

3    A.    I turned over and I said, "What the hell are you

4  doing?" Excuse my language.

5    Q.    Did you say that loudly?

6    A.    No, I did not say it loudly, I don't speak loudly

7  when I'm over there.

8    Q.    Okay.  What was his response to you saying that?

9    A.    He said, "Hold on."

10    Q.    Did he have any further response?

11    A.    He said, "Hold on, Carl Chapman's coming in."

12    Q.    Did he -- did you inquire further as to what he

13  meant by, "Hold on"?

14    A.    Yeah, I said, "What" -- I said, "What's going on

15  here?"

16    Q.    What did he reply back to you?

17    A.    He said, "I got to listen to what's going on with

18  Carl."

19    Q.    Did Carl Chapman ever come in to testify?

20    A.    Yeah, Carl came in.

21    Q.    Did you revisit the issue of testifying with

22  Mr. Wall?

23    A.    Yeah, I did.  I -- I discussed to him many times

24  that I was upset about not being able to be called to testify.

25  And he said, "We'll talk about that."

26    Q.    And when you -- those times when you were having

27  these discussions with counsel in court and he said, "Hold

28  on" --

```
1        A.    Yeah.

2        Q.    -- I take it you were upset, you were angry?

3        A.    Yeah, I was, I was upset about some other things as

4   well.

5        Q.    Okay.  All right.  Did you ask Mr. Wall to request

6   of the Court a recess?

7        A.    No, I did not.

8        Q.    Did you ask yourself of the Court to have a recess?

9        A.    No, I did not.  I did not.

10       Q.    Did you ask for some privacy -- did you ask the

11  Court for some privacy, or the ability to speak to your

12  attorney about an issue?

13       A.    No, I did not.

14       Q.    Did you ask Jim Wall for you all to take a moment to

15  discuss this issue?

16       A.    Yes, I did.

17       Q.    What was his response?

18       A.    He said, "Hold on."

19       Q.    It's true, then, that you, yourself, never brought

20  this issue to the Court's attention; is that right?

21       A.    Did I, myself?

22       Q.    M-hm.

23       A.    No, my attorney did.

24       Q.    You, personally, however, brought it to the Court's

25  attention over two years later when you wrote that first writ

26  of habeas corpus filed with the Superior Court; is that right?

27       A.    That's not necessarily true.  I was under the belief

28  that I had brought it to the Court's attention when Mr. Wall
```

 1   said he couldn't represent me any more. Because Mr. Wall told

 2   me that he had informed the Court about the conflict with my

 3   testimony, and the phone records and the witnesses, and he

 4   said he wasn't going to be my attorney any more and that I

 5   would have a new attorney for that.

 6       Q.   That happened on -- does this date ring a bell with

 7   you, April 16th, 2004?

 8       A.   I'm sorry, the date does not, no.

 9       Q.   Okay.  But there was a point in time, subsequent to

10   your conviction, where Mr. Wall came in and said, "You know,

11   we're having a little bit of a problem, perhaps another

12   attorney needs to be appointed to do a new trial motion"?

13       A.   Yes.

14       Q.   Okay.  And is that the hearing before the Court that

15   you're referring to?

16       A.   No, he said that he had talked to the Judge in the

17   Judge's chambers and informed the Judge and Miss Worsham, who

18   was the prosecutor at that time, that there was a problem,

19   that I didn't get to testify and that he had messed up on the

20   phone records, and he said he was going to get me a new

21   attorney, and they don't normally do that, but he was going to

22   do it for me.

23       Q.   So let's just be clear about the chronology because

24   I wasn't there.

25       A.   Okay.

26       Q.   All right.  So the jury deliberated a couple of days

27   following the close of evidence; is that right?

28       A.   Yes, I -- I think so.

1    Q.    And from the time that your counsel announced that

2  you weren't going to be testifying, or that he was resting,

3  you never brought it up with the Court -- you, yourself,

4  never --

5    A.    No, I didn't.

6    Q.    -- brought it up with the Court?

7    A.    I never brought anything to the Court's attention.

8    Q.    Okay.  Now, following that, there was a hearing

9  where you were present, and your attorney expressed, as we had

10 just discussed, some conflict that might have arisen between

11 the two of you and the need for a new trial motion to be

12 filed --

13   A.    Yes.

14   Q.    -- and counsel to be appointed for that?

15   A.    Yeah -- yes.

16   Q.    Okay.

17   A.    He said he had a conflict, he wouldn't be able to do

18 it 'cause he's not allowed to argue his own ineffectiveness.

19   Q.    You never brought up with the Court at that point in

20 time your desire to and Mr. Wall's not allowing you to

21 testify; is that right?

22   A.    Me, personally, no, I never told the Court anything.

23   Q.    You didn't hear that discussion by any of the

24 parties or the Court on that date --

25   A.    No.

26   Q.    -- is that right?

27   A.    No.

28   Q.    Okay.  You said you reviewed the new trial motion,

1  right?

2      A.    That's correct.

3      Q.    Nowhere there was it mentioned that you wanted to

4  testify and --

5      A.    Yeah.

6      Q.    -- you were deprived of that opportunity; is that

7  right?

8      A.    That's correct.

9      Q.    There was a hearing relative to that new trial

10  motion?

11      A.    That's correct.

12      Q.    It was not discussed at that new trial motion

13  hearing that you wanted to testify and were deprived of that

14  opportunity --

15      A.    That's --

16      Q.    -- is that right?

17      A.    That's correct, it was not discussed in the hearing.

18      Q.    Okay.  And you were present at that hearing?

19      A.    Yes, I was.

20      Q.    There was -- there were a couple of other

21  intervening court dates --

22      A.    M-hm.

23      Q.    -- before the sentencing?

24      A.    That's correct.

25      Q.    Where you were present as well?

26      A.    M-hm.

27      Q.    And at neither of those times, no one brought up the

28  issue of you not testifying and being deprived of that

1  opportunity; is that right as well?

2      A.    That's not correct.  It was brought up at sentencing

3  in a in camera hearing.

4      Q.    But prior to sentencing, nothing was ever mentioned

5  relative to your desire to testify and your being deprived of

6  that opportunity?

7      A.    Well, that's not true.  My attorney informed the

8  Court that I would be testifying prior to the trial -- or

9  during the course of the trial.

10      Q.    Okay.  But other than that limited time, it was

11  never brought up in open court?

12      A.    Not in open court, no.

13      Q.    Okay.  Now, on the day of sentencing, did you make a

14  statement to the Court?

15      A.    On the day of sentencing?

16      Q.    M-hm.

17      A.    Yes, I did.

18      Q.    Okay.  And --

19      A.    Are you talking about the in camera hearing --

20      Q.    Yes, I am.

21      A.    -- or are you talking about the -- the statement I

22  made at sentencing?

23      Q.    Well, let's talk about both for a second.

24      A.    Okay.

25      Q.    The statement that you made at sentencing, did --

26  you, in fact, made an oral statement to the Court?

27      A.    Yeah.  It was real brief, yes.

28      Q.    Okay.  And -- and during that oral statement, you

 1  did not mention to the Court your desire to testify and your

 2  being deprived of that opportunity; is that right?

 3      A.   At that -- that's correct, it was sentencing, it

 4  wasn't an appeal or anything like that.

 5      Q.   Okay.  And speaking of the appeal, you didn't raise,

 6  or your counsel representing you for the appeal didn't raise

 7  the issue of you wanting to testify and your --

 8      A.   No.

 9      Q.   -- being deprived of that opportunity; is that

10  right?

11      A.   I was upset with that, but he referred me to the

12  case of People versus Pope and told me that it was an issue

13  that had to be raised collaterally on habeas corpus, it

14  couldn't be raised on direct appeal because the issue was not

15  contained within the four corners of the trial transcript.

16      Q.   Okay.  Now, let's talk about the in camera hearing

17  that happened on the day of sentencing as well, December 22nd,

18  2004, if I'm correct.

19      A.   I think that's right.

20      Q.   You spoke to the Court during this in camera

21  hearing --

22      A.   Okay.

23      Q.   -- is that right?

24      A.   Yes, I did.

25      Q.   And you expressed dissatisfaction with a number of

26  things that Jim Wall did?

27      A.   Yes.

28      Q.   Okay.  And what I'm trying to reconcile is, your

1   dissatisfaction with what you characterize as actually being,

2   you know, a lot of Jim Wall's performance during the course of

3   the trial --

4       A.    Yeah.

5       Q.    -- and your previous statement that, you know, you

6   thought he was doing a good job.  So how do I reconcile the

7   two?

8       A.    Well, he was doing a really good job during your

9   guy's case in chief -- excuse me, the Prosecution's Office

10  case in chief, he was really doing an excellent job, and then

11  it -- it just kind of changed.  As I had said earlier, he had

12  a family emergency with his father, and all of a sudden

13  everything just seemed to go downhill.  And it went from me

14  having this affirmative defense to it just -- I didn't really

15  have a defense.  It was kind of like our whole case rested on

16  how well we did in the prosecution's case in chief really.

17      Q.    And as you point out in your declaration, and as you

18  stated, there were a number of inconsistencies in the

19  prosecution of the case --

20      A.    Oh, yeah, there were.

21      Q.    -- that were brought up?

22      A.    Yeah, there was -- well, there was a lot that were

23  brought up and then a lot that weren't.

24      Q.    Mr. Wall highlighted those, did he not, during his

25  closing argument?

26      A.    He touched on them, he touched on a few of them.

27      Q.    And you also, at the defense, put on witnesses

28  during the course of this trial?

1     A.   We kept putting on prosecution witnesses, but, yeah,

2 I guess so.  That's correct.

3     Q.   Including Raven Oliver --

4     A.   Yeah.

5     Q.   -- who you referred to in your statement?

6     A.   That's true.

7     Q.   Who spoke to a lot of what you testified to relative

8 to telephone calls that were made?

9     A.   Kind of.  It didn't come out exactly accurately but,

10 yes, she was -- she was on the stand.

11     Q.   Okay.

12     A.   She was actually falsely impeached because -- it

13 made -- made it seem as though there were no phone records

14 that existed even though there was.

15     (Whereupon, there was a discussion between

16     Ms. Ahana and Ms. Worsham off the record.)

17     MS. AHANA:  I have nothing further, your Honor.

18     THE COURT:  Redirect, Mr. Gonser?

19             REDIRECT EXAMINATION

20 BY MR. GONSER:

21     Q.   Prior to the time you were going to -- scheduled to

22 testify, did you discuss with Mr. Wall this prior statement

23 you made to Detective Pata?

24     A.   Yes, I did.  I -- we had talked about that at

25 length.

26     Q.   And so you knew that you could be impeached with

27 that prior statement, just like Miss Ahana has attempted to

28 impeach -- impeach you with that statement today, correct?

1     A.   That's correct.  That was my understanding, that it

2 could be used.  I don't know how much it would have impeached

3 me, but it could have been used, yeah.

4     Q.   Right.  And did you also discuss whether or not your

5 prior convictions would be used to impeach you?

6     A.   Yes.  Yes, it was my understanding, yes.

7     Q.   And so it was your understanding that you could be

8 impeached with your prior convictions and this prior

9 statement, correct?

10     A.   I was under the understanding it could be used, I

11 don't know how much it would have impeached me.  But maybe the

12 statement -- or the conviction shows moral turpitude but --

13     Q.   My point is, knowing those --

14     A.   Yeah.

15     Q.   -- knowing that you could be -- knowing that those

16 statements could be used --

17     A.   Yeah.

18     Q.   -- didn't deter you from wanting to testify; isn't

19 that correct?

20     A.   Yeah, I was still planning on testifying.  That had

21 no effect on me.

22     Q.   Okay.  Did you personally prepare the new trial

23 motion?

24     A.   No, I did not.

25     Q.   Did you have any control over what was put into the

26 new trial motion, other than discussing with Miss Stearns what

27 issues you thought should be raised?

28     A.   No, I did not.

1    Q.    Did you prepare the direct appeal in this case?

2    A.    No, I did not.

3    Q.    But did you raise the issue of whether you were

4    denied your right to testify with your appellate attorney?

5    A.    Yes, I did, I did raise it.

6    Q.    Okay.

7    A.    Numerous -- other issues as well that he wouldn't

8    raise.

9    Q.    This specific issue?

10    A.    This specific issue, yes.

11    Q.    Okay.  And -- and you said -- when you -- when you

12    testified before, you said you went to the 7-11, correct?

13    A.    That's correct.

14    Q.    On the evening of November 6th, 2003, and -- and

15    when you came back, there were people at your house at that

16    time, correct?

17    A.    Well, they were down in the parking garage at that

18    time, there was nobody in my house.

19    Q.    And there's been some discussions about the various

20    points in time when you were in court and you did not raise

21    the denial of your right to testify.  Do you recall those?

22    A.    That's correct.

23    Q.    And why didn't you raise --

24    A.    I --

25    Q.    -- raise the issue at that time?

26    A.    I had been told not to speak to the Court ever, ·

27    that -- that I was never to speak directly to the Court,

28    unless the Court directly spoke to me.  You know, if the Court

1  says, "Good morning," I say, "Good morning."  Other than that,

2  you don't speak 'cause it's the decorum of the court, and --

3  and it would look bad if I said anything.

4      Q.  And when -- when you made a statement to the Court

5  for your sentencing, what was your understanding of the

6  purpose of your statement?

7      A.  At sentencing?

8      Q.  Yes.

9      A.  At sentencing it was just, you know -- I mean,

10  Damian Diprima didn't deserve what happened to him, and I

11  wanted to express that, you know, and -- and the purpose of

12  sentencing is I'd like to get that out there, you know,

13  although I felt that there were some mistakes that were made,

14  that had nothing to do with that day, that was sentencing.

15      Q.  Right.  So did you feel that at -- at the sentencing

16  it was -- it was the time --

17      A.  Well, it would have been frivolous --

18      Q.  -- to raise those issues?

19      A.  It would have been frivolous if I had said anything.

20          MR. GONSER:  That's all I have, your Honor.

21          THE COURT:  I have a question.

22          Mr. Voelker, if I remember correctly, in your

23  probation report, Probation said that they tried to talk to

24  you about the incident --

25          THE WITNESS:  Yeah.

26          THE COURT:  -- which was the subject of the report.

27          THE WITNESS:  Yeah.

28          THE COURT:  You told them that you were not going to

1  discuss it with them --

2          THE WITNESS:  Yeah.

3          THE COURT:  -- on advice of counsel which you were

4  following; is that --

5          THE WITNESS:  That's correct.

6          THE COURT:  -- an accurate statement?

7          THE WITNESS:  That is correct.

8          THE COURT:  Okay.  All right.  Any recross?

9          MS. AHANA:  No, your Honor.

10         THE COURT:  All right.  Can this witness be excused

11  then?

12         You may step down, Mr. Voelker.

13                                      (Witness excused.)

14         THE COURT:  Is the Petitioner calling any further

15  witnesses?

16         MR. GONSER:  No, we would rest at this point.

17         THE COURT:  Is the Respondent calling any witnesses?

18         MS. AHANA:  Yes, your Honor.  We're going to be

19  calling Miss Worsham.

20         THE COURT:  All right.  Miss Worsham, step forward,

21  please.

22         THE CLERK:  Please raise your right hand.

23                        ASHLEY WORSHAM,

24  called as a witness on behalf of the Respondent, having been

25  first duly sworn, testified as follows:

26         THE CLERK:  Thank you.  Please be seated.

27         Please state your name, and spell it for the record.

28         THE WITNESS:  Ashley Worsham.  A-s-h-l-e-y, last

```
 1   name, W-o-r-s-h-a-m.

 2              THE COURT:  Go ahead, Miss Ahana.

 3              MS. AHANA:  Thank you.

 4                   DIRECT EXAMINATION

 5   BY MS. AHANA:

 6        Q.   Miss Worsham, were you the Deputy District Attorney

 7   prosecuting the case against Mr. Voelker?

 8        A.   Yes.

 9        Q.   During the course of the trial, did you observe

10   Mr. Wall's advocacy during that trial?

11        A.   Yes.

12        Q.   Could you describe his advocacy for us?

13        A.   Mr. Wall was a zealous advocate.  He's a very

14   aggressive defense attorney.  He was very aggressive with

15   regards to this particular case.  I have tried numerous cases

16   with Mr. Wall, and he gives 110 percent every time he's in the

17   courtroom.  And that includes the smallest detail to the most

18   important detail.

19        Q.   Could you characterize his examination of Damian

20   Diprima?

21        A.   Exhaustive.  It went on for -- I think Damian

22   Diprima was on the witness stand, at a minimum, three days.  I

23   started, of course, I presented him as my first witness, he

24   was cross-examined at length for probably -- it was hours, you

25   know, it -- I mean, it was just -- I mean, probably one of the

26   longest cross-exams I had seen in being a prosecutor for 10

27   years.

28              I believe that Mr. Wall also called him as a witness
```

1    when they began their -- to present their case, but he was on

2    the witness stand for quite a while.

3        Q.    Did you observe Mr. Voelker's demeanor while Mr.

4    Diprima was being examined --

5        A.    I did.

6        Q.    -- by Mr. Wall?

7        A.    I did.

8        Q.    Could you characterize that for us?

9        A.    Mr. Voelker sat next to Mr. Wall during the entire

10   time of the trial, he always had a note pad with him, he was

11   taking notes constantly, they would whisper to one another.

12   During the time that Damian was testifying, they would

13   communicate constantly with each other.

14             I can remember even before the trial started how I

15   learned a couple of additional facts about the case was

16   observing Mr. Voelker with Mr. Wall, and the exchange that

17   they had in the courtroom led me to believe that there were a

18   couple of facts that were probably missing from the police

19   report that Damian Diprima later admitted at the preliminary

20   hearing, but that came from watching an exchange between Mr.

21   Voelker and his attorney, Mr. Wall.

22             I mean, they communicated constantly.  Mr. Voelker

23   was an active participant at the counsel table.  You know, I

24   don't know what he wrote on his paper, of course, but there

25   was definite interaction, communication, going on between the

26   two constantly.

27       Q.    What was Mr. Voelker's reaction throughout, was

28   it -- was he expressive in any way?

1    A.    You know, at times he was, you know, I think --

2    in -- just in my observations of him, if Damian said something

3    or a witness said something, you know, and Mr. Voelker

4    disagreed with that or thought something about that, he was

5    writing down notes, he was sliding his note pad to Mr. Wall,

6    you know, he was very observant, very participatory in this

7    whole process, and they seemed to be communicating very well

8    throughout.

9    Q.    And did Mr. Wall appear to be responsive to what Mr.

10   Voelker was saying to him and/or communicating to him through

11   his notes?

12   A.    He appeared to be.  Now, you know, I don't know if,

13   you know, Mr. Voelker was writing down suggestions about -- or

14   questions to ask, that I wasn't privy to, but I know that they

15   were communicating with each other throughout the trial.

16   Q.    At some point towards the close of the defense case,

17   Mr. Wall indicated that his client might testify; is that

18   right?

19   A.    That's correct.

20   Q.    Okay.  At what point -- at that point, did you bring

21   up certain things that were previously discussed in motions in

22   limine with the Court?

23   A.    I recall at that point, and this was -- there were

24   just a few of us in the courtroom, the jurors had been

25   excluded, and Mr. Wall had indicated to the Court that his

26   client was gonna testify.  I think the Court might have

27   inquired about how long that was going to take, I think

28   Mr. Wall might have said about an hour.

1      I recall, once I realized he might testify, that I

2  wanted to revisit the issue of being able to impeach Mr.

