United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JASON P. VOELKER,                       No. C 08-1285 CW (PR)

          Petitioner,

     v.                                 ORDER DENYING PETITION FOR WRIT
                                        OF HABEAS CORPUS; DENYING
M.C. KRAMER, Warden,                    CERTIFICATE OF APPEALABILITY

          Respondent.

_____/

INTRODUCTION

     Petitioner Jason P. Voelker, a state prisoner incarcerated at
the Sierra Conservation Center in Jamestown, California, seeks a
writ of habeas corpus under 28 U.S.C. § 2254 challenging his
criminal convictions and sentence from Marin County Superior Court.

     On August 22, 2008, this Court issued an Order to Show Cause
why the writ should not be granted.  On February 20, 2009,
Respondent filed an Answer.  On April 21, 2009, Petitioner filed a
Traverse.

1    Having considered all of the papers filed by the parties, and

2  for the following reasons, the Court DENIES the Petition.

3                              BACKGROUND

4    The following procedural background and summary of the facts of

5  Petitioner's commitment offenses is derived from the November 9,

6  2005 state appellate court opinion[1] affirming the judgment of the

7  trial court.

8        Defendant was convicted following a jury trial
         of first degree robbery in concert (Pen. Code, §§
9        211, 213, subd. (a)(1)(A)),FN1, assault by means
         likely to cause great bodily injury (§ 245, subd.
10       (a)(1)), and false imprisonment by violence (§ 236).
         The jury also found that defendant personally
11       inflicted great bodily injury upon the victim
         (§ 12022.7, subd. (a)) in association with the
12       robbery and assault offenses.  Defendant claims in
         this appeal that the trial court erred by failing to
13       give a voluntary intoxication instruction, and gave
         an erroneous instruction on infliction of great
14       bodily injury.  He also challenges the evidentiary
         support for the great bodily injury enhancement
15       finding, and complains that the enhancement was
         improperly reinstated by the trial court after it
16       was dismissed by the prosecution.  We find that no
         prejudicial instructional errors occurred, the great
17       bodily injury enhancement finding is supported by
         the evidence, and the dismissed enhancement was
18       properly reinstated to correct a clerical error.  We
         therefore affirm the judgment.

19

20                     STATEMENT OF FACTS

21       The victim, Damian Diprima, encountered
         defendant at Matteucci's bar in San Anselmo on the
22       night of November 6, 2003.  Defendant was sitting at
         a poker table in the bar with a man named Zeph
23       Carter, whom Diprima had also met that night.
         Diprima described Carter as a "Black male, five
24       nine," between 160 and 170 pounds.  Diprima
         testified that he was introduced by Carter to
25       defendant, who was a "White male," about "six one,

26
         ─────────────────
27       [1]  This was submitted by Respondent as Exhibit G and will
     hereinafter be referred to as "Opinion."

28                              2

six two, 170 pounds, with a "fade" haircut, wearing
a black hooded sweatshirt and a large diamond
earring. They briefly conversed and drank beer.

During the course of their conversation,
defendant asked if Carter and Diprima "wanted weed."
Diprima replied that he "would take a 20 sack."
Defendant stated that he "had to go to his apartment
to get it," about four or five blocks away, and
asked Diprima for a ride. Diprima declined to drive,
but offered defendant his car and put the keys on
the table.  Defendant did not take the keys, so
Diprima took them back and went to the rear patio
area to smoke a cigarette.

When Diprima returned to the crowded bar area
to get another beer, defendant was seated there.
Diprima put his hand on [Petitioner's] shoulder and
said, "Hey, nigga, let me get in here."  Diprima
considered the word "nigga" as a term of
"endearment," but defendant exhibited a negative
facial reaction to the remark.  A "black male"
seated next to defendant, referred to by Diprima as
"Bob Marley" for a "Bob Marley patch" on the "green
Fidel Castro type army hat" he wore, FN2, also took
offense to Diprima's use of the "N word" and
declared, "That's not right."  Diprima apologized,
and explained that he "didn't mean it like that."
After a short discussion, Diprima bought a beer and
walked away from the bar.

"Maybe an hour later," defendant approached
Diprima to ask for a ride home and a loan of $5 for
a drink.  Diprima gave defendant $5 from the bills
he kept in a money clip in his pocket, and agreed to
drive him home.  They again parted until about 1:30
or 1:40 a.m., when Diprima told defendant he wanted
to leave and asked if he still wanted a ride.
Defendant said, "Yeah, in a minute," so Diprima went
outside to wait.  Defendant was also intermittently
outside the bar, "talking to different people," one
of them Bob Marley, who was standing with a "mulatto
guy" Diprima described as "six one, six two,
somewhat slim," with freckles and curly hair,
wearing a baseball hat, jeans, and running shoes.
FN3. Defendant "may" have gone back inside the bar
momentarily with the "mulatto guy," although Diprima
testified that he was not paying close attention.

Diprima told defendant, "I'm gonna leave, if
you want a ride, let's go."  They finally left the
bar together in Diprima's rented car about 1:45 or

3

1:50 a.m.  On the way to [Petitioner's] apartment
they stopped at a 7-Eleven store.  Diprima bought
cigarettes, and they both bought food which they
heated in a microwave oven and ate on the premises.
Defendant attempted to buy beer, but the clerk told
him, "You're too late."  After defendant made a
telephone call on a cell phone, they proceeded to
his apartment, about three or four minutes away.

Diprima accepted defendant's invitation to come
up to his apartment.  Diprima parked his car in the
apartment complex garage and accompanied defendant
through a metal door into an elevator.  Suddenly,
the elevator stopped, Bob Marley jumped inside,
spoke briefly with defendant, then "jumped back out
of the elevator."  Diprima was uneasy; he felt he
"was being set up" and was in danger of being
attacked.  He asked defendant, "What's going on?"
Defendant assured Diprima not to "worry about it."
When the elevator stopped, Diprima accompanied
defendant into his apartment, although he remained
very fearful.

As Diprima walked out onto the balcony he
thought he was "screwed."  Diprima then walked back
into the living room, whereupon Bob Marley and the
"mullato" [sic] guy wearing a baseball cap "came
through the kitchen area and attacked" him.
Defendant was already in the room. Diprima fell to
the floor, where he was punched and kicked
repeatedly.  He was screaming for them the [sic]
stop and attempting to remain conscious.  Diprima
testified that he covered his head during the attack
and could hardly see, but was sure defendant must
have kicked or punched him five to ten times.

Then defendant placed a "choke hold" on Diprima
from behind while Bob Marley grabbed his arm and
forcibly removed his watch.  As defendant continued
to apply a choke hold to Diprima, the other two men
removed his shoes, socks and belt, and "went
through" his pockets to take keys, a cell phone and
money clip.  The mullato [sic] guy struck Diprima 15
to 20 times with the belt, and angrily asked for
Diprima to produce his credit cards.  Bob Marley
broke a chain off Diprima's neck.

When someone yelled, "Get the knife," Diprima
managed to struggle out of the choke hold, but was
"being kicked again."  Someone, Diprima "believed it
was the mulatto guy," stomped him on the head.
Diprima managed to scramble to his feet.  The

4

mulatto guy grabbed a Duraflame log and "whacked" Diprima "in the head" with it.  Diprima then jumped onto a computer table, and from there leaped onto defendant.  Diprima and defendant struggled before Diprima spun around and ran for the balcony.  Once on the balcony, Diprima grabbed onto the banister, extended his arms, and dropped to the ground below.

Diprima landed on his feet, but cracked his chin with his knee.  He rolled or crawled, then ran for a short distance before he reached a ledge.  There Diprima encountered someone, it "might have been" defendant, with whom he struggled before he jumped off the 8- to 10-foot ledge into a yard.  He ran down a hill to the street, then "kept running" to the bottom of the hill.

In the street Diprima managed to flag down a taxi driver.  Diprima told the driver he wanted to be taken to his home, which was about a mile away, rather than the hospital.  The taxi driver testified that Diprima was "almost comatose," without shoes or a shirt, and "bleeding profusely," but did not seem intoxicated or "on drugs."

Once he reached his home Diprima told his girlfriend Melinda Swanson, "Pack your bags, we're gonna get out of here right now."  Diprima feared that his assailants, who had taken his driver's license, would come to their home and kill them.  Swanson noticed that Diprima was "really dirty," his "face was pretty swollen," blood was "coming out from his mouth and chin," he had scrapes elsewhere on his body, and "a lot of whip marks on his back."

Within five minutes of Diprima's arrival, he and Swanson left their house and drove to the home of a friend, Kofi Darko, in San Francisco.  During the drive to San Francisco and at Darko's residence Diprima related "bits and pieces" or a "rough sketch" "about what transpired" and why he was beaten.  Diprima was reluctant to go to the hospital, but was convinced by Swanson and Darko that he needed treatment.

At San Francisco General Hospital Diprima was treated for his wounds:  two black eyes, a nasal fracture, a severe bruise to his left thumb, serious lacerations on his right scalp and chin, a laceration to his left inner thigh, abrasions on his back, a burn mark across his neck, and bruises over essentially his entire body.  He received five

5

staples for the wound on his head and sutures for
the laceration on his chin.