3  Voelker, not only with his felony convictions, but I wanted to

4  be able to impeach him with a statement that had been excluded

5  in violation of Miranda.

6      And so I believe it was at that point that I

7  probably raised that issue with the Court to let the Court

8  know that that was my intention, if Mr. Voelker chose to take

9  the witness stand, that I thought I was entitled to

10  cross-examine him, not only with the felony convictions, but

11  that he wouldn't be able to take the witness stand and give a

12  different version than what he had told Detective Pata, and I

13  should be able to cross-examine him with that statement.

14      Q.   After you raised that issue, that same day, did

15  Mr. Wall expressly say his client, despite all that, was still

16  going to testify, or did he leave it to the next morning to

17  give a definitive answer in that regard?

18      A.   I think at that point, you know, we sort of wrapped

19  up for the day, and so I came in the next day, you know, just

20  prepared to proceed with trial, so -- .

21      Q.   Your statements in regard to using the felony

22  convictions and these previously suppressed statements or

23  statement, that was said in front of Mr. Wall and Mr. Voelker;

24  was it not?

25      A.   Yes.

26      Q.   The next morning, when the Court inquired once again

27  as to whether or not Mr. Voelker was going to testify, what

28  did Mr. Wall say in response?

1    A.   You know, he -- he stood up rather confidently and

2  said that they were satisfied with the evidence that had been

3  presented.  The -- I don't remember the direct quote, but

4  the -- it was a few sentences, but it was quite confident and

5  matter of fact, that they were satisfied, that they were

6  prepared to rest and -- that's it.  I just remember it being a

7  very confident statement that -- and a couple of sentences.

8    Q.   Did you see Mr. Voelker at that point in time, after

9  Mr. Wall had indicated that they would rest, express any

10 dissatisfaction with what was said by Mr. Wall to the Court?

11           MR. GONSER:  Objection --

12           THE WITNESS:  None whatsoever.

13           MR. GONSER:  -- this is going to call for

14 speculation.

15           THE COURT:  Just a minute.  Overruled.  She was

16 there, she was observing what was going on, as was I.

17           THE WITNESS:  None -- oh, I'm sorry.

18           THE COURT:  You can testify.

19           THE WITNESS:  None whatsoever.

20           MS. AHANA:  Q.  And did either Mr. Wall or Mr.

21 Voelker ask for a recess at that point in time?

22    A.   No.

23    Q.   Did either of them ask to address the Court?

24    A.   No.

25    Q.   Did either of them ask for a moment to confer with

26 one another relative to the issue of testifying?

27    A.   No, they -- they sat there like they had been

28 sitting throughout the trial.  You know, they -- he was -- he

1   continued to take notes, because I believe I called another

2   witness.  There was never any expression of dissatisfaction or

3   asking for a moment from the Court to address that issue.  He

4   continued to communicate with Jim Wall, they appeared to be

5   friendly with one another.  You know, not once during that

6   time was there any sort of expression of -- that would alert

7   anybody in this courtroom that we needed to take a break and

8   address that issue.

9           MS. AHANA:  I have nothing further for this witness.

10          THE COURT:  Cross-examine, Mr. Gonser.

11          MR. GONSER:  Yes, your Honor.

12                      CROSS-EXAMINATION

13  BY MR. GONSER:

14      Q.  You indicated that you believe Mr. Wall vigorously

15  cross-examined Mr. Diprima, correct?

16      A.  Yes.

17      Q.  So what you're saying is, this was a close case,

18  correct?

19      A.  I don't think it was a close case at all.

20      Q.  Okay.  So therefore he -- he didn't do really that

21  effective of a job of --

22      A.  No, he was -- he was very effective with what

23  evidence he had to work with.  I don't believe that this was a

24  close case.  Damian Diprima had testified in this matter on a

25  number of occasions.  He never wavered in his testimony.

26  Really the only inconsistencies that he -- that were brought

27  out were timing things, you know, what time were you at 7-11,

28  how many drinks did you have at Matteucci's, very -- in my

1  opinion, very minor details that -- you know, that you could

2  argue to a jury were just a matter of inconsistencies that are

3  very natural occurring with witnesses.

4      Q.    Well, I'm trying to reconcile those two

5  statements -- the original statement about how effective the

6  cross-examination was with now that -- that it -- that it --

7      A.    He was an effective attorney.

8      Q.    Okay.

9      A.    His cross-examination was fine.  I mean, he

10  cross-examined on what he could cross-examine with.  You know,

11  there's -- I mean, he was able to bring out some things from

12  Damian Diprima.  I mean, Damian Diprima had not been

13  completely 100 percent forthright with the police when he was

14  describing this incident.  You know, he neglected to tell the

15  police that he had used the N word.  He neglected to tell the

16  police that there had been a discussion about purchasing some

17  weed that night, you know, but other than that, I personally

18  feel, being a trial attorney, that the inconsistencies that

19  Mr. Wall brought out -- you know, he did what he could with

20  what the evidence had presented itself.

21      Q.    And Mr. Diprima was really the only witness

22  against -- against Mr. Voelker; isn't that correct?

23      A.    I think he was one of the primary witnesses.  I

24  think, you know, the medical records were a strong indication

25  that a violent assault had taken place in that house.  I think

26  the statement from the taxicab driver about what Damian

27  Diprima looked like, what his demeanor was like shortly after

28  this incident.  The statement from Melinda Swanson, Damian

1   Diprima's girlfriend, Koffi Darko --

2      Q.  But --

3      A.  -- I mean -- so there were -- there were a number

4   of --

5      Q.  But those -- those statements of -- those statements

6   from -- as to his medical condition didn't -- didn't say

7   anything about what happened inside Mr. Voelker's residence,

8   correct?

9      A.  You know, they didn't say anything about what

10  happened inside the residence.

11     Q.  So he --

12     A.  -- but -- whatever took place in the residence came

13  strictly from Damian Diprima's testimony.

14     Q.  Okay.  So he was the sole witness against Mr.

15  Voelker, correct?

16     A.  As to what took --

17        MS. AHANA:  Objection, asked and answered.

18        THE COURT:  Well, that -- it has been, he's the

19  sole --

20        MR. GONSER:  Percipient witness.

21        THE COURT:  -- percipient witness that was there at

22  the time of the incident.

23        MR. GONSER:  Right.

24        THE COURT:  That's very clear.

25        MR. GONSER:  Q.  And you weren't present during any

26  discussions between Mr. Voelker and Mr. Wall with regards to

27  whether or not Mr. Voelker wanted to testify, correct?

28     A.  You know, I really don't recall any of that.

1  Q. And when you were -- and you filed an in limine

2 motion to introduce -- or impeach Mr. Voelker with his prior

3 testimony, correct?  Or his prior felony conviction, correct?

4  A. That's correct.

5  Q. Okay.  And one of the things you state in the --

6 state in there is, "Fourth and finally, it is unlikely that

7 the defendant would not testify based merely upon the

8 admission of his prior turpitudiness conduct," correct?

9  A. I'm not sure if that's my motion.

10  Q. Okay.  Is that something that you submitted with --

11 to -- with your argument?

12  A. Can I take a look at it?

13  Q. Yes.

14  A. Honestly, I'm not --

15    MR. GONSER:  May I approach, your Honor?

16    THE COURT:  All right.

17    THE WITNESS:  Okay.

18    MR. GONSER:  Q.  And so it's -- so it's true that --

19 that one of the arguments you made in favor of being able to

20 impeach Mr. Voelker with his prior felony conviction was the

21 fact that it would not impede his desire to testify in this

22 case, correct?

23  A. Well, I think when I was making that argument, was

24 that, one, I was entitled to impeach him with his felony

25 convictions.  At the time I think that these motion in limines

26 were filed, I was also under the assumption that there was

27 numerous statements, different versions that he provided to

28 Detective Pata were also coming in as well.

1     Q.   M-hm.

2     A.   And so in light of that, I really had no idea what

3 Mr. Voelker was gonna do, whether or not he was going to

4 testify or not, honestly, you know.

5     Q.   Okay.  And -- and Mr. Wall was aware of those

6 various statements that you've described that he'd given to

7 Mr. Pata as well at -- at that time?

8     A.   He was aware, but those statements were excluded

9 early on in the trial.  We had a 402 hearing before one bit of

10 evidence was ever presented, so I don't --

11     Q.   But -- but the understanding was that they were

12 excluded from coming in on -- on direct testimony, correct?

13     A.   Right.

14     Q.   And -- and you indicated that Mr. Wall is a legally

15 astute attorney, and he, as well as you, understood that --

16 that Mr. Voelker potentially could have been impeached with

17 his prior statements, correct?

18     A.   I think so.

19     Q.   Okay.  And so given the fact that he was an astute

20 advocate, you would assume, also based on your expertise and

21 knowledge of Mr. Wall, that he would have discussed that with

22 Mr. Voelker, and that would have entered into their decision

23 whether or not Mr. Voelker was going to testify, correct?

24     A.   I --

25     Q.   Early in the case?

26     A.   I would hope so.  I -- .

27     Q.   Okay.  And you would also assume that he would know

28 that there was a good likelihood that he would be -- be able

1   to be impeached with his prior?

2        A.   Right.

3        Q.   And -- and you also indicated that -- that in your

4   motion, you did -- you argued to the Court you didn't feel

5   that that would stop Mr. Voelker from testifying if he chose

6   to do so, correct?

7        A.   Early on in the trial, yes, that was --

8        Q.   And Mr. Wall stood up and indicated -- announced

9   that -- that the defense was satisfied with the evidence as

10  presented, and so you were looking at Mr. Wall when he said

11  that, correct?

12       A.   M-hm.

13       Q.   Okay.

14       A.   Sitting right next to him.

15       Q.   Right.  But he was the one standing up --

16       A.   Right.

17       Q.   -- and you were looking at Mr. Wall at that --

18       A.   Right.

19       Q.   -- point in time?

20       A.   Right.

21            MR. GONSER:  Thank you.

22            THE COURT:  Anything further, Miss Ahana?

23            MS. AHANA:  No, your Honor.

24            THE COURT:  May this witness be excused?

25            MS. AHANA:  Yes.

26            MR. GONSER:  Yes.

27            THE WITNESS:  Thank you.

28            THE COURT:  Thank you, Miss Worsham.

(Witness excused.)

THE COURT:  Is the Prosecution or -- the Respondent, I should say, calling any further witnesses?

MS. AHANA:  No, your Honor, as far as witnesses go. I was just going to ask the Court to take judicial notice, please, of the trial record, the writs of habeas corpus filed with this Court, the Court of Appeal, and the petition for review in the Supreme Court.

And with that, I have no further evidence.

THE COURT:  All right.  Any objection to my taking notice of the trial record and the various appeals and writs that have been filed post-judgment?

MR. GONSER:  No.  And I would ask the Court to take judicial notice of all the -- all the pleadings in this and the Court of Appeals and the Supreme Court, including the telephone records that are attached, et cetera.

THE COURT:  I will --

MR. GONSER:  Okay.  Thank you.

THE COURT:  -- take notice of all of that.

MR. GONSER:  Thank you, Judge.

MS. AHANA:  Thank you, Judge.

THE COURT:  Okay.  Any rebuttal witnesses?

MR. GONSER:  No, your Honor.

THE COURT:  Okay.  And is there a closing argument you'd like to make on behalf of the Petitioner, Mr. Gonser?

MR. GONSER:  The basic argument is that Mr. Voelker's testimony was uncontroverted.  Nobody's come in to controvert his testimony or state that he did not tell

1    Mr. Wall that he wanted to testify.

2         He raised that issue with Miss Stearns, Miss Stearns

3    has verified that the day prior to the scheduled testimony,

4    it's on the record that he intended to testify.  Obviously,

5    it's -- it obviously would have been well known that Mr.

6    Voelker could have been impeached with his prior felony

7    convictions, that's something that would have been discussed

8    from day one of -- of the trial, and even before then.  And

9    obviously -- obviously would have been known that a violation

10   of Miranda wouldn't preclude a witness from being impeached,

11   if he took the stand.

12        So those two things were obviously discussed and

13   well known to Mr. Voelker.  So it doesn't really ring true

14   that at the last minute, because these things came in all of a

15   sudden after he announces that he's going to testify, that

16   this somehow turns the tide and changes things.  It was

17   announced the day before that he was going to testify.

18        Mr. Voelker's adamantly maintained that during the

19   entire time, he wanted to testify.  And he's given an

20   explanation of why he didn't raise it with the Court at the

21   time, which makes perfect sense, because the jury's -- the

22   jury's sitting in the box and it -- it's a daunting situation

23   or position to be in to be sitting there facing the jury in

24   the middle of a trial, and it -- it doesn't make any sense

25   that you're going to get into a verbal dispute with your

26   attorney in -- in front of the jury.  And Mr. Voelker's

27   offered the explanation that he was told not to directly raise

28   these issues with the Court.

1    Miss Stearns has verified that he did raise that

2    issue with her, and a desire -- that was one of the arguments,

3    he never raised it in the new trial -- he never raised it with

4    his new trial attorney, he never raised it with his appellate

5    attorney.  Miss Stearns has verified that he did, in fact,

6    raise that with her.

7          Mr. Brown had -- had some intent to assist with the

8    preparation of Mr. Voelker's testimony, and it's well known

9    that -- that in a ineffective assistance of counsel motion on

10   a direct appeal, you can't go outside the record.  This is

11   something outside the record, so there's no way an appellate

12   attorney is going to raise this on a direct appeal.  He's

13   testified that he did raise that with his attorney.

14         And finally, referring to the record, Mr. Wall

15   stated on 12-22-04 that he believed there was a valid

16   ineffective assistance of counsel claim, and it's our position

17   that that encompasses this very issue.

18         And the reason I had Mr. Voelker testify about what

19   he would have said is that it was in direct contravention of

20   the only percipient witness inside the house who, Miss Worsham

21   said, Mr. Wall did a very effective job of cross-examining,

22   therefore there is prejudice, coupled with -- and I raised in

23   my traverse that I -- that we have to consider this with the

24   other issues that are raised in the petition, particularly the

25   issue raised by Miss Stearns in her new trial motion, that the

26   phone records were not subpoenaed that would have verified

27   what Miss Oliver was saying.

28         And -- and it's my understanding that in -- in the

1  trial, and in Miss Worsham's closing argument and

2  cross-examination, she pounded on this particular issue, that

3  the phone records weren't there, and this shows that this

4  whole story was just made up, and I think we have to consider

5  this all -- when we consider the issue of prejudice, and I

6  think it shows prejudice.

7          And I would submit it with that, your Honor.

8          THE COURT:  Miss Ahana?

9          MS. AHANA:  Yes, your Honor.

10         I think the Supreme Court -- I think the Supreme

11  Court was very clear when it framed the issue here.  The issue

12  was not relative to phone records that had been brought up in

13  writ after writ in a -- in this case, and in the collateral

14  proceedings relative to this case.  The limited issue is

15  whether or not it constituted ineffective assistance of

16  counsel for Mr. Wall to not call the Petitioner to testify at

17  the trial.

18         As the Court is well aware, the burden of proof is

19  on the Petitioner here.  I submit to the Court, it's a steep

20  burden.  We would have to find, based on the evidence provided

21  today by Petitioner, that Mr. Wall denied this Petitioner of

22  his fundamental right to testify, over his objection, knowing,

23  as experienced lawyers and good lawyers, as everyone has

24  testified to, would know that that would be not only an

25  ethical violation, but something that could potentially cause

26  him to be disbarred.

27         Part of that burden of proof is the Petitioner

28  showing and proving to this Court that Mr. Voelker's statement

1   about his discussions with Mr. Wall were credible, not

2   self-serving.  Again, a steep burden, which I submit to the

3   Court has not been demonstrated here, particularly where, in a

4   post-conviction context, statements of defendants,

5   Petitioners, are to be viewed with caution.

6          In this case, as the trial record has shown, defense

7   witnesses and evidence were put on.  Mr. Wall was vigorous in

8   his advocacy.  He put on all the evidence that he could.  He

9   was very effective at cross-examination.  Petitioner was

10  pleased with Mr. Wall's actions in that regard, and he did

11  argue all these inconsistencies that were brought out through

12  the People's case and raised in Petitioner's affidavit

13  attached to the traverse, and which were testified to by Mr.

14  Voelker.  He brought all these up.

15         Mr. Voelker said, "Well, surely, I should have been

16  able to testify to clear up these inconsistencies."  But,

17  inconsistencies equal reasonable doubt.  It's the bread and

18  butter of a defense attorney arguing, "There's reasonable

19  doubt here, look at all these inconsistencies."

20         It makes no logical sense to put Mr. Voelker on,

21  whose credibility could be attacked, to clear up those

22  inconsistencies.  I think, based on that, Petitioner's

23  position is not well taken.

24         Mr. Voelker was confident throughout the

25  proceedings, communicated effectively and well with the

26  responsive Mr. Wall.  He believes, in hindsight, of course,

27  that his charm and credibility could have won the jury over.

28  But what the jury would have heard relative to his

1    credibility, despite what he now contends, is that he's a

2    convicted felon, and that he said a number of self-serving

3    statements to the police, all of which were inconsistent with

4    one another and his new story.

5        I think it's also significant that Mr. Wall, in his

6    effective and vigorous cross-examination of Mr. Diprima, never

7    cross-examined as to a lot of the details the Petitioner is

8    now testifying, to which calls into question whether or not

9    this was his story from the beginning as he related it to

10   Mr. Wall.

11       Mr. Wall knew this. He's a good attorney. And he

12   advised against it. He's an experienced attorney. He knew

13   his ethical obligations, and, as all good attorneys know, a

14   defendant has a fundamental right to testify.

15       But not only did he have a good, professional

16   relationship with this defendant, this Petitioner, they had a

17   personal relationship, as testified to by Mr. Wall, in the

18   proceedings following the conviction. They had a

19   relationship.

20       The defendant, the Petitioner, appeared to have a

21   say in what happened, a voice in the way things were

22   proceeding, an active role in the defense as testified to by

23   Miss Worsham. Petitioner testified he trusted, he believed

24   Mr. Wall. When Mr. Wall believed it was a good idea to

25   testify, he went along with that.

26       Given what Ms. Worsham was going to do to the

27   Petitioner on cross-examination, it seems logical, a sound,

28   tactical decision, and one likely followed by Petitioner to

1    not testify. That was a sound, tactical decision, and there

2    is no credible evidence showing that there was any deprivation

3    here by Mr. Wall to Mr. Voelker of his fundamental right to

4    testify.

5              And the huge elephant in the room here, your Honor,

6    is the fact that Mr. Wall isn't here to testify when it's the

7    Petitioner's burden of proof. For only he can say that he

8    deprived his client of the right to testify, and there's been

9    no evidence adduced as to this -- as to that fact. It's their

10   burden, he has not been called as a witness, therefore they

11   have not fulfilled their burden.

12             And based on an objective evaluation of the facts

13   and circumstances, I submit to the Court that that burden has

14   not been met, and I would ask the Court then to dismiss the --

15   and deny the writ of habeas corpus as to this limited issue.