Meanwhile, San Rafael police officers were
dispatched to defendant's apartment in response to
911 calls of a disturbance and screams for "help"
there.  The officers entered the apartment about
2:50 a.m. with the assistance of the apartment
complex manager after they received no response to
their knocking on the locked front door.  The
apartment was unoccupied.  What appeared to be
dried, splattered blood was visible on the wall and
floor of the left side of the dining room. Several
chairs and a small table had been knocked over in
the center of the living room, and it looked "like
there might have been a struggle."  Marijuana plants
and a medical marijuana license were observed in the
residence.  The blood stains did not appear to be
fresh, so the officers did not think a physical
altercation had recently occurred in the apartment.
They secured the premises and left.

Later that day, Diprima appeared at the San
Rafael police station with Swanson for an interview
with investigating officers Raffaello Pata and Wanda
Spaletta.  FN4.  During the interview Diprima failed
to disclose to the officers that he "used the N
word" or offered to purchase marijuana from
defendant.  FN5.  He also did not state to the
officers that defendant hit or kicked him during the
assault.

The following day Diprima went with the officers
to defendant's apartment.  Diprima remained quite
fearful as they reached the apartment complex in the
police vehicle, and was reluctant to "go up there" to
defendant's apartment.  Diprima's rental car was
still in the parking lot where he left it.  As
Diprima was showing the officers the hill he "ran
down" following his leap from the balcony, they
discovered the "Bob Marley hat" on the sidewalk.

While Diprima was standing with the officers in
the apartment complex parking lot he suddenly became
"very anxious" and declared, "That's him," referring
to defendant, who was walking out of the apartment
complex with a friend.  When queried, Diprima added,
"That's the guy that beat me up."  He then quickly
returned to the police vehicle as the officers
briefly questioned defendant. Defendant was
subsequently arrested.

1

2    Around midnight the investigating officers
     returned to defendant's apartment to conduct a search

3    pursuant to a warrant.  Diprima's silver chain
     necklace was located on a computer table in the

4    living room, but none of the other personal
     belongings he claimed were taken during the attack

5    were found.  The blood seen by an officer on the wall
     the day before was "gone," and appeared to have been

6    "washed off."  "[S]wipe marks" were visible where
     efforts were made to "clean the wall."  Although a

7    "majority" of the blood had disappeared, traces of
     dried blood drops were still visible on the linoleum
     floor.

8    The investigating officers subsequently
     exhibited a group of six photographs to Diprima.

9    Among them was the photograph of Tristan Harvey,
     whom Diprima positively identified as the assailant

10   with the "Fidel Castro style army hat" he referred
     to as "Bob Marley."  From a separate photo lineup

11   Diprima also tentatively identified a man named
     Vijay Kelly as the third assailant. Kelly was

12   arrested, but never charged in the case.

13   FN1.  All further statutory references are to the
     Penal Code unless otherwise indicated.

14

15   FN2. We will also refer to him as Bob Marley, as the
     parties did at trial.  Diprima testified that Bob
     Marley wore a black jacket and black shirt, along

16   with diamond earrings, and was five nine, five ten
     tall.

17

18   FN3. Again, following the designation used by the
     parties at trial, we will refer to this unidentified
     man as the "mulatto guy."

19

20   FN4. Swanson and Diprima had spoken to the police
     earlier by telephone.

21

22   FN5. Diprima explained, "I didn't want to make myself look
     bad" or divert the "focus" of the interview away from the
     assault.

23

24   People v. Voelker, No. A108798, 2005 WL 2995811 at *1-4 (Cal. Ct.

25   App.); Opinion at 2-7 (footnotes in original).  Petitioner's

26   petition for review to the California Supreme Court was denied on

27   January 18, 2006.

28                                  7

On April 10, 2006, Petitioner filed the first of two habeas petitions in state superior court. The court denied this petition in an order dated August 4, 2006 (2006 Order). Petitioner sought review of this denial in the state appellate court on September 19, 2006. The appellate court denied the petition on October 12, 2006.

Petitioner then asked the state supreme court for review of this denial on October 24, 2006. On January 3, 2007, the California Supreme Court denied all of Petitioner's claims except his claim that he had received ineffective assistance of counsel because his attorney had not called him at the trial to testify on his own behalf. The Supreme Court granted Petitioner's petition for review on this claim and directed the appellate court to (1) vacate its order denying the petition and (2) order the Director of the California Department of Corrections and Rehabilitation to show cause in superior court why Petitioner would not be entitled to relief on his claim of ineffective assistance of counsel. On January 5, 2007, the appellate court vacated its order and issued an order to show cause.

On February 15, 2007, the superior court ordered an evidentiary hearing, which was held on June 21, 2007. Ex. O. Following the hearing, on June 28, 2007, the superior court issued an order denying Petitioner relief. Ex. P (2007 Order).

Two days before the superior court ordered an evidentiary hearing on his first habeas petition, Petitioner filed a document in superior court that was construed as a second habeas petition, challenging a jury instruction, a challenge that the appellate court

8

previously rejected on direct appeal.  Ex. N; <u>People v. Voelker</u>,

2005 WL 2995811 at *6-8.  On February 20, 2007, the superior court

issued an order stating that Petitioner had made a prima facie claim

for habeas relief.  This habeas petition was denied by the superior

court on April 4, 2007.  Ex. N; Doc. #2-3 at 9-10.

On September 25, 2007, Petitioner filed an appeal with the

appellate court, which consolidated both of his state habeas cases.

This appeal was denied by the appellate court on December 27, 2007.

Petitioner sought review of this decision by the state supreme court

on January 4, 2008.  The supreme court summarily denied the petition

on February 13, 2008.

Petitioner then petitioned the United States Supreme Court

for a writ of certiorari on March 20, 2008.  The Court denied this

petition on June 23, 2008.

Petitioner filed a federal habeas petition with this Court on

March 5, 2008.

LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996

(AEDPA), codified under 28 U.S.C. § 2254, provides "the exclusive

vehicle for a habeas petition by a state prisoner in custody

pursuant to a state court judgment, even when the petitioner is not

challenging his underlying state court conviction."  <u>White v.</u>

<u>Lambert</u>, 370 F.3d 1002, 1009-10 (9th Cir. 2004).  Under AEDPA, this

Court may entertain a petition for habeas relief on behalf of a

California state inmate "only on the ground that he is in custody in

violation of the Constitution or laws or treaties of the United

9

1   States."   28 U.S.C. § 2254(a).

2        The writ may not be granted unless the state court's

3   adjudication of any claim on the merits:  "(1) resulted in a

4   decision that was contrary to, or involved an unreasonable

5   application of, clearly established Federal law, as determined by

6   the Supreme Court of the United States; or (2) resulted in a

7   decision that was based on an unreasonable determination of the

8   facts in light of the evidence presented in the State court

9   proceeding."  28 U.S.C. § 2254(d).  Under this deferential standard,

10  federal habeas relief will not be granted "simply because [this]

11  [C]ourt concludes in its independent judgment that the relevant

12  state-court decision applied clearly established federal law

13  erroneously or incorrectly.  Rather, that application must also be

14  unreasonable."  <u>Williams v. Taylor</u>, 529 U.S. 362, 411 (2000).  In

15  <u>Harrington v. Richter</u>, the Court further stressed that "'an

16  <u>unreasonable</u> application of federal law is different from an

17  <u>incorrect</u> application of federal law.'"  131 S. Ct. 770, 785 (2011)

18  (citing <u>Williams</u>, 529 U.S. at 410) (emphasis in original).  "A state

19  court's determination that a claim lacks merit precludes federal

20  habeas relief so long as 'fairminded jurists could disagree' on the

21  correctness of the state court's decision."  <u>Id.</u> at 786 (citing

22  <u>Yarborough v. Alvarado</u>, 541 U.S. 653, 664 (2004)).

23       While circuit law may provide persuasive authority in

24  determining whether the state court made an unreasonable application

25  of Supreme Court precedent, the only definitive source of clearly

26  established federal law under 28 U.S.C. § 2254(d) rests in the

27

28                                  10

holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. <u>Williams</u>, 529 U.S. at 412; <u>Clark v. Murphy</u>, 331 F.3d 1062, 1069 (9th Cir. 2003).

The state court decision to which 28 U.S.C. § 2254 applies is the "last reasoned decision" of the state court. <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-804 (1991); <u>Barker v. Fleming</u>, 423 F.3d 1085, 1091-1092 (9th Cir. 2005). Although <u>Ylst</u> primarily involved the issue of procedural default, the "look through" rule announced there has been extended beyond that particular context. <u>Barker</u>, 423 F.3d at 1092 n.3 (citing <u>Lambert v. Blodgett</u>, 393 F.3d 943, 970 n.17 (9th Cir. 2004) and <u>Bailey v. Rae</u>, 339 F.3d 1107, 1112-1113 (9th Cir. 2003)). When the state court gives no reasoned explanation of its decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law. <u>Plascencia v. Alameida</u>, 467 F.3d 1190, 1197-1198 (9th Cir. 2006).

Even if a petitioner meets the requirements of § 2254(d), habeas relief is warranted only if the constitutional error at issue had a substantial and injurious effect or influence in determining the jury's verdict. <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 638 (1993). Under this standard, petitioners "may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" <u>Brecht</u>, 507 U.S. at 637, citing <u>United States v. Lane</u>, 474 U.S. 438, 439 (1986).

11

DISCUSSION

Petitioner raises eight claims in his Petition.  Respondent denies all of Petitioner's claims.  Each claim is analyzed below.

I.   Ineffective Assistance Of Counsel Claims

Petitioner claims that his trial counsel rendered ineffective assistance to Petitioner when he: (1) failed to call Petitioner to testify on his own behalf; and (2) failed to introduce allegedly exculpatory evidence at trial.