16             THE COURT: Mr. Gonser, you get the last word.

17             MR. GONSER: The burden is not such a daunting

18   burden, it's merely a preponderance of the evidence. And

19   advising a client against testifying is one thing, but it

20   doesn't matter what the advice is, it's -- it's what the

21   client wants to do. And Mr. Voelker has testified that he

22   consistently wanted to testify, it was announced the day

23   before he was scheduled to testify that he was going to

24   testify --

25             THE COURT: No, it wasn't.

26             MR. GONSER: -- so --

27             THE COURT: No --

28             MR. GONSER: Okay.

1          THE COURT:   -- that it was still under serious

2    discussion --

3          MR. GONSER:   Okay.

4          THE COURT:   -- that it was a distinct possibility.

5          MR. GONSER:   Okay.  And Mr. Voelker has testified

6    that he consistently wanted to testify, and his testimony

7    is -- is not contradicted.  Therefore, we've met our burden of

8    proof and -- and I would ask that you grant the relief sought.

9          THE COURT:   All right.  Is the matter submitted?

10         MS. AHANA:   Yes, your Honor.

11         MR. GONSER:   Yes, your Honor.

12         THE COURT:   Okay.  I'll take it under submission.

13   You'll be hearing from me.

14         I'm ordering Mr. Voelker remanded to the custody of

15   the Director of the Department of Corrections and

16   Rehabilitation forthwith.  Thank you.

17         MS. AHANA:   Thank you.

18         THE PETITIONER:   All right.  Thank you, Judge.

19         (Whereupon, at the hour of 11:32 o'clock a.m.,

20          the proceedings were concluded.)

21                      ---oOo---

22

23

24

25

26

27

28

1                REPORTER'S CERTIFICATE

2

3   STATE OF CALIFORNIA       )
                               )    ss.

4   COUNTY OF MARIN         )

5

6        I, SUSAN L. FITZSIMMONS, CSR No. 4369, do hereby

7 certify that I am an official shorthand reporter of the

8 Superior Court of the State of California, in and for the

9 County of Marin, and that as such I was present and reported

10 in stenotype the proceedings had in the within-entitled matter

11 at the time and place therein set forth, consisting of the

12 proceedings held on June 21, 2007 consisting of 98 pages, and

13 that the same is a full, true and correct transcription of

14 said stenotype notes as taken by me in said matter.

15        DATED:   San Rafael, California, this 7th day of

16 August, 2007.

17

18

19                 /s/ Susane L - Fitzsimmons

20                SUSAN L. FITZSIMMONS, CSR NO. 4369

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT B:

[California Supreme Court Orders: Collateral & Direct Appeal].

Court of Appeal, First Appellate District, Div. 1 - No. A119178
**S159616**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re JASON PAUL VOELKER on Habeas Corpus

The petition for review is denied.

Kennard, J., is of the opinion the petition should be granted.

SUPREME COURT
**FILED**

FEB 1 3 2008

Frederick K. Ohlrich Clerk

Deputy

**GEORGE**
Chief Justice

Court of Appeal, First Appellate District, Div. 1 - No. A115331

S147515

# IN THE SUPREME COURT OF CALIFORNIA
## En Banc

In re JASON PAUL VOELKER on Habeas Corpus.

Petition for review GRANTED.

The matter is transferred to the Court of Appeal, First Appellate District, Division One, with directions to vacate its October 12, 2006 order denying the petition for writ of habeas corpus and to issue an order to show cause, returnable before the Marin County Superior Court. The Director of the Department of Corrections and Rehabilitation is to be ordered to show cause, when the matter is ordered on calendar, why petitioner is not entitled to relief based on ineffective assistance of trial counsel for failing to call petitioner to testify at trial, as petitioner contends in Ground II of the original petition for writ of habeas corpus filed in the Court of Appeal on September 26, 2006. The return is to be filed on or before February 2, 2007.

Corrigan, J., was absent and did not participate.

SUPREME COURT
**FILED**

JAN - 3 2007

Frederick K. Ohlrish Clerk

DEPUTY

|  | George |
| --- | --- |
|  | *Chief Justice* |
|  | Kennard |
|  | *Associate Justice* |
|  | *Associate Justice* |
|  | Werdegar |
|  | *Associate Justice* |
|  | Chin |
|  | *Associate Justice* |
|  | Moreno |
|  | *Associate Justice* |
|  | *Associate Justice* |

Court of Appeal, First Appellate District, Division One - No. A108798
**S139554**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

THE PEOPLE, Plaintiff and Respondent,

v.

JASON P. VOELKER, Defendant and Appellant.

Petition for review DENIED.

SUPREME COURT
F I L E D

JAN 18 2006

Frederick K. Ohlrich Clerk

Chin, J., was absent and did not participate.

DEPUTY

GEORGE

Chief Justice

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT C:

[California Court of Appeal Denials: Collateral & Direct Appeal].

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA 

FIRST APPELLATE DISTRICT

DIVISION ONE

FILED
FIRST APPELLATE DISTRICT

DEC 2 7 2007

In re JASON PAUL VOELKER,

on Habeas Corpus.

A119178

DIANA HERBERT, CLERK

_____ DEPUTY CLERK

(Marin County
Super. Ct. No. SC132406A)

By the Court:[1]

　　We take judicial notice (Evid. Code § § 452, subd.(d) and 459, subd. (a)) of this Court's record in A115331. A certified copy of the docket of that case is attached to this order. As it indicates, on January 5, 2007, in response to the order of the California Supreme Court, we issued an order to show cause returnable to the Marin County Superior Court concerning Voelker's petition for writ of habeas corpus filed in Marin County Superior Court case number SC132406A. It appears from the records in this case that, due to clerical error, the Marin County Superior Court proceeded to hearing on the order to show cause with reference to its case number SC146932A rather than the correct case number SC132406A.

　　Since a court may correct its clerical errors at any time, the Marin County Superior Court may correct its records to reflect the fact that evidentiary hearing on the order to show cause issued by this Court was in case number SC132406A.

　　The petition for writ of habeas corpus is denied.

Dated:_____

**MARCHIANO, P.J.**

_____ P.J.

---

[1] Before Marchiano, P.J., Stein, J., and Margulies, J.

1

COURT OF APPEAL, FIRST APPELLATE DISTRICT
DIVISION 1

In re JASON PAUL VOELKER on Habeas Corpus.

CASE NUMBER:              A115331
NOA/PET DATE:             09/26/2006
STATUS:                   complete
PRIORITY:                 std
CAUSE:                    Original Proceeding
CASE TYPE:                Criminal
DISPO DATE:               01/05/2007
FINAL DISP:               Order to show cause issued return before trial court
ORIGIN:                   Superior
CATEGORY:                 hc          Habeas corpus

OTHER CASE NUMBER (S):        A108798,A118736

## TRIAL COURT INFORMATION

CASE NUMBER:              SC132406A
COUNTY:                   Marin
COURT:                    Marin County Superior Court
JUDGE:
JUD. DATE:

## ATTORNEY - PARTY

In propria persona

    Petitioner
    Jason Paul Voelker
    V-62496
    CSP Folsom
    P.O. Box 950
    Represa, CA  95671

Office of the Attorney General (Bar No. SAGSFR-01)
455 Golden Gate Avenue - Suite 1100
San Francisco, CA  94102

    Respondent
    The People

I, DIANA HERBERT, CLERK OF THE COURT OF APPEAL STATE OF CALIFORNIA, FIRST APPELLATE DISTRICT, DO HEREBY CERTIFY THAT THE PRECEDING AND ANNEXED IS A TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE IN MY OFFICE.

WITNESS MY HAND AND THE SEAL OF THE COURT THIS 27th DAY OF December 20 07

DIANA HERBERT,                    CLERK
By                              DEPUTY

Case information as of December 27, 2007

<u>DOCKET ENTRIES</u>

09/26/2006
Petition for a writ of habeas corpus filed.

09/26/2006
Order filed.
Orig sup ct file under rule 60.

10/05/2006
Exhibits lodged.
Orig sup ct file. (SC146932A)

10/12/2006
Order denying petition filed.
(M,S,Sw)

10/12/2006
Case complete.

10/13/2006
Certificate of interested entities or persons filed by:
petitioner

10/24/2006
Record transmitted to Supreme Court.

12/15/2006
Answer to petition for review received.

01/03/2007
Petition for review granted in Supreme Court.
Petition for review GRANTED. The matter is transferred to the Court of Appeal, First Appellate
District, Division One, with directions to vacate its October 12, 2006 order denying the petition for
writ of habeas corpus and to issue an order to show cause, returnable before the Marin County
Superior Court. The Director of the Department of Corrections and Rehabilitation is to be ordered to
show cause, when the matter is ordered on calendar, why petitioner is not entitled to relief based on
ineffective assistance of trial counsel for failing to call petitioner to testify at trial, as petitioner
contends in Ground II of the original petition for writ of habeas corpus filed in the Court of Appeal on
September 26, 2006. The return is to be filed on or before February 2, 2007.

01/03/2007
Supreme Court order filed re:
Petition for review GRANTED. The matter is transferred to the Court of Appeal, First Appellate
District, Division One, with directions to vacate its October 12, 2006 order denying the petition for
writ of habeas corpus and to issue an order to show cause, returnable before the Marin County
Superior Court. The Director of the Department of Corrections and Rehabilitation is to be ordered to

show cause, when the matter is ordered on calendar, why petitioner is not entitled to relief based on ineffective assistance of trial counsel for failing to call petitioner to testify at trial, as petitioner contends in Ground II of the original petition for writ of habeas corpus filed in the Court of Appeal on September 26, 2006. The return is to be filed on or before February 2, 2007.

01/05/2007
Issued order to show cause.
Pursuant to the January 3, 2007 order of the California Supreme Court, in In re Jason Paul Voelker on Habeas Corpus (S147515), this Court's order of October 12, 2006 denying the petition for writ of habeas corpus is vacated. The Director of the Department of Corrections and Rehabilitation is ordered to show cause before the Presiding Judge of the County of Marin Superior Court, or his or her designee, when the matter is ordered on calendar, why petitioner is not entitled to relief based on ineffective assistance of trial counsel for failing to call petitioner to testify at trial in People v. Voelker (County of Marin Superior Court No. SC132406), as petitioner contends in Ground II of the petition for writ of habeas corpus filed herein on September 26, 2006. Certified copies of this order to show cause shall be served by the Clerk of this Court on petitioner, respondent and on the presiding judge. Service shall be complete upon mailing by the Clerk, which shall occur on or before January 5, 2007. The Clerk shall likewise serve copies of all filings in this case on the superior court, as well as copies for service on appointed counsel as directed below. The presiding judge shall forthwith appoint counsel for petitioner, cause all filings to be served on said counsel, notify petitioner of counsels name, address and phone number, and issue all orders necessary to cause petitioner's personal appearance at any evidentiary hearing. A written return to this order to show cause shall be served and filed in the Marin County Superior Court on or before February 2, 2007, and likewise a traverse thereto on or before February 20, 2007. In addition, the Clerk of this Court shall forthwith return the documents received from the Marin County Superior Court on November 15, 2006 (contained in the file returned from the Supreme Court) to the Marin County Superior Court.

01/05/2007
Note:
Pursuant to this Court's 1/5/07 order, certified copies of order sent to petitioner, respondent & presiding judge; 2 copies of all filings sent to presiding judge & appointed counsel; extraneous documents returned to Marin superior court clerk.

01/05/2007
Case complete.

02/06/2007
Received document entitled:
Return and ans to petition for writ of h/c; 2/2/07.

02/20/2007
Received document entitled:
Order for evidentiary hearing; 2/15/07.

03/09/2007
Received document entitled:
People's Informal Response to Petition for Writ of Habeas Corpus dated 3-7-07 filed in Marin Co. Superior Court

### CASE DISPOSITION / JUDGES PANEL INFORMATION

DISPOSITION:          Petition summarily denied by order
DATE:         10/12/2006
STATUS:               Vacated
OPINION TYPE:

No notes

AUTHORIZING JUSTICES
No case opinion vote

DISPOSITION:          Order to show cause issued return before trial court
DATE:         01/05/2007
STATUS:               Final
OPINION TYPE:

No notes

AUTHORIZING JUSTICES
No case opinion vote

### COURT REPORTER INFORMATION

No court reporters

### CASE NOTES

No case notes

### SCHEDULED ACTIONS

Case information as of December 27, 2007

No scheduled actions

END OF DOCKET SHEET



# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

**FILED**

JAN - 5 2007

Court of Appeal - First App. Dist.
DIANA HERBERT

By_____
                    DEPUTY

In re JASON PAUL VOELKER,

on Habeas Corpus.

A115331

(Marin County
Super. Ct. No. SC 132406A)

Pursuant to the January 3, 2007 order of the California Supreme Court, in In re Jason Paul Voelker on Habeas Corpus (S147515), this Court's order of October 12, 2006 denying the petition for writ of habeas corpus is vacated.

The Director of the Department of Corrections and Rehabilitation is ordered to show cause before the Presiding Judge of the County of Marin Superior Court, or his or her designee, when the matter is ordered on calendar, why petitioner is not entitled to relief based on ineffective assistance of trial counsel for failing to call petitioner to testify at trial in People v. Voelker (County of Marin Superior Court No. SC132406), as petitioner contends in Ground II of the petition for writ of habeas corpus filed herein on September 26, 2006.

Certified copies of this order to show cause shall be served by the Clerk of this Court on petitioner, respondent and on the presiding judge. Service shall be complete upon mailing by the Clerk, which shall occur on or before January 5, 2007. The Clerk shall likewise serve copies of all filings in this case on the superior court, as well as copies for service on appointed counsel as directed below.

The presiding judge shall forthwith appoint counsel for petitioner, cause all filings to be served on said counsel, notify petitioner of counsel's name, address and phone number, and issue all orders necessary to cause petitioner's personal appearance at any evidentiary hearing.

A written return to this order to show cause shall be served and filed in the Marin County Superior Court on or before February 2, 2007, and likewise a traverse thereto on or before February 20, 2007.

1

In addition, the Clerk of this Court shall forthwith return the documents received from the Marin County Superior Court on November 15, 2006 (contained in the file returned from the Supreme Court) to the Marin County Superior Court.

Dated: ___JAN – 5 2007___    MARCHIANO, P.J. ___ P.J.

I, DIANA HERBERT, CLERK OF THE COURT OF
APPEAL, STATE OF CALIFORNIA, FIRST
APPELLATE DISTRICT, DO HEREBY CERTIFY
THAT THE PRECEDING IS A TRUE COPY OF A
TRUE AND CORRECT COPY OF THE ORIGINAL
ON FILE IN MY OFFICE.

WITNESS MY HAND AND SEAL OF THE COURT
THIS __5__ DAY OF __Jan__, 20 _07_

BY _____  CLERK
        DIANA HERBERT             DEPUTY

SEAL

2

COURT OF APPEAL, FIRST APPELLATE DISTRICT
350 MCALLISTER STREET
SAN FRANCISCO, CA 94102
DIVISION 1



In re JASON PAUL VOELKER on Habeas Corpus.

A115331
Marin County No. SC132406A

**FILED**

OCT 1 2 2006

Court of Appeal - First App. Dist.
DIANA HERBERT

By_____
DEPUTY

BY THE COURT:

The petition for writ of habeas corpus is denied.

The justices participating in this matter were:

Presiding Justice Marchiano, Justice Stein and Justice Swager

Date:    OCT _____

MARCHIANO, P.J. _____P.J.

omd1a

Filed 11/9/2005

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE



FILED
COURT OF APPEAL  FIRST APPELLATE DISTRICT

NOV 0 9 2005

DIANA HERBERT, CLERK

BY_____ DEPUTY CLERK

THE PEOPLE,

    Plaintiff and Respondent,

v.

JASON P. VOELKER,

    Defendant and Appellant.

A108798

(Marin County
Super. Ct. No. SC132406A)

Defendant was convicted following a jury trial of first degree robbery in concert (Pen. Code, §§ 211, 213, subd. (a)(1)(A)),[1] assault by means likely to cause great bodily injury (§ 245, subd. (a)(1)), and false imprisonment by violence (§ 236). The jury also found that appellant personally inflicted great bodily injury upon the victim (§ 12022.7, subd. (a)) in association with the robbery and assault offenses. Defendant claims in this appeal that the trial court erred by failing to give a voluntary intoxication instruction, and gave an erroneous instruction on infliction of great bodily injury. He also challenges the evidentiary support for the great bodily injury enhancement finding, and complains that the enhancement was improperly reinstated by the trial court after it was dismissed by the prosecution. We find that no prejudicial instructional errors occurred, the great bodily

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.



EXHIBIT A

injury enhancement finding is supported by the evidence, and the dismissed enhancement was properly reinstated to correct a clerical error. We therefore affirm the judgment.

## STATEMENT OF FACTS

The victim, Damian Diprima, encountered defendant at Matteucci's bar in San Anselmo on the night of November 6, 2003. Defendant was sitting at a poker table in the bar with a man named Zeph Carter, whom Diprima had also met that night. Diprima described Carter as a "Black male, five nine," between 160 and 170 pounds. Diprima testified that he was introduced by Carter to defendant, who was a "White male," about "six one, six two, 170 pounds, with a "fade" haircut, wearing a black hooded sweatshirt and a large diamond earring. They briefly conversed and drank beer.

During the course of their conversation, defendant asked if Carter and Diprima "wanted weed." Diprima replied that he "would take a 20 sack." Defendant stated that he "had to go to his apartment to get it," about four or five blocks away, and asked Diprima for a ride. Diprima declined to drive, but offered defendant his car and put the keys on the table. Defendant did not take the keys, so Diprima took them back and went to the rear patio area to smoke a cigarette.

When Diprima returned to the crowded bar area to get another beer, defendant was seated there. Diprima put his hand on defendant's shoulder and said, "Hey, nigga, let me get in here." Diprima considered the word "nigga" as a term of "endearment," but defendant exhibited a negative facial reaction to the remark. A "black male" seated next to defendant, referred to by Diprima as "Bob Marley" for a "Bob Marley patch" on the "green Fidel Castro type army hat" he wore,[2] also took offense to Diprima's use of the "N word" and declared, "That's not right." Diprima apologized, and explained that he "didn't mean it like that." After a short discussion, Diprima bought a beer and walked away from the bar.

---

[2] We will also refer to him as Bob Marley, as the parties did at trial. Diprima testified that Bob Marley wore a black jacket and black shirt, along with diamond earrings, and was five nine, five ten tall.

"Maybe an hour later," defendant approached Diprima to ask for a ride home and a loan of $5 for a drink. Diprima gave defendant $5 from the bills he kept in a money clip in his pocket, and agreed to drive him home. They again parted until about 1:30 or 1:40 a.m., when Diprima told defendant he wanted to leave and asked if he still wanted a ride. Defendant said, "Yeah, in a minute," so Diprima went outside to wait. Defendant was also intermittently outside the bar, "talking to different people," one of them Bob Marley, who was standing with a "mulatto guy" Diprima described as "six one, six two, somewhat slim," with freckles and curly hair, wearing a baseball hat, jeans, and running shoes.[3] Defendant "may" have gone back inside the bar momentarily with the "mulatto guy," although Diprima testified that he was not paying close attention.

Diprima told defendant, "I'm gonna leave, if you want a ride, let's go." They finally left the bar together in Diprima's rented car about 1:45 or 1:50 a.m. On the way to defendant's apartment they stopped at a 7-Eleven store. Diprima bought cigarettes, and they both bought food which they heated in a microwave oven and ate on the premises. Defendant attempted to buy beer, but the clerk told him, "You're too late." After defendant made a telephone call on a cell phone, they proceeded to his apartment, about three or four minutes away.