A.   Legal Standard

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984).  The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.  Id.

In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must establish two things.  First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms.  Strickland, 466 U.S. at 687-688. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable

12

probability is a probability sufficient to undermine confidence in the outcome.  Id.

B.    Failure to Permit Petitioner to Testify

Petitioner claims that it was ineffective assistance for his trial counsel to prevent him from testifying.  The last reasoned state court decision on Petitioner's claim of ineffective assistance of counsel with regard to counsel's failure to permit Petitioner to testify is the 2007 Order.  The superior court provided the following reasoned analysis of Petitioner's claim:

> At the June 21 [, 2007 evidentiary] hearing, Petitioner called as a witness Chief Assistant Public Defender David Brown, who testified that before trial he had discussed with Petitioner's trial counsel, James Wall, ongoing strategy issues, including whether Petitioner would take the witness stand in his own defense.  As far as Mr. Brown knew, the decision whether to call Petitioner as a witness had not been made.  Mr. Brown testified that at that time, he had agreed that, if needed, he would role-play as a prosecutor and cross-examine Petitioner to help prepare him to testify.  Mr. Brown testified that these discussions about mock cross-examination occurred before the trial began, and that at no time before or during the trial was he called upon to help prepare Petitioner to testify.
>
> Attorney Mary Stearns, an experienced criminal defense attorney, testified that she had prepared and argued Petitioner's motion for a new trial.  She did not contend in that motion that a new trial should be granted to Petitioner because he had not been called to testify in his own defense.  She stated that her "factual summary" in connection with a request for monies for an investigator included the following:
>
>> There are a few more issues: like that defendant wanted to testify and [his attorney] said he would on many occasions, but on day that he was to testify, [his attorney] told him not to as defendant had not gotten any sleep the night before.

Ms. Stearns testified that in her experience with
him, Petitioner told her forthrightly of his
concerns; he was not shy or withdrawn.

Both Mr. Brown and Ms. Stearns testified that
Mr. Wall was a zealous, aggressive advocate for his
criminal defense clients.

Petitioner testified that Mr. Wall had told him
all along that he had to testify and that they had
to present an affirmative defense.  He said that
a[s] the defense case was nearing its conclusion,
Mr. Wall told the court that Petitioner would be the
final defense witness.  At that point, court
recessed for the day.  Petitioner testified that Mr.
Wall did not come to visit him in the jail that
evening.  The next morning, Petitioner told Mr. Wall
that he had not slept the night before.  When court
convened the next morning, Mr. Wall rested his case
without calling Petitioner.  Petitioner testified
that when he heard that, he was upset.  He asked his
attorney, "What are you doing, what's going on?  I
wanted to testify," and his attorney replied, "Hold
on."  Petitioner did not ask for a recess so that he
could confer with counsel, and he did not speak out.
He explained that by stating that he had been
admonished never to address the court unless spoken
to.

On cross-examination, Petitioner admitted that
his attorney had done a very good job of cross-
examining the victim for three days, and that he had
managed to bring out many details in the victim's
testimony that were apparently inconsistent.
Petitioner conceded that he had not raised the issue
of his desire to testify in his motion for a new
trial or at any time before the sentencing hearing.

Petitioner went on to recapitulate the
testimony he would have given had he been called as
a witness.

Petitioner did not call his trial counsel,
James Wall, as a witness at this evidentiary
hearing.

The only witness for the Respondents was
Attorney Ashley Worsham, who prosecuted Petitioner
for the Marin County District Attorney's Office.
Ms. Worsham testified that Mr. Wall is a zealous,
very aggressive advocate.  Ms. Worsham testified

14

that although she was of course not privy to
conversations between Petitioner and Mr. Wall, she
noticed during the trial that Petitioner was active,
involved, and participating.  He took lots of notes
and had many whispered consultations with his
counsel.  The court had ruled that if Petitioner
testified in his defense, the People could impeach
his credibility with evidence of a prior felony
conviction and an arrest for an offense involving
moral turpitude.  Petitioner had given a statement
to the San Rafael Police Department; the court had
excluded it from the prosecutor's case in chief as
having been obtained in violation of Petitioner's
<u>Miranda</u> rights.  The issue of whether and to what
extent those statements could be used to impeach
Petitioner had not been ruled on.  Ms. Worsham did
not observe Petitioner express dissatisfaction with
Mr. Wall's decision not to call him.  He did not ask
to address the court or request a recess.  She also
expressed her opinion that the evidence against
Petitioner was strong, that this was not a close
case.

The official record of this trial reveals that
as the trial was nearing its conclusion, the court
noted, out of the jury's presence and in the
presence of Petitioner and both counsel, that the
defense had not decided whether to call defendant as
a witness and that if defendant were to testify, "we
have some <u>Castro</u> and <u>Wheeler</u> issues that we have to
deal with" (RT 1195).  There is no indication in the
record that Petitioner or his counsel disagreed when
the court noted that the defense had not yet decided
whether to call Petitioner as a witness.  The next
morning, when court convened, the court asked if the
defense would be calling any more witnesses.  Mr.
Wall replied: "The defense is satisfied with the
case, the evidence, and we rest."  (RT 1206).
Petitioner says that he remonstrated with his
attorney about this decision.  None of this alleged
colloquy was observed by the prosecutor or by the
court.  None of it was on the record.  Petitioner
did not address the court about his desire to
testify, nor did he request (or ask his attorney to
request) a recess.

DISCUSSION

Viewing the evidence proffered by Petitioner at
this evidentiary hearing in the light most favorable
to Petitioner, it demonstrates that Petitioner's
taking the stand in his own defense was under active

15

discussion until the close of the defense case, at which time Petitioner's counsel made a decision not to call Petitioner as a witness, and that Petitioner acquiesced, perhaps reluctantly, in that strategy decision.  Petitioner has not proven that he did not accede to his attorney's decision not to call him as a witness.

Petitioner was under an obligation <u>timely</u> to assert his right to be called as a witness.  <u>People v. Robles</u>, (1970) 2 Cal.3d 205, 215.  Like Mr. Guillen, Petitioner in this case "did not apprise the court he desired to testify at any time during the trial proceeding when the right could have been accorded him, instead he waited until an adverse verdict was rendered against him before advising the court he had really wanted to take the stand after all, then demanded [a] new trial – another chance before a new jury – on the ground his counsel had 'deprived' him of his right" (<u>People v. Guillen</u>, <u>supra</u>, 37 Cal.App.3d 976, 985-985).

<u>Habeas corpus</u> is civil in nature.  Petitioner has the burden of proving the truth of his contentions by a preponderance of the evidence. Attorney James Wall is a percipient witness of whether Petitioner indeed stated a desire to testify in his own defense.  Petitioner could have called his trial counsel, James Wall, as a witness at this evidentiary hearing, but he did not do so.  Under these circumstances, Petitioner's testimony should be viewed with distrust.  Evidence Code § 412.

If, <u>arguendo</u>, Petitioner had testified at this trial, he has not convinced this court that the outcome of the trial would have been more favorable to Petitioner.  Notwithstanding some contradictions among witnesses, the evidence against Petitioner was convincing and strong.  Petitioner was going to be impeached with evidence of a prior felony conviction and other conduct, and, perhaps, with prior inconsistent statements to the police.  Petitioner has failed to demonstrate that the outcome of the trial would have been different if he had testified. <u>People v. Ledesma</u> (1987) 43 Cal.3d 171.

2007 Order at 2-6.

Petitioner claims trial counsel was ineffective because he did not permit Petitioner to testify as a witness on his own behalf.

16

Respondent argues that Petitioner's right to testify on his own behalf was forfeited when Petitioner failed to object at trial after not being called as a witness by counsel.

Because the Marin County Superior Court, on remand from the California Court of Appeal, held an evidentiary hearing and issued a reasoned opinion on this claim, this claim has been adjudicated on the merits in state court.  <u>Barker</u>, 423 F.3d at 1092.  Thus, this Court is bound by the Superior Court's determination, unless that court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); <u>Williams</u>, 529 U.S. at 411.  After a careful review of the record, and as set forth below, the Court finds that the state superior court's conclusion that trial counsel did not render ineffective assistance when he did not call Petitioner as a witness was not contrary to, nor did it involve an unreasonable application of, clearly established federal law, and it was not based on an unreasonable determination of the facts.  <u>See</u> 28 U.S.C. § 2254(d); <u>Williams</u>, 529 U.S. at 411; <u>Strickland</u>, 466 U.S. at 686.

First, trial counsel's performance was not objectively unreasonable.  <u>Strickland</u>, 466 U.S. at 687-88.  His choice not to call Petitioner as a witness was reasonable, in that the record indicates that calling Petitioner to the stand may have jeopardized

his defense.  2007 Order at 6.  According to the record, potentially damaging impeachment evidence could have been introduced by the prosecutor had Petitioner testified, including evidence of a prior felony conviction, evidence of an arrest involving moral turpitude, and possible evidence of prior inconsistent statements to the police.  2007 Order at 3-6.  Such evidence would likely have been prejudicial to Petitioner.  Because not calling Petitioner as a witness was a reasonable tactical strategy, counsel's performance did not fall below an objective standard of reasonableness, and thus was not deficient under Strickland.  Strickland, 466 U.S. at 687-688.