Diprima accepted defendant's invitation to come up to his apartment. Diprima parked his car in the apartment complex garage and accompanied defendant through a metal door into an elevator. Suddenly, the elevator stopped, Bob Marley jumped inside, spoke briefly with defendant, then "jumped back out of the elevator." Diprima was uneasy; he felt he "was being set up" and was in danger of being attacked. He asked defendant, "What's going on?" Defendant assured Diprima not to "worry about it." When the elevator stopped, Diprima accompanied defendant into his apartment, although he remained very fearful. As Diprima walked out onto the balcony he thought he was "screwed."

---

[3] Again, following the designation used by the parties at trial, we will refer to this unidentified man as the "mulatto guy."

3

Diprima then walked back into the living room, whereupon Bob Marley and the "mullato" guy wearing a baseball cap "came through the kitchen area and attacked" him. Defendant was already in the room. Diprima fell to the floor, where he was punched and kicked repeatedly. He was screaming for them the stop and attempting to remain conscious. Diprima testified that he covered his head during the attack and could hardly see, but was sure defendant must have kicked or punched him five to ten times.

Then defendant placed a "choke hold" on Diprima from behind while Bob Marley grabbed his arm and forcibly removed his watch. As defendant continued to apply a choke hold to Diprima, the other two men removed his shoes, socks and belt, and "went through" his pockets to take keys, a cell phone and money clip. The mullato guy struck Diprima 15 to 20 times with the belt, and angrily asked for Diprima to produce his credit cards. Bob Marley broke a chain off Diprima's neck.

When someone yelled, "Get the knife," Diprima managed to struggle out of the choke hold, but was "being kicked again." Someone, Diprima "believed it was the mulatto guy," stomped him on the head. Diprima managed to scramble to his feet. The mulatto guy grabbed a Duraflame log and "whacked" Diprima "in the head" with it. Diprima then jumped onto a computer table, and from there leaped onto defendant. Diprima and defendant struggled before Diprima spun around and ran for the balcony. Once on the balcony, Diprima grabbed onto the banister, extended his arms, and dropped to the ground below.

Diprima landed on his feet, but cracked his chin with his knee. He rolled or crawled, then ran for a short distance before he reached a ledge. There Diprima encountered someone, it "might have been" defendant, with whom he struggled before he jumped off the 8- to 10-foot ledge into a yard. He ran down a hill to the street, then "kept running" to the bottom of the hill.

In the street Diprima managed to flag down a taxi driver. Diprima told the driver he wanted to be taken to his home, which was about a mile away, rather than the hospital. The taxi driver testified that Diprima was "almost comatose," without shoes or a shirt, and "bleeding profusely," but did not seem intoxicated or "on drugs."

4

Once he reached his home Diprima told his girlfriend Melinda Swanson, "Pack your bags, we're gonna get out of here right now." Diprima feared that his assailants, who had taken his driver's license, would come to their home and kill them. Swanson noticed that Diprima was "really dirty," his "face was pretty swollen," blood was "coming out from his mouth and chin," he had scrapes elsewhere on his body, and "a lot of whip marks on his back."

Within five minutes of Diprima's arrival, he and Swanson left their house and drove to the home of a friend, Kofi Darko, in San Francisco. During the drive to San Francisco and at Darko's residence Diprima related "bits and pieces" or a "rough sketch" "about what transpired" and why he was beaten. Diprima was reluctant to go to the hospital, but was convinced by Swanson and Darko that he needed treatment.

At San Francisco General Hospital Diprima was treated for his wounds: two black eyes, a nasal fracture, a severe bruise to his left thumb, serious lacerations on his right scalp and chin, a laceration to his left inner thigh, abrasions on his back, a burn mark across his neck, and bruises over essentially his entire body. He received five staples for the wound on his head and sutures for the laceration on his chin.

Meanwhile, San Rafael police officers were dispatched to defendant's apartment in response to 911 calls of a disturbance and screams for "help" there. The officers entered the apartment about 2:50 a.m. with the assistance of the apartment complex manager after they received no response to their knocking on the locked front door. The apartment was unoccupied. What appeared to be dried, splattered blood was visible on the wall and floor of the left side of the dining room. Several chairs and a small table had been knocked over in the center of the living room, and it looked "like there might have been a struggle." Marijuana plants and a medical marijuana license were observed in the residence. The blood stains did not appear to be fresh, so the officers did not think a physical altercation had recently occurred in the apartment. They secured the premises and left.

5

Later that day, Diprima appeared at the San Rafael police station with Swanson for an interview with investigating officers Raffaello Pata and Wanda Spaletta.[4] During the interview Diprima failed to disclose to the officers that he "used the N word" or offered to purchase marijuana from defendant.[5] He also did not state to the officers that defendant hit or kicked him during the assault.

The following day Diprima went with the officers to defendant's apartment. Diprima remained quite fearful as they reached the apartment complex in the police vehicle, and was reluctant to "go up there" to defendant's apartment. Diprima's rental car was still in the parking lot where he left it. As Diprima was showing the officers the hill he "ran down" following his leap from the balcony, they discovered the "Bob Marley hat" on the sidewalk.

While Diprima was standing with the officers in the apartment complex parking lot he suddenly became "very anxious" and declared, "That's him," referring to defendant, who was walking out of the apartment complex with a friend. When queried, Diprima added, "That's the guy that beat me up." He then quickly returned to the police vehicle as the officers briefly questioned defendant. Defendant was subsequently arrested.

Around midnight the investigating officers returned to defendant's apartment to conduct a search pursuant to a warrant. Diprima's silver chain necklace was located on a computer table in the living room, but none of the other personal belongings he claimed were taken during the attack were found. The blood seen by an officer on the wall the day before was "gone," and appeared to have been "washed off." "[S]wipe marks" were visible where efforts were made to "clean the wall." Although a "majority" of the blood had disappeared, traces of dried blood drops were still visible on the linoleum floor.

---

[4] Swanson and Diprima had spoken to the police earlier by telephone.

[5] Diprima explained, "I didn't want to make myself look bad" or divert the "focus" of the interview away from the assault.

The investigating officers subsequently exhibited a group of six photographs to Diprima. Among them was the photograph of Tristan Harvey, whom Diprima positively identified as the assailant with the "Fidel Castro style army hat" he referred to as "Bob Marley." From a separate photo lineup Diprima also tentatively identified a man named Vijay Kelly as the third assailant. Kelly was arrested, but never charged in the case.

## DISCUSSION

### I. The Failure to Give a Voluntary Intoxication Instruction.

Defendant makes two claims of instructional error, the first of which is that the trial court erred by failing to instruct, sua sponte, on voluntary intoxication in the terms of CALJIC Nos. 4.21 and 4.21.1. He suggests that the "undisputed evidence" demonstrated his consumption of alcohol at Matteucci's bar, and his "girlfriend testified he was drunk" when she encountered him, apparently shortly after the assault upon Diprima. He therefore claims that if "an intoxication instruction had been given, the jury readily could have found from the evidence of alcohol consumption and drunkenness" that he "lacked the required specific intent" to commit robbery. In the absence of the intoxication instruction defendant argues that his due process right to a fair trial was violated.

Voluntary intoxication, although not a defense, may disprove that the defendant actually formed the requisite specific intent required for the charged offense. (See *People v. San Nicolas* (2004) 34 Cal.4th 614, 669; *People v. Haley* (2004) 34 Cal.4th 283, 314; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 93; *People v. Martinez* (2003) 31 Cal.4th 673, 684-685; *People v. Horton* (1995) 11 Cal.4th 1068, 1118-1119.)[6] A voluntary intoxication instruction must be given if requested by the defense and supported by substantial evidence. A defendant is entitled to a pinpoint instruction in the terms of CALJIC Nos. 4.21 and 4.21.1 upon request "only when there is substantial

---

[6] Section 22, subdivision (b), provides: "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought."

evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's 'actual formation of specific intent.' " (*People v. Williams* (1997) 16 Cal.4th 635, 677; see also *People v. Bolden* (2002) 29 Cal.4th 515, 559; *People v. Horton, supra,* at pp. 1118-1119; *People v. Saille* (1991) 54 Cal.3d 1103, 1117; *People v. Walker* (1993) 14 Cal.App.4th 1615, 1623.)

Defendant was not entitled to a voluntary intoxication instruction without a request, however. Defendant did not rely on voluntary intoxication to negate the specific intent element of the crime of robbery, and it is well settled that a trial court has no duty to instruct on its own motion on voluntary intoxication. (*People v. Wader* (1993) 5 Cal.4th 610, 643; *People v. Hughes* (2002) 27 Cal.4th 287, 342; *People v. Saille, supra,* 54 Cal.3d 1103, 1120; *People v. Lee* (1994) 28 Cal.App.4th 1724, 1734; *People v. Walker, supra,* 14 Cal.App.4th 1615, 1623; *People v. Morales* (1992) 5 Cal.App.4th 917, 927.) "[V]oluntary intoxication 'is proffered in an attempt to raise a doubt on an element of a crime which the prosecution must prove beyond a reasonable doubt.' [Citation.] As such, the burden falls on the defendant to request a 'pinpoint' instruction. [Citation.] '[S]uch a pinpoint instruction does not involve a "general principle of law" as that term is used in the cases that have imposed a sua sponte duty of instruction on the trial court.' [Citation.]" (*People v. San Nicolas, supra,* 34 Cal.4th 614, 669.)

Further, the evidence adduced at trial did not support a voluntary intoxication instruction. Evidence of defendant's consumption of alcohol was presented, and at least some inference of his apparent intoxication near the time of the assault and robbery of Diprima may be drawn from Raven Oliver's testimony. We do not, however, find any evidence in the record of the second necessary element of the defense: "that, because of voluntary intoxication," the requisite specific intent "was not in fact formed." (*People v. Walker, supra,* 14 Cal.App.4th 1615, 1622.) The victim did not perceive that defendant seemed intoxicated. Defendant did not testify, and Oliver did not even suggest that defendant's impairment may have prevented him from forming the mental state necessary to commit robbery. The evidence that defendant was drinking at Matteucci's bar before the robbery occurred does not establish that he was intoxicated at the time of the offense,

8

and nothing in the record indicates that his drinking had any effect upon his mental state or actions. (*People v. Ramirez* (1990) 50 Cal.3d 1158, 1180-1181.) And finally, the manner in which the crimes were committed – a coordinated action with the assistance of friends, and the luring of the defendant into defendant's apartment – suggests planning and design rather than intoxication. (*People v. Horton, supra,* 11 Cal.4th 1068, 1119.)

We therefore conclude that voluntary intoxication instructions were not supported by substantial evidence. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009; *People v. Williams, supra,* 16 Cal.4th 635, 677-678; *People v. Horton, supra,* 11 Cal.4th 1068, 1119-1120; *People v. Ramirez, supra,* 50 Cal.3d 1158, 1180-1181; *People v. Greenberger* (1997) 58 Cal.App.4th 298, 378.) The court need not give pinpoint instructions on theories such as voluntary intoxication "when the evidence is 'minimal and insubstantial.' [Citation.]" (*People v. Barton* (1995) 12 Cal.4th 186, 201; see also *People v. Mills* (1977) 73 Cal.App.3d 539, 544; *People v. Lopez* (1992) 11 Cal.App.4th 1115, 1123.) The failure of the trial court to instruct on voluntary intoxication was not error. (*People v. Horton, supra,* at pp. 1119-1120; *People v. Middleton* (1997) 52 Cal.App.4th 19, 32-33; *People v. Lopez, supra,* at pp. 1123-1124.)

## II. The CALJIC No. 17.20 Instruction.

Defendant also argues that the trial court presented the jury with "an improper legal theory" by including the second part of the "group beating" language in CALJIC No. 17.20 in its instruction to the jury on the great bodily injury enhancement. The court instructed the jury: "When a person participates in a group beating and it is not possible to determine which assailant inflicted a particular injury, he may be found to have personally inflicted great bodily injury upon the victim, if one, the application of unlawful physical force upon the victim was of such a nature that, by itself, it could have caused the great bodily injury suffered by the victim, *or two, that at the time the defendant personally applied unlawful physical force to the victim, the defendant knew that other persons, as part of the same incident, had applied, were applying, or would apply unlawful physical force upon the victim and the defendant then knew, or reasonably should have known that the cumulative effect of all the unlawful physical*

9

*force would result in great bodily injury to the victim.*"[7] (Italics added.) Defendant does not object to the content of the first part of the "group beating" instruction, although he submits that "no evidence satisfying" it was presented. His primary complaint is that the "second basis" articulated in CALJIC No. 17.20 for a section 12022.7 enhancement "allows a finding based on mere knowledge," rather than the requisite evidence "that the defendant personally inflicted the injury." He maintains that by "eliminating the need for a jury finding on the statutorily required elements of the allegation, the instruction misstated the law and therefore was erroneous."

The California Supreme Court established in *People v. Cole* (1982) 31 Cal.3d 568, 579 (*Cole*), that the "designation 'personally' " in section 12022.7 was intended "to limit the category of persons subject to the enhancement to those who directly perform the act that causes the physical injury to the victim." (See also *People v. Lewis* (2004) 120 Cal.App.4th 882, 888-889; *People v. Gutierrez* (1996) 46 Cal.App.4th 804, 813; *People v. Robinson* (1997) 53 Cal.App.4th 270, 283.) "The choice of the word 'personally' necessarily excludes those who may have aided or abetted the actor directly inflicting the injury." (*Cole, supra*, at p. 572; see also *People v. Guzman* (2000) 77 Cal.App.4th 761, 764.) "[A] defendant cannot receive an enhanced sentence under section 12022.7 on a

---

[7] In its entirety the CALJIC No. 17.20 instruction reads: "If you find the defendant guilty of either or both of the crimes charged in Count One, that's residential robbery, or Count Two, assault with a deadly weapon or by means of force likely to produce great bodily injury, you must determine whether the defendant personally inflicted great bodily injury on Damian Diprima in the commission of the crimes charged in Counts One and/or Two. [¶] 'Great bodily injury' as used in this instruction, means a significant or substantial physical injury. Minor, trivial or moderate injuries do not constitute great bodily injury. [¶] When a person participates in a group beating and it is not possible to determine which assailant inflicted a particular injury, he may be found to have personally inflicted great bodily injury upon the victim, if one, the application of unlawful physical force upon the victim was of such a nature that, by itself, it could have caused the great bodily injury suffered by the victim, or two, that at the time the defendant personally applied unlawful physical force to the victim, the defendant knew that other persons, as part of the same incident, had applied, were applying, or would apply unlawful physical force upon the victim and the defendant then knew or reasonably should have known that the cumulative effect of all the unlawful physical force would result in great bodily injury to the victim. [¶] The People have the burden of proving the truth of this allegation. If you have a reasonable doubt that it is true, you must find it to be not true. [¶] Include a special finding on that question in your verdict, using a form that will be supplied for that purpose."

theory of vicarious liability." (*People v. Rodriguez* (1999) 69 Cal.App.4th 341, 348.) Thus, a section 12022.7 enhancement requires a finding that the defendant both personally and intentionally inflicted great bodily injury upon the victim. (*Cole, supra,* at p. 579; *People v. Smith* (1992) 9 Cal.App.4th 196, 205.) "To 'personally inflict' injury, the actor must do more than take some direct action which proximately causes injury. The defendant must directly, personally, himself inflict the injury." (*People v. Rodriguez, supra,* at p. 349.)

Special standards of proof have evolved, however, in cases where multiple assailants simultaneously attack a single victim and great bodily injury is inflicted. Strict adherence to the rule articulated in *Cole* that "an aider and abettor who strikes no blow" cannot be culpable under section 12022.7 has been found misplaced and inapplicable where the defendant is an active participant in a "group pummeling" or beating. (*People v. Corona* (1989) 213 Cal.App.3d 589, 594 (*Corona*).) In *Corona*, the court did not "attempt to set forth a universally applicable test for when an individual ceases to be an accomplice and becomes a direct participant to the infliction of great bodily injury," but concluded "that when a defendant participates in a group beating and when it is not possible to determine which assailant inflicted which injuries, the defendant may be punished with a great bodily injury enhancement if his conduct was of a nature that it could have caused the great bodily injury suffered." (*Corona, supra,* at p. 594; see also *People v. Banuelos* (2003) 106 Cal.App.4th 1332, 1337; *People v. Magana* (1993) 17 Cal.App.4th 1371, 1380.) The rule announced in *Corona* and followed in successor cases does not subject a defendant to section 12022.7 enhancements "because he was one of several participants each of whom engaged in conduct that may have caused injuries to a single victim. Rather, it stands for the proposition that a defendant cannot insulate himself from criminal liability by being one of multiple participants even when proof of

the precise level of culpability is wanting." (*People v. Cobb* (2004) 124 Cal.App.4th 1051, 1058.)[8]

We disagree with defendant's contention that the CALJIC No. 17.20 instruction erroneously authorized a finding of a section 12022.7 enhancement "based upon mere knowledge." Even the second alternative of the group beating rule in CALJIC No. 17.20 specifies that in addition to the element of knowledge of the cumulative effect of all the unlawful physical force inflicted during a group attack, the defendant must have "personally applied unlawful physical force to the victim." The CALJIC No. 17.20 instruction also accurately articulates that the exception to the personal liability rule "applies only when proof of the personally liable defendant is impossible. If the prosecution could have introduced evidence resolving the issue, but did not, the failure of proof does not justify imposition of the enhancement on all potentially culpable defendants." (*People v. Gutierrez, supra,* 46 Cal.App.4th 804, 816, italics omitted; see also *People v. Guzman, supra,* 77 Cal.App.4th 761, 764; *People v. Magana, supra,* 17 Cal.App.4th 1371, 1380-1381.)

Thus in *People v. Banuelos, supra,* 106 Cal.App.4th 1332, 1337 (*Banuelos*), the court found that the language of CALJIC No. 17.20, and specifically the second part of the group beating instruction, "is consistent with the holding in *Cole* that a mere aider and abettor cannot receive the special great bodily injury enhancement; only a person who directly participates in the physical attack can receive the enhancement. [Citation.] So too does the language of paragraph four of CALJIC No. 17.20 comport with the intent of the Legislature to deter personal infliction of great bodily injury in the future by preventing that intent from being frustrated in cases where multiple assailants directly

---

[8] The paragraph of CALJIC No. 17.20 challenged by defendant in the present appeal was added in a revision of the instruction based upon the decision in *Corona,* but has been the subject of dispute, and the issue of its validity is pending before the California Supreme Court. Review has been granted in two cases which found the instruction violative of the requirement articulated in *Cole,* that a finding of a great bodily injury enhancement under section 12022.7 cannot be based upon mere aiding and abetting: *People v. Pena* (2005) 128 Cal.App.4th 1219, review granted July 27, 2005, S134354; *People v. Modiri* (2003) 112 Cal.App.4th 123, review granted December 23, 2003, S120238.

cause the great bodily injury. Because the instruction requires that it be proven a defendant has personally inflicted an injury on the victim during a group attack, such instruction does not lighten the People's burden of proof as Banuelos asserts." The court therefore concluded that that the final paragraph of CALJIC No. 17.20 "is a correct statement of the law." (*Banuelos, supra,* at p. 1338.)

We agree with the decision of the court in *Banuelos* that the CALJIC No. 17.20 properly reflects in a group beating case the requirement of section 12022.7 that "the individual accused of inflicting great bodily injury must be the person who directly acted to cause the injury." (*Cole, supra,* 31 Cal.3d 568, 572.) Pursuant to the instruction the enhancement may not be imposed upon a defendant who has acted only in the capacity of an aider and abettor. Direct participation in the acts that caused the great bodily injury is necessary, as is the impossibility of determining which assailant inflicted a particular injury. We are not persuaded that the jury may have erroneously believed from the instruction that a section 12022.7 enhancement finding was justified even if defendant did not personally inflict the injury upon the victim. (*Banuelos, supra,* 106 Cal.App.4th 1332, 1337-1338.)