Second, even if trial counsel's failure to call Petitioner as a witness was deficient performance, Strickland, 466 U.S. at 687-688, Petitioner cannot demonstrate that counsel's performance was prejudcial to him, i.e. that the outcome of his trial would have been different had he been able to testify.  Id. at 694.  According to Superior Court Judge Verna A. Adams, who presided over the evidentiary hearing on this claim and also presided at Petitioner's criminal proceedings, Petitioner's testimony on his own behalf would have been overshadowed by the "convincing and strong" evidence against him.  2007 Order at 6.  Therefore, it is unlikely that the outcome of Petitioner's trial would have been different had he testified.  Moreover, the superior court's decision was not based on an unreasonable determination of the facts in light of the evidence presented at the state proceedings.  28 U.S.C. § 2254(d); Williams, 529 U.S. at 411.

18

1    Finally, Petitioner was obliged under California law to object

2  timely to his counsel's decision to not call him as a witness at

3  trial.  See People v. Robles, 2 Cal. 3d 205, 215 (1970).  The

4  evidence shows that, although he had ample opportunity to do so,

5  Petitioner did not protest, either to Mr. Wall at the trial or to

6  the judge, after he was not called as a witness at trial.  Because

7  Petitioner cannot demonstrate that the state court's decision

8  denying this claim was unreasonable, see 28 U.S.C. § 2254(d);

9  Williams, 529 U.S. at 411; Strickland, 466 U.S. at 686, this claim

10  must be denied.

11    C.    Failure To Introduce Potentially Exculpatory Evidence

12    Petitioner maintains that phone records, in particular the

13  record of a one-minute phone call made from his apartment at 2:36

14  a.m. on the night in question, should have been offered into

15  evidence by his counsel.  According to Petitioner, evidence of the

16  phone call would have been exculpatory, because it would have

17  contradicted evidence that he had been engaged in an assault on

18  Dipalma at that time.

19    The last reasoned state court decision on Petitioner's claim of

20  ineffective assistance of counsel with regard to his failure to

21  introduce allegedly exculpatory evidence is the Marin County

22  Superior Court opinion of August 4, 2006.  The superior court

23  provided the following reasoned analysis of Petitioner's claim:

24         In his application [for state habeas relief],
         Petitioner contends that: . . .
25
           2.    His trial counsel neglected to introduce
26               exculpatory evidence (in the form of his
               telephone records and those of his
27

28                                    19

girlfriend, Raven Oliver), thereby
demonstrating ineffective assistance of
counsel.

While it is true that the phone records were
not received into evidence,FN2, the jury did hear
testimony of Raven Oliver, who referred to these
records to refresh her memory.  The jury heard Ms.
Oliver's testimony, which was impeached with
evidence of prior inconsistent statements she had
made to D.A. Investigators, and contradicted by
other witnesses.  Those records are not necessarily
exculpatory; moreover, defense counsel, by using
those records to refresh Ms. Oliver's memory,
assured that they were brought to the attention of
the jury.

Petitioner has not convinced this court that
the outcome of the trial would have been different
if the telephone records had been received in
evidence.

FN2. To do so would have been error, because no
proper foundation was laid.

2006 Order at 2-3 (footnote in original).

Petitioner cannot demonstrate that the state court's reasoned

decision was contrary to, or involved an unreasonable application

of, clearly established United States Supreme Court law.  Nor can he

demonstrate that the state court's factual findings were

unreasonable.

A court need not determine whether counsel's performance was

deficient before examining the prejudice suffered by the defendant

as the result of the alleged deficiencies.  See Strickland, 466 U.S.

at 697; Williams v. Calderon, 52 F.3d 1465, 1470 & n.3 (9th Cir.

1995) (approving district court's refusal to consider whether

counsel's conduct was deficient after determining that petitioner

could not establish prejudice).  Here, even if it were deficient

performance for Petitioner's counsel to have failed to introduce the

20

phone records, there is no showing of prejudice.  As the state court reasonably concluded, the phone records at issue were not necessarily exculpatory, and would not have changed the outcome of the trial.  2006 Order at 2-3.

To begin with, the phone call made from the apartment at 2:36 a.m. was no more than one minute long, and was not necessarily inconsistent with Diprima's testimony that Petitioner participated in the assault against him.  While Diprima did not testify that he saw Petitioner on the phone, he did testify that he did not see Petitioner for the entire altercation and that Petitioner's chokehold on him did not last for the entire assault.  In addition, Petitioner could have made the brief call after Diprima jumped from the balcony.[2]  Finally, as the state court noted, Raven Oliver, the recipient of the 2:36 a.m. call, had her memory refreshed by the record of the call, thus alerting the jury of its existence.  2006 Order at 2-3.

Given the record and the state court's reasoned decision, Petitioner cannot establish that he was prejudiced, i.e. that there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 687-688.  Accordingly, this claim must be denied.

_____

[2] The phone call to 911 regarding Diprima's jump, made by Mike Kollin, occurred at 2:39 or 2:40 a.m.  The record does not reveal how long it took Kollin to call 911 after he became aware of Diprima's jump.

II.   Newly Discovered Evidence

     Petitioner claims that the state court violated his
constitutional rights to due process and fundamental fairness when
it refused to consider newly discovered evidence, in the form of
potential witness testimony, submitted by Petitioner in conjunction
with his motion for a new trial.  Petitioner points to two
documents, both of which his defense counsel proffered in the motion
for a new trial, in support of this claim.  One is a report by an
investigator that Karlan Brooks, who lived in an apartment below
Petitioner's at the time of the relevant crimes, saw a man fall off
of Petitioner's balcony and then saw Petitioner approach the man and
ask if he was all right.  The second document is a declaration from
the defense investigator at Petitioner's trial, who states that he
was unable to contact Zeph Carter.  In addition to these documents
that were submitted at Petitioner's motion for a new trial,
Petitioner submits a declaration from Tristan Harvey that
Petitioner's trial counsel knew that Zeph Carter had information
that would have exonerated Petitioner, but does not detail the
alleged information or the source of it.

     The last reasoned state court decision on this claim is the
2006 Order.  The superior court provided the following reasoned
analysis of Petitioner's claim:

          In his application [for state habeas relief],
     Petitioner contends that:. . .

          3.   The trial court committed reversible error
               when it declined to take evidence at the
               hearing on Petitioner's motion for a new
               trial (§ 1181).

In his motion for a new trial, filed post verdict pursuant to [§] 1181, Petitioner requested the court to consider evidence from two witnesses who had not been called to testify at trial -- namely, Zeph Carter and Karlan Brooks. Neither of these persons is an eye witness to the crime. This court declined to hold an evidentiary hearing for the taking of these witnesses' testimony, citing [§] 1181(8). Nothing in Petitioner's [state habeas] application has convinced this court that that ruling was in error.

2006 Order at 3.

Petitioner cannot demonstrate that anything in the state court's reasoned opinion denying this claim is contrary to, or an unreasonable application of, clearly established United States Supreme Court law. Nor can he show that the opinion was based on an unreasonable determination of the facts. As the state court reasonably concluded, the trial court was not in error when it denied Petitioner's motion for a new trial. The documents submitted by Petitioner in support of the new trial motion did not include particularly exculpatory evidence. Neither Brooks nor Carter was an eyewitness to the crime, and the fact that Brooks may have seen Petitioner approach Diprima and ask if Diprima was all right is not necessarily inconsistent with Petitioner having participated in an assault upon Diprima earlier in his apartment. In addition, there was no affidavit submitted by Carter and, therefore, any allegedly exculpatory evidence he supposedly would have offered is speculative. Furthermore, even if Petitioner had demonstrated a colorable claim of error, he would not be able to show that any error had a substantial or injurious effect on the verdict. Brecht, 507 U.S. at 638. As discussed above, the evidence proferred by

23

Petitioner was not exculpatory and substantial evidence was properly admitted to support the jury's conclusion that Petitioner was guilty.

To the extent that Petitioner is, as Respondent argues, attempting to bring an actual innocence claim, his claim must also fail.  To be entitled to relief, a petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent.  See Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir. 1997) (en banc); Jackson v. Calderon, 211 F.3d 1148, 1165 (9th Cir. 2000); Osborne v. District Attorney's Office, 521 F.3d 1118, 1130-31 (9th Cir. 2008), rev'd and remanded on other grounds, 129 S. Ct. 2308 (2009);  Herrera v. Collins, 506 U.S. 390, 417 (1993).  Here, any claim of actual innocence must fail because the evidence proffered did not reach the Herrera standard of a "truly persuasive demonstration of actual innocence."  Herrera, 506 U.S. at 417.  This claim must be denied.

III. Instructional Error: CALJIC No. 3.01

Petitioner claims that the trial court erred when it did not give CALJIC No. 3.01.[3]  The jury was instructed it could find

_____

[3] CALJIC 3.01 reads as follows:

AIDING AND ABETTING--DEFINED

A person aids and abets the [commission] [or] [attempted commission] of a crime when he or she:

(1) With knowledge of the unlawful purpose of the perpetrator, and

(2) With the intent or purpose of committing or encouraging or

24

Petitioner guilty of the charged crimes as either a direct participant or as an aider or abettor.  According to Petitioner, without CALJIC No. 3.01, the jury was not properly instructed that if it found Petitioner guilty under an aiding or abetting theory, it must find that Petitioner had the specific intent required for aiding and abetting.  The state court denied this claim in a summary opinion.