We further conclude that the instruction in its entirety was supported by the evidence. Defendant and two others simultaneously attacked Diprima. According to Diprima's testimony, he believed – although he was not sure – that defendant hit and kicked him while he was on the floor. Defendant then restrained Diprima while the others continued the beating. Defendant directly acted to cause all of the injuries suffered by Diprima. This is also not a case in which the inability of the victim to associate a particular assailant with particular injuries he suffered was due to a failure of the prosecution to offer additional available evidence. (Cf., *People v Gutierrez, supra,* 46 Cal.App.4th 804, 816; *People v. Magana, supra,* 17 Cal.App.4th 1371, 1380-1381.) Rather, the victim's attempts to protect himself prevented him from determining with any accuracy which attacker inflicted which resulting injury. (*Banuelos, supra,* 106 Cal.App.4th 1332, 1338.)

13

We realize that the second alternative of the CALJIC No. 17.20 instruction does not specifically reflect the requirement stated in *Corona* that the defendant's "conduct was of a nature that it could have caused the *great bodily injury* suffered."[9] (*Corona, supra,* 213 Cal.App.3d 589, 594, italics added; see also *Banuelos, supra,* 106 Cal.App.4th 1332, 1337; *People v. Magana, supra,* 17 Cal.App.4th 1371, 1380.) To the extent this omission may be viewed as error, we find it harmless in the present case. An erroneous instruction on the "elements of a statute imposing a sentence enhancement is prejudicial 'only where it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error.' [Citation.] On review, we examine the entire record, including the facts, instructions, arguments of counsel, communications from the jury during deliberations, and the entire verdict." (*People v. Gutierrez, supra,* 46 Cal.App.4th 804, 815.) Defendant's personal participation in the physical aspects of the beating that resulted in the victim's injuries furnishes proof that defendant was not an aider and abettor, that he directly acted with others to cause the great bodily injuries, and that his conduct – in hitting and kicking Diprima while he was on the ground, then restraining him with a choke hold while defendant's two confederates ruthlessly beat him – was of a nature that it directly contributed to the great bodily injury ultimately inflicted. While the prosecutor specifically relied upon the second part of the group beating instruction to persuade the jury that defendant inflicted great bodily injuries upon the victim, the argument was offered in the framework of describing *defendant's acts* that caused the great bodily injury. We conclude that even if the trial court had added to the instruction the element that the defendant's conduct was of a nature that it could have caused the *great bodily injury*, a result more favorable to defendant would not have been reached. No prejudicial error was committed.

---

[9] We observe that in some cases there may be a factual distinction between acts that directly cause injury and acts that could have caused great bodily injury.

14

## III. The Finding of Personal Infliction of Great Bodily Injury.

We proceed to defendant's contention that the great bodily injury findings must be reversed for lack of evidence. Defendant claims that his "cohorts" were "the ones who personally inflicted the injuries on Diprima; thus, as a matter of law, the evidence is insufficient to support the great bodily injury enhancement."

"We often address claims of insufficient evidence, and the standard of review is settled. 'A reviewing court faced with such a claim determines "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citations.] We examine the record to determine "whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] Further, "the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' [Citations.]" (*People v. Moon* (2005) 37 Cal.4th 1, 22.)

Following our discussion of the group beating instruction, and particularly the evidentiary support for it, we need not undertake a detailed further analysis to reach the conclusion that the great bodily injury enhancement finding is based upon substantial evidence. We add only that section 12022.7 "expressly defines great bodily injury as constituting 'a significant or substantial physical injury,' " and the victim in the present case suffered many of those throughout his body and in cumulative effect. (*People v. Escobar* (1992) 3 Cal.4th 740, 746-750.) Nothing in the language of the statute or the *Cole* decision adds a requirement that the defendant's acts *alone* must inflict the great bodily injury. And in fact, the contrary is true. "More than one person may be found to have directly participated in inflicting a single injury." (*People v. Guzman, supra,* 77 Cal.App.4th 761, 764.) Defendant actively participated in the infliction of all of the injuries suffered by the victim by not only hitting and kicking him, but also administering a choke hold while others grievously beat him, then causing him to jump from the balcony. Defendant's conduct was of a nature that it could have caused the great bodily

15

injury suffered. (*Corona, supra*, 213 Cal.App.3d 589, 594-595.) As the group beating instruction was supported by substantial evidence, so is the jury's enhancement finding.

*IV. The Trial Court's Reinstatement of the Great Bodily Injury Enhancement.*

Defendant's final claim of error is that the trial court "wrongly reinstated" the great bodily injury enhancement finding. The record reflects that at a hearing on July 30, 2004, after trial and the jury's finding on the great bodily injury enhancement, the prosecution moved to dismiss "the 12022.7," which was summarily granted by the trial court. The minute order for that date indicates that the "*PC 12022.1(B)*" (on-bail) enhancement allegation was stricken by the district attorney. (Italics added.) At the sentencing hearing on December 22, 2004, the defense claimed that the great bodily injury enhancement had been stricken, and therefore sentence on that finding was impermissible. The prosecutor stated that she intended to dismiss the on bail enhancement allegation at the prior hearing – it had not been submitted to the jury – but "mistakenly" moved to "dismiss the 12022.7." The trial court ruled that the "District Attorney's erroneous reference" to section 12022.7, rather than 12022.1, could be corrected, and the "out on bail enhancement" was dismissed. Defendant now claims that once the trial court dismissed the section 12022.7 enhancement, "it had no power or authority to reinstate it."

We disagree. A trial court retains the inherent power to correct clerical errors or misprisions in its records, whether made by the clerk or the court itself. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185; *Ames v. Paley* (2001) 89 Cal.App.4th 668, 672-673; *People v. McGee* (1991) 232 Cal.App.3d 620, 624.) "The court may correct these errors on its own motion or upon the application of the parties. [Citation.] . . . Likewise, if the minutes or abstract of judgment fails to reflect the judgment pronounced by the court, the error is clerical and the record can be corrected at any time to make it reflect the true facts." (*People v. Little* (1993) 19 Cal.App.4th 449, 452.) "The difference between judicial and clerical error rests not upon the party committing the error, but rather on whether it was the deliberate result of judicial reasoning and determination. The distinction between clerical error and judicial error is whether the error was made in

16

rendering the judgment, or in recording the judgment rendered." (*Rochin v. Pat Johnson Manufacturing Co.* (1998) 67 Cal.App.4th 1228, 1238.) "Changes which correct errors, mistakes and omissions made through inadvertence, but do not involve the exercise of the judicial function, are considered corrections of clerical errors that leave the original judgment intact." (*Stone v. Regents of University of California* (1999) 77 Cal.App.4th 736, 744.) The reference to the section 12022.7 enhancement was inadvertent error rather than any exercise of judicial discretion, and was therefore subject to correction by the trial court. (See *West Shield Investigations & Security Consultants v. Superior Court* (2000) 82 Cal.App.4th 935, 950-951; *APRI Ins. Co. v. Superior Court* (1999) 76 Cal.App.4th 176, 185-186; *Hamilton v. Laine* (1997) 57 Cal.App.4th 885, 891.)

Accordingly, the judgment is affirmed.

_____

Swager, J.

We concur:

_____

Stein, Acting P. J.

_____

Margulies, J.

*People v. Voelker, A108798*

# EXHIBIT D:

[Superior Court Orders: Denial of Habeas Corpus Petitions].

FILED

JUN 2 8 2007

KIM TURNER
Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By: M. Murphy, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF MARIN

In the Matter of the Application of:

JASON P. VOELKER (V-62496),

                   Petitioner,

for a Writ of *Habeas Corpus*.

Case No.: SC146932A

ORDER DENYING PETITION FOR WRIT OF *HABEAS CORPUS*

Pursuant to this court's order filed February 15, 2007, this matter came on for an evidentiary hearing on Petitioner's application for a writ of *habeas corpus* on June 21, 2007 in Department H of the above entitled court, the Honorable Verna A. Adams, presiding. Petitioner was personally present and represented by counsel, Carl Gonser, Esq.; Respondents were represented by DDA Dori Ahana, Attorney at Law.

The court has read and considered Petitioner's application for a writ of *habeas corpus,* filed April 10, 2006; Respondents' informal response, filed June 19, 2006; Petitioner's informal reply, filed July 25, 2006; the Court of Appeals' order filed January 5, 2007 (in A115331); Respondents' return, filed February 2, 2007; and Petitioner's traverse, denial, exception and memorandum of points and authorities, filed February 14, 2007. The court also heard testimony, received evidence, and entertained arguments at the June 21 hearing.

## ISSUE PRESENTED

In Ground II of his petition for a writ of *habeas corpus*, Petitioner alleged that: "My constitutionally protected right to present a defense and testify in my own behalf was violated by trial counsel when he failed to call me to the stand, reversal is required." The Court of Appeals' order directs require Respondents to show cause why Petitioner is not entitled to relief based on ineffective assistance of trial counsel for failing to call Petitioner to testify at trial in People v. Voelker, SC132406A.

## APPLICABLE LAW

Petitioner has the burden of proving that he is entitled to relief in *habeas corpus*, and the standard of proof is preponderance of the evidence. In re Merkle (1960) 182 Cal.App.2d 46; In re Riddle (1962) 57 Cal.2d 848.

A competent criminal defendant has a fundamental right to testify in his own behalf even if contrary to the advice of counsel. People v. Webb (1993) 6 Cal.4th 494, 534-535. A defendant who wishes to assert the right to testify must assert that right in a timely and adequate way. He cannot await the outcome of the trial and then seek reversal based on his claim that despite expressing to his counsel his desire to testify he was deprived of that opportunity. People v. Guillen (1974) 37 Cal.App.3d 976, 984-985.

In order for Petitioner to prevail on an ineffective assistance of counsel theory, he must demonstrate, not only that his trial counsel's performance was deficient, but also that but for counsel's shortcomings the result of the proceeding would have been different. Strickland v. Washington (1984) 466 U.S. 668, 686-687.

## EVIDENCE AT THE HEARING

At the June 21 hearing, Petitioner called as a witness Chief Assistant Public Defender David Brown, who testified that before trial he had discussed with Petitioner's trial counsel, James Wall, ongoing strategy issues, including whether Petitioner would

take the witness stand in his own defense. As far as Mr. Brown knew, the decision whether to call Petitioner as a witness had not been made. Mr. Brown testified that at that time, he had agreed that, if needed, he would role-play as a prosecutor and cross-examine Petitioner to help prepare him to testify. Mr. Brown testified that these discussions about mock cross-examination occurred before the trial began, and that at no time before or during the trial was he called upon to help prepare Petitioner to testify.

Attorney Mary Stearns, an experienced criminal defense attorney, testified that she had prepared and argued Petitioner's motion for a new trial. She did not contend in that motion that a new trial should be granted to Petitioner because he had not been called to testify in his own defense. She stated that her "factual summary" in connection with a request for monies for an investigator included the following:

> There are a few more issues: like that defendant [Petitioner]
> wanted to testify and atty [*sic*] said he would on many
> occasions, but on day that he was to testify, atty told him not to
> as defendant had not gotten any sleep the night before.

Ms. Stearns testified that in her experience with him, Petitioner told her forthrightly of his concerns; he was not shy or withdrawn.

Both Mr. Brown and Ms. Stearns testified that Mr. Wall was a zealous, aggressive advocate for his criminal defense clients.

Petitioner testified that Mr. Wall had told him all along that he had to testify and that they had to present an affirmative defense. He said that at the defense case was nearing its conclusion, Mr. Wall told the court that Petitioner would be the final defense witness. At that point, court recessed for the day. Petitioner testified that Mr. Wall did not come to visit him in the jail that evening. The next morning, Petitioner told Mr. Wall that he had not slept the night before. When court convened the next morning, Mr. Wall rested his case without calling Petitioner. Petitioner testified that when he heard that, he was upset. He asked his attorney, "What are you doing, what's going on? I wanted to testify," and his attorney replied, "Hold on." Petitioner did not ask for a

1   recess so that he could confer with counsel, and he did not speak out. He explained that
2   by stating that he had been admonished never to address the court unless spoken to.

3   On cross examination, Petitioner admitted that his attorney had done a very good
4   job of cross-examining the victim for three days, and that he had managed to bring out
5   many details in the victim's testimony that were apparently inconsistent. Petitioner
6   conceded that he had not raised the issue of his desire to testify in his motion for a new
7   trial or at any time before the sentencing hearing.

8   Petitioner went on to recapitulate the testimony he would have given had he been
9   called as a witness.

10  Petitioner did not call his trial counsel, James Wall, as a witness at this
11  evidentiary hearing.

12  The only witness for the Respondents was Attorney Ashley Worsham, who
13  prosecuted Petitioner for the Marin County District Attorney's Office. Ms. Worsham
14  testified that Mr. Wall is a zealous, very aggressive advocate. Ms. Worsham testified
15  that although she was of course not privy to conversations between Petitioner and Mr.
16  Wall, she noticed during the trial that Petitioner was active, involved, and participating.
17  He took lots of notes and had many whispered consultations with his counsel. The court
18  had ruled that if Petitioner testified in his defense, the People could impeach his
19  credibility with evidence of a prior felony conviction and of an arrest for an offense
20  involving moral turpitude. Petitioner had given a statement to the San Rafael Police
21  Department; the court had excluded it from the prosecution's case in chief as having
22  been obtained in violation of Petitioner's *Miranda* rights. The issue of whether and to
23  what extent those statements could be used to impeach Petitioner had not been ruled on.
24  Ms. Worsham did not observe Petitioner express dissatisfaction with Mr. Wall's
25  decision not to call him. He did not ask to address the court or request a recess. She
26  also expressed her opinion that the evidence against Petitioner was strong, that this was
27  not a close case.

28

1    The official record of this trial reveals that as the trial was nearing its conclusion,

2  the court noted, out of the jury's presence and in the presence of Petitioner and both

3  counsel, that the defense had not decided whether to call Mr. Voelker as a witness and

4  that if the defendant [Petitioner] were to testify, "we have some Castro and Wheeler

5  issues that we have to deal with" (RT 1195).  There is no indication in the record that

6  Petitioner or his counsel disagreed when the court noted that the defense had not yet

7  decided whether to call Petitioner as a witness.  The next morning, when court

8  convened, the court asked if the defense would be calling any more witnesses.  Mr. Wall

9  replied: "The defense is satisfied with the case, the evidence, and we rest."  (RT 1206).

10  Petitioner says that he remonstrated with his attorney about this decision.  None of this

11  alleged colloquy was observed by the prosecutor or by the court.  None of it was on the

12  record.  Petitioner did not address the court about his desire to testify, nor did he request

13  (or ask his attorney to request) a recess.

14

15                              **DISCUSSION**

16    Viewing the evidence proffered by Petitioner at this evidentiary hearing in the

17  light most favorable to Petitioner, it demonstrates that Petitioner's taking the stand in his

18  own defense was under active discussion until the close of the defense case, at which

19  time Petitioner's counsel made a decision not to call Petitioner as a witness, and that

20  Petitioner acquiesced, perhaps reluctantly, in that strategy decision.  Petitioner has not

21  proven that he did not accede to his attorney's decision not to call him as a witness.

22    Petitioner was under an obligation *timely* to assert his right to be called as a

23  witness.  People v. Robles, (1970) 2 Cal.3d 205, 215.  Like Mr. Guillen, Petitioner in

24  this case "did not apprise the court he desired to testify at any time during the trial

25  proceeding when the right could have been accorded him, instead he waited until an

26  adverse verdict was rendered against him before advising the court he had really wanted

27  to take the stand after all, then demanded an new trial – another chance before a new

28

1    jury – on the ground his counsel had 'deprived' him of his right" (People v. Guillen,

2    *supra*, 37 Cal.App.3d 976, 984-985).

3        *Habeas corpus* is civil in nature. Petitioner has the burden of proving the truth of

4    his contentions by a preponderance of the evidence. Attorney James Wall is a

5    percipient witness of whether Petitioner indeed stated a desire to testify in his own

6    defense. Petitioner could have called his trial counsel, James Wall, as a witness at this

7    evidentiary hearing, but he did not do so. Under these circumstances, Petitioner's

8    testimony should be viewed with distrust. Evidence Code §412.

9        If, *arguendo*, Petitioner had testified at this trial, he has not convinced this court

10    that the outcome of the trial would have been more favorable to Petitioner.

11    Notwithstanding some contradictions among witnesses, the evidence against Petitioner

12    was convincing and strong. Petitioner was going to be impeached with evidence of a

13    prior felony conviction and other conduct, and, perhaps, with prior inconsistent

14    statements to the police. Petitioner has failed to demonstrate that the outcome of the

15    trial would have been different if he had testified. People v. Ledesma (1987) 43 Cal.3d

16    171.

17        For the foregoing reasons, this application is denied.

18

19

20    Dated: June 27, 2007

21

22                                        Verna A. Adams

23                                        Judge of the Superior Court

24

25

26

27

28

STATE OF CALIFORNIA )
COUNTY OF MARIN       )

IN RE: **JASON P. VOELKER**

ACTION NO.: **SC146932A**

(PROOF OF SERVICE BY MAIL – 1013A, 2015.5 C.C.P.)

I AM AN EMPLOYEE OF THE SUPERIOR COURT OF MARIN; I AM OVER THE AGE OF EIGHTEEN YEARS AND NOT A PARTY TO THE WITHIN ABOVE-ENTITLED ACTION; MY BUSINESS ADDRESS IS CIVIC CENTER, HALL OF JUSTICE, SAN RAFAEL, CA 94903.  ON **June 28, 2007** I SERVED THE WITHIN ***ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS*** IN SAID ACTION TO ALL INTERESTED PARTIES, BY PLACING A TRUE COPY THEREOF ENCLOSED IN A SEALED ENVELOPE WITH POSTAGE THEREON FULLY PREPAID, IN THE UNITED STATES POST OFFICE MAIL BOX AT SAN RAFAEL, CA ADDRESSED AS FOLLOWS:

| | |
|---|---|
| *JASON P. VOELKER*<br>*CDC#: V-62496*<br>*FOLSOM STATE PRISON*<br>*PO BOX 950*<br>*REPRESA, CA 95671* | *WARDEN*<br>*FOLSOM STATE PRISON*<br>*PO BOX 950*<br>*REPRESA, CA 95671* |
| *ATTORNEY GENERAL*<br>*ATTN: ANYA BINSACCA*<br>*CORRECTIONAL LAW SECTION*<br>*455 GOLDEN GATE AVENUE*<br>*12TH FLOOR*<br>*SAN FRANCISCO, CA 94102* | *MARIN COUNTY DISTRICT ATTORNEY*<br>*ROOM 130*<br><br>*VIA INTER OFFICE DELIVERY* |
| *CALIFORNIA COURT OF APPEAL*<br>*FIRST APPELLATE DISTRICT*<br>*350 MCALLISTER STREET*<br>*SAN FRANCISCO, CA 94102* | *CARL A. GONSER, ESQ.*<br>*PO BOX 151317*<br>*SAN RAFAEL, CA 94915-1317* |

*I CERTIFY (OR DECLARE), UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.*

DATE:     6/28/07

FILED

APR 0 4 2007

KIM TURNER
Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By: _____ Deputy

1

2

3   SUPERIOR COURT OF THE STATE OF CALIFORNIA

4   COUNTY OF MARIN

5

6   In the Matter of the Application of:      )
                                              )   Case No.: SC152013A
7   JASON PAUL VOELKER (V-62496),             )
                   Petitioner,                )   ORDER DENYING PETITION FOR
8                                             )   WRIT OF *HABEAS CORPUS*
    for a Writ of *Habeas Corpus.*            )
9                                             )
                                              )
10  _____)

11      Petitioner is in the custody of the California Department of Corrections and

12  Rehabilitation. In Marin County action SC132406A and SC124701A, he was sentenced

13  to 11 years, 8 months in state prison. He appealed from his conviction in SC132406A

14  and his sentences in both cases, and the verdict and sentences were affirmed by the

15  court of appeals in November, 2005 (case A108798).