A.   Factual Background[4]

On the final day of trial, February 24, 2004, the trial court held a preliminary jury instruction conference out of the presence of the jury.  RT 1215-1216.  Petitioner and counsel for both sides were present.  RT 1215.  The relevant portion of the reporter's transcript is as follows:

> THE COURT: Okay.  And that - so far, have I made any rulings or tentative rulings that either side wants to disagree with?  I haven't gotten to the [CALJIC] 3.00, 3.01 battle yet.
>
> MS. WORSHAM [Prosecutor]: No, your Honor.

---

facilitating the commission of the crime, and

(3) By act or advice aids, promotes, encourages or instigates the commission of the crime.

[A person who aids and abets the [commission] [or] [attempted commission] of a crime need not be present at the scene of the crime.]

[Mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting.]

[Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting.]

[4] The facts in this section are undisputed, unless otherwise indicated.

MR. WALL [Petitioner's counsel]: No.  And we
discussed the 3.00, 3.01, and I think Miss Worsham's
going to say something about it.

THE COURT: All right.

MS. WORSHAM: Your Honor, the People would prefer the
Court to give 3.00.

THE COURT: Okay.  And not - and then 3.01 will be
withdrawn?

MISS WORSHAM: Yes.

THE COURT: Okay.  Then that resolves that, yes?

MR. WALL: Yes, ma'am.

RT 1216.[5]

The court then instructed the jury in relevant part, as
follows:

Persons who - who are involved in committing a
crime are referred to as principals in that crime.

Each principal, regardless of the extent or
manner of participation, is equally guilty.
Principals include: [o]ne, those who directly and
actively commit the act constituting the crime; or,
two, those who aid and abet the commission of the
crime. . . [CALJIC 3.00: Principals - Defined]

Before the commission of the crimes charged in
Counts One, Two and Three, an aider and abettor may
withdraw from participation in those crimes and thus
avoid responsibility for those crimes by doing two
things: [f]irst, he must notify the other principals
known to him of his intention to withdraw from the
commission of those crimes; second, he must do
everything in his power to prevent [the crimes']
commission.  [CALJIC 3.03: TERMINATION OF LIABILITY
OF AIDER AND ABETTOR]

If the evidence establishes beyond a reasonable

---

[5] Given that Petitioner's trial counsel acceded to the withdrawal
of CALJIC 3.01, it is arguable that he is precluded from bringing this
claim on habeas.  Respondent, however, does not so maintain, and this
Court will therefore consider Petitioner's claim on the merits.

26

doubt that the Defendant aided and abetted the
commission of the crimes charged in this case, the
fact, if it is a fact, that he was not present at
the time and place of the commission of the alleged
crimes for which he is being tried does not matter
and does not, in and of itself, entitle the
Defendant to an acquittal. [CALJIC 4.51: ALIBI -
AIDER AND ABETTOR OR CO-CONSPIRATOR]

. . . .

In the crimes charged in Count Two [assault
with a deadly weapon or by means of force likely to
produce great bodily injury, and assault] and in
Count Three [false imprisonment by force or menace,
and false imprisonment], there must exist a union or
joint operation to act or conduct and <u>general
criminal intent</u>. . . . [CALJIC 3.30: CONCURRENCE OF
ACT AND GENERAL CRIMINAL INTENT]

[As to Count One,] [t]o constitute the crime of
robbery, the perpetrator must have formed the
<u>specific intent</u> to permanently deprive an owner of
his property before or at the time that the act of
taking the property occurred.  If this intent was
not formed until after the property was taken from
the person or immediate presence of the victim, the
crime of robbery has not been committed. [CALJIC
9.40.2: ROBBERY - AFTER ACQUIRED INTENT]

For the purpose of determining whether a person
is guilty as an aider or abettor to robbery, the
commission of the crime of robbery is not confined
to a fixed place or a limited period of time, and
continues so long as the stolen property is being
carried away to a place of temporary safety. [CALJIC
9.40.1: ROBBERY - AIDING AND ABETTING - WHEN INTENT
TO ABET MUST BE FORMED]. . . .

Defendant is accused in Count One of having
violated Section 213 Subdivision (a)(1)(A) of the
Penal Code, a crime.

Every person who voluntarily, acting in concert
with two or more persons, commits robbery within an
inhabited dwelling house, is guilty of violating
Penal Code Section 213 Subdivision (a)(1)(A), a
crime.

The term "acting in concert" means two or more
persons acting together in a group crime, and
includes not only those who personally engaged in

27

the act or acts constituting the crime, but also those who aid and abet a person in accomplishing it. . . . [CALJIC 9.42.1: ROBBERY FIRST DEGREE - ACTING IN CONCERT (Penal Code § 213, subdivision (a)(1)(A))

. . . .

Defendant is accused in Count Two of having violated Section 245 Subdivision (a)(1) of the Penal Code, a crime [assault with deadly weapon or by force likely to produce great bodily injury].

. . . .

When a person participates in a group beating and it is not possible to determine which assailant inflicted a particular injury, he may be found to have personally inflicted great bodily injury upon the victim if, one, the application of unlawful physical force upon the victim was of such a nature that by itself it could have caused the great bodily injury suffered by the victim; or two, that at the time Defendant personally applied unlawful physical force upon the victim, and Defendant then knew or reasonably should have known that the cumulative effect of all the unlawful physical force would result in great bodily injury to the victim. [CALJIC 17.20: INFLICTION OF GREAT BODILY HARM § 12022.7(d)]

. . . .

RT 1222-1242.

B.   Legal Standard

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.   See Estelle v. McGuire, 502 U.S. 62, 72 (1991); Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right]. . .'") (internal citation omitted).   The instruction may not

28

be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  See Estelle, 502 U.S. at 72.

The omission of an instruction is less likely to be prejudicial than a misstatement of the law.  See Walker v. Endell, 850 F.2d 470, 475-476 (9th Cir. 1987) (citing Henderson v. Kibbe, 431 U.S. 145, 155 (1977)).  Thus, a habeas petitioner whose claim involves a failure to give a particular instruction bears an "'especially heavy burden.'"  Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson, 431 U.S. at 155).  The significance of the omission of such an instruction may be evaluated by comparison with the instructions that were given.  Murtishaw v. Woodford, 255 F.3d 926, 971-972 (9th Cir. 2001) (quoting Henderson, 431 U.S. at 156).  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson, 431 U.S. at 154).

A jury instruction that omits an element of an offense warrants relief only if the omission is prejudicial under Brecht.  See Evanchyk v. Stewart, 340 F.3d 933, 940 (9th Cir. 2003); Spicer v. Gregoire, 194 F.3d 1006, 1008 (9th Cir. 1999) (citing Brecht, 507 U.S. at 637, and finding that omission of element of offense in jury instruction is not prejudicial if the omission "did not have a 'substantial and injurious effect or influence in determining the jury's verdict.'")  The Supreme Court held in California v. Roy that the omission of the "intent" element from an aiding and abetting

instruction is not prejudicial under <u>Brecht</u> where the jury could have found intent based on the evidence it considered.  519 U.S. 2, 5 (1996).  The omission is not prejudicial and does not require habeas relief unless it "'had substantial and injurious effect or influence in determining the jury's verdict.'"  <u>Roy</u>, 519 U.S. at 4 (quoting <u>Brecht</u>, 507 U.S. at 637); <u>see</u> <u>Roy v. Gomez</u>, 108 F.3d 242, 242 (9th Cir. 1997) (on remand after <u>California v. Roy</u>).

C.    Analysis

Petitioner argues that, because the trial court did not provide the jury with the CALJIC No. 3.01 aiding and abetting instruction, the jury never properly considered whether Petitioner had the specific intent necessary to find him guilty of aiding and abetting the crimes committed against the victim.  Respondent counters that, using the proper deferential standard of review under AEDPA, the state court reasonably concluded that the jury convicted Petitioner by finding the intent necessary under state law,[6] notwithstanding the court's failure to instruct the jury using CALJIC 3.01. Respondent further argues that Petitioner has failed to show that any error had a "substantial and injurious effect or influence in determining the jury's verdict" under <u>Brecht</u>, 507 U.S. at 623. Respondent is correct.

---

[6]California Penal Code section 31 reads in part as follows:

All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission. . .or who, by threats, menaces, command, or coercion, compel another to commit any crime, are principals in any crime so committed.

To obtain relief, Petitioner must show that the omission of CALJIC 3.01, by itself, "so infected the entire trial that the resulting conviction violates due process." Estelle, 502 U.S. at 72.  The jury had the option of finding Petitioner guilty under two theories of participation: as a direct participant in the crimes against Diprima, or as an aider and abettor of the crimes.  The jury verdict forms do not indicate under which theory the jury determined Petitioner guilty of the crimes at issue.  The error which Petitioner claims is only at issue if the jury found him guilty of the charged crimes as an aider or abettor, and not as a direct participant.

Petitioner is unable to demonstrate that the state court's rejection of this claim was unreasonable.  As noted above, the court did instruct the jurors that in order to find Petitioner guilty of the first crime he was charged with, robbery, as defined by § 213(a)(1)(A), they must find that Petitioner "must have formed the specific intent to permanently deprive an owner of his property before or at the time that the act of taking the property occurred." RT 1222-1242.  Roy, 108 F. 3d at 242.  Thus, regardless of whether the jury found Petitioner guilty of robbery as a direct participant or as an aider or abettor, the jury necessarily found that Petitioner had specific intent.