16      The court has read and carefully considered Petitioner's application for a writ of

17  *habeas corpus,* filed February 13, 2007, as well as Respondent's informal response,

18  filed March 7, 2007, and Petitioner's informal reply, filed March 26, 2007.

19      In this petition, Petitioner complains of the same alleged trial court errors that are

20  the subject of his appeal in A108798, which has been finally denied.

21      *Habeas corpus* cannot serve as a substitute for an appeal. Issues which have been

22  or which may be litigated on appeal may not be raised on an application for a writ of

23  *habeas corpus.* In re Terry (1971) 4 Cal.3d 911, 927; In re Waltreus (1965) 62 Cal. 2d

24  218, 225.

25      For the foregoing reasons, the petition for a writ of *habeas corpus* is DENIED.

26  Dated:  04·04·07

27                                    Verna A. Adams

28                                    Verna A. Adams
                                      Judge

STATE OF CALIFORNIA )
COUNTY OF MARIN      )

IN RE **JASON PAUL VOELKER**

ACTION NO.: *SCI52013A*

(PROOF OF SERVICE BY MAIL – 1013A, 2015.5 C.C.P.)

I AM AN EMPLOYEE OF THE SUPERIOR COURT OF MARIN; I AM OVER THE AGE OF EIGHTEEN YEARS AND NOT A PARTY TO THE WITHIN ABOVE-ENTITLED ACTION; MY BUSINESS ADDRESS IS CIVIC CENTER, HALL OF JUSTICE, SAN RAFAEL, CA 94903. ON **February 20, 2007** I SERVED THE WITHIN *COPIES OF REQUEST FOR INFORMAL RESPONSE TO PETITIONER'S APPLICATION FOR WRIT OF HABEAS CORPUS* TO ALL INTERESTED PARTIES, BY PLACING A TRUE COPY THEREOF ENCLOSED IN A SEALED ENVELOPE WITH POSTAGE THEREON FULLY PREPAID, IN THE UNITED STATES POST OFFICE MAIL BOX AT SAN RAFAEL, CA ADDRESSED AS FOLLOWS:

| | |
|---|---|
| **JASON PAUL VOELKER**<br>**V-62496**<br>**FOLSOM STATE PRISON**<br>**P.O. Box 950**<br>**FOLSOM, CA 95763** | **WARDEN**<br>**FOLSOM STATE PRISON**<br>**P.O. Box 950**<br>**FOLSOM, CA 95763** |
| **DISTRICT ATTORNEY   (INTER-OFFICE MAIL)**<br>**SUITE 130**<br>**3501 CIVIC CENTER BLVD**<br>**SAN RAFAEL, CA 94913** | |

*I CERTIFY (OR DECLARE), UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.*

DATE: 2/20/07

FILED

AUG 0 4 2006

KIM TURNER
Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By T. Gardner, Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF MARIN

In the Matter of the Application of:

JASON P. VOELKER (V-62496),

                    Petitioner,

for a Writ of *Habeas Corpus.*

Case No.: SC146932A

ORDER DENYING PETITION FOR WRIT OF *HABEAS CORPUS*

     This court has read and considered Petitioner's application for a writ of *habeas corpus*, filed April 10, 2006, Respondents' informal response, filed June 19, 2006, and Petitioner's informal reply, filed July 25, 2006.

     As a preliminary matter, the court agrees with Petitioner's contention that it should liberally construe his pleadings and that his application should be held to less stringent standards than those that are applied to attorneys.

     Petitioner appealed from his conviction, and that conviction was affirmed on November 9, 2005, in case A108798. The specific assignments of error advanced in this application were not asserted in that appeal. Issues which have been or which may be litigated on appeal may not be raised on an application for a writ of *habeas corpus*. In re Terry (1971) 4 Cal.3d 911, 927; In re Waltreus (1965) 62 Cal. 2d 218, 225. This

1   court could deny the pending application on this ground alone, but it prefers to address

2   the issues raised in this application on their merits.

3         In his application, Petitioner contends that:

4         1. His Constitutional rights were violated because his attorney did not call

5              him as a witness to testify in his own defense; he also argues that this is

6              evidence of ineffective assistance of counsel.

7   It is true that a criminal defendant has an absolute right to testify in his own

8   defense, just as he has an absolute right not to be compelled to testify. P. v. Robles

9   (1970) 2 Cal. 3d 205; 5th Amendment, U.S. and California Constitutions. The record at

10  trial makes it clear that this issue was very much under discussion during this trial

11  (outside the presence of the jury, of course), and that a decision was made, to which

12  Petitioner apparently acquiesced, not to call Petitioner as a witness. If Petitioner wished

13  to take the witness stand, he could have demanded to do so, even against his attorney's

14  advice.[1]  He did not do so. He cannot, post-conviction and with 20-20 hindsight, now

15  convert a tactical decision he and his attorney made during trial into Constitutional

16  error.

17        2. His trial counsel neglected to introduce exculpatory evidence (in the form

18             of his telephone records and those of his girlfriend, Raven Oliver), thereby

19             demonstrating ineffective assistance of counsel.

20  While it is true that the phone records were not received into evidence,[2] the jury

21  did hear testimony of Raven Oliver, who referred to those records to refresh her

22  memory. The jury heard Ms. Oliver's testimony, which was impeached with evidence

23  of prior inconsistent statements she had made to D.A. Investigators, and contradicted by

24  other witnesses. Those records are not necessarily exculpatory; moreover, defense

25

26

27  [1] It is noteworthy that in a companion case, P. v. Harvey, SC132842B, Petitioner submitted to a videotaped interview by the Marin County District Attorney relating to the incident that is the subject of his conviction in this case; however, he

28  invoked his 5th Amendment privilege and refused to testify in Mr. Harvey's trial, which took place in January, 2005, subsequent to Petitioner's trial.
[2] To do so would have been error, because no proper foundation was laid.

1  counsel, by using those records to refresh Ms. Oliver's memory, assured that they were
2  brought to the attention of the jury.

3      Petitioner has not convinced this court that the outcome of the trial would have
4  been different if the telephone records had been received in evidence.

5      3. The trial court committed reversible error when it declined to take evidence
6          at the hearing on Petitioner's motion for a new trial (PC §1181).

7      In his motion for a new trial, filed post-verdict pursuant to PC §1181, Petitioner
8  requested the court to consider evidence from two witnesses who had not been called to
9  testify at trial—namely, Zeph Carter and Karlan Brooks. Neither of these persons is an
10 eye witness to the crime. This court declined to hold an evidentiary hearing for the
11 taking of these witness' testimony, citing PC §1181(8). Nothing in Petitioner's
12 application has convinced this court that that ruling was in error.

13     4. The jury's conviction of Petitioner for violations of PC §§211/213 was not
14         supported by substantial evidence.

15     In this portion of his application, citing P. v. Cardona (1983) 142 Cal.App.3d 481,
16 Petitioner suggests that since he was in the process of moving out of his apartment, that
17 apartment was no longer an inhabited dwelling house. That argument is clearly not
18 supported by the evidence at trial.

19     5. Petitioner was denied his right to effective assistance of counsel.

20     Petitioner was vigorously defended by his trial counsel, James Wall, who was
21 assisted by an able investigator, Michael Williams. In order to prevail on an ineffective
22 assistance of counsel argument, Petitioner must not only demonstrate that counsel's
23 representation was deficient, but also that Petitioner was prejudiced as a result, to the
24 extent that the outcome of the trial would have been different had Petitioner been
25 represented by more competent counsel. P. v. Ledesma (1987) 43 C.3d 171. He has not
26 made that showing on this application.

27     6. The entire proceedings were fundamentally unfair.

28

1        It is axiomatic that Petitioner has the burden of establishing a *prima facie* case for

2    relief on each issue presented by him on his application for a writ of *habeas corpus*.

3    People v. Romero (1994) 8 Cal.4th 728, 737; People v. Duvall (1995) 9 Cal.4th 464, 474.

4    Conclusions unsupported by any evidence are insufficient. Based on the foregoing, the

5    issues set forth in this application do not set forth a case for relief in *habeas corpus*.

6        For the foregoing reasons, this application is denied.

7

8

9    Dated:   August 4, 2006

10

11                     Verna A. Adams

                        Verna A. Adams

12                           Judge of the Superior Court

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STATE OF CALIFORNIA )
COUNTY OF MARIN      )

IN RE **JASON P. VOELKER**
ACTION NO.: *SC146932A*
(PROOF OF SERVICE BY MAIL – 1013A, 2015.5 C.C.P.)


I AM AN EMPLOYEE OF THE SUPERIOR COURT OF MARIN; I AM OVER THE
AGE OF EIGHTEEN YEARS AND NOT A PARTY TO THE WITHIN ABOVE-
ENTITLED ACTION; MY BUSINESS ADDRESS IS CIVIC CENTER, HALL OF
JUSTICE, SAN RAFAEL, CA 94903.  ON **August 10, 2006** I SERVED THE WITHIN
***ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS***  IN SAID
ACTION TO ALL INTERESTED PARTIES, BY PLACING A TRUE COPY
THEREOF ENCLOSED IN A SEALED ENVELOPE WITH POSTAGE THEREON
FULLY PREPAID, IN THE UNITED STATES POST OFFICE MAIL BOX AT SAN
RAFAEL, CA ADDRESSED AS FOLLOWS:

| | |
|---|---|
| *JASON P. VOELKER*<br>*V-62496*<br>*FOLSOM STATE PRISON*<br>*P.O. BOX 950*<br>*FOLSOM, CA 95671* | *ATTORNEY GENERAL*<br>*DEPARTMENT OF JUSTICE*<br>*ATT: CORRECTIONAL LAW SECTION*<br>*455 GOLDEN GATE AVENUE*<br>*SUITE 11000*<br>*SAN FRANCISCO, CA 94102-7004* |
| *WARDEN*<br>*FOLSOM STATE PRISON*<br>*FOLSOM, CA 95671* | |

*I CERTIFY (OR DECLARE), UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE*
*STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.*


DATE:   *8/10/06*          _____

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT E:

[Declaration of Jason Voelker].

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

IN RE JASON PAUL VOELKER

      Petitioner,

ON HABEAS CORPUS

No: _____

DECLARATION OF
JASON VOELKER IN
SUPPORT OF PETITION FOR
WRIT OF HABEAS CORPUS

### DECLARATION OF VOELKER

1).     In the month of October 2003, my former roommate, Nick Cruz, and myself decided to move out of our apartment. We both informed the management that we would not be paying the rent for the month of November because we would be vacated by November 1st. By the end of October, Mr. Cruz and myself had moved out of the apartment. Mr. Cruz later moved back in with his mother and I moved into the Holiday Inn in Mill Valley. However, I still had several pieces of furniture, some boxes, and a medical marijuana hydroponics system left at the apartment. These few items were left at the apartment because I could not take them with me to the hotel and I was having a hard time finding a place for them. Although I had left several items at the apartment – as of November 1st, I was no longer living in the apartment. I was in fact residing at the Holiday Inn.

2).     One day, early in the month of November, I made a phone call from my motel room to my defense attorney, James Wall, and told him that I wanted him to remand me

back into custody. (At that time I was out on bail due to a drug arrest and Mr. Wall was my attorney in that case. Also it may be important to note that the pending drug case was the contributing factor that lead to Mr. Cruz and myself splitting ways and vacating the 216 Marin Street apartment.) After I explained to Mr. Wall that I wanted to be remanded, he responded by saying that I sounded like I had been drinking. I admitted that I had been drinking and further went on to tell him that I was so stressed out and depressed about my life and the pending drug case that I couldn't function without drinking. I had lost my girlfriend and the respect of my close friends and family for my involvement with the drugs. Just recently my roommate had decided to renege on our rental agreement because he felt that I would be going to jail and he would be unable to pay the rent without my assistance. My attorney then told me that I should check into a drug treatment program instead of asking the court to remand me. He said that the court would look favorably on such a decision and he felt treatment would really help me. After further discussion, Mr. Wall reminded me that I had a court hearing in a couple of days and that we would talk again then. A couple of days later I showed up to my court date and Mr. Wall put off the proceedings for a later date. He then reminded me to check into rehab. I told him that I would, but I first had to finish moving some items out of my former apartment.

3).    Directly after Court, I began making phone calls to see if I could find someone to take the remainder of my possessions. After talking with my friend, Luke Mann, we decided that we would meet at my old apartment and he would pick up most of my leftover possessions. I also spoke with my ex-girlfriend, Raven Oliver, who said that she would hold on to the remaining items until my legal troubles were fixed. I then asked her if she wanted to spend some time together later that night. She told me to call her when I wasn't busy. I then went to the 216 Marin Street apartment and I began doing some touch-up painting and sterilized the bathroom. A few hours later, Luke Mann appeared with his girlfriend. I asked him if he was ready to carry some stuff to his car, but he said that it would have to wait until the next day. He was driving his

girlfriend's convertible BMW and he couldn't fit the boxes into it. He then promised that he would help me the next day. He and his girlfriend then asked me to go with them to the Matteucci's bar in San Anselmo to play some pool and have a few drinks. I agreed and we ended up going to Matteucci's. While I was at the bar, I ran into an old neighbor, Zeph Carter, who introduced me to man named Damian Diprima. The three of us talked for a while. At one point, Zeph Carter told Damian Diprima that I smoked weed and suggested that I might have some. Damian Diprima asked if I would sell him a twenty sack. I responded that I had some weed, but that it wasn't for sale. I told him that if he bought me a drink, I would smoke some with him. He agreed. After Damian Diprima Bought me a drink, I realized that I had left the marijuana back at the apartment on Marin Street. When I told Damian Diprima that I didn't have any marijuana because I had left it back at the apartment, he tossed his car keys on the table and told me to take his rental car to get it. I replied that I was to drunk to drive and I didn't feel comfortable taking his car. I also said that if he wanted, he could drive me to the apartment and we could smoke there. Damian Diprima liked that idea and said that would work for him. I then found Luke Mann at the bar and told him that I no longer needed a ride. Luke asked if we were still going to meet back at the apartment the next day. I said yes and thanked him in advance for the work that he was going to help me with. I then had a few more drinks and hung out and socialized for a while. At about 1:30 a.m. I found Damian Diprima talking with several people. I briefly interrupted his conversation and asked if he was ready to go. Damian Diprima asked me if we could take some people back to my place. I Was about to, and probably should have, said no, but I realized that I knew the girls and one of the guys. Eventually they all talked me into it. We all decided to meet back at the apartment. The girls had been there before so they knew the way. The guy that I knew (this is the black male referred to through the trial as "Bob Marley") was also familiar with the way to my apartment. So Damian Diprima and I got into his car and heeded to the apartment to meet up with everyone. On the way, we decided to stop off at at 7-Eleven to pick up some beer. When we stopped at 7-Eleven, I asked Damian Diprima if I could use his cell phone to call my

ex-girlfriend, Raven Oliver. With his permission, I called Raven and asked her if she still wanted to meet up; she said yes and told me to call her back when I got to the apartment. Damian Diprima and I then attempted to purchase some beer, but we were told it was to late. We then purchased some food items and went to the apartment. Once we arrived at the apartment, we met the two guys from the bar and learned that the girls had gone somewhere else. Then Damian Diprima "Bob Marley" and I headed upstairs to the apartment. The other guy that was with us, whom I didn't know, said that he would come up in a few minutes when he was finished with something. I'm not sure what he was doing, but I told him the apartment number and told him that he would have to press the intercom system so that I could buzz him up. Once we got upstairs, I passed out some beers leftover from a previous purchase and gave one both to Damian Diprima and "Bob Marley." Then I went and got the marijuana and told "Bob Marley" and Damian Diprima to help themselves. I then headed to the back bedroom to call Raven Oliver. When I got on the line with Raven Oliver, I told her that I was at the Marin Street apartment and asked if she wanted to meet up. She said that she did and we continued to have a conversation. At one point, she interrupted me and asked what was going on in the apartment. I didn't notice at first, but then I realized that there was a whole lot of yelling coming from the living room. I told Raven that I would call her back after I found out what was going on. (This phone call was never even mentioned in my trial.) I hung up the phone and I went into the living room. I saw "Bob Marley" and the other black youth yelling at Damian Diprima, calling him a racist and threatening to beat him up. That's when I stepped in to try and calm things down and figure out what was going on.

4).    "Bob Marley" and the other youth started telling me that Damian Diprima, who is white, called both of them, who are black, "niggers." Damian Diprima immediately explained that he didn't mean it in a derogatory way and apologized for saying it. Damian Diprima explained that he was from Minnesota and had a lot of black friends. He hadn't meant any offense. Damian Diprima explained that it was common to talk

that way. At one point I asserted that I didn't believe Damian Diprima to be a racist and I thought that he was "cool." I then told everyone that we would have to leave because they were being too loud and we weren't even supposed to be in the apartment. They said that they would be quitter. I then rolled a marijuana cigarette for the four of us to smoke. While the three of them were smoking I returned to the back bedroom to redial my ex-girlfriend, Raven Oliver. When she answered, she asked what had happened. I explained that it was just a misunderstanding and that everything was now fine.

5).     Raven and I then engaged in a conversation. All of a sudden I started hearing a thumping sound followed by the sound of someone yelling "help!" I told Raven Oliver that I would call her back. I hung up and ran out to the living room. When I got out to the living room I saw Damian Diprima's necklace being flung to the floor as he and "Bob Marley" were exchanging blows and the other black youth was swinging a belt buckle at Damian Diprima. I immediately intervened by jumping in the middle of the melee. I remember grabbing "Bob Marley" and somehow we ended up falling to the floor. When I looked up I could see the other black male kicking Damian Diprima in the head. At that point, I could see blood all over the place and I thought that I had seen a knife. When I got up I could see Damian Diprima on his feet as well. At this point "Bob Marley" wasn't fighting anymore, but all of a sudden, the other black youth came out of nowhere with a fire log and bashed it against the side of Damian Diprima's head. Damian Diprima stumbled threw the living room and then started running towards the deck and jumped off the the third story balcony.

6).     At that point everything seemed to be in slow motion. I felt paralyzed. I could hear the black males talking, but I couldn't make anything out. I was completely frozen for what seemed like an eternity, but was really only a few seconds. I snapped out of it and ran down the four flights of stairs (three stories plus a parking garage) to find Damian Diprima lying in the dirt just a few feet away from a retaining wall. At first I was horrified because he looked as though he was dead. Then I noticed he was slightly

moving. I ran out to him and found that he was breathing. I then told him not to move and I was going to call him an ambulance.

7).    Damian Diprima then started screaming "help" and he said, "don't hit me."
I responded by saying, "hey look, its me, Jason. I'm not going to hit you."
In the background I could hear people saying, "what's going on down there?" and "were calling the police."