It was also reasonable for the state court to uphold Petitioner's convictions for the crimes of assault by means of force likely to produce great bodily injury and false imprisonment by violence.  Regarding Petitioner's conviction for assault, the jury

31

also found true the special allegations that Petitioner <u>personally</u>
inflicted great bodily injury in the assault.  Because the jury
found that Petitioner personally inflicted injury, it almost
certainly found Petitioner guilty as a direct participant in the
assault, and not as an aider or abettor.  And while the court
instructed the jury generally that persons can commit crimes either
as direct participants or by aiding and abetting, the prosecutor
specifically argued that the false imprisonment charge resulted from
Petitioner "holding the victim in the choke hold while [others]
robbed and beat him."  RT 1280.  The prosecutor's theory of the
case, combined with testimony from Diprima that Petitioner had him
in a chokehold (RT 805, 847, 863), demonstrates that the jury almost
certainly found Petitioner guilty of false imprisonment as a direct
participant.

For the reasons discussed above, Petitioner cannot demonstrate
that omission of CALJIC No. 3.01 had a substantial or injurious
effect on the verdict.  <u>Brecht</u>, 507 U.S. at 638.  The evidence
against Petitioner was substantial, including evidence that he was a
direct participant in the attack and robbery.  Because Petitioner
cannot demonstrate that he was prejudiced by the omission of the
instruction at issue, his claim must be denied.

IV.  Instructional Error: CALJIC No. 17.20

In this claim, Petitioner maintains that the trial court erred
by giving CALJIC No. 17.20.  This claim was addressed in a reasoned
opinion by the California Court of Appeal.

> Defendant also argues that the trial court
> presented the jury with an "improper legal theory"

by including the second part of the "group beating"
language in CALJIC No. 17.20 in its instruction to
the jury on the great bodily injury enhancement.
The court instructed the jury: "When a person
participates in a group beating and it is not
possible to determine which assailant inflicted a
particular injury, he may be found to have
personally inflicted great bodily injury upon the
victim, if one, the application of unlawful physical
force upon the victim was of such a nature that, by
itself, it could have caused the great bodily injury
suffered by the victim, <u>or two, that at the time the
defendant personally applied unlawful physical force
to the victim, the defendant knew that other
persons, as part of the same incident, had applied,
were applying, or would apply unlawful physical
force upon the victim and the defendant then knew,
or reasonably should have known that the cumulative
effect of all the unlawful physical force would
result in great bodily injury to the victim.</u>"
[Footnote omitted].

Defendant does not object to the content of the
first part of the "group beating" instruction,
although he submits that "no evidence satisfying" it
was presented.  His primary complaint is that the
"second basis" articulated in CALJIC No. 17.20 for a
section 12022.7 enhancement "allows a finding based
on mere knowledge," rather than the requisite
evidence "that the defendant personally inflicted
the injury."  He maintains that by "eliminating the
need for a jury finding on the statutorily required
elements of the allegation, the instruction
misstated the law and therefore was erroneous."

The California Supreme Court established in
<u>People v. Cole</u> (1982) 31 Cal.3d 568, 579 (<u>Cole</u>),
that the "designation 'personally'" in section
12022.7 was intended "to limit the category of
persons subject to the enhancement to those who
directly perform the act that causes the physical
injury to the victim. . . ."  "The choice of the
word 'personally' necessarily excludes those who may
have aided or abetted the actor directly inflicting
the injury." (<u>Cole</u>, <u>supra</u>, at p. 572. . .) Thus, a
section 12022.7 enhancement requires a finding that
the defendant both personally and intentionally
inflicted great bodily injury upon the victim.
(<u>Cole</u>, <u>supra</u>, at p. 579. . .)

Special standards of proof have evolved,
however, in cases where multiple assailants

33

simultaneously attack a single victim and great
bodily injury is inflicted.  Strict adherence to the
rule articulated in <u>Cole</u> that "an aider and abettor
who strikes no blow" cannot be culpable under
section 12022.7 has been found misplaced and
inapplicable where the defendant is an active
participant in a "group pummeling" or beating.
(<u>People v. Corona</u> (1989) 213 Cal.App.3d 589, 594
(<u>Corona</u>)).  In <u>Corona</u>, the court did not "attempt to
set forth a universally applicable test for when an
individual ceases to be an accomplice and becomes a
direct participant in the infliction of great bodily
injury," but concluded "that when a defendant
participates in a group beating and when it is not
possible to determine which assailant inflicted
which injuries, the defendant may be punished with a
great bodily injury enhancement if his conduct was
of a nature that it could have caused the great
bodily injury suffered."  (<u>Corona</u>, <u>supra</u>, at p. 594;
see also <u>People v. Banuelos</u> (2003) 106 Cal.App.4th
1332, 1337; <u>People v. Magana</u> (1993) 17 Cal.App.4th
1371, 1380.)  The rule announced in <u>Corona</u> and
followed in successor cases does not subject a
defendant to section 12022.7 enhancements "because
he was one of several participants each of whom
engaged in conduct that may have caused injuries to
a single victim.  Rather, it stands for the
proposition that a defendant cannot insulate himself
from criminal liability by being one of multiple
participants even when proof of the precise level of
culpability is wanting."  (<u>People v. Cobb</u> (2004) 124
Cal.App.4th 1051, 1058.) FN8.

We disagree with defendant's contention that
the CALJIC No. 17.20 instruction erroneously
authorized a finding of a section 12022.7
enhancement "based upon mere knowledge."  Even the
second alternative of the group beating rule in
CALJIC No. 17.20 specifies that in addition to the
element of knowledge of the cumulative effect of all
the unlawful physical force inflicted during a group
attack, the defendant must have "personally applied
unlawful physical force to the victim."  The CALJIC
No. 17.20 instruction also accurately articulates
that the exception to the personal liability rule
"applies only when proof of the personally liable
defendant is impossible.  If the prosecution could
have introduced evidence resolving the issue, but
did not, the failure of proof does not justify
imposition of the enhancement on all potentially
culpable defendants."  (<u>People v. Gutierrez</u>, <u>supra</u>,
46 Cal.App.4th 804, 816, italics omitted. . . .)

34

Thus in <u>People v. Banuelos</u>, <u>supra</u>, 106 Cal.App.4th 1332, 1337 (<u>Banuelos</u>), the court found that the language of CALJIC No. 17.20, and specifically the second part of the group beating instruction, "is consistent with the holding in <u>Cole</u> that a mere aider and abettor cannot receive the special great bodily injury enhancement; only a person who directly participates in the physical attack can receive the enhancement. . . . So too does the language of paragraph four of CALJIC No. 17.20 comport with the intent of the Legislature to deter personal infliction of great bodily injury in the future by preventing that intent from being frustrated in cases where multiple assailants cause the great bodily injury. Because the instruction requires that it be proven a defendant has personally inflicted an injury on the victim during a group attack, such instruction does not lighten the People's burden of proof as Banuelos asserts." The court therefore concluded that the final paragraph of CALJIC No. 17.20 "is a correct statement of the law." (<u>Banuelos</u>, <u>supra</u>, at p. 1338.)

We agree with the decision of the court in <u>Banuelos</u> that the CALJIC No. 17.20 properly reflects in a group beating case the requirement of section 12022.7 that "the individual accused of inflicting great bodily injury must be the person who directly acted to cause the injury." (<u>Cole</u>, <u>supra</u>, 31 Cal.3d 568, 572.) Pursuant to the instruction the enhancement may not be imposed upon a defendant who has acted only in the capacity of an aider and abettor. Direct participation in the acts that caused the great bodily injury is necessary, as is the impossibility of determining which assailant inflicted a particular injury. We are not persuaded that the jury may have erroneously believed from the instruction that a section 12022.7 enhancement finding was justified even if defendant did not personally inflict the injury upon the victim. (<u>Banuelos</u>, <u>supra</u>, 106 Cal.App.4th 1332, 1337-1338.)

We further conclude that the instruction in its entirety was supported by the evidence. Defendant and two others simultaneously attacked Diprima. According to Diprima's testimony, he believed – although he was not sure – that defendant hit and kicked him while he was on the floor. Defendant then restrained Diprima while the others continued the beating. Defendant directly acted to cause all of the injuries suffered by Diprima. This is also not a case in which the inability of the victim to

associate a particular assailant with particular
injuries he suffered was due to a failure of the
prosecution to offer additional available evidence.
(Cf., People v. Gutierrez, supra, 46 Cal.App.4th
804, 816; People v. Magana, supra, 17 Cal.App.4th
1371, 1380-1381.)  Rather, the victim's attempts to
protect himself prevented him from determining with
any accuracy which attacker inflicted which
resulting injury.  (Banuelos, supra, 106 Cal.App.4th
1332, 1338.)

We realize that the second alternative of the
CALJIC No. 17.20 instruction does not specifically
reflect the requirement stated in Corona that the
defendant's "conduct was of a nature that it could
have caused the great bodily injury suffered." FN9.
(Corona, supra, 213 Cal.App.3d 589, 594, italics
added; see also Banuelos, supra, 106 Cal.App.4th
1332, 1337; People v. Magana, supra, 17 Cal.App.4th
1371, 1380.)  To the extent this omission may be
viewed as error, we find it harmless in the present
case.  An erroneous instruction on the "elements of
a statute imposing a sentence enhancement is
prejudicial 'only where it is reasonably probable
that a result more favorable to the defendant would
have been reached in the absence of the error.'
[Citation.] On review, we examine the entire record,
including the facts, instructions, arguments of
counsel, communications from the jury during
deliberations, and the entire verdict." (People v.
Gutierrez, supra, 46 Cal.App.4th 804, 815.)