8).    Looking back, I wish I had made a different decision, like waiting for the police, or calling the police myself. Perhaps I could have even driven Damian Diprima to the hospital myself, but I did none of these things. Instead, out of fear and having had too much to drink, I didn't know what to do. I fled the scene with Damian Diprima. I helped him over the fence that led towards the street. Once on the street, Damian Diprima fled north and I fled east. He fled from the assault of his two attackers and I fled out of paranoia that any more police contact while out on bail would equal a definite prison sentence on my drug case. I wasn't even supposed to be at that apartment that night, technically, and I had previously been threatened with an eviction. So I fled. I decided to go straight to Raven Oliver so she could take me to my motel room in Mill Valley. When I found her, she asked what was happening and how I'd gotten there. I told Raven Oliver that something really bad had happened at the apartment and someone had been stabbed. (I later learned that no one had been stabbed.) I then asked her to drive me to to the apartment before we went to my motel room. Back at the apartment, I found blood all over the living room and dining room walls. I washed the blood off of the walls and then asked Raven Oliver to drive me back home for the night. Once we arrived at my motel room, it was nearly 4:45 a.m. and we were exhausted and fell asleep. In the morning, I told Raven Oliver that we had to get back to the Marin Street apartment so I could meet with Luke Mann and finish moving out the remaining items. When we returned to the apartment, I started moving the last of the furniture out. Luke Mann arrived and we carried down an entertainment system to his car. Upon reaching the

parking garage, I was approached by San Rafael detectives, Pata and Martin, and was taken to the police station. At the police station, Detective Pata asked me to tell him what happened the night before. I told Detective Pata the whole story, up until the assault.

9).     I Was afraid to tell on the the two guys that beat up Damian Diprima, so I lied and said that I had left before the assault had occurred. Detective Pata told me that he was going to take me to jail unless I told him who the two black guys were that beat up Damian Diprima. Again I lied and said that I didn't know. Detective Pata then had me booked at the Marin County Jail. While in the county jail, my defense attorney, James Wall, visited with me. After going over my story several times, Mr. Wall advised me against taking a deal on this case because I hadn't committed a crime. He also stated that he was going to push a speedy trial because he did not want either of the two black perpetrators at my trial as co-defendants. He felt that their presence would be prejudicial to his efforts.

10).     As far as trial strategy was concerned, my defense counsel, Mr. Wall, told me that after talking with his friend, Public Defender David Brown (whom he considered a mentor), he felt that the only way my defense would be successful would be if I testified and told my side of the facts to a jury. Mr. Wall further explained that the phone records, in collaboration with my testimony, would prove my innocence. At other times, Mr. Wall made this point more definitively by stating that my successful defense was contingent on my phone records and testimony. I came to agree with Mr. Wall and told him that I definitely wanted to testify.

11).     Mr. Wall did tell me that he had a concern about my testimony. His concern was that I had previously lied to Detective Pata. He therefore asked me to write him with exactly what I remembered telling Detective Pata. He also asked me write down on a separate piece of paper what I had told my ex-girlfriend, Raven Oliver. In this way he

would be able to iron out any inconsistencies before I took the stand.

12).    Sometime during that same period, Mr. Wall told me that he was going to have Public Defender David Brown visit with me to conduct a mock cross examination in order to prepare my trial testimony. For reasons unknown to me, that visit never happened. When I asked about the visit with Public Defender David Brown, Mr. Wall told me that he was going to have his attorney friend from San Francisco conduct the mock cross examination. Ultimately, this visit never took place either.

13).    Throughout the trial, there were many discrepancies. For instance, the prosecution argued that Damian Diprima was beaten during the first seconds of entering the apartment, but this is not true. During the first ten minutes, Damian Diprima was hanging out drinking beer and smoking marijuana. In fact, there's no way I could have been assaulting Damian Diprima in the first minute, because I was in the back room on the phone with my ex-girlfriend, Raven Oliver, during the first four minutes. However this state of events and this first phone call from the apartment at 2:24 a.m. was never even mentioned in the trial.

14).    Also, the prosecutor alleged that the "n" word incident took place at the bar and the two black males and I hatched a plan to lure Damian Diprima to the apartment to assault and rob him. This is absolutely false. First of all, If I had in fact planned to rob Damian Diprima, I would like to think that I would have at least been a smart enough robber to have 1) stolen the twenty-thousand dollar rental vehicle he had offered to lend me, 2) never used his cell phone to call a number that be traced back to me, 3) never gone into a 7-Eleven store with him to buy beer while being monitored on film, 4) never would have taken him to be robbed and assaulted in an apartment where the walls were paper thin and any such activity would be sure to be heard, and 5) never taken him to be robbed in a place where I had thousands of dollars worth of hydroponics marijuana growing. As far as the "n" word incident is concerned, Damian Diprima

actually used this racially charged word in the apartment, which more than likely precipitated the two black males beating him up.

15).    Throughout this trial there were many other inconsistencies as well. For that reason, Mr. Wall and I both knew that I would have to testify so I could help clarify the record. I would have testified to my presence at the scene of the crime, without aiding and abetting it, which is corroborated by the phone records. Later, as the trial was winding down to its final stages, the judge asked the defense if I would be testifying. Having already confirmed my desire to testify, defense counsel James Wall informed the court that I would in fact be testifying. That was the end of the day's proceedings and we were scheduled to return the following day for my testimony. Before I was escorted back to the county jail for the night, Mr. James Wall told me that he would come visit with me so we could go over my testimony. However, he never showed up for that visit.

16).    The next morning, I was escorted back to court. Upon entering the courtroom, to my surprise and against my wishes, Mr. James Wall rested the case without calling me as a witness. If I had known what I know now, i.e., that I had a constitutionally protected right to testify and that I could have overridden Mr. Wall's last-second decision to keep me from the stand, I would have disregarded counsel's admonishment that I was to never speak directly to the court and I would have interrupted the trial proceedings and told the court that I wanted to testify.

17).    Shortly after, the case went to the jury for the deliberations. While I was waiting on the jury to come back with a verdict, the trial judge called the prosecution and defense back into the courtroom and informed us that the jury requested to see the phone records.

18).    Again, to my surprise, Mr. James wall responded by saying that we didn't have

the certified phone records, so the jury's request was denied. At this point I became frantic. I remember thinking that I was doomed.

19).    Mr. Wall had consistently told me that my successful defense was contingent upon my testimony and phone records and now he hadn't presented either to the jury. When I returned to the jail holding tank, I cried frantically because I already knew that without the phone records and my testimony, the verdict was one of guilty. Soon thereafter, the jury came back and announced a guilty verdict on all counts.

I declare under the penalty of perjury under the laws of the state of California that the forgoing is true and correct.

Executed this ⎯12⎯ day of July, 2006, at Folsom, California.

_____
Jason P. Voelker

Original Declaration
written on Dec. 18, 2005.
[Rev. July 27, 2006]



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT F:

[Transcript of In Camera Hearing re attorney conflict].

1

1     IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

2         FIRST APPELLATE DISTRICT A103798

3                   ---oOo---

4                                           COPY

5   THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                           )
6            Plaintiff and Respondent,     )
                                           )
7       vs.                                )    Marin County
                                           )    Superior Court
8   JASON PAUL VOELKER,                    )    Case No. SC132406A
                                           )
9            Defendant and Appellant.      )
                                           )
10  _____

FILED
Court of Appeal First Appellate District

APR 2 0 2005

Diana Harbert, Clerk
_____Deputy Clerk

11

12

13                  SEALED

14

15      APPEAL FROM THE SUPERIOR COURT OF MARIN COUNTY

16      HONORABLE VERNA A. ADAMS, JUDGE PRESIDING

17

18         REPORTER'S TRANSCRIPT ON APPEAL

19              DECEMBER 22, 2004

20     IN CAMERA HEARING RE ATTORNEY CONFLICT

21

22     ** SEALED BY ORDER OF THE COURT **

23

24

25

26

27  Reported by:
    SUSAN L. FITZSIMMONS
28  CSR No. 4369

2

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF MARIN

---oOo---

HON. VERNA A. ADAMS, JUDGE                        DEPARTMENT J


THE PEOPLE OF THE STATE OF CALIFORNIA, )
                                       )
                          Plaintiff,   )
                                       )
     vs.                               )    No. SC132406A
                                       )
JASON PAUL VOELKER,                    )
                                       )
                          Defendant.   )
_____)



REPORTER'S TRANSCRIPT OF PROCEEDINGS

DECEMBER 22, 2004

IN CAMERA HEARING RE ATTORNEY CONFLICT


** SEALED BY ORDER OF THE COURT **






APPEARANCES:

For the Defendant:          JAMES WALL
                            Attorney at Law
                            4240 Civic Center Drive
                            San Rafael, California



Reported by:
SUSAN L. FITZSIMMONS
CSR No. 4369

3

1    WEDNESDAY, DECEMBER 22, 2004                9:27 O'CLOCK A.M.

2                              ---oOo---

3              (Whereupon, the following proceedings were held

4              in camera in the courtroom:)

5              THE COURT:  In the case of People versus Voelker,

6    the record will reflect that the courtroom has been cleared,

7    the door is locked, the only people present are court

8    personnel, Mr. Voelker and Mr. Wall.

9              And I'm ordering court personnel not to disclose to

10   anybody anything that's said in this session.

11             I'm ordering no transcript to be prepared unless

12   ordered by me or by a higher court.

13             Mr. Wall, in view of the timing and the

14   circumstances of this case, please tell me the nature of the

15   conflict that has recently arisen between you and Mr. Voelker.

16             MR. WALL:  I went in to -- to see Mr. Voelker

17   yesterday afternoon right before I came to -- to the Court,

18   and Mr. Voelker expressed and made statements about he felt

19   like that I was dumping him, that I was not acting in his best

20   interests, and that I haven't been since I started

21   representing him.

22             There were things that Mr. Voelker said to me that I

23   believe make it so I am hesitant to defend him, because some

24   of the statements that were made were quite personal, and I

25   always have trepidation when people express feelings towards

26   me of personal dislike.

27             THE COURT:  Okay.  Do you concur with that,

28   Mr. Voelker?

1      THE DEFENDANT:  Can I say something, your Honor?

2      THE COURT:  Sure.

3      THE DEFENDANT:  I just wanted to say, ever since the

4  whole motion for new trial thing, the ties between me and

5  Mr. Wall have been strained.  And I have been telling him I'm

6  very disappointed in him, and the thing is there's things that

7  I've asked Mr. Wall to do that he hasn't done.  I gave him a

8  list of references from the community of people that I wanted

9  him to contact, he never contacted them.

10      Also, the whole approach -- the whole defense in the

11  trial thing, I disagreed from the start.  I really was leery

12  of the whole speedy trial thing, especially with Mr. Wall

13  taking care of a sick family member in a different part of the

14  state at the same time while dealing with my trial.  I didn't

15  want to do that, but I also wanted to testify.  I wasn't given

16  that chance either.

17      I've been disagreeing with a lot of the defense

18  strategy, I feel I wasn't really a part of it, I was really

19  alienated from the whole strategy.  The strains have been --

20  it's definitely been awkward for both of us ever since the

21  motion for new trial on the grounds of ineffective assistance

22  of counsel.

23      And also -- and ever since Mr. Wall has been

24  reappointed to my case, it has been awkward between the both

25  of us.  But as far as sentencing goes, he -- I feel that he

26  hasn't really been working with me or the outside community as

27  far as helping me with references.

28      THE COURT:  Well, in this case I have, gosh,

5

1  something in the neighborhood -- I mean, the letters of

2. reference, certificates, materials I've been given compare

3  favorably with the Marin County phone book.

4        I am mildly puzzled at the contention that

5  preparation for sentencing hasn't been properly completed.

6        It's not unusual, if a case is tried and the verdict

7  is against the interests of the defendant, for the defendant

8  to feel some concern about whether he was properly

9  represented.  Ineffective assistance of counsel is clearly

10  grounds for appeal in this state.  Whether that's grounds for

11  substitution of counsel on the eve of sentencing is something

12  that I'm not at all sure of.  So, Mr. Wall, you're going to

13  have to talk me into that.

14        MR. WALL:  Judge, I --

15        THE COURT:  My tentative ruling is to deny this

16  request.

17        MR. WALL:  I understand.

18        I don't come to the Court -- there are many times

19  when there are disagreements between counsel and their -- the

20  defendants, I -- I understand that.  And I don't come to the

21  Court lightly, because almost all the time the people who are

22  being sentenced disagree with what's going on, and they

23  manifest it towards us primarily.

24        I just think that the way that the conversation went

25  yesterday -- he doesn't trust me.  And if he doesn't trust me,

26  and there's an ineffective assistance of counsel claim, which

27  I think is valid here, on an appeal, I -- I firmly do believe

28  that's a valid claim, I don't think it's fair -- I don't think

1  it's fair to him for him to not know that I have given a

2  hundred percent.  If there's any trepidation in him that I

3  haven't given a hundred percent, then it's not fair to him.

4          And I -- I don't -- I didn't want to come to this

5  Court and do this.  I anticipated going there and talking

6  about what we were going to do, but what went on in the

7  holding cell yesterday made me say, "Look, something's not

8  right here."

9          And if the defendant doesn't think that the lawyer

10 is fighting for him, and there may be something subconscious

11 or unconscious in me too, because I believe that I made a huge

12 mistake, if that is there, I don't want him to be the person

13 who loses because of that.  I'm the one who should lose

14 because of that, that's on me, as an attorney.  Jason

15 shouldn't lose.

16          And if -- and if there's any inkling that that's

17 there -- I can't say whether it is or it isn't, but I can also

18 say that I feel very guilty, and I felt like I did

19 inadequately do part of my job in this trial.  I'm not going

20 to get into tactics or anything else like that because that's

21 not an issue to me, what's an issue is the relationship -- is

22 the relationship broken down so much that I don't think I can

23 represent him?  Yes.

24          THE COURT:  Okay.  Is the matter submitted?

25          MR. WALL:  Yes.

26          THE COURT:  All right.  This case has been set for

27 receipt of the probation report and imposition of sentence six

28 times since September 15th, 2004.  At no time until late

 1   yesterday was I told that there was a conflict such that new

 2.  counsel had to be appointed.

 3          I don't find that there's any problem between Mr.

 4   Voelker and Mr. Wall that isn't to be expected when a case is

 5   tried to a jury and a verdict against the defendant is

 6   received.

 7          This has gone on for far too long.  I do not find

 8   good grounds for finding a conflict, the motion is denied.

 9          Please open the courtroom, Miss Peterson, we'll get

10   on with the sentencing.

11          MR. WALL:  I -- I just need to put on the record

12   that I feel like I'm in a Catch 22 here.

13          THE COURT:  You've made that clear.  I've ruled.

14          MR. WALL:  Could we at least have -- could I at

15   least have a moment?

16          THE COURT:  Just a moment, we're opening the

17   courtroom.

18          Would you like me to pass the matter so you can talk

19   to Mr. Voelker?

20          MR. WALL:  Well, I'd like some time now because --

21          THE COURT:  We'll deal with the request for a

22   continuance in open court.

23          MR. WALL:  That's fine.

24          (Whereupon, at the hour of 9:36 o'clock a.m.,

25           the in camera hearing re attorney conflict

26           was concluded.)

27                      ---oOo---

28

8

<u>REPORTER'S CERTIFICATE</u>

STATE OF CALIFORNIA )
                     )   ss.
COUNTY OF MARIN      )

      I, SUSAN L. FITZSIMMONS, CSR No. 4369, do hereby
certify that I am an official shorthand reporter of the
Superior Court of the State of California, in and for the
County of Marin, and that as such I was present and reported
in stenotype the proceedings had in the within-entitled matter
at the time and place therein set forth, consisting of the in
camera hearing proceedings re attorney conflict held on
December 22, 2004, consisting of 8 pages, and that the same is
a full, true and correct transcription of said stenotype notes
as taken by me in said matter.

      DATED:  San Rafael, California, this 8th day of
February, 2005.




/S/ SUSAN L. FITZSIMMONS
SUSAN L. FITZSIMMONS, CSR NO. 4369

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT G:

[Post-trial procurement of Raven Oliver's phone records].

# **T** · **·Mobile**·
## Get more from life

Law Enforcement Relations Group

T-Mobile USA, Inc.
12920 SE 38th St
Bellevue, WA 98006
(425) 378-6011 Fax: (425) 378-6050

June 11, 2004

Atty. Mary A. Stearns
Attorney at Law
4340 Redwood Hwy., Suite F-119
San Rafael, CA 94903

Dear Atty. Stearns:

This is in response to the subpoena issued pursuant to §21 U.S.C.876, dated June 2, 2004, and served upon T-Mobile USA, Inc. June 2, 2004. This subpoena requests customer identification/account information and Call Detail Records for the T-Mobile subscriber assigned mobile telephone number **(415) 299-0234**.

A search of our subscriber database discloses the following information:

|  |  |
|---|---|
| Account Number: | **262902210** |
| Subscriber Account Name: | **RAVEN OLIVER** |
| Date of Birth: | **07/14/1983** |
| Social Security Number: | **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** |
| Address: | **1943 LAS GALLINAS AVE** |
|  | **SAN RAFAEL, CA 94903-1743** |
| Home Telephone: | **(415) 472-2337** |
| Work Telephone: | **(415) 459-4354** |
| IMSI: | **310260310138686** |
| Date Account Established: | **08/28/2002** |
| Service Plan | **MONTHLY - INDIVIDUAL** |
| Current Status | **ACTIVE** |
| Disconnect Date | **N/A** |
| Last Refill Date |  |

☐ Call Detail Records are provided on the pages which follow.
☐ Call Detail Records are presently being compiled.
☐ Original materials follow via US Mail.

Should you have any questions regarding this information please feel free to contact me at your convenience. My direct telephone number is: **(425) 378-6331**.