Defendant's personal participation in the
physical aspects of the beating that resulted in the
victim's injuries furnishes proof that defendant was
not an aider and abettor, that he directly acted
with others to cause the great bodily injuries, and
that his conduct - in hitting and kicking Diprima
while he was on the ground, then restraining him
with a choke hold while defendant's two confederates
ruthlessly beat him - was of a nature that it
directly contributed to the great bodily injury
ultimately inflicted.  While the prosecutor
specifically relied upon the second part of the
group instruction to persuade the jury that
defendant inflicted great bodily injuries upon the
victim, the argument was offered in the framework of
describing defendant's acts that caused the great
bodily injury.  We conclude that even if the trial
court had added to the instruction the element that
the defendant's conduct was of a nature that it
could have caused the great bodily injury, a result
more favorable to defendant would not have been

36

reached.  No prejudicial error was committed.

FN8.  The paragraph of CALJIC 17.20 challenged by defendant in the present appeal was added in a revision of the instruction based upon the decision in <u>Corona</u>, but has been the subject of dispute, and the issue of its validity is pending before the California Supreme Court.  Review has been granted in two cases which found the instruction violative of the requirement articulated in <u>Cole</u>, that a finding of a great bodily injury enhancement under section 12022.7 cannot be based upon mere aiding and abetting. . . .[7]

FN9.  We observe that in some cases there may be a factual distinction between acts that directly cause injury and acts that could have caused great bodily injury.

Opinion at 9-14.[8]

Here, Petitioner has not demonstrated that the state court's reasoned opinion is contrary to, or an unreasonable application of, clearly established United States Supreme Court law.  Petitioner also fails to demonstrate that the state court's opinion relied on an unreasonable determination of the facts.

Petitioner primarily maintains that the instruction incorrectly sets forth the applicable state law, and that the state court's decision to the contrary was in error.  This argument must fail.

In this case, the California Court of Appeal was engaged in an analysis and interpretation of California state law, and whether

---

[7] The California Supreme Court has since resolved this issue, holding that CALJIC 17.20 does not misstate the law regarding allegations of personal infliction of great bodily injury, and overturning the decisions of the Courts of Appeal that found the instruction violative of <u>Cole</u>.  <u>People v. Modiri</u>, 39 Cal. 4th 481 (2006).

[8] All emphasis in the California Court of Appeal's opinion is original.

1   state jury instructions were consonant with state substantive
2   criminal law.  A state court's interpretation of state law,
3   including one announced on direct appeal of the challenged
4   conviction, binds a federal court sitting in habeas corpus.
5   Bradshaw v. Richey, 546 U.S. 74, 76 (2005); Hicks v. Feiock, 485
6   U.S. 624, 629 (1988).

7       The state's highest court is the final authority on the law
8   of that state.  Sandstrom v. Montana, 442 U.S. 510, 516-517 (1979).
9   Even a determination of state law made by an intermediate appellate
10  court must be followed and may not be "'disregarded by a federal
11  court unless it is convinced by other persuasive data that the
12  highest court of the state would decide otherwise.'"  Hicks, 485
13  U.S. at 630 n.3 (quoting West v. American Telephone & Telegraph Co.,
14  311 U.S. 223, 237-238 (1940)).  A federal court may, however, re-
15  examine a state court's interpretation of its law if that
16  interpretation appears to be an obvious subterfuge to evade
17  consideration of a federal issue.  Mullaney v. Wilbur, 421 U.S. 684,
18  691 n.11 (1975).

19      Petitioner does not and cannot cite to any evidence either
20  that the California Supreme Court would decide this matter
21  differently[9] or that the California Court of Appeal's decision was a
22  subterfuge to evade consideration of a federal issue.  The
23  California Supreme Court denied Petitioner's petition for review of

24  _____

25      [9]As noted above, the California Supreme Court has since resolved
    this issue, holding that CALJIC 17.20 does not misstate the law
26  regarding allegations of personal infliction of great bodily injury,
    and overturning the decisions of the Courts of Appeal that found the
27  instruction violative of Cole.  People v. Modiri, 39 Cal. 4th 481
    (2006).

28                              38

the decision on direct appeal and later denied Petitioner's habeas petition.  Had the California Supreme Court wanted to overturn the California Court of Appeal's analysis of the state law at issue, it could have done so, either on direct or collateral review of Petitioner's case.

Petitioner also argues that the instruction violated his due process rights under the federal Constitution because the instruction relieved the prosecution of its burden of proving every element of the crime.  Elements of a crime are determined by state law, however, and as discussed above, the state court reasonably concluded that the challenged jury instruction was consonant with the state law regarding the elements of the charged crimes.  As such, and because Petitioner may not "transform a state-law issue into a federal one merely by asserting a violation of due process," Longford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996), this argument must fail.

Finally, even if Petitioner had demonstrated that the state court's decision was in error, he would not be entitled to relief because he has not demonstrated that any alleged error was prejudicial.  The state court reasonably found that, based on the evidence from the victim of Petitioner's "personal participation in the physical aspects of the beating that resulted in the victim's injuries," even a different instruction would not have resulted in a verdict more favorable to Petitioner.  Opinion at 14.  Accordingly, Petitioner also cannot show that any alleged error had "'a substantial and injurious effect' on the verdict." Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (quoting Brecht, 507 U.S. at

1   623).  Because Petitioner cannot demonstrate prejudice, his claim

2   must be denied.

3   V.   Sufficiency Of The Evidence

4        In this claim, Petitioner maintains that there was insufficient

5   evidence to support the jury's conclusion that Petitioner inflicted

6   great bodily injury on victim Diprima.  California Penal Code

7   section 12022.7 allows for additional punishment for "[a]ny person

8   who personally inflicts great bodily injury."  The California Court

9   of Appeal considered this issue in a reasoned opinion on direct

10  appeal.

11          We proceed to defendant's contention that the
        great bodily injury findings must be reversed for
12      lack of evidence. Defendant claims that his
        "cohorts" were "the ones who personally inflicted
13      the injuries on Diprima; thus, as a matter of law,
        the evidence is insufficient to support the great
14      bodily injury enhancement."

15          "We often address claims of insufficient
        evidence, and the standard of review is settled.  'A
16      reviewing court faced with a such a claim determines
        "whether, after viewing the evidence in the light
17      most favorable to the prosecution, any rational
        trier of fact could have found the essential
18      elements of the crime beyond a reasonable doubt."
        [Citations.] We examine the record to determine
19      "whether it shows evidence that is reasonable,
        credible, and of solid value from which a rational
20      trier of fact could find the defendant guilty beyond
        a reasonable doubt." [Citation.] Further, "the
21      appellate court presumes in support of the judgment
        the existence of every fact the trier could
22      reasonably deduce from the evidence."' [Citations.]"
        (People v. Moon (2005) 37 Cal.4th 1, 22.)

23
            Following our discussion of the group beating
24      instruction [see Section III.D., supra], and
        particularly the evidentiary support for it, we need
25      not undertake a detailed further analysis to reach
        the conclusion that the great bodily injury
26      enhancement finding is based upon substantial
        evidence.  We add only that section 12022.7
27      "expressly defines great bodily injury as

28                              40

constituting 'a significant or substantial physical injury,'" and the victim in the present case suffered many of those throughout his body and in cumulative effect. (People v. Escobar (1992) 3 Cal.4th 740, 746-750.)

Nothing in the language of the statute or the Cole decision adds a requirement that the [Petitioner]'s acts alone must inflict the great bodily injury. And in fact, the contrary is true. "More than one person may be found to have directly participated in inflicting a single injury." (People v. Guzman, supra, 77 Cal.App.4th 761, 764.) Defendant actively participated in the infliction of all of the injuries suffered by the victim by not only hitting and kicking him, but also administering a choke hold while others grievously beat him, then causing him to jump from the balcony. [Petitioner]'s conduct was of a nature that it could have caused the great bodily injury suffered. (Corona, supra, 213 Cal.App.3d 589, 594-595.) As the group beating instruction was supported by substantial evidence, so is the jury's enhancement finding.

Opinion at 15-16.

Petitioner cannot demonstrate that anything in the state court's reasoned opinion denying this claim is contrary to, or an unreasonable application of, clearly established United States Supreme Court law. Nor can he show that the opinion was based on an unreasonable determination of the facts.

A federal court reviewing collaterally a state court conviction on a claim of insufficient evidence does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" See id. (quoting Jackson, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt

41

beyond a reasonable doubt, has there been a due process violation. Jackson, 443 U.S. at 324; Payne, 982 F.2d at 338; Miller v. Stagner, 757 F.2d 988, 992-993 (9th Cir.), amended, 768 F.2d 1090 (9th Cir. 1985); Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984).

Here, without resolving any factual disputes, the appellate court properly viewed the evidence in the light most favorable to the prosecution. Payne, 982 F. 2d at 338; Opinion at 15. The evidence showed that Petitioner "actively participated" in the attack on Diprima. In addition, Petitioner's participation in the attack "was of a nature that it could have caused the great bodily injury suffered [by Diprima]." Id.