Very truly yours,

Heather Mayberry, Analyst
Law Enforcement Relations Group

File: 2004-036382

E-1

Statement For:   EN OLIVER
Mobile Number:  (415) 299-0234
Account Number:  262902210

Customer Service Number   1-800-937-8997

Dec 07, 2003

## LOCAL AIRTIME, LONG DISTANCE and INTERNATIONAL CHARGES

| Date | Call Destination | Time | Number Called | Call Type | Minutes | Airtime Charges | | Toll Charges | | Additional Charges | | Total | |
|------|------------------|------|---------------|-----------|---------|-----------------|--|--------------|--|--------------------|--|-------|--|
| 11/05/03 | Incoming | 11:06 AM | 415-571-3085 | | 1 | $ | - | $ | - | $ | - | $ | - |
| 11/05/03 | San Fran, CA | 12:09 PM | 415-571-3085 | | 1 | $ | - | $ | - | $ | - | $ | - |
| 11/05/03 | San Fran, CA | 12:12 PM | 415-571-3085 | | 2 | $ | - | $ | - | $ | - | $ | - |
| 11/05/03 | Incoming | 12:13 PM | 415-571-3085 | | 4 | $ | - | $ | - | $ | - | $ | - |
| 11/05/03 | Incoming | 1:01 PM | 510-224-8641 | | 2 | $ | - | $ | - | $ | - | $ | - |
| 11/05/03 | Incoming | 1:05 PM | 415-571-3085 | | 5 | $ | - | $ | - | $ | - | $ | - |
| 11/05/03 | San Fran, CA | 1:16 PM | 415-571-3085 | | 1 | $ | - | $ | - | $ | - | $ | - |
| 11/05/03 | San Rafael, CA | 1:24 PM | 415-459-7063 | | 1 | $ | - | $ | - | $ | - | $ | - |
| 11/05/03 | San Fran, CA | 1:26 PM | 415-571-3085 | | 1 | $ | - | $ | - | $ | - | $ | - |
| 11/05/03 | Incoming | 1:27 PM | 415-459-7063 | | 1 | $ | - | $ | - | $ | - | $ | - |
| 11/05/03 | Incoming | 1:28 PM | 415-459-7063 | | 1 | $ | - | $ | - | $ | - | $ | - |
| 11/05/03 | Incoming | 1:38 PM | 415-573-8641 | | 1 | $ | - | $ | - | $ | - | $ | - |
| 11/05/03 | San Rafael, CA | 2:32 PM | 415-459-7063 | | 1 | $ | - | $ | - | $ | - | $ | - |
| 11/05/03 | Incoming | 7:06 PM | 415-459-7063 | | 3 | $ | - | $ | - | $ | - | $ | - |
| 11/05/03 | Incoming | 9:14 PM | 415-847-8126 | | 2 | $ | - | $ | - | $ | - | $ | - |
| 11/05/03 | Incoming | 9:32 PM | 415-203-7424 | | 2 | $ | - | $ | - | $ | - | $ | - |
| 11/05/03 | San Fran, CA | 9:50 PM | 415-203-7424 | | 2 | $ | - | $ | - | $ | - | $ | - |
| 11/05/03 | Incoming | 9:55 PM | 415-455-8126 | | 1 | $ | - | $ | - | $ | - | $ | - |
| 11/05/03 | Incoming | 10:05 PM | 415-455-8128 | | 1 | $ | - | $ | - | $ | - | $ | - |
| 11/05/03 | San Rafael, CA | 10:19 PM | 415-455-8128 | | 2 | $ | - | $ | - | $ | - | $ | - |
| 11/05/03 | Incoming | 10:28 PM | 415-455-8128 | | 1 | $ | - | $ | - | $ | - | $ | - |
| 11/05/03 | San Rafael, CA | 11:59 PM | 415-455-8128 | | 3 | $ | - | $ | - | $ | - | $ | - |
| 11/06/03 | Incoming | 12:04 AM | 415-459-7063 | | 2 | $ | - | $ | - | $ | - | $ | - |
| 11/06/03 | San Rafael, CA | 1:50 AM | 415-459-7063 | | 2 | $ | - | $ | - | $ | - | $ | - |
| 11/06/03 | San Rafael, CA | 4:09 AM | 415-459-7063 | | 1 | $ | - | $ | - | $ | - | $ | - |
| 11/06/03 | Incoming | 5:15 PM | 415-459-7063 | | 1 | $ | - | $ | - | $ | - | $ | - |
| 11/06/03 | San Rafael, CA | 5:35 PM | 415-459-7063 | | 1 | $ | - | $ | - | $ | - | $ | - |
| 11/06/03 | Incoming | 5:48 PM | 415-459-7063 | | 1 | $ | - | $ | - | $ | - | $ | - |
| 11/06/03 | Incoming | 7:07 PM | 415-459-7063 | | 4 | $ | - | $ | - | $ | - | $ | - |
| 11/06/03 | San Fran, CA | 9:13 PM | 415-571-3085 | | 4 | $ | - | $ | - | $ | - | $ | - |
| 11/06/03 | Incoming | 9:39 PM | 415-459-7063 | | 2 | $ | - | $ | - | $ | - | $ | - |
| 11/06/03 | Incoming | 9:55 PM | 415-459-7063 | | 3 | $ | - | $ | - | $ | - | $ | - |
| 11/06/03 | Incoming | 10:03 PM | 415-927-1767 | | 5 | $ | - | $ | - | $ | - | $ | - |
| 11/06/03 | Incoming | 10:08 PM | 415-459-7063 | | 1 | $ | - | $ | - | $ | - | $ | - |
| 11/07/03 | Incoming | 2:24 AM | 415-459-7063 | | 3 | $ | - | $ | - | $ | - | $ | - |
| 11/07/03 | Incoming | 2:36 AM | 415-459-7063 | | 1 | $ | - | $ | - | $ | - | $ | - |

Call Type: (A) Call Waiting (B) Call Forward (C) Conference Call (E) Data/Fax (F) Mobile2Mobile (G) Voicemail (H) Free Calls

(I) Internat'l Call (K) WPS Call

E-2

Statement For:    RAVEN OLIVER
Mobile Number:    (415) 299-0234
Account Number:    262902210

**Customer Service Number    1-800-937-8997**

Dec 07, 2003

## LOCAL AIRTIME, LONG DISTANCE and INTERNATIONAL CHARGES - (Continued)

| Date | Call Destination | Time | Number Called | Call Type | Minutes | Airtime Charges | Toll Charges | Additional Charges | Total |
|------|------------------|------|---------------|-----------|---------|-----------------|--------------|--------------------|-------|
| 11/07/03 | San Rafael, CA | 2:53 AM | 415-459-7063 | | 1 | $ - | $ - | $ - | $ - |
| 11/07/03 | Cortmadera, CA | 4:35 AM | 415-927-9007 | | 1 | $ - | $ - | $ - | $ - |
| 11/07/03 | Cortmadera, CA | 4:36 AM | 415-927-9007 | | 1 | $ - | $ - | $ - | $ - |
| 11/07/03 | San Rafael, CA | 12:40 PM | 415-302-4638 | | 4 | $ - | $ - | $ - | $ - |
| 11/07/03 | Cortmadera, CA | 12:46 PM | 415-927-9007 | | 1 | $ - | $ - | $ - | $ - |
| 11/07/03 | San Fran, CA | 12:47 PM | 415-596-4421 | | 1 | $ - | $ - | $ - | $ - |
| 11/07/03 | San Fran, CA | 12:59 PM | 415-571-3085 | | 1 | $ - | $ - | $ - | $ - |
| 11/07/03 | San Fran, CA | 1:00 PM | 415-571-3085 | | 1 | $ - | $ - | $ - | $ - |
| 11/07/03 | Incoming | 1:01 PM | 415-571-3085 | | 21 | $ - | $ - | $ - | $ - |
| 11/07/03 | Incoming | 2:28 PM | 415-725-4489 | | 1 | $ - | $ - | $ - | $ - |
| 11/07/03 | San Fran, CA | 2:54 PM | 415-571-3085 | | 1 | $ - | $ - | $ - | $ - |
| 11/07/03 | Incoming | 10:30 PM | 415-491-1005 | | 3 | $ - | $ - | $ - | $ - |
| 11/07/03 | Incoming | 10:46 PM | 415-424-5705 | | 2 | $ - | $ - | $ - | $ - |
| 11/08/03 | San Rafael, CA | 1:32 PM | 415-847-8126 | | 2 | $ - | $ - | $ - | $ - |
| 11/08/03 | San Fran, CA | 1:34 PM | 415-425-0699 | (F) | 2 | $ - | $ - | $ - | $ - |
| 11/08/03 | Cortmadera, CA | 2:56 PM | 415-927-1767 | | 1 | $ - | $ - | $ - | $ - |
| 11/08/03 | Incoming | 3:35 PM | 415-573-8641 | | 2 | $ - | $ - | $ - | $ - |
| 11/08/03 | Incoming | 3:37 PM | 415-302-4638 | | 2 | $ - | $ - | $ - | $ - |
| 11/08/03 | San Rafael, CA | 3:39 PM | 415-455-8128 | | 1 | $ - | $ - | $ - | $ - |
| 11/08/03 | Incoming | 4:34 PM | 510-224-8641 | | 4 | $ - | $ - | $ - | $ - |
| 11/08/03 | San Fran, CA | 8:50 PM | 415-609-4851 | | 1 | $ - | $ - | $ - | $ - |
| 11/08/03 | Incoming | 9:18 PM | 415-573-8641 | | 1 | $ - | $ - | $ - | $ - |
| 11/08/03 | San Fran, CA | 9:23 PM | 415-573-8641 | | 1 | $ - | $ - | $ - | $ - |
| 11/08/03 | San Rafael, CA | 9:24 PM | 415-256-9007 | | 1 | $ - | $ - | $ - | $ - |
| 11/08/03 | San Rafael, CA | 9:25 PM | 415-256-9007 | | 1 | $ - | $ - | $ - | $ - |
| 11/08/03 | San Rafael, CA | 10:40 PM | 415-847-8126 | | 1 | $ - | $ - | $ - | $ - |
| 11/08/03 | Petaluma, CA | 10:40 PM | 707-769-1495 | | 4 | $ - | $ - | $ - | $ - |
| 11/08/03 | Incoming | 11:06 PM | 415-927-1767 | | 5 | $ - | $ - | $ - | $ - |
| 11/09/03 | Incoming | 9:39 AM | 510-224-8641 | | 1 | $ - | $ - | $ - | $ - |
| 11/09/03 | San Rafael, CA | 10:31 AM | 415-472-7235 | | 1 | $ - | $ - | $ - | $ - |
| 11/09/03 | San Fran, CA | 10:32 AM | 415-573-8641 | | 3 | $ - | $ - | $ - | $ - |
| 11/09/03 | San Fran, CA | 1:11 PM | 415-424-5705 | | 2 | $ - | $ - | $ - | $ - |
| 11/09/03 | Incoming | 1:15 PM | 415-424-5705 | | 2 | $ - | $ - | $ - | $ - |
| 11/09/03 | San Fran, CA | 2:04 PM | 415-424-5705 | | 1 | $ - | $ - | $ - | $ - |
| 11/09/03 | San Fran, CA | 2:05 PM | 415-424-5705 | | 1 | $ - | $ - | $ - | $ - |
| 11/09/03 | San Fran, CA | 2:06 PM | 415-424-5705 | | 1 | $ - | $ - | $ - | $ - |

Call Type: (A) Call Waiting (B) Call Forward (C) Conference Call (E) Data/Fax (F) Mobile2Mobile (G) Voicemail (H) Free Calls

(I) Internat'l Call (K) WPS Call

E3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT H:

[Jim Wall Declaration].

1  MARY A. STEARNS (SBN 136078)
   4340 Redwood Hwy, Suite F-119
2  San Rafael, CA 94903
   (415) 479-5677
3
   Attorney for Defendant
4  JASON VOELKER

5
                IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
6
                         FOR THE COUNTY OF MARIN
7

8
   THE PEOPLE OF THE STATE OF              Case No. SC132406A
9  CALIFORNIA,
                                           DECLARATION IN SUPPORT
10          Plaintiff,                     OF MOTION FOR A NEW
                                           TRIAL
11       v.

12  JASON VOELKER

13  _____/

14
   I, James Wall, do declare under a penalty of perjury the following:
15

16      1. I was appointed to represent Jason Voelker in the above-entitle matter. I went to

17  trial on behalf of Mr. Voelker in February of this year.

18      2. I concluded that a telephone call by my client to Raven Oliver on the night in

19  question would be exculpatory evidence for my client. I saw Raven's phone bill and it

20  showed the particular call. I had Raven Oliver willing to testify, but because of her bias for

21  my client, I decided that documentary evidence would be necessary for my client's defense..

22

23      3. Trial began on February 5th. It continued on the 6th, 9th, 10th, 13th, 17th, 19th, 20th

24  , 23rd, and 24th of February.

25      3. I prepared a subpoena duces tecum on February 5, 2004. I remember sending it out

26  after that date, but am not certain as to when. My records indicate that I sent out the

27  subpoena and a letter on February 12, 2004. (See attachments).

28


                                      D-1

1    4. Several times during trial, I looked for the subpoenaed records, but they did not

2  arrive.  I did not seek a continuance to get the records or check on their status.

3

4

5

6  Dated: 6-17-04                                       _James Wall_____

7                                                       James Wall

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

D- 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT I:

[Karlan Brooks Interview].

# GARETY & ROGERS
Lic. PI13615

(415) 258-1880
1363 Lincoln Avenue, Suite 7

(415) 258-1868 FAX
San Rafael, CA 94901

June 1, 2004

MARY ALICE STEARNS
Attorney at Law
4340 Redwood Hwy., Ste. F-119
San Rafael, CA 94903

RE: People v. Jason VOELKER
Our File No. 04-051

Interview with KARLAN BROOKS
c/o Marin County Jail

Karlan BROOKS was interviewed May 20, 2004 at Marin County Jail by Denise
Garety. BROOKS is currently incarcerated on a domestic violence charge and is
represented by attorney Jim Wall. Mr. Wall earlier gave his permission to speak with his
client about Jason VOELKER's case.

BROOKS said he was a former neighbor of VOELKER's when the two lived at
an apartment building located at 216 Marin Street, San Rafael. BROOKS said and he and
his girlfriend, Tracy ALLISON, lived in apartment #106 which was directly below
VOELKER's apartment #306.

BROOKS said on November 7, 2003 in the early morning hours he and
ALLISON were in bed sleeping when they were awoken by "a lot of noise coming from
right above us. It went on for about 20 minutes. We could hear voices and it sounded like
some fighting." BROOKS said he could not distinguish what was being said above him
and was only able to characterize the fighting sounds as "a kind of thumping noise."

After about 20 minutes of listening to the commotion going on above them,
BROOKS and ALLISON got out of bed and went out onto their balcony to check out the

C-1

situation above them. As soon as they stepped outside they saw "a guy flying off the balcony upstairs into the trees." BROOKS estimated the time to be somewhere between 1:00 a.m. and 3:00 a.m. BROOKS said "the guy flying through the trees landed in the yard next door. He was laying there for a minutes and crying out 'call an ambulance, I'm hurt.'"

BROOKS then saw VOELKER, who he knew by sight as living above him but said the two had never spoken, "come out from under the garage area and run up to the guy who had flown off the balcony. BROOKS heard VOELKER ask the man lying on the ground "Are you alright? Do you need an ambulance?" BROOKS did not hear the man respond but said "he got up and took off running."

BROOKS said it was very dark and difficult to see where the man ran to. He also said "there was no light to tell where the guy went over the balcony." BROOKS believes he saw VOELKER go back toward the garage area after the man took off running.

BROOKS said after the incident he smoked a cigarette and he and ALLISON went back to bed. He said the police may have knocked on their door later that morning but he is not sure. BROOKS has not been contacted by anyone regarding his observations until our interview May 20, 2004.

BROOKS said he had been in jail for about a week when he and VOELKER recognized each other as former neighbors. BROOKS asked VOELKER why he was in jail and when he learned it involved the incident in which he and ALLISON saw a man go over the balcony he told VOELKER that he and ALLISON had seen some of what happened.

C-2

BROOKS said VOELKER asked him if he would be willing to speak with his attorney or investigator and did not ask him to say anything that wasn't true.

BROOKS provided ALLISON's telephone number as 415/261-2898. He said that at the time of the incident involving the man flying over the balcony he and ALLISON had been living at the apartment building for approximately two years.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT J:

[Michael Williams Declaration].

Voelker's 28 U.S.C. § 2254 EXHIBITS

1  MARY A. STEARNS (SBN 136078)
   4340 Redwood Hwy, Suite F-119
2  San Rafael, CA 94903
   (415) 479-5677
3
   Attorney for Defendant
4  JASON VOELKER

5

6          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

7                     FOR THE COUNTY OF MARIN

8

9  THE PEOPLE OF THE STATE OF                Case No.  SC132406A
   CALIFORNIA,
10                                           DECLARATION IN SUPPORT
              Plaintiff,                     OF MOTION FOR A NEW
11                                           TRIAL
          v.
12
   JASON VOELKER
13  _____/

14

15  I, Mike Williams, do declare under penalty of perjury the following:

16      1. I was the investigator for the above-entitled case and worked for Mr. James Wall

17  on behalf of Jason Voelker.

18      2. I went to the home of Zeph Carter several times in November, 2003, to speak with

19  Zeph Carter. I knew that he lived in Fairfax with his father and was a coach at a local school.

20  On 11/28/03, I ran into him on his way to work.  He was very cordial and gave a phone

21  number for me to use.  He did not have time to talk because of his work.   I did not get an

22  interview of any substance at this time.  I had no inkling that he would be uncooperative in

23  the future.  I also did not know what information he possessed.

24      3. Later, I tried to use the phone number, but it was no good.  Thereafter, I went to

25  his home multiple times, including but not limited to the following occasions:  12/04/03;

26  12/07/03; 12/28/03; 1/7/04; 1/8/04; and 1/18/04.

27      3.  I spoke to Mr. Carter's father, Mike Smith, on 1/8/04 and 1/18/04 to request

28  assistance in finding Mr. Carter.

    4.  The above-outlined efforts were not fruitful.  I never saw Zeph Carter again after

                                    B-1

1  11/28/03.

2     5.  I attempted to interview one person at the apartment building, the assistant

3  apartment manager, on 1/19/04 and 1/20/04, and actually spoke with her on 1/20/04. I was

4  not requested to interview any other apartment dwellers and did not speak with anyone by the

5  name of Karlan Brooks.

6

7

8  Dated: 6/16/04                                    Mike Williams

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

B-2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT K:

[Teston Harvey Declaration].

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


IN RE JASON PAUL VOELKER

      Petitioner,

No: _____


ON HABEAS CORPUS

DECLARATION OF
TRISTAN HARVEY IN
SUPPORT OF PETITION FOR
WRIT OF HABEAS CORPUS


### DECLARATION OF HARVEY

1.    I am a prisoner incarcerated in Folsom California. I am currently

serving a nine year sentence for the same crime that Mr. Voelker is serving time for,

i.e., I am Mr. Voelker's supposed "crime associate" in the trial that is subject to this

appeal.


2.    I am well aware that in the case of (People v. Voelker, Marin County

Case No: SC12406A), Mr. Voelker's defense team knew that Zeph Carter held

exculpatory information that would have exonerated Mr. Voelker. I am also aware

that Mr. Voelker made an effort to retrieve Carter from a Court ordered program so

that he could exonerate Mr. Voelker. I further know that the Court denied Mr.

Voelker's attempts and Carter never testified on behalf of Mr. Voelker.


-1-

3.      In my case, (*People v. Harvey*, Marin County Case No: SC132841A), the District Attorney believed that Zeph Carter held information that would incriminate me. Ultimately, in my trial the District Attorney and the Court facilitated Carter's damaging testimony against me.


4.      I am writing this declaration because I do not believe it is fair or proper for the Court to pick and choose when Mr. Carter can incriminate one man and not exonerate the other.


I declare under the penalty of perjury under the laws of the state of California that the forgoing is true and correct.

Executed this 29 day of July, 2006, at Folsom, California.

Tristan Harvey

2

## DECLARATION OF SERVICE BY UNITED STATES MAIL

I, Jason Paul Voelker, do hereby declare:

I am a citizen owing loyalty to entitled to the protections of the United States of America. I am 26 years old; I am a party to the within action; my legal address is California State Prison, Folsom, P.O. Box 950, Represa, California 95673.

On _____ 3-2-08 _____, I served the within:

### PETITIONER'S LODGED EXHIBITS

on the following interested persons in said action by delivering a true copy thereof enclosed in an envelope to prison staff addressed as follows:

**CALIFORNIA ATTORNEY GENERAL'S OFFICE**
ATTN: Jeremy Friedlander (State Bar No. 125138), Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004

I am readily familiar with the prison's practice of collection and processing correspondence for legal mailing. It is normally deposited with the U.S. Postal Service within a "reasonable amount of time" in the ordinary course of business.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated: 3-2-08

_____
Jason Paul Voelker