Moreover, the appellate court, in considering relevant state law, determined that the requirement in § 12022.7 that Petitioner "personally" inflict great bodily injury did not mean that Petitioner alone must have inflicted great bodily injury in order for the jury to find him guilty of this offense. Doc. #13-2, Ex. G; Doc. #2-2 at 30. Therefore, the appellate court correctly applied Jackson to the facts of the case in its determination that sufficient evidence supported the finding that Petitioner committed great bodily injury under § 12022.7. See Jackson, 443 U.S. at 1275; see 28 U.S.C. § 2254(d).

Finally, Petitioner's suggestion that the victim's testimony was not sufficient evidence that Petitioner personally inflicted great bodily injury is a credibility issue this Court must presume that the trier of fact resolved in favor of the prosecution. See Jackson, 443 U.S. at 326. Because the jury determined that the victim's testimony was credible evidence of Petitioner's personal

infliction of great bodily injury, this Court must defer to that

factual determination.  Accordingly, this claim must be denied.

VI.   Sentencing Enhancement

     Petitioner claims that by reinstating a sentencing enhancement

under § 12022.7 for great bodily injury, previously dismissed on the

prosecutor's motion, the trial court erred as a matter of law,

violating Petitioner's right to due process and the constitutional

prohibition against double jeopardy.  Respondent argues that

Petitioner's claim fails because he cites only California case law,

and has not cited any constitutional law to support his claim.

Respondent further argues, citing <u>Sattazahn v. Pennsylvania</u>, 537

U.S. 101, 109 (2003), that the trial court's dismissal and

reinstatement of the § 12022.7 enhancement was not a violation of

the Double Jeopardy Clause of the Constitution because the clause

only applies when there is some event, such as an acquittal, that

terminates the original jeopardy; inadvertent trial error is not

sufficient to qualify as such an event under the clause.  Respondent

is correct.

     This claim was addressed in a reasoned opinion by the

California Court of Appeals.

          Defendant's final claim of error is that the
     trial court "wrongly reinstated" the great bodily
     injury enhancement finding.  The record reflects
     that at a hearing on July 30, 2004, after trial and
     the jury's finding on the great bodily injury
     enhancement, the prosecution moved to dismiss "the
     12022.7," which was summarily granted by the trial
     court.  The minute order for that date indicates
     that the "PC 12022.1(B)" (on-bail) enhancement
     allegation was stricken by the district attorney.
     (Italics added.)  At the sentencing hearing on
     December 22, 2004, the defense claimed that the
     great bodily injury enhancement had been stricken,

and therefore a sentence on that finding was
impermissible.  The prosecutor stated that she
intended to dismiss the on bail enhancement
allegation at the prior hearing - it had not been
submitted to the jury - but "mistakenly" moved to
"dismiss the 12022.7."  The trial court ruled that
the "District Attorney's erroneous reference" to
section 12022.7, rather than 12022.1, could be
corrected, and the "out on bail enhancement" was
dismissed.  Defendant now claims that once the trial
court dismissed the section 12022.7 enhancement, "it
had no power or authority to reinstate it."

     We disagree.  A trial court retains the
inherent power to correct clerical errors or
misprisions in its records, whether made by the
clerk or the court itself.  (<u>People v. Mitchell</u>
(2001) 26 Cal.4th 181, 185; <u>Ames v. Paley</u> (2001) 89
Cal.App.4th 668, 672-673; <u>People v. McGee</u> (1991) 232
Cal.App.3d 620, 624.) "The court may correct these
errors on its own motion or upon the application of
the parties. [Citation.] . . . Likewise, if the
minutes or abstract of judgment fails to reflect the
judgment pronounced by the court, the error is
clerical and the record can be corrected at any time
to make it reflect the true facts." (<u>People v.
Little</u> (1993) 19 Cal.App.4th 449, 452.) "The
difference between judicial and clerical error rests
not upon the party committing the error, but rather
on whether it was the deliberate result of judicial
reasoning and determination.  The distinction
between clerical error and judicial error is whether
the error was made in rendering the judgment, or in
recording the judgment rendered." <u>(Rochin v. Pat
Johnson Manufacturing Co.</u> (1998) 67 Cal.App.4th
1228, 1238.) "Changes which correct errors,
mistakes and omissions made through inadvertence,
but do not involve the exercise of the judicial
function, are considered corrections of clerical
errors that leave the original judgment intact."
(<u>Stone v. Regents of University of California</u> (1999)
77 Cal.App.4th 736, 744.)

     The reference to the section 12022.7
enhancement was inadvertent error rather than any
exercise of judicial discretion, and was therefore
subject to correction by the trial court. (See <u>West
Shield Investigations & Security Consultants v.
Superior Court</u> (2000) 82 Cal.App.4th 935, 950-951;
<u>APRI Ins. Co. v. Superior Court</u> (1999) 76
Cal.App.4th 176, 185-186; <u>Hamilton v. Laine</u> (1997)
57 Cal.App.4th 885, 891.)

1    Accordingly, the judgment is affirmed.

2    Opinion at 16-17 (emphasis in original).

3    The state court neither contravened nor unreasonably applied

4    established federal law when it refused to expand the protections of

5    the Double Jeopardy Clause to Petitioner's case based on the

6    prosecutor's inadvertent motion to dismiss the § 12022.7

7    enhancement.   28 U.S.C. § 2254(d).

8    The record shows that the jury, after considering all of the

9    evidence presented at trial, found Petitioner guilty of inflicting

10   great bodily injury, supporting the enhancement under § 12022.7.   RT

11   1337.   Section 12022.1(B), the "on-bail" enhancement ultimately

12   dismissed by the court, was never presented to the jury.   RT 1388.

13   Further, the record shows that the hearing on July 30, 2008 was

14   specifically calendared for the court's consideration of a dismissal

15   of the § 12022.1(B) enhancement, and not the § 12022.7 enhancement

16   already decided upon by the jury.   RT 1384, 1387-1388.   This

17   evidence indicates it was the prosecutor's intention to move for

18   dismissal of the § 12022.1(B) enhancement, which had not been

19   supported with evidence or submitted to the jury during the trial.

20   Id.

21   Therefore, the reinstatement of the § 12022.7 enhancement

22   reflects the "true intent" of the jury, which was to find Petitioner

23   guilty of inflicting great bodily injury under § 12022.7.   Williams,

24   422 F.3d at 1012; Stauffer, 922 F.2d at 514.   As such, the original

25   dismissal was a clerical error, correctable at any time, American

26   Trucking v. Frisco Transport Co., 358 U.S. 133, 145 (1958), and does

27   not implicate the Double Jeopardy Clause of the Constitution.

28                              45

1    <u>Williams</u>, 422 F.3d at 1012.   Petitioner is not entitled to relief on

2    this claim.

3    VII. Cumulative Error

4        Petitioner claims that the cumulative effect of the errors at

5    his trial deprived him of his constitutional rights.   The Superior

6    Court considered this claim in a reasoned decision on August 4,

7    2006, as follows:

8           In his [state habeas] application, Petitioner
            contends that: . . .

9
10              6.   The entire proceedings were fundamentally
                     unfair.

11          It is axiomatic that Petitioner has the burden
            of establishing a <u>prima facie</u> case for relief on
12          each issue presented by him on his application for a
            writ of <u>habeas corpus</u>.   <u>People v. Romero</u> (1994) 8
13          Cal.4th 728, 737; <u>People v. Duvall</u> (1995) 9 Cal. 4th
            464, 474.   Conclusions unsupported by any evidence
14          are insufficient.   Based on the foregoing, the
            issues set forth in this application do not set
15          forth a case for relief in *habeas corpus*.

16   2007 Order at 3-4.

17       In some cases, although no single trial error is sufficiently

18   prejudicial to warrant reversal, the cumulative effect of several

19   errors may still prejudice a defendant so much that his conviction

20   must be overturned.   See <u>Alcala v. Woodford</u>, 334 F.3d 862, 893-895

21   (9th Cir. 2003).   However, where there is no single constitutional

22   error existing, nothing can accumulate to the level of a

23   constitutional violation.   See <u>Mancuso v. Olivarez</u>, 292 F.3d 939,

24   957 (9th Cir. 2002).

25       Because this Court finds that, based on its assessment of

26   Petitioner's claims, no single constitutional error exists,

27   Petitioner's claim of cumulative error is DENIED.

28                                    46

CONCLUSION

For the foregoing reasons, the Petition for a Writ of Habeas Corpus is DENIED.  Further, a Certificate of Appealability is DENIED.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases (effective Dec. 1, 2009).  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  <u>See</u> Rule 11(a) of the Rules Governing Section 2254 Cases (effective Dec. 1, 2009).

The Clerk of Court shall terminate all pending motions as moot, enter Judgment in accordance with this Order and close the file.

IT IS SO ORDERED.


Dated:   9/30/2011

_____
CLAUDIA WILKEN
United States District Judge

47

1

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF CALIFORNIA

2

3

JASON P. VOELKER,

4

Case Number: CV08-01285 CW

Plaintiff,

5

**CERTIFICATE OF SERVICE**

v.

6

M.C. KRAMER et al,

7

Defendant.

8

_____/

9

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

10

11

That on September 30, 2011, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

12

13

14

15

Jason Paul Voelker V-62496
Sierra Conservation Center
5150 O'Byrnes Ferry Road
B5-BB2-11
Jamestown,  CA 95327

16

17

18

Dated: September 30, 2011

Richard W. Wieking, Clerk
By: Nikki Riley, Deputy Clerk

19

20

21

22

23

24

25

26

27

28

48